Richard W. Havel (SBN 52922)
Christina M. Craige (SBN 251103)
Jeremy E. Rosenthal (SBN 223199)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rhavel@sidley.com
ccraige@sidley.com
jrosenthal@sidley.com

Ryan M. Sandrock (SBN 251781)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400
Email: rsandrock@sidley.com

Attorneys for Canpartners Realty Holding Company IV LLC

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>CMR MORTGAGE FUND, LLC,<br><br>Debtor. | Case No. 3:08-32220-TC<br><br>Chapter 11<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>Date: January 5, 2009<br>Time: 1:00 p.m.<br>Place: Courtroom 23<br>235 Pine Street, 19th Floor<br>San Francisco, CA 94104<br>Judge: Honorable Thomas E. Carlson |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Canpartners Realty Holding Company IV LLC (hereinafter "Canyon"), a Delaware Limited Liability Company, hereby submits this Memorandum of Points and Authorities in support of its Motion for Relief from the Automatic Stay (the "Motion"). Canyon seeks to complete its

foreclosure upon certain limited liability membership interests held by a non-debtor third-party. CMR Mortgage Fund, LLC ("CMR" or the "Debtor") holds, at most, a subordinated interest in the loan being enforced by Canyon.

In support hereof, Canyon submits the declaration of Jonathan P. Roth, dated December 4, 2008 (the "Roth Declaration") and Request for Judicial Notice ("RJN"), which are concurrently filed herewith. In further support of this Motion, Canyon respectfully states as follows:

## INTRODUCTION

CMR filed its bankruptcy petition in order to delay Canyon from foreclosing on property owned by a non-debtor, Halekua Development Corporation ("HDC"). CMR has no business to reorganize and holds a mere subordinated interest in a loan jointly-made by CMR and Canyon to HDC and its affiliate Halekua-Kunia, LLC ("HK" and collectively with HDC, the "Borrower"). The Borrower has been in default of this loan for over eight months. Neither the Borrower nor CMR is making any further payments to Canyon, and Canyon continues to suffer as a result of the non-payment of the matured loan. Canyon seeks relief from the automatic stay because (i) CMR has no protectable interests in the property Canyon seeks to foreclose upon, (ii) CMR's subordinated interest in the loan is valueless and not necessary to an effective reorganization, and (iii) cause exists to lift the automatic stay.

## JURISDICTION AND VENUE

On November 19, 2008, CMR filed a voluntary petition for relief under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code"). CMR is a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.

This Court has jurisdiction to hear and determine this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

The statutory predicates for the relief requested herein are Sections 362 and 365 of the Bankruptcy Code.

# FACTUAL BACKGROUND

a. The Loan Transaction

In 2006, CMR approached Canyon to co-fund a loan to HDC[1] in order to acquire a parcel of distressed property in Hawaii. On or about March 12, 2007, Canyon and CMR (collectively, the "Lenders") entered into a credit agreement (the "Credit Agreement") and other Loan Documents[2] with the Borrower, pursuant to which the Borrower obtained a first priority secured loan of $97,900,000 (the "Loan"). A true and correct copy of the Credit Agreement is attached as Exhibit A to the Roth Declaration.

In connection with the Loan, the Borrower executed and delivered two promissory notes (collectively, the "Notes"): (i) a Promissory Note (A Loan) in favor of Canyon in the original principal amount of $55,000,000 (the "A Note"), a true and correct copy of which is attached as Exhibit B to the Roth Declaration; and (ii) a Promissory Note (B Loan) in favor of CMR in the original principal amount of $42,900,000 (the "B Note"), a true and correct copy of which is attached as Exhibit C to the Roth Declaration.

The Loan and related charges under the Credit Agreement were secured, among other things, by a mortgage on the property to be acquired: approximately 161.36 acres of undeveloped land in Honolulu, Hawaii (the "Property") ultimately owned by HK. A true and correct copy of the Property Mortgage, Security Agreement and Financing Statement (the "Mortgage") is attached as Exhibit D to the Roth Declaration. To further secure the Loan, HDC also pledged to the Lenders all membership interests in HK (the "Membership Interests") and granted to the Lenders a first priority security interest in all of HDC's right, title and interest as the sole owner and member of HK (the "Pledge Agreement"). A true and correct copy of the Pledge Agreement is attached as Exhibit I to

---

[1] Although HDC executed each of the Loan Documents, HDC assigned all of its rights, interests, and obligations under the Loan Documents and all of its rights and interest in the property securing the Loan Documents to HK.

[2] The Credit Agreement, Notes, Mortgage, HDC Real Property UCC-1, HDC Non-Real Property UCC-1, Loan Assumption Agreement, Mortgage Assumption Agreement, HDC Pledge Agreement, HK LLC Equity UCC-1, and all other documents that govern, evidence, secure, guaranty and/or perfect the Loan are referred to herein collectively as the "Loan Documents." True and correct copies of the listed Loan Documents are attached as exhibits to the Roth Declaration. See Roth Declaration ¶¶ 3-7.

the Roth Declaration.

b. The Co-Lender Agreement

In connection with the making of the Loan, the Lenders entered into a co-lender agreement (the "Co-Lender Agreement"), a true and correct copy of which is attached as Exhibit K to the Roth Declaration. Although both Canyon and CMR are secured parties under the Loan Documents, the Co-Lender Agreement governs the rights and remedies of each under the joint-loan structure. The Co-Lender Agreement designated Canyon as agent to the Lenders and provided that CMR's B Note was subordinated to Canyon's A Note for purposes of payment. See Co-Lender Agreement § 7. CMR waived any available enforcement remedies under state or other law, see id. § 9(a), and generally subordinated other rights to those of Canyon, see id. § 6. The Co-Lender Agreement provided that neither Canyon nor CMR owe fiduciary duties to the other. See id. § 8(a). The Co-Lender Agreement did provide CMR with limited rights encompassing redemption and cure upon the Borrower's default and gave CMR the right to purchase the A Note from Canyon. See id. §§ 9-11.

c. Borrower's Default and Subsequent Events

When it agreed with CMR to make the Loan, Canyon expected the Borrower and CMR to find additional equity investors. The Credit Agreement obligated the Borrower to arrange for an equity infusion of at least $40 million of new capital by March 12, 2008. See Credit Agreement § 9.39. Notwithstanding ample opportunity and time, the Borrower failed to garner new investment. Borrower failed to repay the A Note and the A Loan[3] on or before the March 12, 2008 maturity date. On March 13, 2008, Canyon sent a notice to HK that the A Loan had matured and that HK's failure to repay the A Loan in accordance with the Loan Documents constituted an immediate Event of Default under the Credit Agreement. A true and correct copy of the March 13, 2008 letter is attached as Exhibit M to the Roth Declaration.

Canyon, CMR, and the Borrower continued to negotiate regarding the default and entered into a Pre-Negotiation Agreement as of May 1, 2008 to set out the terms and conditions

---

[3] All capitalized terms not defined herein have the same meaning ascribed to them in the Credit Agreement.

governing such negotiations. A true and correct copy of the Pre-Negotiation Agreement is attached as Exhibit N to the Roth Declaration.[4] The negotiations failed to resolve the parties' disputes, and Canyon eventually elected to pursue a foreclosure sale of the Membership Interests held by HDC, to be conducted in accordance with the Hawaii Uniform Commercial Code (the "UCC Foreclosure"). Canyon took all steps necessary so that the UCC Foreclosure would be completed on November 20, 2008. See Roth Declaration ¶ 20. However, on November 19, 2008, the day immediately prior to the scheduled UCC Foreclosure, CMR filed a voluntary bankruptcy petition. As a result, Canyon postponed the UCC Foreclosure Sale until December 29, 2008.

## ARGUMENT

a. **Canyon is entitled to relief from the automatic stay because CMR has no "equity" in its subordinated position, and the subordinated interest is not necessary to an effective reorganization.**

CMR invokes the protection of the automatic stay in an expansive and controversial context.[5] Canyon was enforcing its lien against HDC and pursuing foreclosure on the assets of HDC. The Borrower's obligations under the Loan are not claims against CMR, and the Property and

---

[4] The Pre-Negotiation Agreement provides that neither the substance of the Negotiations (as defined therein) nor any correspondences related to the Negotiations may be divulged or referenced by the parties. See Pre-Negotiation Agreement § 1.

[5] Although Canyon acknowledges that the automatic stay probably restrains completion of the UCC Foreclosure under the Ninth Circuit's decision in Harsh Investment Corp. v. Bialac (In re Bialac), 712 F.2d 426 (9th Cir. 1983), Bialac is suspect in light of its reasoning and subsequent judicial interpretation and application of the Bankruptcy Code. Bialac acknowledges that a senior lender's foreclosure of non-debtor property did not fall within the protection of the automatic stay under a literal reading of the statute, but reached its decision in order to fulfill "the purposes of the [Bankruptcy] Act." Id. at 432. Both the Supreme Court and the Ninth Circuit have subsequently abandoned such reasoning. See, e.g., Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2339 (2008) (stating that "it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress") (quotation marks omitted and alteration in original); Lamie v. United States Tr., 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.") (quotation marks omitted and alteration in original); Maney v. Kagenveama (In re Kagenveama), 541 F.3d 868, 875 (9th Cir. 2008) ("If the changes imposed by BAPCPA arose from poor policy choices that produced undesirable results, it is up to Congress, not the courts, to amend the statute."); Perlman v. Catapult Entm't. (In re Catapult Entm't), 165 F.3d 747, 754 (9th Cir. 1999) ("Policy arguments cannot displace the plain language of the statute . . . ."). The Fourth Circuit has also sensibly distinguished Bialac from the case of a junior lienholder because "the debtor in Bialac had an ownership interest in the collateral upon which foreclosure was sought . . . ." Saratoga Group, Ltd. v. Peoples Nat'l Bank (In re Geris), 973 F.2d 318, 320 (4th Cir. 1992).

Membership Interests are not property of the estate. They are not protected by the automatic stay in CMR's case. See, e.g., Scripps GSB I, LLC v. A Partners, LLC (In re A Partners, LLC), 344 B.R. 114, 123 (Bankr. E.D. Cal. 2006) (hereinafter In re A Partners) (stating that the debtor's junior security interest "does not extend the automatic stay to the" underlying collateral owned by a third-party).

CMR holds merely a subordinated interest in the secured loan against the Property and the Membership Interests. CMR's rights and interests are established under the Co-Lender Agreement. Therefore, the property protected by CMR's stay are its rights, if any, under the Co-Lender Agreement, and the determination of potential "equity" is measured by the realistic value of such rights. See id. at 121 ("Debtor's [junior security] interest is materially different from that of a fee holder."); id. at 123 ("When a creditor's collateral consists of a contract right, the value of the collateral is a function of the creditor's ability to exercise that right."). Although CMR may argue that it has "equity" because the alleged value of the Property exceeds the amount due under the A Loan, courts have rejected this type of argument. See id. at 124 ("The purported 'value' of the collateral was immaterial to the economic value of the creditors' liens because the collateral was unavailable to satisfy those liens."); cf. In re Gabor, 155 B.R. 391, 394 (Bankr. N.D. W.V. 1993) ("The estate's interest in the [unavailable collateral] is of no value. Upon this basis, the value of [lienholder's] interest in the estate's interest is zero.").

At most, CMR will point to the fact that Canyon's foreclosure will indirectly have an adverse effect on the value of CMR's subordinated interest. However, the automatic stay does not protect against indirect economic effects as against a debtor's assets, nor does it provide blanket protection against diminution in the value of such assets. See, e.g., In re Geris, 973 F.2d at 321 ("The interest Geris has in seeing that the value of the property, when sold to satisfy the debt, is maximized . . . is far too attenuated to warrant extending the automatic stay protections of the Bankruptcy Code to prevent Peoples National Bank from foreclosing on the [non-debtor] property."); In re A Partners, 344 B.R. at 127; Funding Sys. Railcars, Inc. v. Pullman Standard, Inc., 34 B.R. 706, 709 (N.D. Ill. 1983) ("Courts have consistently held that the fact that a debtor owns all of the stock of a subsidiary does not provide a sufficient basis for a bankruptcy court to enjoin the

prosecution of a suit against the subsidiary.").

Section 362(d)(2) of the Bankruptcy Code provides that a bankruptcy court shall grant relief from stay if (a) the debtor does not have equity in the property, and (b) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). As discussed below, CMR is unable to exercise any rights under the Co-Lender Agreement that justify continued application of the automatic stay.

1.  CMR has no equity in its subordinated interest.

CMR's rights as a subordinated participant in the Loan derive from and are subject to the Co-Lender Agreement. By entering into the Co-Lender Agreement, CMR "expressly and irrevocably waive[d] . . . any and all rights that it might have under [state or other law] to initiate any loan enforcement or foreclosure proceedings." Co-Lender Agreement § 9(a). CMR also subordinated "all rights, titles, interests and remedies of [CMR] under the Loan to the A Note and all of the rights, titles, interests and remedies of [Canyon] under the Loan and the Loan Documents . . . ." See id. § 6.

CMR did bargain for certain rights in the Co-Lender Agreement that may be invoked in this instance. Under the Co-Lender Agreement, CMR obtained: (i) a limited right to cure the Borrower's default, § 10; (ii) a right to buy out Canyon's position in the A Loan, § 11; (iii) a limited right to step into the shoes of the Borrower, subject to meeting certain conditions, § 9(c); and (iv) a limited right to direct Canyon to credit bid CMR's debt at a foreclosure sale, § 9(a).

Even though it bargained for these rights, CMR failed to take advantage of them while it was eligible to do so. Because (i) CMR's rights are subordinated to Canyon's; (ii) CMR defaulted on its obligations under the Co-Lender Agreement, as discussed below; and (iii) CMR cannot assume the Co-Lender Agreement, these rights have no economic value and should not be protected by the automatic stay.

The bankruptcy court for the Eastern District of California recently analyzed substantially similar issues in In re A Partners. In that case, a junior lienholder filed for bankruptcy, and the senior lienholder moved for relief from stay in order to complete foreclosure on property owned by a non-debtor. In considering whether the debtor had "equity" protectable by the automatic

stay, the court analyzed what rights arose from its lien under state law. The court considered whether these rights, rather than the value of the property securing the debtor's lien, created any economic benefit for the estate. Id. at 121 ("The concept of 'equity' in property is based on the premise that the property itself has some economic value to its owner. . . . The property at issue here is a fifth priority security interest in the Guarantee Buildings, not the Guarantee Buildings themselves.").

The court concluded that the only right held by the debtor which had any potential economic value was the right of redemption. See id. at 121 n.8, 123 ("[T]he economic value of the Debtor's lien in this case is tied to the Debtor's ability to redeem the Properties, i.e., to pay the full balance due to Scripps GSB in cash."). Because the debtor had no resources with which to exercise that right, the court concluded that "the Debtor's Lien has no practical value to this bankruptcy estate" and lifted the automatic stay so that the senior lender could foreclose. Id. at 123-24.

### A. CMR's rights of cure and redemption under the Co-Lender Agreement have expired and cannot be revived in bankruptcy.

The Co-Lender Agreement gives CMR a limited right to cure the Borrower's defaults. See Co-Lender Agreement § 10. However, any exercise of CMR's right to cure Borrower's failure to pay the A Loan on maturity expired no later than March 23, 2008, ten days after Canyon notified CMR of the Borrower's failure to pay the balance of the A Note. See Roth Declaration, Exhibit M.

CMR's limited right of redemption under the Co-Lender Agreement lapsed upon CMR's default under Sections 9(d) and 5(e) of the Co-Lender Agreement. Section 9(d) provides that both CMR's right to step into the Borrower's shoes under Section 9(c) and CMR's right under Section 9(a) to direct Canyon to credit bid CMR's debt at a foreclosure sale lapse if it fails to make an Obligatory B Note Advance.[6] Under Section 5(e), CMR was required to make an Obligatory B Note Advance of six-months' projected interest on the A Note on or about March 1, 2008, when the

---

[6] Obligatory B Note Advance is defined in Section 5(e) of the Co-Lender Agreement and elsewhere in the Loan Documents.

A Loan Interest Reserve dipped below the monthly rate at which interest accrues on the A Note. See Co-Lender Agreement § 5(e). At that time, CMR became obligated to put $3,373,333.33 into the A Loan Interest Reserve, but CMR never paid this Obligatory B Note Advance. Therefore, on or about March 1, 2008, any right CMR had to acquire title to either the Premises or the Membership Interests under Section 9(c) of the Co-Lender Agreement expired. See Co-Lender Agreement § 9(b)-(d).

Because CMR's options to cure, credit bid, and exercise its rights under Section 9(c) expired before the bankruptcy, it cannot now revive those rights in bankruptcy. See, e.g., Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir. 1984); In re A Partners, 344 B.R. at 122 ("The debtor-in-possession can assert no greater property rights than the debtor had on the date the case was commenced."). Thus, any rights under Sections 9 and 10 are without economic value and are too attenuated to be further shielded by the automatic stay.

> B. Any protectable interests derive from the Co-Lender Agreement, an executory contract, and CMR cannot assume the contract under § 365(c)(2).

CMR's bankruptcy petition has further precluded it from exercising its rights under the Co-Lender Agreement, because the Co-Lender Agreement includes provisions that constitute a contract "to issue a security of the debtor." Bankruptcy Code § 365(c)(2) prohibits debtors from assuming executory contracts containing such provisions.

In order for CMR to step into the shoes of the Borrower under section 9(c) of the Co-Lender Agreement, CMR must "execute[] and deliver[] to A Note Holder new senior mortgage loan documents . . . substantially similar to the Loan Documents . . . ." See Co-Lender Agreement § 9(c). Section 1(a)(xlix) of the Co-Lender Agreement includes the A Note within the definition of "Loan Documents," and a "note" falls within the definition of a security for the purposes of Bankruptcy Code § 365(c)(2). See 11 U.S.C. § 101(49). Therefore, even if CMR's rights did not expire prepetition, section 365(c)(2) prohibits CMR from assuming the Co-Lender Agreement in order to exercise its rights under Section 9(c) because Section 9(c) requires the issuance of a security of the debtor. Therefore, CMR either cannot assume the Co-Lender Agreement or cannot exercise its rights under section 9(c).

### C. CMR cannot assume the Co-Lender Agreement because it does not have the practical ability to perform and cannot provide adequate assurance of performance.

CMR must assume the Co-Lender Agreement subject to all benefits and burdens therein. See AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc., 115 F. Supp. 2d 378, 390-91 (S.D.N.Y. 2000) (holding that an executory contract must be assumed with all of its benefits and burdens). Canyon contends that CMR is no longer able to exercise its rights under Section 9(c). However, even if it were eligible to exercise rights under that provision, Section 9(b) would nevertheless require CMR to meet certain obligations, including providing certain payments to Canyon. As of December 1, 2008, CMR would have needed to pay Canyon at least $4,779,394.42, including (i) $1,848,759.59 to replenish the A Loan Interest Reserve up to and including March 12, 2009, and (ii) $2,930,634.83 to bring current the payments owed to Canyon under Section 9(c)(iv)(x) of the Co-Lender Agreement. See Roth Declaration ¶ 10. Interest currently accrues on the A Loan at $25,677.22 per day. See id. Among other things, CMR would also need to pay any costs incurred by Canyon (including attorneys' fees) in facilitating the exercise of CMR's option.[7] Certain other payments must be made to Canyon in order for CMR to assume the Co-Lender Agreement, regardless of whether CMR exercises its option under Section 9(c). See, e.g., Co-Lender Agreement §§ 4(k); 5(e).

Because CMR must take its contract as a whole and may not "cherry pick" the benefits it wishes to keep, in order to assume the Co-Lender Agreement, CMR must cure any past breaches and must furnish adequate assurance that it can meet all of its future obligations. See In re Pacific Express, Inc., 780 F.2d 1482, 1486 n.3 (9th Cir. 1986) ("Assumption . . . . requires the trustee or debtor-in-possession to cure all past defaults and to offer adequate assurance of future performance."); In re Atlanta Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994) (stating that a debtor cannot "cherry pick" pieces of a contract it wishes to assume or reject). In light of the

---

[7] CMR would also, among other things, need to deliver to Canyon, by an entity reasonably satisfactory to Canyon, a non-recourse carve-out guaranty substantially in the form of the guaranty attached to the Subordination Agreement (Warrants). See Co-Lender Agreement § 9(c) (relating the full list of requirements for exercise of CMR's option); Exhibit A to Subordination Agreement (Warrants), attached as Exhibit L to the Roth Declaration.

1 | extensive contractual obligations, the large amount of money necessary to perform under the Co-
2 | Lender Agreement, and the long passage of time in which CMR failed to meet its obligations,
3 | Canyon believes that the Court may draw an inference that the Debtor lacks the ability to meet its
4 | obligations now.

        2.        The Lien is not Necessary to an Effective Reorganization because the Debtor has no reasonable possibility of a successful reorganization within a reasonable time.

After Canyon has established by a preponderance of the evidence that the Debtor lacks equity in its subordinated interest, the burden of proof shifts to the Debtor to establish that such interest is necessary to an effective reorganization within a reasonable time. United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375-76 (1988) ("What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'") (citations omitted and emphasis in original); In re A Partners, LLC, 344 B.R. at 121 ("The Debtor has the burden of proof on all other issues.").

Here, CMR has no reasonable possibility of a successful reorganization in a reasonable time. Even if it had such a reasonable possibility, CMR's subordinated interest in the Loan could not be essential to such reorganization. The Loan cannot be a basis for reorganization when the future development of the Property itself remains questionable. Borrower and its affiliates have struggled for over ten years to bring the Property into compliance with several conditions imposed, among others, by the Hawaii State Land Use Commission ("LUC") when the LUC reclassified and rezoned the Property. See Amended Findings of Fact, Conclusions of Law, and Decision and Order, attached as Exhibit A to the RJN. The Borrower has made some progress in this task over the past twenty months. See Roth Declaration ¶ 14. However, the Property remains completely undeveloped and lacking in any infrastructure or improvements; it produces no income. See id. Therefore, CMR cannot reorganize around the Borrower's ability to make the Property profitable. See In re A Partners, 344 B.R. at 127 ("The Debtor cannot tie its reorganization effort to the financial fortunes of AB Parking, a non-party to the proceedings, which has no apparent ability

to control or improve its own financial situation.").

CMR is also unable to exercise any enforcement rights arising from its subordinated position and cannot now restructure the terms of the Loan Documents to benefit itself. See, e.g., AGV Prods., Inc., 115 F. Supp. 2d at 390-91; First Fed. Bank v. Cogar (In re Cogar), 210 B.R. 803, 812 (B.A.P. 9th Cir. 1997) (holding that the junior lienholder debtor could not restructure the senior lien because the lender "did not hold a claim against the bankruptcy estate which was subject to treatment in the Chapter 11 plan"). Finally, no other entity will likely be willing to invest in or collaborate with the Debtor on the B Loan because Debtor's rights in the Co-Lender Agreement have no economic value and the A Loan is in default.

  b. <u>Canyon is entitled to relief from stay for cause.</u>

Canyon is also entitled to relief from the automatic stay for cause. "Cause" has no clear definition and is determined on a case by case basis. See Benedor Corp. v. Conejo Enters., Inc. (In re Conejo Enters., Inc.), 96 F.3d 346, 352 (9th Cir. 1996) (citing Ward v. Tucson Estates, Inc. (In re Tucson Estates, Inc.), 912 F.2d 1162, 1166 (9th Cir. 1990)). "The term 'cause' as used in § 362(d)(1) "is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." In re A Partners, 344 B.R. at 127.

The In re A Partners court considered the following list of non-exclusive factors in deciding that cause existed to lift the automatic stay:

> (1) an interference with the bankruptcy; (2) good or bad faith of the debtor; (3) injury to the debtor and other creditors if the stay is modified; (4) injury to the movant if the stay is not modified; and (5) the relative portionality of the harms from modifying or continuing the stay.

In re A Partners, 344 B.R. at 127. The court concluded that granting relief would not substantially interfere with the bankruptcy because, to the extent the debtor had any remaining rights that would be affected by permitting the senior lienholder to foreclose, these rights were of no significant value and could not practically be exploited by the debtor. The court noted that (i) the debtor was essentially unsecured by virtue of the subordinated nature of its interest, (ii) the debtor could not practically exercise its rights, and (iii) the debtor could not "control the liquidation of AB Parking's assets in this bankruptcy." Id. Likewise here, CMR is deeply subordinated to Canyon's

rights against the Borrower, CMR cannot exercise any of its contractual rights, and CMR cannot control the disposition of the Borrower's assets. Moreover, the Borrower and Property have historically suffered substantial problems, and the Property remains undeveloped, unproductive, and unprofitable. Therefore, lifting the stay in this case will not substantially interfere with CMR's bankruptcy because CMR's subordinated interest lacks meaningful value and cannot be practically exploited by CMR.

Moreover, CMR has evidenced bad faith by filing its bankruptcy petition on the day before the scheduled UCC Foreclosure sale. See, e.g., In re Kaplan Breslow Ash, LLC, 264 B.R. 309, 333-36 (Bankr. S.D.N.Y. 2001) (citing the timing of the Debtor's filing as evidence of bad faith). The test for bad faith "is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994).

CMR had ample opportunity to protect its subordinate position before it filed for bankruptcy, and it failed to do so. The Borrower was obligated (and failed) to procure at least $40 million in additional capital to complete improvements on the Property, see Credit Agreement § 9.39, because the Property was distressed and needed additional capital within one year to even have a chance of producing income. CMR worked closely with the Borrower to try to meet this obligation.[8] The Borrower and CMR failed to find a new investor, and after Borrower failed to repay the A Loan when due, they attempted to market the Property through CB Richard Ellis, a prominent real estate services company. See Roth Declaration ¶ 19. That attempt also failed. CMR has had ample time and opportunity to find another party interested in investing in the Property or in joining with CMR to buy out Canyon's position. The Borrower has been cooperative with Canyon in the foreclosure process and has thus far taken no actions to delay or oppose the scheduled UCC Foreclosure sale. See Roth Declaration ¶ 21. CMR's bankruptcy petition demonstrates its

---

[8] In a somewhat unusual side-arrangement, the managing member of CMR received certain warrants to purchase additional membership interests in HDC which would provide an additional investor with a controlling interest in HDC, see Roth Declaration ¶ 8, thereby creating a potential conflict of interest between CMR's position as a junior participant and as an indirect holder of equity.

desperation to delay Canyon from completing an authorized and uncontested foreclosure, not any legitimate attempt to reorganize. See In re Detienne Assocs. Ltd P'ship, 342 B.R. 318, 326 (Bankr. D. Mont. 2006) ("The subjective bad faith inquiry is aimed at determining whether the petitioner's real motivation is to abuse the reorganization process and to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.").

Canyon can more than demonstrate ample prejudice from delay. The A Note matured by its terms on March 12, 2008. Canyon took no immediate enforcement action after notifying the Borrower of the default, entered into formal negotiations regarding the default with the Borrower and CMR, and continued to forbear from foreclosing for over seven months in a good faith attempt to salvage the situation. The amount due on the A Loan as of December 1, 2008 was $54,375,281.99. Roth Declaration ¶ 23. Interest of $25,677.22 continues to accrue on Loan A every day, see id. ¶ 10, as do fees, which neither Borrower nor CMR is able to pay. The Pre-Development Reserve used to fund the procurement of entitlements to develop the Property is now running low. See id. Furthermore, the prospects of developing the Property from its raw and unimproved state in a timely manner, in light of the current economic crisis and its own troubled history, continue to dim. See id. ¶ 15. And although the Borrower is presently cooperative with respect to foreclosure of the Membership Interests, Canyon has no assurance that it might not later switch course and fight the Lenders' exercise of remedies under the Loan Documents. As was the case in In re A Partners, a foreclosure will not "make the Debtor's financial condition materially worse than it already is," id., and the harm to Canyon from delay far outweighs any injury to the Debtor.

c. <u>Although the Debtor may dispute certain actions Canyon has taken in administering the Loan, any such disputes are collateral to the relief sought by this Motion and should be heard at a later date.</u>

Because the grounds for obtaining relief from stay are limited and the schedule for a hearing on the motion is expedited, "most courts hold that motion for relief from stay hearings should not involve an adjudication of the merits of claims, defenses, or counterclaims, but simply determine whether the creditor has a colorable claim to the property of the estate." Biggs v. Stovin (In re Luz Int'l), 219 B.R. 837, 842 (B.A.P. 9th Cir. 1998); see Grella v. Salem Five Cent Sav. Bank,

42 F.3d 26, 33 (1st Cir. 1994) ("We find that a hearing on a motion for relief from stay is merely a summary proceeding of limited effect, and . . . a court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has a colorable claim to property of the estate."). The Ninth Circuit has opined that "[s]tay litigation is limited to issues of the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization." In re Johnson, 756 F.2d 738, 740 (9th Cir. 1985) (citations omitted). Therefore, hearings for relief from the automatic stay are conducted "in a summary fashion. The validity of the claim or contract underlying the claim is not litigated during the hearing." Id. (citations omitted).

CMR has filed an adversary complaint against Canyon alleging breach of contract and other claims arising from the Loan. See CMR Mortgage Fund, LLC v. Canpartners Realty Holding Company IV LLC, No. 08-03148 (Bankr. N.D. Cal. filed Nov. 30, 2008). Canyon believes that the allegations in CMR's complaint are baseless and will vigorously defend its actions under the Loan Documents and Co-Lender Agreement. However, CMR is at most seeking damages from Canyon or declaratory relief as to the rights between the Lenders. By seeking relief from the stay, Canyon is not seeking to obtain property of the estate, and Canyon can demonstrate more than a colorable claim to the Property and Membership Interests. Therefore, the Court should not entertain any arguments at this time as to the value of the Property or the propriety of any actions taken by Canyon in administering the Loan because neither issue affects the right of Canyon to foreclose on assets owned by a third-party. See In re A Partners, 344 B.R. at 124 ("The Debtor disputes, *inter alia*, Scripps GSB's appraisal of the Guarantee Buildings and the interest accrual on the senior debt, but the court does not need to decide these disputed issues because the benefits of the Debtor's Lien are not available to the bankruptcy estate."). CMR will have its day in court on its complaint, but that day need not and should not delay foreclosure of the Membership Interests.

## CONCLUSION

For each of the foregoing reasons, Canyon respectfully requests that this Court grant Canyon relief from the stay to exercise any and all of its state law rights and remedies, including without limitation, its right to complete foreclosure of the Membership Interests, and for such other relief as the Court deems just and necessary.

DATED: December 4, 2008

Respectfully submitted,

Richard W. Havel (SBN 52922)
Christina M. Craige (SBN 251103)
Ryan M. Sandrock (SBN 251781)
Jeremy E. Rosenthal (SBN 223199)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rhavel@sidley.com
ccraige@sidley.com
rsandrock@sidley.com
jrosenthal@sidley.com