1  Richard W. Havel (SBN 52922)
   Christina M. Craige (SBN 251103)
2  Jeremy E. Rosenthal (SBN 223199)
   SIDLEY AUSTIN LLP
3  555 West Fifth Street, Suite 4000
   Los Angeles, California 90013-1010
4  Telephone: (213) 896-6000
   Facsimile: (213) 896-6600
5  Email: rhavel@sidley.com
          ccraige@sidley.com
6         jrosenthal@sidley.com

7  Ryan M. Sandrock (SBN 251781)
   SIDLEY AUSTIN LLP
8  555 California Street
   San Francisco, California 94104
9  Telephone: (415) 772-1200
   Facsimile: (415) 772-7400
10 Email: rsandrock@sidley.com

11 Attorneys for Canpartners Realty Holding Company IV LLC

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 3:08-32220-TC |
| CMR MORTGAGE FUND, LLC, | Chapter 11 |
| Debtor. | **DECLARATION OF JONATHAN P. ROTH IN SUPPORT OF CANPARTNERS REALTY HOLDING COMPANY IV LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| | Date: January 5, 2009<br>Time: 1:00 p.m.<br>Place: Courtroom 23<br>235 Pine Street, 19th Floor<br>San Francisco, CA 94104<br>Judge: Honorable Thomas E. Carlson |

**DECLARATION OF JONATHAN P. ROTH IN SUPPORT OF CANPARTNERS REALTY HOLDING COMPANY IV LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

I, Jonathan P. Roth, declare and state as follows:

1. I am a Principal of Canyon Capital Realty Advisors LLC ("CCRA"), a member of Canpartners Realty Holding Company IV LLC ("Canyon"), and I make this Declaration in support of Canyon's Motion for Relief from Stay (the "Motion"). I am a competent witness to give testimony to the facts set forth herein.

2. As a Principal of CCRA, I am a custodian of the books and records of Canyon pertaining to the Loan funded by Canyon and the debtor CMR Mortgage Fund, LLC ("CMR" or the "Debtor"). I make this Declaration based on my personal knowledge and the information contained in the records of Canyon, which I have reviewed and which this Declaration accurately reflects. In my capacity as custodian of records for Canyon, I can state that the records and other documents in the files of Canyon constitute writings made in the regular and ordinary course of business of Canyon at or near the time of the events or acts of which they are a record. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

I. The Loan Documents

3. In 2006, CMR approached Canyon to co-fund a loan to HDC in order to acquire a parcel of distressed property in Hawaii. On or about March 12, 2007, HDC, Canyon and CMR entered into the Credit Agreement, pursuant to which HDC obtained a loan in an amount up to $97,900,000 (the "Loan"). A true and correct copy of the Credit Agreement is attached hereto as Exhibit A.

4. To evidence the making of the Loan, and as part of the same transaction, the following Notes were executed and delivered by HDC:

    a. a Promissory Note (A Loan), dated as of March 12, 2007, made by HDC in favor of Canyon, in the original principal amount of $55,000,000, a true and correct copy of which is attached hereto as Exhibit B, and

    b. a Promissory Note (B Loan), dated as of March 12, 2007, made by HDC in favor of CMR, in the original principal amount of $42,900,000, a true and correct copy of which is attached hereto as Exhibit C.

5. The Loan and related charges under the Credit Agreement were secured, among other things, by a mortgage on the real property to be acquired. The following documents, among other things, were delivered to Lenders:

    a. a Real Property Mortgage, Security Agreement and Financing Statement, dated as of March 12, 2007, executed and delivered by HDC in favor of Lenders (the "Mortgage"), a true and correct copy of which is attached hereto as Exhibit D, encumbering the Premises and the Collateral (as such terms are defined in the Mortgage, including, but not limited to, the Property), which Mortgage was recorded on March 12, 2007, in the Bureau of Conveyances of the State of Hawaii as Document No. 2007-045267;

    b. a UCC-1 Financing Statement (the "HDC Real Property UCC-1"), naming HDC as Debtor and Lenders as Secured Party, a true and correct copy of which is attached hereto as Exhibit E, which was recorded on March 12, 2007 in the Real Estate Records of the Bureau of Conveyances of the State of Hawaii as Document No. 2007-045268; and

    c. a UCC-1 Financing Statement (the "HDC Non-Real Property UCC-1"), naming HDC as Debtor and Lenders as Secured Party, a true and correct copy of which is attached hereto as Exhibit F, which was recorded on March 12, 2007 in the Bureau of Conveyances of the State of Hawaii as Document No. 2007-045269.

6. Immediately following the closing of the Loan, HDC conveyed and transferred all of its interests in the Property and other assets to HK. HDC assigned to HK all of HDC's interests in, to and under the Assumed Loan Documents, as defined in the Loan Assumption Agreement and Modification of Loan Documents, dated as of March 12, 2007, by and among HDC, HK, Lenders and others (the "Loan Assumption Agreement"), a true and correct copy of which is attached hereto as Exhibit G. HDC, HK, and the Lenders also executed as part of this transaction the Assignment and Assumption of, and First Amendment to, Real Property Mortgage, Security Agreement and Financing Statement, dated as of March 12, 2007 (the "Mortgage Assumption Agreement"), a true and correct copy of which is attached hereto as Exhibit H, which was recorded on March 12, 2007, in the Bureau of Conveyances of the State of Hawaii as Document No. 2007-

045277. HDC also delegated to HK all of HDC's obligations and liabilities under the Assumed Loan Documents.

  7.  In connection with the above-described assignment and assumption, and as further security for the repayment of the Loan, HDC delivered to Lenders the following:

  a.  a Pledge Agreement – Membership Interests (HK LLC Equity), dated as of March 12, 2007 (the "<u>HDC Pledge Agreement</u>"), executed by HDC in favor of Lenders, a true and correct copy of which is attached hereto as <u>Exhibit I</u>, pursuant to which HDC granted to Lenders a first priority security interest in all of HDC's right, title and interest as the sole owner and member of HK LLC; and

  b.  a UCC-1 Financing Statement (the "<u>HK LLC Equity UCC-1</u>"), naming HDC as Debtor and Lenders as Secured Party, a true and correct copy of which is attached hereto as <u>Exhibit J</u>, which was recorded on March 12, 2007 in the Bureau of Conveyances of the State of Hawaii as Document No. 2007-045270.

  8.  When it agreed with CMR to make the Loan, Canyon expected the Borrower and CMR to find additional equity investors. To facilitate raising this capital, the managing member of CMR received certain warrants to purchase additional membership interests in HDC which would provide an additional investor with a controlling interest in HDC.

II. <u>The Co-Lender Agreement</u>

  9.  In connection with the making of the Loan, Lenders also entered into the Co-Lender Agreement, dated as of March 12, 2007, a true and correct copy of which is attached hereto as <u>Exhibit K</u>. Although both Canyon and CMR are secured parties under the Loan Documents, the Co-Lender Agreement governs the rights and remedies held by both under the joint-loan structure.

  10.  In order to exercise any rights under Section 9(c) of the Co-Lender Agreement, Section 9(b) requires CMR to meet certain obligations, including providing certain payments to Canyon. As of December 1, 2008, CMR would have needed to pay Canyon at least $4,779,394.42, which includes (i) $1,848,759.59 to replenish the A Loan Interest Reserve up to and including March 12, 2009 and (ii) $2,930,634.83 in order to bring current the payments owed to Canyon under Section 9(c)(iv)(x) of the Co-Lender Agreement. Among other things listed in

Section 9(c), CMR must also pay any costs Canyon incurs (including attorneys' fees) in facilitating the exercise of CMR's option and must also, among other things, deliver to Canyon, by an entity reasonably satisfactory to Canyon, a non-recourse carve-out guaranty substantially in the form of the guaranty attached to the Subordination Agreement (Warrants). A true and correct copy of the Subordination Agreement (Warrants) is attached as Exhibit L. Interest continues to accrue on the A Loan at $25,677.22 per day in December and will increase thereafter as unpaid interest is added to the principal amount monthly.

11. On or about March 1, 2008, CMR defaulted under Section 5(e) of the Co-Lender Agreement. Under Section 5(e), CMR was required to make an Obligatory B Note Advance of six-months' projected interest on the A Note when the A Loan Interest Reserve dipped below the monthly rate at which interest accrues on the A Note. On that date, CMR became obligated to put $3,373,333.33 into the A Loan Interest Reserve, but CMR never paid this Obligatory B Note Advance. Section 9(d) prohibits CMR from exercising its rights under Section 9(c) if it defaults under Section 5(e).

III. The Property

12. The Property consists of approximately 161.36 acres of raw, undeveloped land, which is part of the 503.9 acre Royal Kunia Phase II master planned community in Oahu, Hawaii.

13. The Borrower has made some progress in meeting certain outstanding conditions imposed by state and local land use agencies over the past twenty months. However, the Borrower has experienced some delays in obtaining other necessary permits and entitlements.

14. The Borrower's attempt to garner new investment within the terms of the Credit Agreement failed, and the Property remains completely undeveloped and lacking in any infrastructure or improvements. It produces no income.

15. As of December 1, 2008, $680,583.08 remained in the Pre-Development Reserve (as defined in the Credit Agreement) used to fund the procurement of entitlements to develop the Property. The Pre-Development Reserve will likely run out if not replenished in early

2009. Upon information and belief, the prospects of developing the Property in a timely manner, in light of the current economic crisis and its own troubled history, continue to dim.

IV. <u>Borrower's Default and Subsequent Events</u>

16. On March 12, 2008, HK defaulted under the Credit Agreement by, among other things, (i) failing to repay the A Note and the A Loan (as defined in the Credit Agreement) on or before the March 12, 2008, maturity date of the A Loan, and (ii) failing to procure $40 million in Additional Capital (as defined in the Credit Agreement) on or before March 12, 2008.

17. By letter dated March 13, 2008, a true and correct copy of which is attached hereto as <u>Exhibit M</u>, Canyon notified HK and CMR that:

    a. The A Loan matured on March 12, 2008, and HK did not qualify for any extension of the A Loan under the terms of the Credit Agreement; and

    b. HK failed to repay the A Loan on or before 12:00 noon (California time) on the applicable A Loan maturity date as required under <u>Sections 3.1.1</u> and <u>4.4</u> of the Credit Agreement, and this failure constituted an immediate event of default under <u>Section 12.1.3</u> of the Credit Agreement.

18. Canyon took no immediate enforcement action under the Loan Documents after sending the March 13, 2008 letter. On or about May 1, 2008, in connection with the commencement of formal negotiations, Canyon, HK, HDC, CMR and others entered into the Pre-Negotiation Agreement, a true and correct copy of which is attached hereto as <u>Exhibit N</u>, pursuant to which the parties thereto set forth the terms and conditions of such negotiations. The Pre-Negotiation Agreement prohibits disclosure of the substance of the negotiations and reference to any documents drafted pursuant to such negotiations.

19. After Borrower failed to repay the A Loan when due, Borrower and CMR attempted to market the Property through CB Richard Ellis, a prominent real estate services company. These attempts were unsuccessful.

20. Canyon eventually decided to pursue a foreclosure sale of the HDC Pledge Agreement, to be conducted in accordance with the Hawaii Uniform Commercial Code. To that end, Canyon took the following actions:

  a. On or about October 16, 2008, Canyon transmitted (i) to HDC, a notice of default, a true and correct copy of which is attached hereto as Exhibit O, informing HDC that due to the outstanding Events of Default (as defined in the Credit Agreement), HDC was in default under the HDC Pledge Agreement; and (ii) to HDC and others, a notice of disposition of collateral, a true and correct copy of which is attached hereto as Exhibit P, informing the recipients that Canyon intended to conduct the UCC Foreclosure on November 20, 2008.

  b. Canyon advertised the UCC Foreclosure Sale in the legal notices section of the Honolulu Advertiser on October 22, 2008, October 29, 2008 and November 5, 2008, and in the legal notices section of the Investor's Business Daily on October 24, 2008, October 31, 2008 and November 7, 2008. True and correct copies of such advertisements are attached hereto as Exhibit Q, Exhibit R, Exhibit S, Exhibit T, Exhibit U, and Exhibit V, respectively.

  21. The Borrower has been cooperative with Canyon in the foreclosure process and has thus far taken no actions to delay or oppose the scheduled UCC Foreclosure sale. Although the Borrower is presently cooperative, Canyon has no assurance that it might not later switch course and fight the Lenders' exercise of remedies under the Loan Documents.

  22. On or about November 19, 2008, the day immediately prior to the scheduled UCC Foreclosure, Canyon was notified that CMR had filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. As a result thereof, Canyon postponed the UCC Foreclosure Sale until December 29, 2008.

  23. The amount due on the A Loan as of December 1, 2008 was $54,375,281.99.

//
//
//
//
//
//
//
//

1 I declare under penalty of perjury under the laws of the United States of America that the foregoing
2 is true and correct.
3     Executed on December 4, 2008 at Los Angeles, California.



JONATHAN P. ROTH