McNUTT LAW GROUP LLP
MICHAEL A. SWEET (CSBN 184345)
DALE L. BRATTON (CSBN 124328)
LINDSEY R. MORAN (CSBN 242038)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone:     (415) 995-8475
Facsimile:     (415) 995-8487

Attorneys for Official Committee
of Equity Security Holders

(List of Counsel Continues on following page)

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case Nos.   08-32220 TEC |
| | 09-30788 TEC |
| CMR MORTGAGE FUND, LLC, | 09-30802 TEC |
| CMR MORTGAGE FUND II, LLC, | |
| CMR MORTGAGE FUND III, LLC, | Chapter 11 |
| Debtors. | |

☐ Affects **FUND I**

☐ Affects **FUND II**

☐ Affects **FUND III**

☒ Affects **ALL FUNDS**

**DISCLOSURE STATEMENT FOR EQUITY COMMITTEE AND DEBTORS JOINT PLAN OF REORGANIZATION**
Dated June 24, 2010

Judge:      The Hon. Thomas E. Carlson

1

DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION

HEINZ BINDER, #87908
ROBERT G. HARRIS, #124678
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408)295-1700
Facsimile: (408) 295-1531
Email: Rob@bindermalter.com

Attorneys for Debtor and Debtor In
Possession CMR Mortgage Fund II, LLC

IAIN A. MACDONALD (#051073)
RENO F.R. FERNANDEZ III (#251934)
MACDONALD & ASSOCIATES
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor and Debtor In
Possession CMR Mortgage Fund III, LLC

PENN AYERS BUTLER (#56663)
ELIZABETH BERKE-DREYFUSS (#114651)
WENDEL, ROSEN, BLACK & DEAN, LLP
1111 Broadway, 24th Floor
Oakland, CA 94607-4036
Telephone: (510) 834-6600
Facsimile: (510) 834-1928

Attorneys for Debtor and Debtor In
Possession CMR Mortgage Fund, LLC

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................1

    A.    Plan Governs Disclosure Statement ..................................................................2

    B.    Procedural Setting ............................................................................................2

    C.    Consolidation of the Chapter 11 Cases ............................................................2

    D.    Court Approval of Disclosure Statement ..........................................................2

    E.    Court Approval of the Plan ..............................................................................3

II. CONSOLIDATED PLAN FOR THE THREE FUNDS ...................................................3

III. PLAN VOTING PROCEDURES ....................................................................................4

    A.    Persons Entitled to Vote on the Plan ................................................................4

    B.    Voting Instructions ..........................................................................................5

IV. CONFIRMATION OF THE PLAN .................................................................................6

V. HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES .................................8

    A.    Formation, Organizational Structure, and Business..........................................8

    B.    Chapter 11 Filings; Course of the Chapter 11 Cases ......................................11

VI. FINANCIAL CONDITION OF THE FUNDS ..............................................................13

VII. PLAN TREATMENT OF CREDITOR AND EQUITY INTEREST CLAIMS;
       DISPUTED CLAIMS ...........................................................................................14

    A.    Administrative Expense and Priority Tax Claims...........................................14

    B.    U.S. Trustee Fees. .........................................................................................14

    C.    Professional Fee Claims .................................................................................15

    D.    DIP Financing - Repayment ...........................................................................15

    E.    Secured Claim (Class 1 under the Plan) .........................................................16

    F.    Class 2 – Priority Claims (other than unclassified priority claims) .................19

    G.    Class 3A – General Unsecured Claims ..........................................................20

    H.    Class 3B – Claims for penalty, fine, or forfeiture ..........................................20

    I.    Class 4 – Claims of Equity Interest holders ...................................................21

DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............24

    A.    Rejection if Not Assumed. ...........................................................24

    B.    Approval of Rejections. ...............................................................24

    C.    Bar Date for Rejection Damages. ................................................24

IX. DISPUTED CLAIMS .................................................................................25

    A.    Objections to Claims or Equity Interests. ...................................25

    B.    Proof of Claim Filed After Confirmation Date. ..........................25

    C.    Distribution to Disputed Claims. ................................................25

    D.    Disputed Claim Reserve. .............................................................26

    E.    Estimation of Disputed Claims and Equity Interests. .................26

    F.    Minimum Distributions; Rounding .............................................26

    G.    Disputes Regarding Distributions. ..............................................27

    H.    Particular Disputed Claims .........................................................27

        1.    Canyon Claim ..................................................................27

        2.    Other Claims May Be Objected To ..................................30

X. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN ...........30

    A.    General ........................................................................................30

    B.    Creation of the Wind-Down Trust ..............................................33

        1.    The Wind-Down Trust ....................................................33

        2.    The Wind-Down Trust Agreement ..................................34

        3.    Treatment of Transfer of Assets to the Wind-Down Trust ...........35

        4.    Acceptance by Wind-Down Trust of Obligations under the Plan ...........35

        5.    The Trustee of the Wind-Down Trust ..............................35

        6.    The Wind-Down Trust Supervisory Board .....................38

        7.    Disposition of Wind-Down Trust Assets for benefit of beneficiaries ...........39

        8.    Investment Powers of the Trustee ...................................39

        9.    Certain Tax Requirements ...............................................40

        10.    Registry of Beneficial Interests .......................................40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

183049.2

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 16:29:13   Page 4 of 65

DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

| | 11. | Reporting to Beneficiaries | 40 |
|---|---|---|---|
| | 12. | Attorney-Client Privilege | 41 |
| | 13. | Right to Claims and Actions | 41 |
| | 14. | Limitation of Liability; Indemnification | 42 |
| | 15. | Request Approval of Bankruptcy Court | 42 |
| | 16. | Purpose of the Wind-Down Trust | 42 |
| | 17. | Termination of the Wind-Down Trust | 42 |
| C. | | Settlement Negotiations Regarding Claims By And Against Manage | 43 |
| D. | | United States Trustee Quarterly Reports | 45 |
| E. | | Status of Committee Post Confirmation | 45 |
| F. | | Post-Effective Date Limited Notice List | 45 |

XI. PROJECTED RESULTS OF PLAN FOR CREDITORS AND EQUITY HOLDERS ... 46

XII. ALTERNATIVE TO THE PLAN:  LIQUIDATION UNDER CHAPTER 7 ... 47

XIII. COMPENSATION AND REIMBURSEMENT OF PROFESSIONAL PERSONS ... 48

| A. | | Pre-Effective Date Compensation | 48 |
|---|---|---|---|
| B. | | Post-Effective Date Compensation | 48 |

XIV. TAX CONSEQUENCES OF THE PLAN ... 48

| A. | | Consequences to the Wind-Down Trust | 49 |
|---|---|---|---|
| B. | | Consequences to Holders of Allowed Claims and Interests | 50 |
| | 1. | Gain or Loss: Allowed Claims | 50 |
| | 2. | Gain or Loss: Allowed Interest | 51 |
| | 3. | Grantor Trust Taxation | 51 |
| | 4. | Information Reporting and Withholding | 51 |
| C. | | Consequences to the Funds | 52 |

XV. RETAINED JURISDICTION ... 53

XVI. WIND-DOWN TRUST SUCCESSOR TO DEBTORS ... 53

XVII. TRANSFERS UNDER PLAN NOT SUBJECT TO TAX ... 53

XVIII. EFFECT OF ACCEPTANCE OF REJECTION OF PLAN ... 54

183049.2

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 5 of 65

|   |   | A. | Voting Rights of Classes. ......................................................................... | 54 |
|   |   | B. | Reservation of Section 1129(b) Rights to seek Non-Consensual Confirmation. ........................................................................ | 54 |
| XIX. | RETENTION OF RIGHTS, CLAIMS AND CAUSES OF ACTION ................................. | | | 54 |
| XX. | AMENDMENT AND INTERPRETATION OF THE PLAN ................................ | | | 54 |
|   |   | A. | Amendment. ........................................................................... | 54 |
|   |   | B. | Severability. ........................................................................... | 54 |
|   |   | C. | Conditions Precedent. ........................................................... | 55 |
|   |   | D. | Notice. ................................................................................... | 55 |
| XXI. | EFFECT OF CONFIRMATION AND INJUNCTION .................................. | | | 56 |
|   |   | A. | Binding Effect of Plan. .......................................................... | 56 |
|   |   | B. | Injunction. ............................................................................. | 56 |
|   |   | C. | Discharge. .............................................................................. | 57 |

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10  16:29:13    Page 6 of
65

DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

# I.  INTRODUCTION

This is the Disclosure Statement for the Equity Committee And Debtors Joint Plan Of Reorganization ("Disclosure Statement") filed by the Official Committee of Equity Security Holders ("Equity Committee"), jointly with debtors CMR Mortgage Fund LLC, CMR Mortgage Fund II, LLC, and CMR Mortgage Fund III, LLC (collectively, the "Funds" and sometimes referred to as the "Debtors"), debtors-in-possession in Case Nos. 08-32220, 09-30788, and 09-30802 respectively.  All exhibits attached to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement (except those exhibits – K and L – identified as statements solely by the party(ies) they are identified to).  A copy of the Equity Committee And Debtors Joint Plan of Reorganization dated May 24, 2010 ("Plan"), is served with this Disclosure Statement.  Capitalized terms used in this Disclosure Statement shall have the meanings given to them in the Plan.

The statements contained in this Disclosure Statement are made as of the date of the Disclosure Statement, unless another time is specified.  The contents of this Disclosure Statement are substantially accurate and fairly presented, to the best of the Equity Committee and Debtors' knowledge, information, and belief as of the date of this filing.

Nevertheless, the Equity Committee and Debtors do not represent or warrant that the information contained in this Disclosure Statement is free from inaccuracy.  The attorneys, accountants, and other professionals for the Equity Committee and the Debtors do not make any representation regarding the information in this Disclosure Statement.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR IN THE PLAN ITSELF, HAVE BEEN AUTHORIZED BY THE DEBTOR OR APPROVED BY THE COURT.  COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT MEAN THAT THE COURT HAS CONDUCTED AN INQUIRY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 7 of 65

**A.    Plan Governs Disclosure Statement**

Although this Disclosure Statement is intended to accurately describe the Plan, all statements about and summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and its exhibits.  In the event of any inconsistency, the Plan and it exhibits are controlling over statements in the Disclosure Statement.

**B.    Procedural Setting**

The Chapter 11 case for Fund I was commenced by the filing of a voluntary petition with the United States Bankruptcy Court, Northern District of California, San Francisco Division (the "Bankruptcy Court") on November 18, 2008 (the "Petition Date" as to Fund I).  The Chapter 11 case for Fund II was commenced by the filing of a voluntary petition with the Bankruptcy Court on March 31, 2009 (the "Petition Date" as to Fund II).  The Chapter 11 case for Fund III was commenced by the filing of a voluntary petition with the Bankruptcy Court on March 31, 2009 (the "Petition Date" as to Fund III).  .

**C.    Consolidation of the Chapter 11 Cases**

After investigation of the Funds' affairs by the Committee, and discussions between the Equity Committee and the Debtors, it was mutually decided to seek substantive consolidation of the Debtor's Chapter 11 Cases.  By order dated March 31, 2010, the Bankruptcy Court conditionally approved substantive consolidation, subject only to confirmation of the Plan.

This means that the assets and liabilities of the three CMR Funds are combined for purposes of the Plan, and this Plan is a single plan that deals in a unified way with the creditor claims and equity interests in all three of the Funds.  In particular, Equity Interest holders in the Funds will vote on this Plan in a single combined class.

**D.    Court Approval of Disclosure Statement**

After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement under Section 1125 of the Bankruptcy Code as containing information of a kind and in sufficient detail in light of the nature and history of the Debtors, that would enable a hypothetical and reasonable investor, typical of creditors of the Funds to make an informed judgment to vote to accept or reject

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 8 of
65

the Plan. The approval of this Disclosure Statement by the Bankruptcy Court does not constitute a recommendation by the Court to accept or reject the Plan.

**E.      Court Approval of the Plan**

Now the Plan is submitted to the creditors and interest holders for a vote. The voting process is described in Section II below. When the voting process has been completed, the results of the voting will be reported to the Bankruptcy Court. The Bankruptcy Court will then hold a hearing to consider whether or not the Plan should be confirmed. You will receive notice of the hearing date on confirmation.

At the hearing date on confirmation, the Bankruptcy Court will review the voting on the Plan, but will also independently review whether the Plan satisfies the requirements for confirmation specified in the Bankruptcy Code.

## II.  <u>CONSOLIDATED PLAN FOR THE THREE FUNDS</u>

The Bankruptcy Court has, by its order entered on March 31, 2010, conditionally substantively consolidated the Bankruptcy Estates of the three Funds into a single entity – the Consolidated Estate – for all purposes under the Plan. Substantive consolidation means that, for purposes of classification of claims, voting, and distributions under the Plan, (a) all assets and liabilities of the Funds are treated as merged so that all of the assets of all of the Funds will be available to pay all of the liabilities of all of the Funds as if they were one entity (but still according to the Bankruptcy Code order of priority of claims and interests, for example secured claims are senior to general unsecured claims), (b) all claims of any Fund against any other Fund are cancelled and extinguished – that is, there is a mutual cancellation of claims of Funds against each other, and (c) no distributions will be made under the Plan on account of any ownership interests of any Fund in any other of the Funds.

There is a limited exception to the consolidation, to preserve litigation assets that the Funds may have. The consolidation of the Bankruptcy Estates of the Funds will not eliminate any preference actions that a Fund might have a right to bring under the Bankruptcy Code, and will not release or waive any litigation claims that any of the Funds may have against any party, other than

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 9 of
65

1 such claims against another Fund itself.

2     The consolidation of the Chapter 11 Cases, and of the Bankruptcy Estates into the

3 Consolidated Estate, is conditional only in the sense that this Plan must be confirmed before the

4 consolidation takes effect. Once the Plan is confirmed (i.e., the Plan's Effective Date has

5 occurred), the Chapter 11 Cases of the three Funds will be administered as a single case.

6     The substantive consolidation integrates the interests of all equity investors in the three

7 Funds, while eliminating inter-Fund claims and disputes, with their high potential for litigation,

8 expense and delay. A Committee statement of the background and basis for the weighting of

9 interests for the purposes of recovery under the Plan is attached to this Disclosure Statement as

10 Exhibit J.

11 ### III.  PLAN VOTING PROCEDURES

12 **A.  Persons Entitled to Vote on the Plan**

13     Under the Bankruptcy Code, classes of Claims and Equity Interests that are impaired under

14 the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Under the

15 Bankruptcy Code, a Class is impaired if the legal, equitable, or contractual rights that the holders

16 of Claims or Interests outside of bankruptcy are entitled to are modified, other than by curing

17 defaults and reinstating maturities. Classes 1, 3A, 3B, and 4 in this Plan are impaired and entitled

18 to vote on the Plan.

19     Classes of Claims that are not impaired are not entitled to vote on the Plan and are deemed

20 to have accepted the Plan. Class 2 will not vote on the Plan.

21     In determining acceptances of the Plan, the vote of a creditor will only be counted if

22 submitted by a creditor or interest holder whose Claim is an Allowed Claim or Allowed Interest.

23 Generally speaking, a creditor holds an Allowed Claim if such Claim is duly scheduled by the

24 Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the

25 Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to the

26 counting of the votes on the Plan. The Ballot form which you received does not constitute a proof

27 of Claim.

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 10 of
65

The vote of an interest holder will be counted if the Interest appears on the books and records of one of the Funds, and there has not been an objection to the Interest or the Interest has not been disallowed.  For voting purposes, Interest holders have a claim that may be voted in the dollar amount of their investment in a Fund, weighted according to the total investments in all Funds as of the Chapter 11 Petition Dates.  This topic is discussed further in Section VII(I) below. The ballot that each interest holder receives will indicate the claim amount of that investor for Plan voting purposes as calculated by the Committee and Debtors.

Creditors and interest holders whose Claims are not allowed (typically, because they are disputed in amount or validity) but wish to vote must have objections to their Claim or Interest resolved in their favor or, pursuant to Bankruptcy Rule 3018(a), seek to have the Bankruptcy Court allow the Claim for the purpose of voting to accept or reject the Plan.  Any creditor or interest holder whose Claim has been objected to that seeks to have its Claim allowed temporarily for the purpose of voting must take the steps necessary to arrange an appropriate hearing with the Court under Rule 3018(a).

**B.     Voting Instructions**

A vote to accept or reject the Plan must be in writing.  A ballot to be used for voting is enclosed with this Disclosure Statement.  Creditors and interest holders are required to indicate on the ballot whether the creditor or interest holder accepts or rejects the Plan, to sign and date the ballot, and to indicate the name and address of the creditor or interest holder, and then to mail the ballot according to the instructions set forth on the ballot.  The amount of an Interest holder's claim for voting purposes will be stated on the ballot that Interest holder receives.  A vote will not be counted unless a ballot is properly completed, signed, and returned so that it is received no later than 5:00 p.m. Pacific Daylight Time on July 28, 2010, by counsel for the Equity Committee at the following address:

McNutt Law Group LLP
Attn:  CMR Ballot Administrator
188 The Embarcadero, Suite 800
San Francisco, CA 94105

1    If a ballot is damaged or lost, or the ballot recipient has any questions concerning voting

2  procedures, the recipient should contact Jackie Jacobus at McNutt Law Group.  A ballot, once

3  submitted, cannot be changed or withdrawn except for good reason, approved by the Bankruptcy

4  Court, within the time period for voting on the Plan.

5                    **IV.  <u>CONFIRMATION OF THE PLAN</u>**

6    "Confirmation" is the technical term for the Bankruptcy Court's approval of a Chapter 11

7  plan.  At a hearing on confirmation, the Bankruptcy Court must be satisfied that the Plan meets

8  requirements specified in the Bankruptcy Code.  If those requirements are met, the Court will also

9  consider whether there have been sufficient votes of creditors and interest holders accepting the

10  Plan.

11    Voting is counted according to the classes established in the Plan.  A class of creditors has

12  accepted a plan of reorganization if the plan has been accepted, in the aggregate for that class, by

13  at least 2/3 in dollar amount and more than ½ in number of creditors holding allowed claims in

14  that class who actually vote to accept or reject such plan.

15    A class of equity interest holders has accepted a plan of reorganization if the plan has been

16  accepted, in the aggregate for that class, by at least 2/3 of the dollar amount of all outstanding

17  equity interests in that class who actually vote to accept or reject such plan.  Voting by equity

18  interest holders will be weighted, as indicated below in Section VII(I) discussing distributions to

19  equity interest holders under the Plan.

20    Even if a class of creditors or interests votes against a plan of reorganization, the plan may

21  still be confirmed by the Bankruptcy Court so long as certain extraordinary requirements under the

22  Bankruptcy Code are met by the plan.  One of these requirements is that at least one voting class

23  of creditors or interests must accept the plan by the required number and dollar amount.  This is

24  called a "cram down."  If necessary, the Committee and Debtors are prepared to seek confirmation

25  of the Plan through a cram down.

26    If the Bankruptcy Court determines that all of the requirements under the Bankruptcy Code

27  have been satisfied, and that there have been sufficient acceptances by creditors and interest

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 12 of
65

1 holders, the Bankruptcy Court will enter an order confirming the Plan. The Equity Committee and

2 the Debtors will request that the Bankruptcy Court confirm the Plan and enter a confirmation

3 order.

4      The Bankruptcy Court has set a hearing on August 42010, at 9:30 a.m. to determine

5 whether to confirm the Plan. That hearing may be continued from time to time and day to day

6 without further notice. Any objections to confirmation of the Plan must be in writing, filed with

7 the Clerk of the Bankruptcy Court, and served on counsel for the Equity Committee on or before

8 the date stated in the notice of the confirmation hearing sent to you with this Disclosure Statement

9 and the Plan.

10      Any objection must be served on:

11

12            **Counsel for the Committee**
           McNutt Law Group, LLP
           Attn: Lindsey Moran

13            188 The Embarcadero, Suite 800
           San Francisco, CA 94105

14

15            **Counsel for CMR Fund**
           Wendel, Rosen, Black & Dean, LLP

16            Attn: Elizabeth Berke-Dreyfuss
           1111 Broadway, 24th Floor

17            Oakland, CA 94607-4036

18

19            **Counsel for CMR Fund II**
           Binder & Malter, LLP

20            Attn: Robert G. Harris
           2775 Park Avenue

21            Santa Clara, CA 950

22            **Counsel for CMR Fund III**
           Macdonald & Associates

23            Reno F. R. Fernandez
           221 Sansome Street, Third Floor

24            San Francisco, CA 94104

25            and

26            **Office of the U.S. Trustee**
           235 Pine Street, Suite 700

27            San Francisco, CA 94104

28

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 16:29:13   Page 13 of
65

# V.   HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES

## A.   Formation, Organizational Structure, and Business.

All three Funds are California limited liability companies.  Fund I was formed on November 17, 2000.  Fund II was formed on September 5, 2003.  Fund III was formed on August 24, 2005.  Each of the funds is managed by a non-member management company, California Mortgage and Realty, Inc. ("Manager" or "CMRI").  The president and principal of CMRI is David Choo.  Investment decisions for the Funds were entirely made by CMRI.  Copies of the original Offering Circulars for the each of the Funds are available upon request from the Committee, and are also posted on the Equity Committee's web site.

The Funds were formed for the purpose of making or investing in business loans secured by deeds of trust on real estate properties ─ predominantly income producing property or land held for development ─ located primarily in California.  Loans in which the Funds invested were arranged and serviced by the Manager, which was licensed as a California Finance Lender, as were the Funds.  The Manager has provided general operating and administrative services to the Funds and has had essentially complete control of the Funds business activities.

In the years after their formation, the Funds enjoyed generally favorable conditions in the real estate markets.  Growth was particularly rapid in the real estate boom that peaked in mid-2007.  This led to relatively rapid growth in the size of the Funds.  The combined investments by members in the Funds was $186,392,050 at March 31, 2008.  The number of members in Fund I was 361, in Fund II 888, and in Fund III 710 at that date.  There is considerable overlap among the Funds, with many members having interests in two or even three of the Funds.

The Plan calls for a liquidation of the Funds, and the recovery of as much as possible via an orderly disposition of all assets of the Funds.  Accordingly, this background information does not provide extensive discussion of the historical operations of the Funds.

The financial condition of the Funds turned down as first the housing slump, and then the general credit crisis, developed in 2007 and accelerated through 2008.  Cash flow from payment on notes invested in contracted, and the Manager's income to meet administrative expenses for

1 operating the Funds also contracted because it has been based in significant part on fees and

2 charges relating to loan originations and servicing.

3 The general crisis in the economy also caused a significant number of the borrowers on the

4 notes the Funds had invested in to stop making note payments. The Funds then foreclosed on such

5 notes, and – as is frequently done by real estate lenders, for such purposes as limiting

6 environmental liability exposure – placed title to those real properties in special purpose entities

7 holding the one property foreclosed on. (Some borrowers themselves went into bankruptcy cases.)

8 These entities, for purposes of the Plan, are known as REO Entities (referring to "real estate

9 owned" by a lender that began with a mortgage interest rather than ownership when the loan was

10 made). A list of such REO Entities, and the properties they hold, is attached as Exhibit A. The

11 REO Entities are not in bankruptcy cases, except Hamilton Creek LLC.

12 The REO Entities are themselves organized as limited liability companies. Typically, one

13 or more of the Funds is the sole member of such limited liability company. CMRI is also the

14 Manager for these entities, and has essentially complete control over the administration of the

15 REO Entities. In some instances, the Funds invested in a junior lien position on the property in an

16 REO Entity, and is therefore now subject to possible loan enforcement activities by a senior

17 lender.

18 During the period of rapid growth in the Funds' investors and funds inflow, and portfolio

19 of loans made, CMRI took some steps that have later led to significant problems for the Funds.

20 Numerous occasions arose when CMRI perceived an opportunity for investment, but did not have

21 funds sufficient to make that investment available in the appropriate Fund. CMRI accordingly

22 drew on funds in more than one Fund to make such an investment, and syndicated the loans

23 among additional non-Fund investors. CMRI also advanced monies from one Fund on behalf of

24 another which became obligations to the Fund making such advances with repayment contingent

25 upon availability of cash, and several intercompany loans remained unpaid. The Funds frequently

26 made loans to a borrower pursuant to one or more separate loans with separate lien priorities,

27 which were secured by liens against real property and cross-collateralized against the debtors'

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:22:13 of REORGANIZATION Page 15 of
65

other real property.  Contributions by the Funds and third-party investors were secured by liens against real property in various orders of priority, giving rise to a "ladder effect" in which the Funds hold positions in a lien senior or junior to each other.  In other words, the Manager treated the Funds as part of a single enterprise, notwithstanding the fact that the Funds' assets and liabilities were accounted for as separate entities.  These practices had various distorting consequences, and the Plan provides for substantive consolidation of the Funds in order to remedy such distortions, settle potential inter-Fund litigation, and afford equitable treatment to the Funds' investors.  The Committee and the Debtors anticipate that substantive consolidation will avoid substantial administrative and legal costs.

The period of rapid growth also led to the requirement that Fund II and Fund III register and report with Securities and Exchange Commission ("SEC") because they had exceeded 500 investors, which was larger than their original securities filings anticipated.  CMRI worked to register and report as required but was subject to difficulties in obtaining audited financial statements, which were a necessary part of the filings.  Fund II successfully registered with the SEC and filed the required reports prior to the filing of its Chapter 11 Case, although the registration and each of the reports was filed late.  Fund III was unable to register and report as of the date of the filing of its Chapter 11 Case.  The difficulties with obtaining audited financial statements from the Funds' auditors was in large part due to the rapidly declining real estate markets and the uncertainty surround fair market values of the Funds' mortgage and real estate assets.  When the Funds and CMRI's cash flow contracted in the market crisis, the cost of compliance became burdensome and the Funds' ability to keep current with the accounting and auditing requirements needed to register and report to the SEC also became challenged.  The SEC initiated an informal inquiry of CMRI and the Funds, but as of the date hereof it has taken no action against CMRI or the Funds.

As problems grew, CMRI attempted to assist the Funds to some extent by advancing some monies to the Funds to help them meet expenses.  CMRI bought problem loans from the Funds at par, absorbing the reductions in value, absorbed various Fund expenses, and forgave substantial

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 16 of
65

servicing and asset management fees. CMRI has also subsequently deferred various fees and charges that it was otherwise entitled to under the Funds' operating agreements, although that leaves sizable claims by CMRI against the Funds. As discussed below, the Plan contemplates negotiations to seek to comprehensively resolve the relations between the Funds and CMRI, including claims against CMRI and claims by CMRI against the Funds.

**Additional History**

Additional disclosure concerning the history and operations of the Funds pre-petition is provided by the Funds, as Exhibit K to this Disclosure Statement. Those additional disclosures are made by the Debtors, and have not been approved or disapproved by the Committee.

**B.      Chapter 11 Filings; Course of the Chapter 11 Cases**

The Funds suffered continued cash flow problems. To gain relief, and develop strategies for effectively dealing with their problems overall, the Funds filed bankruptcy cases under Chapter 11 of the Bankruptcy Code  While in Chapter 11, the Funds have continued efforts to maintain their investment portfolio, including the more valuable underlying real properties held in REO Entities. To achieve this, the Funds have – with Bankruptcy Court approval – sent funds down to the REO Entities as necessary to avoid loss of properties where possible and desirable.

The Bankruptcy Code permits the appointment of a creditors' committee in Chapter 11. However, such a committee was not appointed in any of the Funds' cases. The Funds invested in promissory notes, and therefore had relatively little direct operations. This gives them relatively few general creditors, most with smaller claims. That may have contributed to the absence of a creditors' committee.

Most of the claims against the Funds are held by equity interest holders. Eventually, on October 2, 2009, the Equity Committee was appointed by the Office of the U.S. Trustee. (The U.S. Trustee is an arm of the federal government, with some powers in bankruptcy cases, such as the appointment of committees to represent creditors or equity interests.) As noted above, the Funds have a single Manager, CMRI, and considerable overlap among their investors. The Equity Committee therefore was appointed as a single committee for all three of the Chapter

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 17 of
65

11 Cases, and has at least one member from each of the three Funds. Some of the Committee's members have membership in more than one Fund. None of the Committee members has a business relationship with CMRI or Mr. Choo, apart from their membership interests in one or more of the Funds.

The Equity Committee engaged a financial advisor, Wayne Elggren of LECG, LLC. Mr. Elggren is, among other things, a Certified Insolvency and Restructuring Advisor. (CIRA expertise includes accounting, operational, managerial strategies, and finance issues related to business bankruptcy and insolvency.) The Committee, through Mr. Elggren's efforts, undertook an extensive and substantial analysis of the Funds' affairs and situation. The Debtors, recognizing the value of an independent analysis, provided substantial cooperation in providing documents and information to Mr. Elggren.

Mr. Elggren analyzed or supervised the analysis of over 100,000 pages of documents provided by the Debtors and related parties r regarding the Debtors' financial affairs. Mr. Elggren's firm has analyzed the Debtors' loan and real estate portfolio, and Mr. Elggren has discussed the portfolio with CMRI management. Believing that its independent view is important to these Chapter 11 Cases, the Committee sought an active oversight role in the Debtors' affairs while in Chapter 11. The Committee and the Debtors entered into a pre-confirmation agreement, in which the Debtors' agreed to operate within the limits of a budget approved by the Committee and not to take major financial initiatives without input from the Committee. Since the Debtors were under the managerial control of CMRI, it was agreed that the Committee would be the designated party to investigate relations with, and any potential claims against, the Manager.

As part of the Committee's efforts, Mr. Elggren has formed estimates of what may be recovered by Chapter 7 liquidation, versus an orderly wind-down disposition of the Funds' assets. These estimates are discussed further in Art. XII below.

In its analysis of the Funds, the Committee concluded that issues of overlap of investments, common management by the single Manager, potential disputes among the three Funds that could lead to lengthy and expensive delays, and related issues meant that the

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 18:28:13    Page 18 of 65

bankruptcy estates of the three Funds could best be treated by consolidation of the Funds into a Consolidated Estate. The Committee, with the concurrence of the Debtors, brought a motion to approve consolidation to the Bankruptcy Court, which approved it by order entered on March 31, 2010, conditional only on confirmation of the Plan. As a result, the Plan deals with the combined assets and liabilities of all three Funds in a unified way.

## VI.  **FINANCIAL CONDITION OF THE FUNDS**

For general information of creditors and equity interest holders, this Disclosure Statement includes as exhibits certain financial statements for the Funds (combined as consolidated except where noted).

Financial statements in summary form for each of the Funds at the Petition Date in its Chapter 11 Case are attached as Exhibit B.

In their bankruptcy cases, the Funds have been required to file financial statements monthly with the Bankruptcy Court. These statements are known as Monthly Operating Reports ("MOR"). The most recent MOR for each of the Funds is attached as Exhibit C. All of the MOR's are also available on the Committee's web site.

Financial statements for the Consolidated Estate as of December 31, 2009, are attached as Exhibit D.

The material assets of the Consolidated Estate are listed on Exhibit E. This list includes both notes invested in, and REO Entity interests concerning foreclosed properties.

The liabilities of the Consolidated Estate are summarized as (a) one secured claim, filed for $23 million, (b) priority claims of approximately $20,000, (c) Chapter 11 administrative expenses of approximately $3.4 million, and (d) general unsecured claims of approximately $5.5 million ($1.9 million without the disputed claims of Canpartners). Potential Disputed Claims are discussed further in Section IX below.

/ / /

/ / /

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 16:29:13   Page 19 of
65

# VII. PLAN TREATMENT OF CREDITOR AND EQUITY INTEREST CLAIMS; DISPUTED CLAIMS

In overview, the Plan is based on some straight-forward realities. These include the need to realize value from the Consolidated Estate's assets, pay in full Chapter 11 administrative expenses, secured claims, and general unsecured claims, and recover as much as possible for equity interest holders. Claims senior to equity interest holders must be provided the means to obtain payment in full for equity holders to have any remaining interest, by bankruptcy law.

Throughout the discussion that follows, payment is made only if the claim or interest referred to is Allowed, rather than disallowed or disputed. Disputed Claims may be reserved for as appropriate, but they will be paid only if they become allowed.

## A. Administrative Expense and Priority Tax Claims

Administrative Expense and Priority Tax Claims (other than Professional Fee Claims and DIP Financing Claims) will be paid in full on the later of the Effective Date of the Plan or the date such Administrative Expense becomes an Allowed Claim. However, Administrative Expenses representing liabilities incurred in the ordinary course of business by a Debtor during the Chapter 11 Cases will simply be paid according to their business terms. Payment on an Administrative Expense may be deferred to a date later than the Effective Date if the claimant agrees to do so; a claimant might do that to help the Consolidated Estate with its cash flow needs in the early post-confirmation period of the Plan. Priority Tax Claims are minimal.

The Equity Committee estimates that the Administrative Expenses as of the date of this Disclosure Statement amount to approximately $3.4 million. It is possible there may be some deferrals to a later date than Confirmation that may be agreed to with some Administrative Expense claimants.

## B. U.S. Trustee Fees.

There are regular quarterly fees payable to the Office of the U.S. Trustee, calculated according to the amount of disbursements made from the Consolidated Estate during the quarter. These fees will initially be small, as relatively modest disbursements are expected early in the life

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 20 of 65

of the Plan.  The Plan does not limit the amount of such fees to the U.S. Trustee.

**C.      Professional Fee Claims**

Professional Fee Claims are fees of professionals employed with court approval in the Chapter 11 Cases, such as the attorneys and accountants for the Committee, and the attorneys for the Debtors.  These professionals are required to submit applications to the Bankruptcy Court for unpaid amounts due to them.  There is an opportunity to object, including by the U.S. Trustee, and such fees are paid only after the Court has determined that they were reasonably necessary for the administration of the Chapter 11 Cases.

The Equity Committee estimates the amount of these professional fees that will become due in the period shortly after confirmation of the Plan at approximately $2.2 million.

**D.      DIP Financing - Repayment**

During the Chapter 11 Cases, some of the Debtors obtained approval to borrow funds in order to assist with the expenses of the Chapter 11 Cases and make some contribution to the immediate post-confirmation obligations ("DIP Financing"); provided, however, that DIP Financing will not be used to make distributions under the Plan.  The Committee and the Debtors have determined that it is important to obtain DIP Financing in order to fund post-confirmation operations.  The DIP Financing obtained by the Funds prior to the Effective Date of the Plan will be treated under the Plan according to the DIP Financing terms.  Under these terms of the DIP Financing, it will be repaid only after all Secured Claims, Administrative Expenses, Priority Tax Claims, and Professional Fees are paid or provided for.  DIP Financing will have seniority over General Unsecured Claims and Equity Interests.

The minimum borrowing requirement had not been met as of filing of this Disclosure Statement.  Solicitation of DIP Financing had been awaiting resolution of several matters in the Chapter 11 Cases, including appointment of the Committee, approval of substantive consolidation and publication of the Plan and Disclosure Statement.  With resolution of these matters, solicitation of DIP Financing is underway.

Additional financing of $12 million is discussed below in connection with implementation

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 21 of
65

of the Plan.

**E.  Secured Claim (Class 1 under the Plan)**

Class 1 consists of the secured claim of Wells Fargo Capital Finance, Inc. ("WFCF"), in the principal a mount of $22,153,359 and together with any interest, fees and other expenses owed thereon the "Obligation."

The WFCF Secured Claim is briefly described as follows.  In 2006, Fund II sought a loan to partially fund a loan to a third party borrower.  At that time, CMR Income Fund, LLC ("CMRIF") had an existing loan facility with WFCF, then known as Wells Fargo Foothill, Inc. and WFCF was willing to and did increase its loan facility with CMRIF by $25 million (the "WFCF Term Loan"), in order to facilitate a loan from CMRIF to Fund II.  Accordingly, in May 2006, CMRIF drew on the WFCF Term Loan and advanced those funds to Fund II. CMRIF's obligations to WFCF – including the WFCF Term Loan – are secured by a first priority lien on all assets of CMRIF, including CMRIF's and Fund II's respective first priority security interest in the Wheatland Loan and the Wheatland Property.

The security interests and lien rights granted to WFCF in support of the Term Loan are provided in that certain Pledge And Security Agreement dated as of May 26, 2006 among Fund II as Pledgor and WFCF and CMRIF as Secured Parties.  The lien and security interests granted to WFCF attach to the following collateral:

> **Grant of Security Interest**.  As collateral security for the prompt and complete payment and performance of the Obligations when due, Pledgor hereby (i) pledges, transfers, hypothecates and assigns to Secured Party, and (ii) grants to Secured Party, a continuing first priority lien on and security interest in, all of Pledgor's right, title, and interest in and to the following, whether now or hereafter existing or acquired (the "Collateral"):
>
> > (a)  Promissory Note, dated as of May 25, 2006, in the original principal amount of Forty Eight Million Dollars ($48,000,000), executed by Eagle Meadows of Wheatland 187, LLC, Eagle Meadows of Wheatland 130, LLC and Eagle Meadows of Wheatland 115, LLC payable to the order of Pledgor (the "EMW Note"), the Deeds of Trust (as defined in the EMW Note), the Other Security Documents (as defined in the EMW Note) and any and all other documents evidencing or securing the EMW Note (collectively, the "Loan Documents"); and
> >
> > (b)  all Proceeds of any of the foregoing.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 22 of
65

Fund II utilized the $25 million advance from CMRIF and $23 million of its own funds to make the loan of $48 million ("Wheatland Loan") to the third-party borrower ("Wheatland Borrower"), which loan was secured by, among other things, approximately 435 acres of land in Wheatland, California (the "Wheatland Property"). Funds I, II and III also made additional loans to the Wheatland Borrower, secured primarily by liens on other real property: 1 Quarry Road, Brisbane, California (the "Brisbane Property"); and 900 acres in Casa Grande, Arizona (the "Casa Grande property"). WFCF also took a lien on Fund II's interests as junior lienholder against the Casa Grande Property, and against the Brisbane Property. The latter lien was released when Fund II released its junior note in connection with the foreclosure of the Brisbane Property through which the Funds became the owners of Hamilton Creek LLC.

The Wheatland Borrower defaulted on its obligations, and the third priority lienholder foreclosed on October 10, 2008. Thereafter, the Wheatland Property has been owned by Wheatland Holdings, LLC, an REO entity owned by the Funds. WFCF holds a lien against Fund II's first priority lien and Fund II's interest in Wheatland Holdings, by reason of the Pledge Agreement. The obligation owed to WFCF has matured, and absent satisfactory treatment of its claim in the Plan, WFCF would likely seek to foreclose on the first and second priority liens, which action would cause the Funds to lose their interest in the underlying Wheatland Property. The Committee and Debtors believe that the property has substantial value, with medium-term prospects of realizing on that value. In addition, despite Fund II's junior position in the Brisbane Property and the Casa Grande Property, the Committee and Debtors also believe these could ultimately have significant value.

The Plan proposes a treatment of the WFCF Secured Claim that protects the realizable value of the Wheatland Property. WFCF has agreed to a resolution of the Obligation it holds with the following economic elements (the agreement relating to such arrangement being the "Participation Agreement"):

(1)     The Funds or the Wind-Down Trust will purchase a participation in the Obligation, as described in the Participation Agreement, on or before June 30, 2010 or such other date as

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:22:13     Page 23 of
65

WFCF in its sole discretion may consent, for a purchase price of $2,000,000, together with any unpaid accrued interest. This participation interest will be junior to the interest of WFCF, and will be held by the Wind-Down Trust under the Plan.

(2) The Funds or Wind Down Trust may purchase WFCF's remaining interest in the Obligation for an additional payment of $10,500,000 on or before March 31, 2011. If such purchase occurs, this would result in the Funds or the Wind Down Trust obtaining a 100% interest in the Obligation, and upon receipt of the $10,500,000 payment WFCF would accordingly release all of its lien interests in the collateral securing the Obligation. Interest paid to WFCF during the period from July 1, 2010, through March 31, 2011, would be credited against principal outstanding on the Obligation.

(3) WFCF will forbear from exercising any rights and remedies on account of the Obligation from July 1, 2010, through March 31, 2011, absent the occurrence of certain events of default including without limitation, a) failure to make any interest payment under the Loan Documents (for the Term Loan) when due, b) conversion of the Funds' Chapter 11 Cases to Chapter 7 cases, c) other defaults under the Loan Documents, d) failure by the Funds or the Wind Down Trust to enter into the Participation Agreement by June 30, 2010, or such other date as WFCF may agree to in its sole discretion, or (e) failure to make any payment under the Participation Agreement on or before the date such payment is due.)

(4) Other than as otherwise provided under the Participation Agreement, WFCF will continue to have, and be entitled to exercise, all rights and remedies under its credit and security agreements with CMRIF and the Funds including the Pledge Agreement. If the participation transaction is not performed in full by the Funds or the Wind-Down Trust before March 31, 2011, WFCF will, as of March 31, 2011, be entitled to take all enforcement actions, including but not limited to foreclosure, on any and all of its security interests in collateral for the Obligation, and neither the Funds nor the Wind-Down Trust shall take any action to prevent or hinder such enforcement. No provision of this Plan shall in any respect bar such enforcement actions by WFCF. Under the Plan, the WFCF Secured Claim will be paid in full on or before April 1, 2011.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 24 of 65

(5)     The amount of the Obligation, and the validity, first priority, and enforceability of WFCF's liens and rights against all collateral set forth in that certain Loan and Security Agreement, dated as of August 11, 2005, by and among CMRIF, California Mortgage and Realty, Inc., and WFCF, as amended, and all other related agreements, notes, deeds of trusts and other documents executed in connection thereof, each, as amended (including without limitation, that certain Pledge and Security Agreement, dated as of May 6, 2006, among WFCF, CMRIF, and Fund II, as amended), are hereby affirmed, are not disputed, and are not affected by this Plan (except as provided in the Participation Agreement), notwithstanding any other provision of this Plan..

(6)     The Participation Agreement will be filed prior to Confirmation of the Plan, and shall be enforceable as an agreement made hereunder.

The Committee regards this treatment of the WFCF Secured Claim as advantageous to the Wind Down Trust.  It obtains needed forbearance from possible foreclosure that would result in loss of the Wheatland Property, and also offers the possibility of a significantly discounted payoff of the obligations otherwise owed on the WFCF Secured Claim.

The WFCF Secured Claim is "impaired" within the meaning of the Bankruptcy Code and will vote on acceptance or rejection of the Plan.

**F.     Class 2 – Priority Claims (other than unclassified priority claims)**

Priority Claims other than unclassified claims will be paid in full on the Effective Date, or within 30 days of the date such Priority Claim becomes an Allowed Claim if that is later.  Payment on a Priority Claim may be deferred to a date later than the Effective Date if the claimant agrees to do so.

The Equity Committee believes that claims in this class are less than $20,000 in the aggregate.

These claims are "unimpaired" within the meaning of the Bankruptcy Code and will not vote on acceptance or rejection of the Plan.

/ / /

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 25 of
65

**G.      Class 3A – General Unsecured Claims**

General Unsecured Claims include trade and supplier claims, fees owed to law firms for pre-petition professional services, unsecured borrowings by any of the Funds, and similar unsecured obligations.  This category includes a claim by Canpartners Realty Holding Company IV LLC ("Canyon") relating to breach of contract claims under the co-lending agreement between Canyon and Fund I.  That claim is disputed, and is further discussed under Disputed Claims below.

Claims in this category will be paid in full, with interest at the federal legal rate, or such other rate as the Bankruptcy Court may direct, from the relevant Fund petition date to the date of payment (i) within 180 days of the Effective Date, unless otherwise agreed between the holder of such Claim and the Wind-Down Trustee, or (ii) if later, within 30 days after such Claim becomes an Allowed Claim.  Compliance with this timetable is dependent upon exit financing, and sale of assets producing net proceeds of $1.6 million.

The aggregate amount of claims without Canyon in this category is approximately $1.9 million.  If the disputed Canyon claim were included, the aggregate would be approximately $5.5 million.

Claims in this category are "impaired" within the meaning of the Bankruptcy Code and will vote on acceptance or rejection of the Plan.

**H.      Class 3B – Claims for penalty, fine, or forfeiture**

Claims that are not for actual economic damages, i.e claims that are based on penalty, fine, or forfeiture, receive a lower priority under the Bankruptcy Code than Secured Claims and General Unsecured Claims.  In this case, however, because equity interests retain a possibility for recovery, these claims will be paid in full, with interest at the federal legal rate from the relevant Fund petition date to the date of payment (i) within 180 days of the Effective Date, unless otherwise agreed between the holder of such Claim and the Wind-Down Trustee, or (ii) if later, within 30 days after such Claim becomes an Allowed Claim.

The Equity Committee believes that claims in this category are minimal, or none.

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 13:33 AN OF REORGANIZATION Page 26 of
65

Claims in this category are "impaired" within the meaning of the Bankruptcy Code and will vote on acceptance or rejection of the Plan.

**I.     Class 4 – Claims of Equity Interest holders**

This class includes the equity interest holders in the Funds combined.  These interest holders are entitled to the residual value of the assets in the Consolidated Estate, that is, the value after other, senior categories are paid or provided for.  The treatment of this class under the Plan recognizes this status and provides the means for distributing the recovery from assets to which they may become entitled over time.

On the Effective Date of the Plan, the Funds will be dissolved, and their Equity Interests will be converted into Beneficial Interests in the equity class of the Wind-Down Trust.  The conversion will be calculated as follows:

(a)     The Equity Interest holder's percentage interest in each Fund in which the holder has a Member Interest as of the Plan Effective Date, shall be determined by reference to the Fund's books and records.  The ratio of the Equity Interest holder's account value to the total of all Equity Interest holders' account values for the Fund in which the holder holds an interest as of the Plan Effective Date, shall be the Equity Interest holder's "Percentage Interest" in that Fund.

(b)     The Equity Interest holder's Percentage Interest in a Fund shall be multiplied by 0.224185 if the interest is in Fund I, by 0.474160 if the interest is in Fund II, and by 0.301025 if the interest is in Fund III.  The result shall be the Equity Interest holder's Beneficial Interest, which is their percentage share of the Wind-Down Trust's equity.

(c)     When an Equity Interest holder has more than one account in a Fund and/or accounts in more than one Fund, such holder's accounts shall each be converted to Beneficial Interests in the Wind-Down Trust as provided above.

(d)   The Wind-Down Trust will recognize the ownership of an Equity Interest holder's Beneficial Interest(s) based upon the Funds' books and records as of the Effective Date.

(i)   After the Effective Date, transfers of ownership of an Equity Interest holder's Beneficial Interest will only be recognized by the Wind-Down Trust upon valid, written notice of such transfer to the Wind-Down Trustee. The Wind-Down Trustee may provide appropriate forms for this purpose.

(ii)   Transferability of Beneficial Interests is subject to applicable law, including Bankruptcy Code Sec. 1145 and otherwise applicable federal and state securities laws to the extent not modified by Sec. 1145. Certain categories of recipients of Beneficial Interests under the Plan may be subject to restrictions under securities laws from selling their Beneficial Interests to others. These restrictions are highly technical matters under securities laws, and any recipient concerned about their effect on him or her should consult an attorney or accountant well versed in securities and/or bankruptcy law.

(iii)   Neither the Wind-Down Trust nor the Trustee will take any steps, directly or indirectly, to facilitate the development of a secondary market in the Beneficial Interests. Thus the Trustee will not take any steps for listing the Beneficial Interests on any national securities exchange or on the NASDAQ Stock Market, placing advertisements designed to facilitate the transfer of the Beneficial Interests, distributing marketing materials regarding the Beneficial Interests or collecting or publishing information regarding prices at which the Beneficial Interests may be transferred.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 28 of
65

(e)     The Wind-Down Trust will make distributions (consistent with the terms of this Plan) to the owners of record of the Equity Interest holder's Beneficial Interest as shown in the registry of Beneficial Interests maintained by the Wind-Down Trustee.

(f)     Whether an Equity Interest holder had requested a redemption that was unpaid, or had invested in the Funds through a retirement account is disregarded, consistent with applicable bankruptcy law.

(g)     For additional clarity, Exhibit G to this Disclosure Statement shows the Beneficial Interest in the Wind-Down Trust calculated according to the Plan for each equity interest holder, listed by the account number.

The Beneficial Interests in the Wind-Down Trust will receive distributions as provided under the terms of the Wind-Down Trust.  In general, Beneficial Interests will receive distributions, net of expenses and according to the proportion of their Beneficial Interests to the total of the Trust, from time to time as asset sales and other realizations permit, subject to the treatment of classes superior to equity as provided above.  The frequency and amount of distributions will be also affected by adherence to IRS guidelines for liquidating grantor trusts.  A final distribution, whether it results in recovery of less or more than the aggregate of all Claims of Equity Interest holders, will be made on Claims of Equity Interest holders – if not before – at or about the time of the end date of the Wind-Down Trust.

The recovery ultimately achieved for Equity Interest holders depends on several factors that will play out over time.  These are discussed below in connection with the implementation of the Wind-Down Trust as the means for carrying out the Plan.  As noted there, Exhibit G includes a projected outcome for each Equity Interest holder if the Plan is confirmed.  The projection, which the Committee believes to be feasible predicated upon a number of assumptions concerning economic conditions, values of portfolio properties, and ability to raise funds sufficient to protect assets from foreclosure, indicates that equity interest holders may receive over 40 percent recovery on their interests.  That projected result is based on disposition of all of the assets of the

DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 29 of
65

1 Consolidated Estate, and after anticipated payments to senior classes, administrative expenses of

2 the Wind-Down Trust, and so forth. You should review carefully the limitations stated with

3 respect to those projected results. The actual result for equity interest holders may be significantly

4 lower or higher than the projected result.

5 **VIII. <u>TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

6 **A. Rejection if Not Assumed.**

7 Executory contracts are those agreements that are still being performed – that have not yet

8 been completed by both parties to the agreement. Executory contracts do not include agreements

9 to lend money, and thus do not include many kinds of financial obligations. Under the

10 Bankruptcy Code, the Debtors have the ability to assume (keep and pay on) an executory contract,

11 or reject (which acts as a breach of) the agreement. Under the Plan, as of the Effective Date, each

12 executory contract and unexpired lease not expressly assumed on or before the Effective Date or

13 the subject of a pending motion to assume as of the Effective Date, will be treated as rejected..

14 (Insurance policies, and REO Entity Operating Agreements are the subject of specific provisions

15 in the Plan, Secs. V.D and V.E.)

16 Those parties whose agreements are to be assumed (kept) will be notified prior to the

17 hearing on confirmation of the Plan, and given an opportunity to object if they so choose.

18 **B. Approval of Rejections.**

19 The order confirming the Plan will serve as an order of the Bankruptcy Court approving

20 the rejection of the executory contracts and unexpired leases as provided for in the Plan, as of the

21 Effective Date.

22 **C. Bar Date for Rejection Damages.**

23 If the rejection of an executory contract or unexpired lease pursuant to this Article IV gives

24 rise to a Claim by the other party or parties to such contract or lease, such Claim, to the extent that

25 it is timely filed and is an Allowed Claim, shall be classified in Class 3A (General Unsecured

26 Claims); <u>provided</u>, however, that any General Unsecured Claim arising from an executory contract

27 or unexpired lease rejected under this Plan shall not be enforceable against the Consolidated Estate

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 30 of
65

or Wind-Down Trust unless a proof of Claim is filed and served on the Wind-Down Trustee and the United States Trustee within thirty (30) days after the mailing of the Notice of Effective Date.

## IX. DISPUTED CLAIMS

**A.      Objections to Claims or Equity Interests.**

Following the Effective Date, the Trustee of the Wind-Down Trust will be authorized, and vested with the exclusive right, to object to any and all Claims or Equity Interests, and to initiate, file, and prosecute such objections on behalf of the Consolidated Estate so as to have the Bankruptcy Court determine the allowed amount, if any, of such Claims or Equity Interests to be paid under this Plan.  All objections to Claims or Equity Interests shall be filed with the Court and served upon the holder of the Claim no later than one hundred eighty (180) days after the Effective Date.  The Trustee shall be entitled to withdraw, settle, or compromise any such objections in his or her discretion, with the approval of the Wind-Down Trust Supervisory Board to the extent provided in the Wind-Down Trust Agreement, without notice, a hearing, or approval of the Court. The Court shall retain jurisdiction to adjudicate any objection to a Claim or Equity Interest, any counterclaim and any adversary proceeding related to a Claim or Equity Interest.

**B.      Proof of Claim Filed After Confirmation Date.**

Any Proof of Claim that was required to be filed by the Claims Bar Date or the Administrative Claims Bar Date but was not so filed shall be deemed disallowed without further action by the Trustee or order of the Court.

**C.      Distribution to Disputed Claims.**

No payments or distributions shall be made on account of any portion of a Disputed Claim or Disputed Equity Interest unless all objections to such Claim or Equity Interest have been withdrawn, settled, or resolved by final, non-appealable order of a court of competent jurisdiction. Distributions on account of Allowed Claims or Equity Interests shall be made only to the extent of such allowance.  Distributions on account of Allowed Claims or Equity Interests to which an objection was filed shall be made as soon as practical following allowance.  Under no circumstances will Distributions be made on account of Claims or Equity Interests that are not

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 31 of
65

allowed.

**D.     Disputed Claim Reserve.**

Upon each Distribution to holders of Allowed Claims and Equity Interests of equal or junior priority, the Disbursing Agent also shall compute the amount of the Distribution that would have been made to holders of Disputed Claims had the Disputed Claims or Disputed Equity Interests been allowed by using the Disputed Claims Amount.  ("Disputed Claim Amount" means the amount that is (a) the liquidated amount as set forth in a timely proof of claim relating to a Disputed Claim or proper amendment thereof, (b) the amount estimated by the Bankruptcy Court for the purposes of distributions to such Disputed Claim under Bankruptcy Code Sec. 502(c), or (c) the amount of such Disputed Claim as finally allowed by the Bankruptcy Court.)  The amount computed shall be held by the Trustee as the "Disputed Claims Reserve."  No holder of a Disputed Claim or Disputed Equity Interest shall have any right to funds reserved with respect to such Claim or Interest unless and until such time as it is allowed, but shall, pending resolution of the objection, be deemed to have a contingent beneficial interest in the Wind-Down Trust.

After all Disputed Claims and Disputed Equity Interests are either allowed or disallowed pursuant to a Final Order or by operation of the provisions of this Plan, the Trustee shall apply any remaining funds in the Disputed Claims Reserve to the purposes of this Plan and the Wind-Down Trust.

**E.     Estimation of Disputed Claims and Equity Interests.**

For the purposes of effectuating the provisions of this Plan, the Court may estimate the amount of any Disputed Claim or Disputed Equity Interest pursuant to section 502(c), and the amount fixed or liquidated by a Final Order shall be deemed to be an Allowed Claim or Equity Interest pursuant to section 502(c) for purposes of making Distributions.

**F.     Minimum Distributions; Rounding**

No payment of less than one thousand dollars ($1,000.00) shall be made by the Wind-Down Trustee to any holder of an Allowed Claim or Allowed Interest, but instead amounts less than that minimum shall be cumulated and distributed at the time of the next distribution at which

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 32 of
65

the claimant would be entitled to receive more than this minimum payment. The Wind-Down Trustee may waive this requirement as to a particular distribution if a request therefor is made in writing within 30 days after the distribution date. Notwithstanding the foregoing, a payment of less than one thousand dollars shall be made when it is the only payment that will be made on an Allowed Claim or Allowed Interest, or it is the final payment that will be made on an Allowed Claim or Allowed Interest.

The Trustee may round the amount to be received by any holder of an Allowed Claim or Equity Interest down to the nearest dollar.

## G. Disputes Regarding Distributions.

In the event of a dispute as to the right to receive any payment or Distribution to be made under this Plan, the Trustee may either defer such payment or Distribution until the dispute is resolved or interplead the amount of the payment or Distribution for resolution of the dispute by the Court. The Court shall retain jurisdiction to adjudicate such disputes.

## H. Particular Disputed Claims

The Equity Committee is aware of several claims that it expects will be objected to after the Effective Date of the Plan (and perhaps before that date if necessary).

### 1. Canyon Claim

This is the single most significant claim that is disputed. The circumstances of the dispute may be summarized as follows:

In March, 2007, Fund I entered into an agreement to participate with Canyon in a $97.9 million loan to HDC for the development of the Hawaii Property (the "Co-Lender Agreement"). Under the agreement, Fund I would pay up to $42,900,000, and Canyon agreed to lend $55,000,000. As part of the transaction, HDC gave Canyon a promissory note in the principal sum of $55,000,000 ("A Note"), and gave to the Debtor a promissory note in the principal sum of $42,900,000 ("B Note"). Fund II and Fund III ultimately participate in the B Note.

The Debtor and Canyon also entered into a Co-Lender Agreement, which structured and prioritized the relationship between Canyon and the Debtor and provided that Canyon would

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 33 of
65

service and administer the Loan as agent for itself and the Debtor. Fund I contends that, as the A Note approached its maturity date in March, 2008, Canyon was engaged in a course of commercially unreasonable and inequitable conduct designed to frustrate and block all efforts by Fund I to negotiate a work-out that would preserve the interests of both Canyon and Fund I and assure that their respective Notes would be paid off. In March, 2008, Fund I was negotiating to acquire HDC's interest in the property by way of a transaction intended to fully protect Canyon's rights to payment of the A Note in full. Fund I deposited $1,375,000 with Canyon as a fee for extending the maturity date of the A Note for one year. Although Canyon accepted the money, it later took the position that the Loan had not been extended, but it failed to return the fee to Fund I.

HDC was ultimately unable to pay its obligations. After rejecting the work-out efforts by Fund I and the developer, Canyon issued a Notice of Default and gave notice of a UCC public foreclosure sale of the interest in the holding company which controlled the developer.

Fund I commenced its case on November 19, 2008. During the course of Fund I's case, Fund I has been involved in extensive litigation with Canyon and other parties involved in the Hawaii development. On November 30, 2008, Fund I commenced an adversary proceeding against Canyon (Adv. Proc. No. 08-03148). Fund I's claims relate to Canyon's conduct as manager, including whether Canyon was entitled to foreclose on the property. Fund I also alleges that Canyon improperly took the $1,375,000 in exchange for a one-year extension of the due date of the A Note but then refused to extend the term of the note (the "Extension Claim").

On December 4, 2008, only fifteen days after the commencement of the case, Canyon filed a motion for relief from stay to allow it to proceed with its Foreclosure Sale of the membership interest in HK LLC. Canyon's motion presented numerous and complicated issues of fact and law. On February 5, 2009, the Court granted Canyon relief from stay to foreclosure on the real estate collateral for the HDC Note and on March 20, 2009, in response to another motion brought by Canyon, the Court amended its stay relief order to allow Canyon to proceed with its UCC sale of HDC's membership interest in HK LLC. Fund I filed an appeal of the February 5, 2009 and the March 20, 2009 orders, and those appeals have been consolidated and are currently pending

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 22:13    Page 34 of
65

1    before the United States District Court for the Northern District of California.

2         In granting Canyon relief from stay to foreclose upon the Hawaii Property, the Court

3    limited the order by restricting Canyon's ability to transfer the Property to third parties prior to

4    resolution of the Debtor's litigation against Canyon.  Upon the Court's granting Canyon's motion

5    to dismiss the Debtor's litigation (with leave to amend), Canyon filed a motion asking the Court to

6    lift the remaining restrictions in the relief from stay order so that it could freely transfer the

7    property to a third party following foreclosure.  That motion was granted by an order filed on

8    December 11, 2009.  Fund I filed an appeal from that order and the appeal is pending before the

9    United States District Court for the Northern District of California.

10        On September 4, 2009, the Bankruptcy Court granted a motion to dismiss all of Fund I's

11   claims against Canyon in the adversary proceeding except for the Extension Claim.  Fund I is in

12   process of appealing that ruling.  The trial on the Extension Claim has been postponed pending a

13   ruling on the confirmation of the Plan.

14        Canyon has asserted several counterclaims against Fund I in the above-referenced

15   adversary proceeding and filed a proof of claim in Fund I's case (Claim No. 15).  Canyon alleges

16   that under the Co-Lender Agreement, Fund I breached the Co-Lender Agreement by suggesting to

17   HDC that it seek protection under the Bankruptcy Code in order to prevent or delay Canyon's

18   foreclosure on the Hawaii Property.  Second, Canyon alleges that when HDC defaulted, Fund I

19   was obligated pursuant to the Co-Lender Agreement to make six months worth of interest

20   payments on the A Note and that Fund I failed to make those payments.

21        Canyon claims that it has incurred damages and attorneys fees and costs, and estimates

22   those amounts to be approximately $3 to $5 million.  Canyon has requested that its own Statement

23   of Claim attached hereto as Exhibit L be included with this Disclosure Statement.  Attaching that

24   Statement by Canyon does not indicate, whether expressly or by implication, any agreement,

25   admission, or concession of any nature whatsoever, by Fund I, or any of the Funds, or the

26   Committee.  The Committee and the Debtors continue to reserve all rights, disputes, and

27   objections to the Canyon claim.

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 13:29:13    Page 35 of
                                                65

1    Fund I disputes Canyon's proof of claim and counterclaims, which are the subject of

2   pending litigation as described above.. In the event that the Plan is confirmed, the Committee,

3   through the Wind-Down Trust, expects to take over the litigation surrounding the Hawaii

4   development, including both the appeal and the Extension Claim.

5    The Committee expects to object to the claim of Canyon, and expects that it will be

6   substantially reduced if not eliminated.  In any event, however, it must receive the treatment for a

7   Disputed Claim (including possible estimation under the Bankruptcy Code) until its amount and

8   validity, if any, are finally established.

9    2.    Other Claims May Be Objected To

10    There are many claims that have been filed in the Chapter 11 Cases that are erroneous in

11   one of several ways.  Claims that are not secured have incorrectly been filed as secured.  Claims

12   that are not priority in character have been filed as priority.  Claims that are not for creditor debts

13   but are instead equity interest claims have been filed as creditor claims.  Claims with these defects

14   are numerous, and appropriate objections to resolve them will be made as necessary.

15    The discussion in this Section of particular Disputed Claims is without prejudice to

16   objections that may be made to other claims.  The review of claims that may be objectionable is

17   ongoing, is not complete, and may indicate other claims or equity interests that should not be

18   allowed.

19    **X.  MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

20   **A.    General**

21    1.    The Plan utilizes the Wind-Down Trust, under the overall management of the

22   Wind-Down Trustee, to liquidate all assets of the Consolidated Estate, for the benefit of Claimants

23   and Interest holders, and otherwise administer the Chapter 11 Cases (which liquidation may

24   include, among other things, objecting to Claims as appropriate and the initiation of litigation to

25   collect amounts owing to the Funds).  This liquidation of assets, and related distributions as

26   circumstances of the Trust permit, will take place over a defined time period, initially set at five

27   years.

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 12:13:43    Page 36 of
65

2.     On the Effective Date, all assets, including without limitation litigation assets, of the Funds will vest in the Wind-Down Trust. For tax purposes, the Funds will be treated as the grantor of the Wind-Down Trust, and the Wind-Down Trust will take a carryover basis in the assets. The Funds will thereupon be deemed to have made a distribution of all Beneficial Interests in the Wind-Down Trust to the holders of Claims and Interests.  For tax purposes, the holders of Claims will receive their Wind-Down Trust Interest in satisfaction of their Claim.  The fair market value of the Wind-Down Trust Interest transferred to a Claim holder will be deemed to be equal to the amount of such Claim.  The Interest holders will be deemed to have received their Wind-Down Trust Interest in a liquidating distribution from the Fund in complete satisfaction of their Interest. The Interest holders will take a carryover basis in the Wind-Down Trust Interest equal to the basis they had in their Interest in the Fund.  After such distributions, the Claim and Interest holders will be taxed as the grantors of the Wind-Down Trust.

3.     On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company ("LLC") action of the Debtors or any of them, including but not limited to actions requiring a vote or other approval of the manager or members of an LLC and execution of all documentation that may be required for purposes of the Plan, will be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the manager or members of any of the Funds.

4.     Immediately after the occurrence of the Effective Date of the Plan, (i) the Funds will be deemed dissolved.  This process, and the transformation of membership interests into Beneficial Interests in the Wind-Down Trust, should, among other things, eliminate any further SEC compliance requirements.  The Wind-Down Trust is then authorized to take all actions reasonably necessary to dissolve the entities under applicable laws.  No assets revert to Funds as Debtors.  To the extent that any Fund is a necessary party to commence or prosecute an Avoidance Action or Retained Claim, or claim contributed or assigned to the Trust, however, the Wind-Down Trustee will still be authorized to sue or prosecute such action or claim in the name of the relevant

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 37 of 65

Fund, as a wind-down activity associated with such Fund.

5. <u>No New Loans or Issues of Securities</u>

The Funds have not made or invested in any new loans following the applicable Petition Dates, and the Wind-Down Trust will not make or invest in any new loans other than loans to potential future purchasers of assets or potential joint venture partners for assets which are sold and which may involve the Wind-Down Trust carrying back a portion of the consideration to be paid by any such future purchase or potential joint venture partners. Neither the Funds nor the Wind-Down Trust will renew or obtain any licenses or permits pertaining to lending or issuing securities. The Funds have not offered or issued membership interests or any other securities following the applicable Petition Dates, and the Wind-Down Trust will not offer or issue any securities, except as follows: (a) as provided in the Plan, the exchange of Claims and Equity Interests for beneficial interests in the Trust, to the extent such exchange constitutes an offering or issue of securities; and (b) the circulation of a Bankruptcy Court approved Private Placement Memorandum in order to solicit DIP Financing, which is exempt from registration with the SEC pursuant to Regulation D. The Trustee will determine, with the advice of counsel, whether the Wind-Down Trust is required subsequently to comply with the registration and reporting or other requirements of federal securities law, and the Trustee will take any and all actions to comply with applicable reporting or other requirements and to file periodic reports with the Securities and Exchange Commission as may be appropriate.

6. Not later than ten (10) days after the Effective Date of the Plan, the Wind-Down Trustee will mail a Notice of Effective Date to the Limited Notice List and all holders of Claims against, and Equity Interests in, the Funds.

7. The needs of the Wind-Down Trust for funds to meet obligations and expenses in the immediate period after confirmation of the Plan will be met from a combination of financing proceeds. Part of the financing will be available from DIP Financing that is currently being solicited from members of the Funds. A larger part of the financing will be available from an exit financing lender, in the approximate amount of $12 million ("Exit Financing"). The lender –

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 38 of
65

1  A.S.K. Financial Acquisition Group I, LLC ("Lender") – has committed to provide the Exit

2  Financing, in phases over the next ten months. The Lender's commitment is subject to

3  confirmation of the Plan and other usual terms and conditions. A copy of the Lender's executed

4  letter of intent, which summarizes the amounts, terms, and conditions for the Exit Financing, is

5  attached to this Disclosure Statement as Exhibit M.

6      The Committee estimates that the combined availability of DIP Financing and Exit

7  Financing proceeds will be $12 million or more. These funds will provide the Wind-Down Trust

8  with ample liquidity to deal with immediate expense needs under the Plan, organize for its work of

9  implementing the Plan, and protecting and preserving the Trust assets.

10  **B.      Creation of the Wind-Down Trust**

11      1.      The Wind-Down Trust

12      On or before the Effective Date, the Wind-Down Trust will be formed. Assets of the

13  Funds will be transferred to the Wind-Down Trust and then deemed concurrently to be distributed

14  to the holders of Claims against and Interests in the Funds. The holders of Claims against and

15  Interests in the Funds will be the sole beneficiaries of the Wind-Down Trust. There will be two

16  classes of beneficial interests in the Wind-Down Trust, the Creditor Class and the Equity Class.

17      (a)     The Creditor Class will consist of the Allowed Claims of all holders of

18              creditor claims of any and every nature against any of the Funds. A

19              Disputed Claim that becomes an Allowed Claim shall, from the time of

20              allowance, have a Beneficial Interest to the extent of the amount of its

21              Allowed Claim. Beneficial Interests in the Creditor Class shall be equal to

22              the dollar amount of their Allowed Claims, but pro rata with all other

23              Allowed Claims of holders of creditor claims if insufficient to pay all such

24              claims as provided in this Plan.

25      (b)     The Equity Class shall consist of the Allowed Interests of all Equity Interest

26              Holders in any of the Funds. A Disputed Interest that becomes an Allowed

27              Interest shall, from the time of allowance, have a Beneficial Interest to the

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 39 of
65

extent of the amount of its Allowed Claim.  Beneficial Interests in the
Equity Class shall be calculated as stated in Sec. VII(I) above.

(c)     The issuance of Beneficial Interests in the Wind-Down Trust to holders of
Claims and Interests shall be exempt from federal and state securities laws
as provided in Bankruptcy Code Sec. 1145(a).  Sale of Beneficial Interests
by the recipients of such issuance under this Plan without registration under
securities laws may be permissible pursuant to Bankruptcy Code Sec.
1145(c), but only as limited by the restrictions placed on certain categories
of recipients as provided by Sec. 1145(b).  If the Trustee determines, with
the advice of counsel, that the Wind-Down Trust is required subsequently to
comply with the registration and reporting or other requirements of federal
securities law, then the Trustee shall take any and all actions to comply
with, or determine that such compliance is not necessary, such reporting or
other requirements and to file periodic reports with the Securities and
Exchange Commission as may be appropriate.

The scope of restrictions imposed on certain categories of recipients of
Beneficial Interests is a highly technical matter under securities laws, and
any recipient concerned about their effect on him or her should consult an
attorney or accountant well versed in securities and/or bankruptcy law.

2.      The Wind-Down Trust Agreement

The Wind-Down Trust Agreement shall be in the form attached to the Plan as Exhibit A.[1]
The Wind-Down Trust Agreement shall, if the Wind-Down Trust has been formed, take effect on
the Effective Date.  The Wind-Down Trust Agreement may be amended if the Supervisory Board
deems it appropriate, upon motion to and approval by the Bankruptcy Court.  In the event of any
inconsistencies or conflicts between the Wind-Down Trust Agreement and this Plan, the terms and

---

[1] This will be provided prior to the hearing on Disclosure Statement.  Its contents are primarily
administrative in nature.

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 19:22:13     Page 40 of
                                         65

provisions of this Plan shall control.

3. <u>Treatment of Transfer of Assets to the Wind-Down Trust</u>

On the Effective Date, all assets, including without limitation litigation assets, of the Funds will vest in the Wind-Down Trust. For tax purposes, the Funds will be treated as the grantor of the Wind-Down Trust and the Wind-Down Trust will take a carryover basis in the assets. The Funds will thereupon be deemed to have made a distribution of all Beneficial Interests in the Wind-Down Trust to the holders of Claims and Interests, including Disputed Claims and Disputed Interests. For tax purposes, the holders of Claims shall receive their Wind-Down Trust Interest in satisfaction of their Claim. The fair market value of the Wind-Down Trust Interest transferred to a Claim holder shall be deemed to be equal to the amount of such Claim. The Interest holders shall be deemed to have received their Wind-Down Trust Interest in a liquidating distribution from the Fund in complete satisfaction of their Interest. The Interest holders will take a carryover basis in the Wind-Down Trust Interest equal to the basis they had in their Interest in the Fund. After such distributions, the Claim and Interest holders shall be taxed as the grantors of the Wind-Down Trust.

4. <u>Acceptance by Wind-Down Trust of Obligations under the Plan</u>

On and as of the Effective Date, all rights and obligations with respect to each Claim and Equity Interest treated by the Plan shall be deemed accepted by the Wind-Down Trust Trustee.

5. <u>The Trustee of the Wind-Down Trust</u>

(a) On the Effective Date, F. Wayne Elggren will be appointed Trustee of the Wind-Down Trust. The successor to the Trustee of the Wind-Down Trust, if any, will be appointed as provided in the Wind-Down Trust Agreement.

(b) The initial compensation for the Trustee will be at his regular compensation rate for bankruptcy engagements, namely $625 per hour and reimbursement of reasonably incurred personal expenses on Trust business. Compensation of the Trustee may be adjusted thereafter as the Supervisory Board, in its

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 41 of
65

business judgment, shall deem appropriate.  The Trustee may employ his firm, LECG LLP, for administrative and other assistance, at its usual rates.

(c) From time to time after the Effective Date, the Trustee of the Wind-Down Trust may employ, engage the services of, and compensate other persons (which may include employees, temporary employees, or independent contractors) and professional persons (which may include Professionals), reasonably necessary to assist the Trustee of the Wind-Down Trust in performing his or her duties under the Wind-Down Trust Agreement and this Plan.  The fees and expenses of such persons may be paid by the Wind-Down Trust Trustee without the necessity of further authorization or allowance of fees and expenses by the Bankruptcy Court.

(d) The Wind-Down Trust Trustee shall be deemed the Consolidated Estate's representative, and the representative of the estate of any one of the Funds, in accord with Section 1123 of the Bankruptcy Code, and shall have all powers, authority, and responsibilities specified in this Plan and the Wind-Down Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108, and 1106 of the Bankruptcy Code (including without limitation commencing, prosecuting, or settling Avoidance Actions or Retained Claims and Defenses.

(e) The duties and powers of the Wind-Down Trustee are extensive, and are not listed in detail here.  They are as provided in Section VI(B)(5) of the Plan, which should be reviewed with care.  Among the more notable provisions are that the Trustee is empowered:

(i) To seek an estimate of contingent or unliquidated Claims under Section 502(c) of the Bankruptcy Code for Claims filed against the Debtors, the estates or the Liquidating Trust;

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 42 of
65

(ii)    To sell or otherwise transfer for value any assets of the Wind-Down Trust, with the authorization of the Supervisory Board to the extent provided in the Wind-Down Trust Agreement;

(iii)   To abandon any property or assets of the Funds, or of the Wind-Down Trust, that cannot be sold or otherwise disposed of for value and whose distribution to holders of Allowed Claims or Allowed Equity Interests would not be feasible or cost-effective based in the judgment and discretion of the Trustee, with the authorization of the Supervisory Board, and without the necessity of a hearing or approval by the Bankruptcy Court;

(iv)    To set off amounts owed to the Funds or the Wind-Down Trust against any amounts to be distributed to the holder of a Claim or Equity Interest under the Plan;

(v)     To pursue litigation seeking affirmative recovery on behalf of the Wind-Down Trust..  For example, the Trust will hold claims against guarantors of certain loans made by the Funds pre-petition.  The Trust may commence actions to collect on these guarantees, and the guarantors are advised that this Plan does not limit or waive the guarantee claims that may be made against such guarantors.  The guarantees held by the Funds, and the related guarantors who may be the subject of litigation to collect on the guarantees, are identified on Exhibit N to this Disclosure Statement.

(vi)    To appear in, defend, or otherwise be heard as a party in interest in (i) appeals from the Confirmation Order and any proceedings related thereto; (ii) proceedings related to the enforcement or interpretation of the Plan or the Wind-Down Trust Agreement; (iii) proceedings related to modifications or amendments to the Plan or the Wind-

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:22:13    Page 43 of
65

Down Trust Agreement; (iv) proceedings related to the establishment and administration of the Wind-Down Trust; and (v) proceedings related to the allowance of Claims for compensation or expenses of professionals employed by the Debtors, the estates, the Committee or the Liquidating Trust; and

(vii) To take all other actions not inconsistent with the provisions of this Plan and the Wind-Down Trust Agreement.

6. The Wind-Down Trust Supervisory Board

(a) For giving oversight and direction to the Trustee, the Wind-Down Trust shall have a Supervisory Board comprised initially of five members. As of the Effective Date, the members of the Supervisory Board shall be those members of the Equity Committee who are willing to serve on the Supervisory Board. If such number is less than five, but not less than three, the initial members of the Supervisory Board shall select sufficient initial members, from among the holders of Beneficial Interests to bring the total number up to five. After the Effective Date, the Supervisory Board is authorized to appoint additional suitable members of the Supervisory Board, except that the number of members of the Board shall not exceed nine. If Supervisory Board members resign or are removed, successor Supervisory Board member shall be selected as provided in the Wind-Down Trust Agreement.

(b) Initially, the Supervisory Board shall not be compensated, other than reimbursement of actually incurred expenses in the performance of their duties. However, the Plan contemplates that it may subsequently, depending on the work load of the Supervisory Board, be appropriate to compensate Supervisory Board members for their services. Accordingly, the Trustee may, if the Supervisory Board and Trustee agree that such

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 44 of 65

1  compensation is appropriate, seek approval from the Bankruptcy Court to
2  pay compensation to the Board members.

3      7.      <u>Disposition of Wind-Down Trust Assets for benefit of beneficiaries</u>

4  The Trustee, with the authorization of the Supervisory Board to the extent provided in the
5  Wind-Down Trust Agreement, shall – using his or her business judgment – liquidate and convert
6  to cash the assets of the Wind-Down Trust, and make distributions on Beneficial Interests as and
7  when appropriate.  The Trustee will make at least annual distributions of net income plus all net
8  proceeds from the sale of assets, except that the Trust may retain amounts necessary to meet
9  claims and contingent liabilities of the Trust (including disputed claims) and reserves necessary
10 for the protection of the Trust assets, including at the Trustee's discretion paying down senior
11 liens on remaining assets.  Trustee will, if feasible and prudent, make distributions to holders of
12 Beneficial Interests to the extent necessary to pay tax on any income generated at the Trust level.
13 Administration of the assets of the Wind-Down Trust may include prosecuting or settling
14 Avoidance Actions and Retained Claims and Defenses.

15     8.      <u>Investment Powers of the Trustee</u>

16 The right and power of the Wind-Down Trust Trustee to invest assets of the Trust, the
17 proceeds thereof, and any income earned by the Trust, shall be limited to the right power that a
18 liquidating trust is permitted to hold pursuant to Treasury Regulations, or any modification in the
19 IRS guidelines, whether set forth in IRS ruling, other IRS pronouncements, or otherwise.  The
20 Wind-Down Trust Trustee may expend cash of the Wind-Down Trust (x) as reasonably necessary
21 to meet contingent liabilities and to maintain the value of the assets during the liquidation process,
22 (y) to pay the administrative expenses (including, but not limited to, any taxes imposed on the
23 Wind-Down Trust), and (z) to satisfy other liabilities incurred by the Wind-Down Trust consistent
24 with this Plan or the Wind-Down Trust Agreement.  Funds of the Trust will, consistent with IRS
25 guidelines, be invested only in short-term interest bearing accounts and other temporary liquid
26 investments such as Treasury bills.

27 / / /

28

183049.2

DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 16:29:13   Page 45 of
65

9.     Certain Tax Requirements

The Trustee will make at least annual distributions of net income plus all net proceeds from the sale of assets, except that the Trust may retain amounts necessary to meet claims and contingent liabilities of the Trust (including disputed claims) and reserves necessary for the protection of the Trust assets, including at the Trustee's discretion paying down senior liens on remaining assets.  Administration of the assets of the Wind-Down Trust may include prosecuting or settling Avoidance Actions and Retained Claims and Defenses.  Funds of the Trust will, consistent with IRS guidelines, be invested only in short-term interest bearing accounts and other temporary liquid investments such as Treasury bills.  The Wind-Down Trust will file tax returns as a grantor trust under Treas. Reg. 1.671-4(a).  The Trustee may, at his election, to file a tax return for the Disputed Claims Reserve treated as a separate taxable entity.  The Trustee is required to make this election, if at all, in the Trust's first taxable year.  It is anticipated that the Trustee will make this election, to prevent Allowed Interest holders from being taxed on income that might eventually go to holders of Disputed Claims or Interests that are not yet allowed.

10.     Registry of Beneficial Interests

The Wind-Down Trust Trustee shall maintain a registry of holders of Beneficial Interests in the Trust.

Any transfer of a Beneficial Interest shall not be effective unless and until the Wind-Down Trust Trustee has received valid, written notice of such transfer.


11.     Reporting to Beneficiaries

(a)     The Trustee shall prepare annual reports for the holders of Beneficial Interests.  Such annual reports shall be distributed within 90 days of the end of each calendar year.  Such annual reports shall be in such form, and provide such detail, as specified in the Wind-Down Trust Agreement, as the Supervisory Board shall determine.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:22:13    Page 46 of
65

(b)     The annual reports to beneficiaries shall include financial statements.  The Trustee shall propose the form and content of such financial statements to the Supervisory Board, which shall approve the form and content prior to their issuance.

(c)     Financial statements of the Wind-Down Trust may be, but are not required to be, audited.  The Supervisory Board shall have discretion to make that determination.

(d)     Additional financial and other reporting to the Supervisory Board shall be as specified in the Wind-Down Trust Agreement.

(e)     Notwithstanding any other provision of this Plan, the financial and other reporting requirements shall be conducted, and modified if and to the extent necessary, so as to maintain the grantor trust status of the Wind-Down Trust.

12.    Attorney-Client Privilege

Any attorney-client privilege, work-product privilege, or other privilege or immunity to that the estates or the Consolidated Estate are entitled to assert shall vest in the Wind-Down Trust, and the Wind-Down Trust Trustee shall be entitled to assert such privilege or immunity to the extent that the Debtors or the Equity Committee were entitled to do so prior to the Effective Date. After the Effective Date, the Trustee shall be entitled, in his or her sole discretion, to waive any privilege, work-product privilege, or other privilege or immunity which the estates or the Consolidated Estate are entitled to assert if the Trustee deemed such waiver appropriate.

13.    Right to Claims and Actions

On the Effective Date, any right, claim, or cause of action belonging to the Debtors or their estates or the Consolidated Estate against any person or entity, the Confirmation Order, or other order of the Court, shall be transferred to the Wind-Down Trust.  The Trustee, as provided herein and in the Wind-Down Trust Agreement, may pursue, settle, compromise, or release all causes of action in his or her sole discretion, without hearing or approval of the Court.

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 47 of
                                                 65

14.     Limitation of Liability; Indemnification

None of the Trustee, the Supervisory Board, their respective members, agents, or Professionals, or the employees of any of them, shall be liable for any act or omission taken or omitted to be taken in or in connection with the implementation of the Plan or the Wind-Down Trust, other than acts or omissions resulting from such person's willful misconduct, gross negligence, or fraud.

The Wind-Down Trust will indemnify and hold harmless the Trustee and the Supervisory Board, from all liabilities, damages, etc., including, but not limited to attorney's fees and costs, arising out of or due to their actions or omissions, or consequences of their actions or omissions with respect to the Trust or the implementation or administration of the Trust.  However, no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.

15.     Request Approval of Bankruptcy Court

The Wind-Down Trust is authorized and permitted, in the discretion of the Trustee and the Supervisory Board, to seek approval or instruction from the Bankruptcy Court for any matter concerning the administration, implementation, or activities of the Wind-Down Trust.  Such approval or instruction may be sought by motion, on the procedures provided in the Bankruptcy Local Rules of the Bankruptcy Court, provided, however, that notice need be given only to those parties as provided for post-Effective Date limited notice as described below.

16.     Purpose of the Wind-Down Trust

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing its assets in accord with Treasury Regulation 301.7701-4(d), and shall engage only in activities that are part of, and activities that are all reasonably necessary to, and consistent with, the accomplishment of that purpose.

17.     Termination of the Wind-Down Trust

The Wind-Down Trust shall terminate after liquidation, administration, and distribution of its assets in accord with this Plan and the Wind-Down Trust Agreement.  Termination of the

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 48 of
65

1   Wind-Down Trust shall occur no later than the fifth (5th) anniversary of the Effective Date,

2   provided, however, that the Bankruptcy Court may, upon motion by the Trustee may extend the

3   term of the Wind-Down Trust, if it is appropriate in order to facilitate or complete the liquidation

4   and administration of the Wind-Down Trust assets.

5   **C.      Settlement Negotiations Regarding Claims By And Against Manage**

6           The Plan contemplates the settlement of claims by and against CMRI, and its president and

7   owner David Choo.  Settlement of all such claims is subject to approval by the Court and insurers

8   providing coverage for such claims.

9           Claims have been asserted in state court and arbitration proceedings (the "State

10  Proceedings") by certain investors in the Funds against the Funds, CMRI and/or David Choo

11  based on representations, acts, errors, omissions, misstatements, misleading statements and/or

12  breaches of duty by CMRI and/or Choo in connection with the solicitation for, investments by,

13  financial, economic or investment advice concerning, management of, and operation of the Funds.

14  It is the position of the Committee that all investors in the Funds that all investors in the Funds

15  were similarly affected by such actions, errors, omissions, misstatements, misleading statements

16  and/or breaches of duty and, consequently, may have claims similar to those asserted in the State

17  Proceedings.  It is further the position of the Committee that, by virtue of § 541 of the Bankruptcy

18  Code, all such claims belong to the Funds as debtors in possession and that this Court's February

19  1, 2010 Order empowers the Committee to pursue all such claims.  Moreover, even if some of

20  these claims were personal to investors in the Funds, they may only be adjudicated in this

21  Bankruptcy Court, under § 362 of the Bankruptcy Code. That is so because CMRI and Choo have

22  made claims for indemnity against the Funds in connection with the State Proceedings, and

23  because the same insurance policies apply to claims against the Funds and claims against CMRI

24  and Choo.  Thus the State Proceedings affect assets and liabilities of the Consolidated Estate and

25  are stayed by the Chapter 11 Cases.

26          Certain members of the Committee, as investors in the Funds, therefore will file (or have

27  already filed) a class action adversary proceeding (the "Investor Class Action") in the Bankruptcy

28

1 Court to assert all such claims. A copy of the Investor Action Complaint is attached as Exhibit C

2 to the Plan. Upon confirmation of this Plan, the claims in the Investor Class Action will be

3 assigned, if approved by the Bankruptcy Court, to the Wind-Down Trust, and the Wind-Down

4 Trustee would then pursue and/or seek to settle them, with the approval of the Bankruptcy Court

5 according to the procedures applicable to class actions in federal court.

6       The Investor Class Action will be prosecuted for the benefit of all investors in the Funds,

7 with the result that any recovery (whether by settlement or judgment), including any recovery

8 from applicable insurance coverage, will be fairly shared among all investors, and not

9 disproportionately by a few investors acting through the State Proceedings only for their own

10 benefit. The Investor Class Action is consistent with the policies favoring class actions. It will

11 avoid depletion of a limited source of recovery for investors (the applicable insurance coverages,

12 which do not exceed $8 million), in the face of claims that are as much as $180 million in

13 potential investor losses. It will avoid the possibility of inconsistent judgments in different

14 litigations involving essentially the same facts, but in different courts making separate rulings.

15       The Committee will seek to ensure that all of the State Proceedings against CMRI and/or

16 Choo are stayed, in favor of the prosecution of the Investor Class Action for the benefit of all

17 investors. The Committee contemplates that one or more motions will be necessary to achieve

18 this protection for the investors as a whole.

19       The Committee, as representative of the investors, has engaged in negotiations with CMRI

20 and Choo in an effort to explore the resolution of claims by and against these insiders, and to

21 maximize the recovery by the investors. Any settlement would be subject to approval by the

22 Bankruptcy Court and any insurers providing coverage. By engaging in these negotiations the

23 Committee hopes to avoid extensive litigation of the claims against CMRI and Choo.

24       In its negotiations, the Committee has considered the contract claims that CMRI holds

25 against the Funds, which amount to approximately $6 million for various advances and fees owed.

26 Also considered is the value of having the services of CMRI and Choo to assist with liquidating

27 the asset portfolio of the Funds. The Committee understands that CMRI has relationships in the

28

183049.2

44

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 12:13:37   Page 50 of
65

real estate industry that can be of value, as well as potential access to financing sources. In addition, the Committee has considered that David Choo, and various entities in which he has controlling interests, could attempt to avoid any success in litigation against him by filing bankruptcy for himself or his entities. In balancing these factors against the claims held by the Funds and their investors, the Committee will seek to reach a fair and reasonable resolution in an expeditious and effective manner.

**D. United States Trustee Quarterly Reports.**

The Wind-Down Trust Trustee shall file and serve on the Post-Effective Date Limited Notice List the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee. The fees payable, and the reports required, under the section of the Plan shall, pursuant to the Consolidation Order be paid on account of the single, Consolidated Estate.

**E. Status of Committee Post Confirmation.**

On the Effective Date of the Plan, so long as the Wind-Down Trust has been formed and the Wind-Down Trustee appointed, the Equity Committee shall be dissolved, except for the purpose of presenting a final fee application.

**F. Post-Effective Date Limited Notice List.**

1. There shall be established after the Effective Date a Limited Notice List. Persons on such Limited Notice List will be given notice of matters that come before the Bankruptcy Court post-Confirmation, and an opportunity – if such party is otherwise a party in interest with respect to the matter – to object and be heard on the matter, whether or not the matter is otherwise one that would be noticed to all creditors and/or equity interest holders.

2. Any person desiring to be included in the Limited Notice List must (1) file a request to be included on the Limited Notice List and include thereon its name, contact person, mailing address, telephone number, facsimile number (if any), and email address, within 30 days after the Effective Date, and (2) concurrently serve a copy of its request to be included on the Limited Notice List on the Trustee. On or before 60 days after the Effective Date, the Trustee

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 13:29:13   Page 51 of
65

shall compile a list of all persons on the Limited Notice List and file such list with the Bankruptcy Court.

## XI.  **PROJECTED RESULTS OF PLAN FOR CREDITORS AND EQUITY HOLDERS**

The Committee, through its financial advisor, F. Wayne Elggren, a Certified Insolvency and Reorganization Advisor with expertise in bankruptcy and financial matters, has conducted a review of the Funds' financial condition, analyzed its portfolio of assets and properties, and prepared a projection of the likely outcome for creditors and investors under the Plan ("Projection").  The Projection includes the Exit Financing available to support implementation of the Plan, in the amount of approximately $12 million.  (See Section X.A.7 above)  This Projection is attached as Exhibit F to this Disclosure Statement.  As with any Projection, it is based on a number of assumptions, and upon variables, factors, and economic circumstances that cannot be forecast with high precision.  It is, however, the Committee's best estimate of how interested parties may recover under this Plan.

On the basis of the Projection, the Committee and Debtors believe that the assets of the Consolidated Estate can ultimately be disposed of in an orderly wind-down of the Funds' affairs for sufficient proceeds to return payment in full on creditor claims, and net recovery for investors of approximately 40 percent of their investment.  You should review the assumptions provided with the Projection, as well as the detailed three-year cash flow that supports the projected result.  Actual results may be higher or lower than the projected amounts.

To add additional clarity for investors, Exhibit G shows, for each investor (by account number, not name, for privacy reasons) in the column headed "Return Based on $75,000,000" the projected recovery for each investor individually.  For further clarity, the Committee will prepare a form to be provided to each investor individually in connection with voting on the Plan that shows the projected outcome just for that particular investor.  The format of this form is shown as Exhibit H to this Disclosure Statement.

The Committee notes that a recovery of 40 percent – and potentially more –  for investors in the Chapter 11 setting would be a major achievement, and one that the Committee believes

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 52 of
65

1  strongly supports a vote in favor of this Plan.

2  **XII.   ALTERNATIVE TO THE PLAN:  LIQUIDATION UNDER CHAPTER 7**

3      If the Plan is not approved, the likely alternative is a conversion of these Chapter 11 Cases

4  to liquidating cases under Chapter 7 of the Bankruptcy Code.  In that scenario, a trustee appointed

5  by the Office of the U.S. Trustee would take control of the Funds and their assets, and seek to sell

6  the assets.  Fees and expenses of a Chapter 7 trustee would be deducted from the sale proceeds.  If

7  the cases are not consolidated (as is provided in Chapter 11 under the Plan), there could be three

8  trustees, with three sets of attorneys and their fees.  There would also be the potential – highly

9  likely in the Committee's view – for disputes among the three Chapter 7 cases that could lead to

10  expensive litigation.

11      The Committee, through its financial advisor, has also projected the likely outcome for

12  creditors and investors in a Chapter 7 liquidation of the Funds ("Chapter 7 Projection").  This

13  Chapter 7 Projection is attached as Exhibit I to this Disclosure Statement.  It is the Committee's

14  best estimate of how interested parties may recover if the Plan is not confirmed.

15      The Chapter 7 Projection believes that the assets of the Funds can be disposed of by a

16  Chapter 7 trustee for sufficient proceeds to return payment in full on creditor claims, and net

17  recovery for investors of under ten percent of their investment.  You should review the

18  assumptions provided with the Chapter 7 Projection, as well as the detailed three-year cash flow

19  that supports the projected result.  Actual results could vary from the projected amounts.

20      Here again, to add additional clarity for investors, Exhibit G shows, for each investor (by

21  account number, not name, for privacy reasons) in the column headed "Liquidation Analysis"

22  shows the projected recovery for each investor individually.  Investors may therefore refer to

23  Exhibit G for a direct comparison of what the Committee believes they would receive under the

24  Plan vs. what they would receive in liquidation under Chapter 7.

25      The Committee believes that the comparison shows strongly the desirability of a vote in

26  favor of the Plan, rather than a liquidation under Chapter 7, or the auction alternative set forth

27  below.

28

Case: 08-32220   Doc# 589   Filed: 06/24/10   Entered: 06/24/10 16:22:13   Page 53 of
                                            65

1  Some investors do not agree with the Committee's recommendation, would prefer an

2  immediate auction of all estate assets, and urge investors to reject the Plan.  These dissenting

3  investors have not filed a formal plan or disclosure statement.

4  **XIII.  COMPENSATION AND REIMBURSEMENT OF PROFESSIONAL PERSONS**

5  **A.  Pre-Effective Date Compensation.**

6  All Professional persons requesting compensation or reimbursement of expenses under

7  Sections 327, 328, 330, 331, 503(b)(2), 1103 and/or 1107(b) of the Bankruptcy Code for services

8  rendered before the Effective Date, and for costs and expenses incurred after the Effective Date in

9  preparing and presenting such requests for compensation and reimbursement of expenses shall file

10  and serve on Debtor' Counsel, Post-Confirmation Committee Counsel, the Debtor and the United

11  States Trustee an Application for Final Allowance of Compensation and Expenses (collectively,

12  the "Final Fee Applications") no later than thirty (30) days after the Effective Date of the Plan.

13  Counsel for the Trustee shall prepare a notice of the Final Fee Applications and obtain from the

14  Bankruptcy Court a hearing date for the Final Fee Applications and a date by which all objections

15  to Final Fee Applications must be filed and served.  Notice of Final Fee Applications, the hearing

16  date on the Final Fee Applications and the last date to object to Final Fee Applications will be

17  filed and served on the United States Trustee, persons on the Limited Notice List, and all

18  Professional persons who file Final Fee Applications.

19  **B.  Post-Effective Date Compensation.**

20  The Wind-Down Trustee and Professionals retained by the Wind-Down Trustee shall be

21  entitled to payment of their post-Effective Date fees and reimbursement of expenses in the

22  ordinary course of business.  The Wind-Down Trustee may, but is not required to, bring the

23  payment of fees and costs of Professionals before the Bankruptcy Court for review and approval,

24  not more often than semi-annually.

25  **XIV.  TAX CONSEQUENCES OF THE PLAN**

26  The following discusses certain U.S. federal income tax considerations in connection with

27  the implementation of the Plan relating to the Debtor and to holders of Allowed Claims and

28

Allowed Interests and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement. These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the federal income tax considerations described below.

The federal income tax considerations in connection with the Plan are complex and are subject to significant uncertainties, as a result of both the uncertainty of the law in certain contexts and the uncertainty regarding the precise manner in which the Plan will be implemented. The Committee and Debtors have not requested, nor do they expect to request, a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this description does not address state, local, or foreign income or other tax considerations relating to the Plan, nor the federal income tax considerations relating to the Plan particular to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an Allowed Claims as part of a hedging, integrated constructive sale or straddle, investors in pass-through entities, and retirement account holders).

*Accordingly, the following summary of certain material U.S. federal income tax considerations is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to a holder of a Claim or Interest . Each holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors for the federal, state, local and foreign income and other tax consequences applicable under the Plan.*

A.    **Consequences to the Wind-Down Trust.**

The Wind-Down Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for

federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). In Revenue Procedure 82-58, as modified and amplified by Revenue Procedures 91-15 and 94-45 (the "Revenue Procedures"), the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a bankruptcy plan. The Wind-Down Trust has been structured with the intention of complying with such general criteria to the extent possible balancing the differences in taxation of debtors that are LLCs compared to debtors that are taxed as corporations. Pursuant to the Plan, and in conformity with the Revenue Procedures, all parties (including the Debtors, the Trustee of the Wind-Down Trustee, and the holders of beneficial interests in the Wind-Down Trust) are required to treat, for federal income tax purposes, the Wind-Down Trust as a grantor trust of which its -beneficiaries are the owners and grantors. The Funds will transfer their assets directly to the Wind-Down Trust. In consequence, the Wind-Down Trust will take the same basis in the assets transferred as the Funds had in the assets. The Funds will then be deemed to immediately distribute the Wind-Down Trust Interests to the Claim and Interest holders. As a result of such distributions, the Claim and Interest holders shall become the grantors of the Wind-Down Trust under Treasury Regulations § 1.671-2(e)(3). No ruling has been requested from the IRS concerning the tax status of the Wind-Down Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Wind-Down Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Wind-Down Trust and its beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

**B.** **Consequences to Holders of Allowed Claims and Interests.**

    1.    <u>Gain or Loss: Allowed Claims</u>.

    In general, each holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such holder in satisfaction of its Claim (other than any Claim representing accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest). The "amount

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 12:13 Page 56 of
65

realized" by a holder of an Allowed Claim will equal the sum of the cash as received by such holder with respect to its Claim (excluding any portion required to be treated as imputed interest) plus the fair market value of the Wind-Down Trust Interest. As the Claim holders are expected to receive a 100% distribution, the value of the Wind-Down Trust Interest will be equal to the Allowed Claim. Each holder should consult his, her, or its own tax advisor as appropriate to determine matters of basis, realization, gain or loss, and the like.

2.    Gain or Loss: Allowed Interest.

In general, the distribution of the Wind-Down Trust Interest to an Allowed Interest holder will create no gain or loss to the Interest holder. Under partnership taxation liquidating distribution provisions, the Allowed Interest holder will take a carryover basis in the Wind-Down Trust Interest equal to the basis he, she or it had in his, her or its Interest in the Fund. If the holder has a negative capital account, in some cases, an Allowed Interest holder with a negative capital account may recognize gain from the decrease in liabilities upon the Fund termination. Under partnership tax law, the decrease in liabilities is treated as a deemed cash distribution and can create a recapture of a negative capital account. Each holder should consult his, her, or its own tax advisor as appropriate to determine matters of basis, realization, gain or loss, and the like.

3.    Grantor Trust Taxation.

The Allowed Claim and Allowed Interest holders will be the grantors of the Wind-Down Trust for tax purposes. Any income (or loss) generated by the Wind-Down Trust will be income of the grantors and will be reported on the Allowed Claim holders' and the Allowed Interest holders' personal income tax returns. The Trustee is required to make distributions (cash permitting) to the Allowed Claim and Allowed Interest holders to pay the taxes on the income allocated to them as grantors.

4.    Information Reporting and Withholding.

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 57 of
65

withholding" at the then applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## C.     Consequences to the Funds.

In general, the Funds will not recognize any gain or loss on the transfer of their assets to the Wind-Down Trust. The Funds will not recognize any gain or loss on the distribution of the Wind-Down Trust Interests to the Allowed Interest holders. If the Allowed Interest holders are non-US residents, the Funds may be required to pay a withholding tax on the value of the Wind-Down Trust Interest transferred to such non-US residents. The Funds do not expect to pay a significant withholding tax. Any such tax would be an administrative claim of the estate. The Funds will not receive any deductions for the Wind-Down Trust Interests transferred to the Allowed Interest holders.

The Funds will transfer Wind-Down Trust Interests to the Allowed Claim holders. The

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 13:  JOINT PLAN OF REORGANIZATION
65

Allowed Claim holders' claims will be satisfied by the transfer of the Wind-Down Trust Interests. This transfer will create no cancellation of indebtedness income ("COD Income") to the Funds as the Wind-Down Trust Interests' value will equal the amount of the Allowed Claims. If the Allowed Claims include interest, wages or other items that constitute deductible expenses, the Funds will be entitled to interest, compensation, or other expense deductions.

## XV.  RETAINED JURISDICTION

After the Plan is approved, the Bankruptcy Court will retain jurisdiction to resolve many potential matters and disputes affecting the Chapter 11 Cases and the Wind-Down Trust. The categories for which jurisdiction is retained are listed in detail in Article XI of the Plan, which should be reviewed with care.

## XVI.  WIND-DOWN TRUST SUCCESSOR TO DEBTORS

The Wind-Down Trust shall be the successor to each of the Funds for all purposes under the Bankruptcy Code, including without limitation Sections 1123, 1129, and 1145 of the Bankruptcy Code.

## XVII.  TRANSFERS UNDER PLAN NOT SUBJECT TO TAX

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under this Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by this Plan, including, without limitation, any transfers to or by the Wind-Down Trust Trustee of the property of any of the Debtors in implementation of or as contemplated by this Plan (including, without limitation, any subsequent transfers to or by the  Wind-Down Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

183049.2
DISCLOSURE STATEMENT FOR
JOINT PLAN OF REORGANIZATION

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 59 of
65

# XVIII. EFFECT OF ACCEPTANCE OF REJECTION OF PLAN

**A.      Voting Rights of Classes.**

Each impaired class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan.

**B.      Reservation of Section 1129(b) Rights to seek Non-Consensual Confirmation.**

In the event that any impaired class of Claims or Interests shall fail to accept the Plan by the requisite number or amount in accordance with Section 1126(c) or (d) of the Bankruptcy Code, the Committee requests that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

# XIX. RETENTION OF RIGHTS, CLAIMS AND CAUSES OF ACTION

The Estate shall retain all Retained Claims and Defenses; and the Wind-Down Trust Trustee shall investigate and, if appropriate, pursue such Retained Claims and Defenses. Also expressly retained are all of the claims, causes of action, defenses, counterclaims, causes of action for equitable or contractual subordination, offset and recoupment rights of the Estate or the Debtor, against any person whether or not particularly disclosed in the Disclosure Statement.

# XX. AMENDMENT AND INTERPRETATION OF THE PLAN

**A.      Amendment.**

This Plan may be altered, amended, or modified by the Committee, or the Debtors and Committee if the Committee affirmatively consents, before or after the Confirmation Date in the manner provided by Section 1127 of the Bankruptcy Code. A holder of a Claim or Equity Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**B.      Severability.**

Should any term or provision of the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of the Plan.

183049.2

Case: 08-32220      Doc# 589      Filed: 06/24/10      Entered: 06/24/10 16:29:13      Page 60 of
65

**C. Conditions Precedent.**

This Plan shall be of no force and effect until:

(a) the Confirmation Order shall have been entered by the Bankruptcy Court, and

(b) conditions to exit financing from ASK Financial Acquisition Group I, LLC on the terms stated in Exhibit M to the Disclosure Statement for this Plan (or financing in an equivalent amount and on terms not less favorable) have been satisfied.

**D. Notice.**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally, by an email with receipt confirmed, or by first class mail, as follows:

| | |
|---|---|
| If to the Wind-Down Trustee: | F. Wayne Elggren<br>LECG, LLP<br>201 Mission Street, Suite 800<br>San Francisco , California , 94105 |
| If to a holder of an Allowed Claim: | At the address set forth in its proof of Claim filed at the Bankruptcy Court, or if none, at the address set forth in the Schedules. |
| If to holder of an Allowed Equity Interest | At the address found in the relevant Fund list of holders of Membership Interests |

Notice shall be deemed given upon the earlier of:  (1) if notice is given by overnight delivery service, the first business day after deposit with the delivery service, or (2) if notice is given by email, the business day on which receipt of the email is confirmed by the recipient if confirmation occurs during normal business hours at the recipient's location or the first business day after the day on which receipt of the email is confirmed by the recipient if confirmation occurs

Case: 08-32220     Doc# 589     Filed: 06/24/10     Entered: 06/24/10 16:29:13     Page 61 of
65

later than close of business on the day of transmission during normal business hours at the recipient's location, or (3) if notice is given by mail, the third calendar day after deposit in the United States Mail, first class postage prepaid . Any person may change the address at which such person is to receive notices under the Plan by sending written notice, pursuant to the provisions of this Section, to the person to be charged with knowledge of such change, and by filing such notice with the Bankruptcy Court if appropriate or required.

## XXI. EFFECT OF CONFIRMATION AND INJUNCTION

### A. Binding Effect of Plan.

The provisions of this Plan shall bind the Debtors, the Wind-Down Trust, and any successor or assign including a Chapter 7 or Chapter 11 trustee; and shall bind any person asserting a Claim or Interest against any of the Debtors, whether or not the Claim or Interest is impaired under the Plan, and whether or not such person has accepted the Plan. Except as provided for in the Plan, all property of the Consolidated Estate vests in the Trust, and is free and clear of all Claims and Equity Interests. The Wind-Down Trust shall not have any liability to any creditors or interest holders of the Funds other than to make the distributions expressly provided for under the Plan, and the Wind-Down Trust.

### B. Injunction.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all persons who have held, currently hold or may hold a Claim or Interest treated or provided for pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such Claim: (i) commencing or continuing, in any manner and in any place, any action or proceeding against the Estates; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or other order against the Estates; (iii) creating, perfecting or enforcing any lien against property of the Estates without leave of the Bankruptcy Court; (iv) taking any action to obtain possession of property of the Estates or to obtain possession of property from the Estates or to exercise control over the Estates or property of the Estates; and (v) taking any of the actions proscribed in subsections )(i) – (iv) above against the Wind-Down

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 22:13:58    Page 62 of
65

1  Trust, in any manner and in any place, that does not comply with or is inconsistent with the

2  provisions of the Plan.  Any person injured by any willful violation of such injunction shall be

3  entitled to recover actual damages, including costs and professional fees and, in appropriate

4  circumstances, punitive damages from the willful violator.

5  **C.      Discharge.**

6          Because the Plan is a liquidating plan, and pursuant to Bankruptcy Code Section

7  1141(d)(3), entry of the Confirmation Order shall not act as a discharge of any debt of Debtors that

8  arose prior to Confirmation.  Neither the Wind-Down Trust, the Wind-Down Trustee, nor any

9  employee, agent or other representative of them shall have any liability to any creditors or interest

10  holders of Fund I, Fund II, or Fund III other than to make the distributions expressly provided for

11  under the Plan.

12

13  Dated: June 24, 2010                OFFICIAL COMMITTEE OF EQUITY SECURITY
                                        HOLDERS

14

15

16                                      By:   _/s/ William Bergman_____
                                              William Bergman

17                                            Chairman

18  Dated: June 24, 2010                Respectfully submitted,

19                                      McNUTT LAW GROUP LLP

20

21

22                                      By:   _/s/ Michael A. Sweet_____
                                              Michael A. Sweet

23                                      Attorneys for Official Committee
                                        of Equity Security Holders

24  / / /

25  / / /

26  / / /

27

28

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:22:13    Page 63 of
65

Dated: June 24, 2010

By: _/s/ Graham Seel_
        Graham Seel
Responsible Individual for CMR I

Dated: June 24, 2010        WENDEL, ROSEN, BLACK & DEAN

By: _/s/ Elizabeth Berke-Dreyfuss_
        Elizabeth Berke-Dreyfuss
Attorneys for CMR Mortgage Fund, LLC

Dated: June 24, 2010

By: _/s/ Graham Seel_
        Graham Seel
Responsible Individual for CMR II

Dated: June 24, 2010        BINDER & MALTER

By: _/s/ Robert G. Harris_
        Robert G. Harris
Attorneys for CMR Mortgage Fund II, LLC

Dated: June 24, 2010

By: _/s/ Graham Seel_
        Graham Seel
Responsible Individual for CMR III

183049.2

Case: 08-32220    Doc# 589    Filed: 06/24/10    Entered: 06/24/10 16:29:13    Page 64 of 65

Dated: June 24, 2010                    MACDONALD  & ASSOCIATES


By:  _/s/ Reno F. R. Fernandez_
          Reno F. R. Fernandez, III
Attorneys for Attorneys for CMR Fund III, LLC