UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

| | |
|---|---|
| In Re: | ) Case Nos. 08-32220 TEC |
| | )            09-30788 TEC |
| CMR MORTGAGE FUND, LLC; | )            09-30802 TEC |
| CMR MORTGAGE FUND II, LLC; | ) |
| CMR MORTGAGE FUND III, LLC, | ) Chapter 11 |
| | ) |
| Debtors. | ) MOTION for SETTLEMENT AMONG |
| | ) the FUNDS, the EQUITY |
| | ) COMMITTEE, and CANPARTNERS |
| | ) REALTY HOLDING COMPANY |
| | ) |
| | ) Thursday, September 22, 2010 |
| | ) San Francisco, California |

Appearances:

| | |
|---|---|
| For Debtor CMR Mortgage Fund II, LLC: | Robert G. Harris, Esq.<br>Binder & Malter, LLP<br>2775 Park Avenue<br>Santa Clara, California  95050 |
| For Debtor CMR Mortgage Fund III, LLC: | Reno F. R. Fernandez III, Esq.<br>Macdonald & Associates<br>221 Sansome Street, Third Floor<br>San Francisco, California  94104 |
| For the Equity Committee: | Dale L. Bratton, Esq.<br>Law Offices of Dale L. Bratton<br>172 Seventh Avenue<br>San Francisco, California  94118-1207 |
| | Michael A. Sweet, Esq.<br>McNutt Law Group LLP<br>188 The Embarcadero, Suite 800<br>San Francisco, California  94105 |
| For Creditor Hanauma One, LLC: | Jeff J. Friedman, Esq.<br>Katten Muchin Rosenman LLP<br>575 Madison Avenue<br>New York, New York  10022 |

Appearances continued on next page.

Appearances, continued:

| | |
|---|---|
| For unrepresented investors: | Robert Feinbaum, investor |
| For Oxford Investment Properties, LLC: | Stephen T. O'Neill, Esq. Murray & Murray 19400 Stevens Creek Boulevard, Suite 200 Cupertino, California 95014-2548 |
| For Canpartners Realty Holding Company IV LLC: | Sidley Austin LLP 555 West Fifth Street, Suite 4000 Los Angeles, California 90013 |
| For Stanford Carr, Stanford Carr Development, and | Rachel Turner Farella Braun & Martel 235 Montgomery Street San Francisco, California 94104 |
| For Defendants SCD Kunia and Stanford Carr: | Richard Van Duzer, Esq. Douglas R. Young, Esq. Farella, Braun & Martel 235 Montgomery Street San Francisco, California 94104 |
| Digital Court Recorder: | United States Bankruptcy Court Clerk of the Court Akbar Malakooti 235 Pine Street, 23rd Floor (94104) Post Office Box 7341 San Francisco, California 94120-7341 (415) 268-2360 |
| Certified Electronic Transcriber: | Palmer Reporting Services 1948 Diamond Oak Way Manteca, California 95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 2 of 65

1    <u>Thursday, September 22, 2010</u>                    <u>9:34 o'clock a.m.</u>

2                         P R O C E E D I N G S

3          THE CLERK:  All rise.

4          THE COURT:  Please be seated.  Good morning.

5          THE CLERK:  In the matter of CMR.

6          MR. BRATTON:  Good morning, Your Honor.  Dale Bratton

7    and Michael Sweet of McNutt Law Group for the Equity Committee.

8          MR. HARRIS:  Good morning, Your Honor.  Robert Harris

9    of Binder and Malter appearing for CMR Mortgage Fund II.  And

10   with me in court is Graham Seale (phonetic), the responsible

11   individual.

12         MR. FERNANDEZ:  Good morning, Your Honor.  Reno

13   Fernandez of Macdonald and Associates for CMR Mortgage Fund III

14   and specially appearing for Fund I.

15         MR. FEINBAUM:  Good morning, Your Honor.  Robert

16   Feinbaum, investor, here for myself and for all the other

17   unrepresented investors.

18         MR. FRIEDMAN:  Good morning, Your Honor.  Jeff

19   Friedman from Katten Muchin Rosenman.  My *pro hac vice* motion

20   was submitted to the Court last week.  And I ask the Court's

21   permission to appear on behalf of Hanauma One this morning.

22         THE COURT:  Is there any objection?  I don't know

23   whether we signed that or not.

24         MR. FRIEDMAN:  I didn't see it on the docket.

25         MR. BRATTON:  Objection to the *pro hac vice*, no, Your

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 3 of
65

1  Honor.

2        THE COURT:  Okay.  Well, we'll clean it up later, but

3  you're of course welcome to participate today.

4        MR. FRIEDMAN:  Thank you, Your Honor.

5        MR. O'NEILL:  Good morning, Your Honor.  Stephen

6  O'Neill, Murray and Murray, for the Oxford Investors.

7        MR. HAVEL:  Good morning, Your Honor.  Richard Havel

8  with Sidley and Austin.  And we're counsel for Canpartners

9  Realty Holding Company and the affiliated Canyon Partners

10  Entities (phonetic).

11        MS. TURNER:  Good morning, Your Honor.  Rachel Turner

12  from Farella, Braun and Martel.  We represent Stanford Carr,

13  Stanford Carr Development, and Stanford Carr SCD Committee.

14        THE COURT:  Okay.  Should we deal with the compromise

15  first?

16        MR. BRATTON:  I believe so, Your Honor.

17        THE COURT:  Makes sense?  All right.  I sent out a

18  tentative ruling.  I hope it got to everyone.  And I'm glad to

19  hear any comments about it.

20        I think, Mr. Friedman, it's probably you that wants to

21  speak.

22        MR. FRIEDMAN:  Your Honor, again, Jeff Friedman,

23  Katten Muchin Rosenman for Hanauma One, LLC, for the record.

24        Your Honor, we did see the Court's tentative decision

25  yesterday.  And respectively, probably not surprisingly to the

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 4 of 65

1  Court, we disagree with it.

2        THE COURT:  Well, one of the reasons to send out

3  tentatives is to let the parties and counsel know what I'm

4  thinking.  And if I've completely misconceived something, it's a

5  — you'll know ahead of time and can steer me — steer me away

6  from that.

7        MR. FRIEDMAN:  We appreciate that, Your Honor.  And

8  specifically I'm going to try to address the points that Your

9  Honor raised and — and indicate where I think we have some

10  differences.

11        One of — one of the points Your Honor made, if I

12  interpreted Your Honor's tentative ruling correctly, was that

13  the colender agreement sort of trumps all here, and that you

14  believe that Fund I, CMR Mortgage Fund, which I'll refer to as

15  Fund I, because everyone else does...

16        THE COURT:  Can I ask something?  Here's where maybe —

17  maybe I need to know exactly what you're arguing.

18        You're — you're claiming that — that Fund — I'll just

19  call it Fund, because it was Fund I, and it's referred to here

20  Fund, I think — breached duties to you.  And did that — is that

21  — did that happen in — in this settlement?  Did it happen in —

22  in somehow what they did to enforce — or attempt to enforce the

23  colender agreement.

24        MR. FRIEDMAN:  No, Your Honor.  We think it did happen

25  in the settlement, in giving up the claim that at least until a

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 5 of
65

1    couple weeks ago apparently the debtors and the Equity Committee

2    thought were worth perhaps $50 million against Canyon.

3            And we do think that the standard of care that

4    governs, not withstanding, that — I — I do agree with Your

5    Honor, Hanauma One was certainly aware of the existence of

6    colender agreement, nevertheless, Your Honor, we think that the

7    standard of care and we think that the duties of the Fund to the

8    participants are set forth in the participation agreement and

9    not in the colender agreement and that it is the participation

10   agreement that controls that standard of care.  And that's what

11   we believe has been breached.

12           THE COURT:  But the question is — so the breach would

13   be in agreeing to this settlement, because the settlement

14   undervalues the claim?

15           MR. FRIEDMAN:  Correct.  It gives up the claim and

16   purports to give away the rights of Hanauma, which we don't

17   think the debtor has the ability to do, under the — under the

18   agreement, as well.  So they're —

19           THE COURT:  Well, I think what — Hanauma is a

20   participant in the note.  Does Hanauma have direct rights

21   against the A lender?

22           MR. FRIEDMAN:  It doesn't have direct rights, Your

23   Honor, but it is not what I would — would euphemistically refer

24   to as blind participation.  For example, there was a portion of

25   the mortgage, of the B loan mortgage, actually assigned to

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 6 of 65

1  Hanauma and of record.

2          So we believe Canyon was aware of Hanauma One's

3  existence and how much of the relationship and exactly whether

4  they understood all of the terms that govern the relationship

5  between the Fund and Hanauma One is something I can't answer

6  today.

7          THE COURT:  Now in the release here, this exchange of

8  releases, is — would be, if authorized, executed by — by the

9  Fund.  It does not purport to release whatever rights you have

10 that are not, except to the extent that only Fund could ever

11 enforce them.

12         MR. FRIEDMAN:  Well, yeah, I do think —

13         THE COURT:  They don't list you as a releasing party.

14         MR. FRIEDMAN:  They — they don't square the lease —

15 leasing party, but they do make a representation that they are

16 authorized to enter into the settlement agreement on behalf of

17 all entities with any interest in the B loan.  And we think that

18 pretty squarely was intended to include Hanauma One, because we

19 are not aware of any other entity with an interest in the B loan

20 besides the Fund and Hanauma One.

21         And so to that extent we think that Canyon probably

22 thanks that it's done, once this settlement is signed.

23         THE COURT:  All right.  So but — but under the

24 participation agreement, they are given complete discretion to

25 decide the manner in which they will enforce their rights under

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 7 of
65

1  the colender agreements and the other loan docs, have they not?

2     MR. FRIEDMAN:  I respectfully disagree with that, Your

3  Honor.  I think that that they are given broad discretion on how

4  to enforce the loan documents relative to the borrower.

5     Section 10 of the participation agreement, which is

6  what we assume that the debtor and the Equity Committee are

7  relying upon for that proposition, although they haven't said so

8  squarely we assume that's what they're relying on, we believe

9  limits that broad discretion to the Fund's relationship and —

10  and the B loan's relationship to the borrower.  And the language

11  in Section 10 of the participation agreement we think it's

12  consistent with our position.  We believe, Your Honor, that it

13  is Section 13 of the participation agreement that —

14     THE COURT:  Yeah, that's what I'm looking at.

15     MR. FRIEDMAN:  You're given — you're looking at

16  Section 13?

17     THE COURT:  Yeah.

18     MR. FRIEDMAN:  We believe that Section 13 gives rise

19  to the breach of the standard of care.  And specifically the

20  last sentence of Section 13, that says, "CMR Fund will exercise

21  and give the same care and attention to the B loan as the Fund

22  gives to its other loans in similar facilities as if it owned

23  the entire B loan in substantial conformity with the loan

24  documents.

25     And what we submit, Your Honor, is that the Fund has

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 8 of
65

1   done two things here that are inconsistent with that duty.  We

2   believe based on discussions that have taken place with

3   representatives of the Equity Committee and of the debtor and

4   with the class A members of Hanauma One —

5           MR. BRATTON:  Objection, Your Honor.  This is an

6   attempt to address matters that are subject of a purely

7   settlement discussions.

8           MR. FRIEDMAN:  Well, Your Honor, I'm not — I'm simply

9   telling you why we think that this is a breach.  And ultimately,

10  you know, we'll — if Your Honor approves the settlement, we will

11  file —

12          THE COURT:  Talk about this, talk about how 13 — 13

13  says that they have absolute discretion in making decisions as

14  to how to enforce this on behalf of all the participants.  And

15  then it says — it says that they have — of the same duty of

16  care.

17          But then they say without in any way limiting the

18  foregoing, and the foregoing are more specific.

19          MR. FRIEDMAN:  Right.  Well, Your Honor, what we think

20  has happened here is that the Equity Committee and — primarily

21  Equity Committee has analyzed this.  And because under the

22  participation agreement, Hanauma One is entitled to the first

23  moneys out in respect to the B loan to the tune of about six and

24  a half million dollars, that they concluded that whatever value

25  there is above Canyon — above Canyon's amount isn't enough or is

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 9 of
65

1  not quite enough to justify, in their view, not settling with

2  Canyon on this basis.

3        But the fact of the matter is that in giving up

4  whatever value there is beyond Canyon's first lien position,

5  that's money that's coming directly out of Hanauma One's pocket,

6  because it's got first rights to those funds.  So that's one of

7  the things it's doing that is as patently inconsistent with the

8  last sentence of paragraph 13 as there could possibly be.

9        We think that if the first money was going to the

10  Fund, or was at least shared pari passu on a prorated basis with

11  Hanauma One that — we think the outcome would be different.

12        The other point Your Honor made is that the — and to

13  us the more transparent breach and one they, you know, virtually

14  admit is that they think they = need this settlement to get done

15  in order to confirm a plan.  And that's a plan that benefits

16  Fund I, Fund II, and Fund III.

17        And certainly if we were outside of bankruptcy, Fund I

18  would have no business considering what effects its settlement

19  had on Fund II or III for purposes of deciding the duties it

20  owed to Hanauma.  So we think those two aspects of it would

21  breach its duty to Hanauma under the participation agreement and

22  that we think give rise to a claim.

23        Now, the Court also observed, in its tentative

24  decision, that the litigation that's ongoing would be expensive.

25  A couple of points on that.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 10 of
65

1     One, this litigation and litigation with Canyon has

2  been pending since the end of November of 2008.  And presumably

3  sophisticated counsel have a pretty good idea of what it costs

4  to litigate claims like this.

5     Nevertheless, they continue to litigate, perceive that

6  they had claims that at least purported to be worth something on

7  the order of $50 million against Canyon.  But even if they've

8  now concluded that perhaps they were hasty in concluding that

9  the litigation expense is worth it, the class A members of

10 Hanauma One offered to fund the ongoing litigation expenses.  So

11 we don't think that's a justification for the settlement here,

12 because we would have picked up the litigation expenses.

13     So we've got the two violations that we think are a

14 breach of the standard of care in paragraph 13, which is that

15 they've sort of sold out Hanauma One because they don't think in

16 light of Hanauma One's priority under the participation

17 agreement there's going to be enough value left for the Fund.

18     And, two, they want to see if they can get a plan done

19 for Funds II and III as well.  So we think that's a violation of

20 the standard of care as well.  And as to the extent that

21 litigation costs were the other major justification for settling

22 and — and a complete walkaway for no consideration whatsoever,

23 we think that that also is — is really —

24     THE COURT:  There's no-fee costs in this, right?

25     MR. FRIEDMAN:  I'm not sure what you're — I'm not sure

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 11 of 65

1  what you're —

2          THE COURT:  In the colender agreement.

3          MR. FRIEDMAN:  I don't know, Your Honor.

4          THE COURT:  Okay.  I'll ask the other parties.

5          MR. FRIEDMAN:  So — so we do believe that the Court is

6  — is justified.  And to the extent your final position was —

7  your final point in — in the — really went to the overall

8  litigation risk and the prospects that that litigation would

9  turn out favorably, it's harder — it's harder for us to respond

10 to that other than to say that for, you know, the better part of

11 almost two years the debtor and subsequently the equity

12 Committee thought there were worthwhile claims against Canyon

13 and spent a fair amount of the estate's money pursuing those

14 claims, only to walk away for no consideration at the end of the

15 day under this settlement agreement.  So we do have —

16         THE COURT:  Now there really is not no consideration

17 as a release of claim.

18         MR. FRIEDMAN:  Right.  But the only claim that we're

19 aware of Canyon asserting was the proof of claim, the amended

20 proof of claim to which the Equity Committee objected.  Our

21 understanding of that claim is that it's worth less than we

22 think Hanauma's claim will be for the breaches that are

23 occurring by virtue of Fund I's conduct here.

24         THE COURT:  Okay.  Anything else?

25         MR. FRIEDMAN:  No, Your Honor.  Thank you.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 12 of
65

1          MR. BRATTON:  If I may, Your Honor?

2          THE COURT:  Yes.

3          MR. BRATTON:  First of all, the colender agreement is

4     one of the defined loan documents in the participation

5     agreement.  Recital D of the participation agreement makes that

6     clear.  It refers to what the loan documents are.

7          THE COURT:  I read the participation agreement, I

8     think, carefully.

9          MR. BRATTON:  Yes, that — that —

10         THE COURT:  I know that the participation — in the

11    participation agreement the Hanauma acknowledges receipt and

12    understanding of the —

13         MR. BRATTON:  But I — I —

14         THE COURT:  — relationship between the A and B loan

15    and the colender agreement.

16         MR. BRATTON:  But I wanted to go a half-step beyond

17    that, Your Honor, to point out that the authority of Fund I to

18    act with regard to enforcement, or not enforcement, and so

19    forth, of the B note, includes everything to do with the loan

20    documents.  And the loan documents includes the colender

21    agreement to those purposes.

22         THE COURT:  Well, let me tell you what I'm —

23         MR. BRATTON:  And direct —

24         THE COURT:  — thinking now, that I would like you to

25    address.  And that is it's pretty clear to me that under the —

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 13 of
65

1    under the participation agreement, you have authority to act on

2    behalf of all the participants.

3          The question is whether if they are, indeed, willing

4    to take over the prosecution of the claim, which will be

5    expensive and which given the various appeals, given the various

6    rulings that I've made and that I'm very confident in, is a long

7    shot.  Okay?

8          I spent a lot of time looking over those documents.

9    But to — to the — and there has to be — we have to analyze the

10   other consideration.  If — if, you know, they're going to — the

11   alternative would be simply to abandon the claim to them.  But

12   then you don't get a release.  And the question is what is the

13   value of the release from the defendant in the proceedings?

14         MR. BRATTON:  Well, the value of the release, of

15   course, is substantial.  But the —

16         THE COURT:  You have to look at both sides of the

17   balance.

18         MR. BRATTON:  Can I —

19         THE COURT:  I understand your position entirely that

20   these claims are of limited value, let's put it.

21         MR. BRATTON:  Yes.

22         THE COURT:  But what are you getting on the other

23   side?

24         MR. BRATTON:  Well, —

25         THE COURT:  What's the — what is the assessment of

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 14 of
65

1    those?

2            MR. BRATTON:  The — the value on the other side is

3    that — is a number of things.  One of the things they've said is

4    that the settlement sort of pops out from nowhere just as the

5    plan is about to be confirmed and is there a Canyon objection?

6            As experienced bankruptcy counsel know, including

7    counsel for Hanauma, settlements take place at a time when there

8    are opportune.  It's not just an objection to plan that triggers

9    this settlement taking place.  It's the long-term aspect —

10            THE COURT:  I understand that completely.  I guess

11    what I want to ask is tell me whatever you want to tell me about

12    the value of Canpartners' claims against the estate?

13            MR. BRATTON:  Well, they — they have asserted claims

14    against the estate that would amount to 5.82 to as much as $7.8

15    million, when you include possible attorney's fees.  We

16    believe —

17            THE COURT:  There's no-fee clause in the colender

18    agreement, right?

19            MR. BRATTON:  I believe that there is.

20            THE COURT:  There is?

21            MR. FRIEDMAN:  Yes.

22            MR. BRATTON:  There is, Your Honor.

23            MR. FRIEDMAN:  Yes, yes.

24            THE COURT:  Okay.  Do you have it here?

25            MR. BRATTON:  I don't think that we have that —

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 15 of 65

1    THE COURT:  I mean, the — the first question that

2  comes up is, is the estate potentially liable for fees for the

3  proceedings that have taken part to date?

4    MR. BRATTON:  Yes, Your Honor.  That is a major part

5  of our calculus in entering into this settlement.

6    THE COURT:  Is there any dispute that there's a fee

7  clause in the colender agreement?

8    MR. FRIEDMAN:  Your Honor, I just don't know the

9  answer, so I — if I'm told that there is —

10    THE COURT:  Okay.  Could somebody show it to me?

11    MR. FRIEDMAN:  Yes.

12    THE COURT:  You know, I remember going through this

13  very carefully.  That wasn't the issue I was focused on, on the

14  motions to dismiss.

15    MR. BRATTON:  But I'm — I'm virtually certain that it

16  is, because we had considered discretion, Your Honor.

17    THE COURT:  Okay.

18    MR. FRIEDMAN:  And then, of course, Your Honor, it's a

19  question of what fees the B clause covers since courts routinely

20  sort of strictly construe those clauses.  And you can't

21  necessarily throw everything in the kitchen sink, just because

22  there happens to be litigation.

23    MR. BRATTON:  The other thing about fees is that

24  counsel for Hanauma suggests that the settlement is throwing

25  away a right to first moneys that they have.  But the

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 16 of
65

1   participation agreement provides that Fund I can recover its

2   expenses of enforcement prior to any moneys going to Hanauma.

3          So it's not correct that they would get the first

4   dollars back if, in fact, we were to prevail.  It's not a

5   calculus here that, oh, we'd just be getting money for them, we

6   wouldn't be getting any money for us.  They are — they're behind

7   us as to expenses and ahead of us as to other things.

8          THE COURT:  As to equity, right?

9          MR. BRATTON:  Yes.  The other thing here is that the

10  standard-of-care issue is one that I think that we have clearly

11  the better position, which is that the agreement says that Fund

12  I may act here as if it owned the loan 100 percent.

13         And so the question of whether or not there are first

14  moneys to them is one that's irrelevant under the terms of the

15  document.  Under the terms of the document we'd treat it as if

16  it was a hundred-percent-owned loan, well, we would settle that,

17  which is the calculus that's, in fact, been made.

18         The other thing that's worth noting is that the

19  assertion is that again, related to, well, the settlement

20  suddenly occurs, all settlements suddenly occur.  But Fund I has

21  already gone to extraordinary lengths to attempt to avoid a loss

22  on this B note.  They negotiated with Canyon in the summer of

23  2008.  They obtained Canyon's delay from May of 2008 to November

24  of 2008 through negotiation before Canyon started to take

25  enforcement actions on the A note.

1    When Canyon no longer was willing to defer, Fund I

2  then filed bankruptcy in a further attempt to slow down Canyon

3  from exercising on the A note.  And when Canyon moved for relief

4  from stay there was a hard-fought fight to try to avoid that as

5  well.

6    THE COURT:  You fought very hard.  That's —

7    MR. BRATTON:  And so it —

8    THE COURT:  No question about that.

9    MR. BRATTON:  It — it can't be said —

10    THE COURT:  Mr. Havel doesn't either.

11    MR. BRATTON:  It can't — it can't be said with any

12  reasonable basis that Fund I hasn't done just about as much as

13  it could do to — to fight this off.

14    The other thing is, and — and this goes back my point

15  about settlement discussions that are — that are privileged

16  matters here, there has not been an offer to fund the litigation

17  from somebody else on behalf of the Fund.  There's just no such

18  offer there.

19    There are offers to provide a few dollars here and

20  there, but to take over the litigation and fund it, that doesn't

21  exist.  If — if it did, I would have expected to have seen a

22  piece of paper with that offer on paper in front of us here, but

23  it's not.  There is no such evidence before the Court.

24    The other thing is that this is not just a question of

25  trading one claim for another here, as Hanauma would like us to

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 18 of 65

1   think.  The claim that Canyon has is under a contract.  It's

2   contractual provisions that have some — some degree of clarity

3   to them.  We might be genuinely exposed to that.

4           The claim that Hanauma is threatening to assert here

5   is one that has clear likelihood of invalidity, because it's

6   contrary to the express terms of the contract that we have in

7   front of us.  The — the terms of — of the participation

8   agreement that counsel for Hanauma has referred to are exactly

9   the ones that the Court has referred to and that we refer to,

10  Sections 10 and 13, that give Fund I the discretion, in fact, to

11  make these decisions, make this calculus, and make a reasoned

12  determination that it's better not to go on with this than to go

13  on with it.

14          THE COURT:  How would you — what are the various

15  components of the — the Canpartners claim?  Maybe we ought to

16  let Mr. Havel do this.  And — and I would like you to do that,

17  because I don't want the estate to have to tout your claim.

18      (Laughter.)

19          MR. BRATTON:  Thank you, Your Honor.

20          THE COURT:  We want to let the people who were hired

21  to represent that claim assert that claim.

22          MR. HAVEL:  Yes, Your Honor.  Thank you.  Richard

23  Havel for Canyon.

24          The question is, is the estate getting a substantial

25  benefit —

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 19 of
65

1    THE COURT:  That's exactly the question.

2    MR. HAVEL:  — from Canyon's withdrawal of its pending

3    claim.  I do regret that I brought everything relating to the

4    plan confirmation and the settlement agreement but I didn't

5    bring the colender agreement because it's part of the proof of

6    claim.  But the proof of claim, which includes the colender

7    agreement, cites the specific sections.  And I want to say I

8    believe it's in Section 9.

9    THE COURT:  Okay.  Well, I can take a break and look

10   at this.

11   MR. HAVEL:  Section 9, where there is an express right

12   to attorney's fees over disputes.  And we have cited that in the

13   proof of claim and the —

14   THE COURT:  And that's in which agreement?

15   MR. HAVEL:  That's in the colender agreement.

16   THE COURT:  Okay.  Because I mean that's where the

17   main disputes have been, —

18   MR. HAVEL:  That — our — our —

19   THE COURT:  — under the colender agreement.

20   MR. HAVEL:  — proof of — proof of claim is based on

21   the colender agreement.  It's — we're not attempting to say

22   because we didn't collect money from the original borrower, they

23   somehow owe us deficiencies or indirect liabilities.  This is

24   all direct contractual liabilities.  And there are two major

25   components.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 20 of
65

1        First, in the colender agreement we were the senior

2    position.  And we had, during the life of the loan, an interest

3    reserve that we were entitled to use to pay us monthly interest

4    on our loan.  There was an obligation of the B noteholder to

5    replenish that interest reserve if and when it went below a

6    certain level.  And that would have required a contribution of

7    about three and a half million dollars.

8        In the spring of '08 the interest reserve dropped

9    below that level and the obligation to fund the interest reserve

10   arose.  And that is a base claim of about $3 million.  On top of

11   that, we have the express obligation to reimburse the attorney's

12   fees that have been incurred in the case.

13       And, admittedly, we have — and admitted in our proof

14   of claim — we have disclosed all of our attorney's fees, both

15   those related directly to the adversary proceeding and those

16   directly — indirectly relating to our rights in the case, such

17   as getting relief from stay and protecting our claim as a

18   creditor.  Some of that may fall within and some may not fall

19   within, but the fact of the matter is there is certainly

20   somewhere between one and one and a half million dollars of

21   attorney's fees already on the adversary proceeding side that is

22   going to be additions to the claim.

23       In addition, as well detailed in the motion for the

24   settlement, if this litigation is to proceed there is at least,

25   if the party is to prevail, two rounds of trials to go through

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 21 of 65

1  before they get to any substance.

2        THE COURT:  I know all about the merits —

3        MR. HAVEL:  All right.  But —

4        THE COURT:  — and then all about the hurdles to come.

5        MR. HAVEL:  But the — the point about the merits is

6  this isn't something where it's going to be taken over by

7  somebody and they're going to win one motion and the litigation

8  will end.  This will go on interminably.  It will add to the

9  attorney's fees.  And unless they have a remarkable reversal of

10  the merits, it will all be borne by this estate.

11        The benefit of withdrawing the claim is obviously, in

12  one sense, a dollar-for-dollar benefit to other parties.  It

13  either goes to pay more — other creditors more quickly or it

14  goes directly up to the investors.

15        I think there's another important benefit, and Hanauma

16  One tried to characterize this as a bad motivation.  And I think

17  it's entirely appropriate motivation for the committee and the

18  debtors.  And that is this settlement is going to facilitate a

19  plan.  And it's going to facilitate a plan because it's not only

20  going to remove a certain dollar amount from how much they have

21  to pay creditors upfront, which increases feasibility

22  substantially because when our claim is removed, they are able

23  to satisfy the burden of paying other creditors in full quite

24  easily, and that immediately allows them to start generating

25  money for investors, rather than running the risk they're not

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 22 of 65

1    able to pay creditors off in full.

2           Secondly, the claim will not continue to grow by our

3    attorney's fees that will accrue.  And therefore they won't have

4    to be additional reserves going forward.  So it ensures

5    feasibility and it increases the recovery upstream.

6           Why shouldn't this be a good idea for Fund Number I?

7    Fund Number I, if you'll recall in this substantive

8    consolidation motion, was going to actually benefit from the

9    assets held by Fund II and Fund III.  This was not a case where

10   on an individual-entity basis Fund I had lots of surplus value

11   and was contributing it to the other investors.  The investors

12   in all three funds have voted in favor of commingling these

13   together and retreating them on a consolidated basis.  Our only

14   objection was if you keep this separate we want to make sure

15   that we get paid.  And Your Honor's order directed that issue.

16          So I think the idea that it increases feasibility of

17   the plan, it allows the investors and the plans to accomplish

18   the structuring that they want should be viewed as a positive.

19   It shouldn't be viewed as just a throwaway issue or an issue

20   that isn't improperly motivated.

21          CMR, as the holder of its B note can decide that it's

22   better to settle the B note and allow the rest of its assets to

23   be consolidated, because that's going to get it more money for

24   its investors.  So I see those are the benefits of our releasing

25   our claim and facilitating the process going forward.

1    This was not an easy resolution by us.  I will tell

2  you that for an extended period of time we insisted on payments

3  to us before we would walk away from this deal.  This was not

4  something where we are happy to leave the table, with the fees

5  accrued and unpaid, because we believe very strongly that we

6  have a claim and that this estate is going to pay its creditors.

7    So this settlement is like most settlements, no one is

8  happy with it completely, but we all believe it should be

9  justified and gone forward.

10    THE COURT:  Okay.  I want to — I want to take a break

11  to — I want to — I need to examine this proof of claim and the

12  colender agreement for a moment.  Do you have it with you?

13    MR. BRATTON:  No, but I wanted to mention just one

14  other thing before you take your break, because it's relevant to

15  the whole thing.  It's a minor point, but one that we should

16  probably put before you before you take your break.

17    THE COURT:  That's fine.

18    MR. BRATTON:  The parties to the settlement agreement

19  have one minor amendment to it that they've made since it was

20  filed.  And that's in the release section that Canyon and the

21  Canyon parties release the CMR parties and each entity with an

22  interest in the B note.  So they — they release us and each

23  entity with an interest in the B note.  That's in 4.1.  And in

24  4.2, we release the Canyon parties and each entity with an

25  interest in the A note.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 24 of
65

1          Now as you said earlier, that's not releasing on

2    behalf of somebody else.  It's them releasing us and somebody

3    else and us releasing them and somebody else.

4          I have this in redline form, if you'd like a copy.

5          THE COURT:  Yeah, I think I needed to read this.

6          Did you want to speak?

7          MS. TURNER:  Yes.  I want to be heard just on one more

8    point, Your Honor.  We also believe that the settlement has

9    value.  I'm Rachel Turner on behalf of Stanford Carr and

10   Stanford Carr Development.

11         As you know, there's only one remaining claim against

12   SCD.  It's a breach of contract under the Assignment Agreement.

13   That Assignment Agreement does have an attorney's-fees clause.

14   Unfortunately, I also did not bring not for you.  But I wanted

15   to give you a cite if you're going to go back and look at the

16   docket.  It's Docket Number 16, which is my declaration in

17   support of our motion to dismiss.  And it's Exhibit C, paragraph

18   20, is the attorney's —

19         THE COURT:  Theor motion to dismiss in the adversary

20   proceeding.

21         MS. TURNER:  Yes.  So it's Docket Number 16, Exhibit C

22   is the Assignment Agreement, and paragraph 20 is the

23   attorney's-fees provision.  And, from our perspective, Your

24   Honor, the debtor is exchanging what we see to be worthless

25   claims, essentially a fraud claim, that SCD had somehow — made

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 25 of
65

1   misrepresentations about the property, which from our

2   investigation have — there will be no basis in fact to go to

3   trial.  And they will, in the end, be responsible for our

4   attorney's fees, to date, over $130,000 and at the end of this

5   trial obviously much higher.  So something to add to your

6   weighing equation.

7           THE COURT:  Thank you.  Can I see the — this clause —

8   this amendment?

9       (Pause in the proceedings.)

10          THE COURT:  So this amendment expands the scope of the

11  release that the debtors get.  In other words, it releases

12  parties that in 4.1 that may not have been released.  But that's

13  a release by the creditors for the Canyon parties.

14          MR. BRATTON:  Correct.

15          THE COURT:  And the debtor's release is — releases a

16  broader group of parties, but not on behalf of a broader group

17  of entities.

18          MR. BRATTON:  Correct, Your Honor.

19          THE COURT:  I got it.  That's quite clear.

20          Mr. Feinbaum.

21          MR. FEINBAUM:  Yes, Your Honor.  I trust Your Honor

22  received the filing that I put in last week.  And that had to do

23  with my strong belief that one part of the Canyon filing was

24  very appropriate and should not be eliminated if this settlement

25  is approved.  And that is the part of the Canyon filing which

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 26 of
65

1    asked for specific assurances that money would be available to

2    fund Canyon's legal expenses.  Now I've taken that in a

3    direction —

4         THE COURT:  Well, that was the — that was the part

5    that was dealt with in a conditional order that the plan isn't

6    going to go into effect until funds are assured, till — till the

7    funding of this new loan is assured.

8         MR. FEINBAUM:  No.  That's — that's not what that was

9    about.  What that was about is to assure the information that

10   was sent out to investors, indicated in their cash-flow analysis

11   that $75 million would be — was expected to be available to send

12   to investors at the end of 2013 — by the end of 2013.  And from

13   that they derived the — for each individual investor how much

14   money they would receive or could receive at the end of 2013 if

15   this plan was approved.

16        The second thing that they sent to investors was a

17   statement of how much money investors would receive if there was

18   an immediate liquidation which incidentally, as I pointed out,

19   was not proposed by anybody.  And it turned out that 10 times as

20   much money would be received by investors if we went along with

21   the reorganization plan.

22        Now what I've been asserting or trying to assert and

23   get to for at least six months is the basis for that $75 million

24   figure.  I believe from my analysis — what I can analyze, that

25   that figure is phony, that there is no prospect whatsoever of

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 27 of
65

1   $75 million going to investors by the end of 2013.

2           And what I have asked for repeatedly and what I

3   continued ask for is an analysis on the part of Mr. Elgrin, who

4   maintains that he has the figures, of what properties will be

5   sold, when they will be sold, how much they expect to sell it

6   for, and why they expect to sell those properties for those

7   prices.  This information has not ever been disclosed.  It's not

8   in the disclosure statement.  And I think that this Court, if

9   nothing else, needs that information to — to find out whether

10  the figures that have been proposed by the proponents of this

11  plan are not only realistic but at some expectation that they

12  will be available for investors.

13          I understand that investors are not in the same

14  position as Canyon would be if they pursued their claim.

15  However, we were told $75 million is expected to be, you know,

16  available.  If that is just a made-up figure to manufacture

17  consent, that's a different story than if there is a realistic

18  prospect that that amount of money will be available.

19          So I would like to see that considered today —

20          THE COURT:  This has nothing to do with the

21  settlement, though.

22          MR. FEINBAUM:  It does.

23          THE COURT:  How does it have anything to do with the

24  settlement?

25          MR. FEINBAUM:  It has something to do with the

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 28 of
65

1   settlement because, as I understand it, if the settlement is

2   approved then Canyon is going to drop all of its claims.  And

3   Canyon has asked for this.  They have extraordinarily good

4   justification to ask for it.  If Canyon's claims get dropped

5   then I fear that this attempt to piggyback on this same request

6   will go out the window.  So I think it needs to be considered by

7   Your Honor to — to do that.

8            The second thing in terms of the settlement itself is

9   although this is a nice interesting settlement, investors' $42

10  million, or if Mr. Feldman is correct, $37 million has just

11  vanished, it's gone.  And that has not been considered

12  whatsoever in any of these discussions.

13           And the third thing I'd like to point out — not being

14  a lawyer I guess I can do it because it's out of left field — is

15  that the people who engaged in this loan — okay — well, let me —

16  let me go back.

17           As investors, investors had an agreement with CMR.

18  That, as far as I understood, was a contract.  We had a

19  contract.  And that contract was breached by David Choo when he

20  made this Hawaii loan.  In my view, the folks who invested in

21  the Hawaii loan, namely Canyon, should have been privy to the

22  Investor Agreement that Choo had with investors that said that

23  he can't put more than x amount of money in a certain loan.

24           And since they went ahead and funded the loan, perhaps

25  they're on their own on this thing and may not have such a

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 29 of
65

1  strong claim as they seem to assert.  Now I'm sure Mr. Havel has

2  a different idea about that.  But it seems to me that investors

3  had the prior agreement with CMR and that there was a due

4  diligence duty on the part of Canyon to investigate that to see

5  whether somebody, namely Choo, was breaching that to such a

6  serious extent that he was violating any kind of fiduciary duty

7  to investors.

8            THE COURT:  Okay.

9            MR. FEINBAUM:  Thank you, Your Honor.

10           THE COURT:  Mr. Friedman, is there anything you want

11  to say in response to the other parties before I take a break?

12           MR. FRIEDMAN:  Yes.  Briefly, Your Honor.  Thank you.

13           I wanted to respond to the argument that somehow the

14  last sentence of paragraph 13 which says the CMR Fund will

15  exercise and give the same care and attention to the B loan as

16  it gives to its other loans, as if it owned the entire B loan,

17  is somehow intended to give CMR absolute free reign, as if the

18  participant didn't exist.  We think this clearly was intended to

19  protect the participant.  This was not clearly intended to give

20  CMR Fund carte blanche to do whatever it wants.

21           And, Your Honor, to the extent that there is broad

22  authority for CMR to deal with the loan documents, we don't

23  dispute that the colender agreement is part of the loan

24  documents, never have.  We simply say that there is this

25  standard of care that — that overlays all of that.  And on top

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 30 of
65

1    of that, Your Honor,  there's an element of good faith that's

2    read into every contract.

3           And certainly if CMR, for no reason at all, chose to

4    just give away the loan and walk away from everything on day one

5    when it was clearly in the money, I mean it would be easy for

6    the Court to say, 'Well, you can't do that.  That's ridiculous

7    and it's in bad faith.  And how would you ever do that?'

8           The argument by Mr. Havel that facilitating a plan is

9    a good thing, it may in fact be a very good thing for Fund I and

10   for Funds II and III.  It's a very bad thing for Hanauma One.

11   And to the extent the standard of care refers to the ordinary

12   course of business of CMR, whatever this is, Your Honor, a

13   bankruptcy with substantive consolidation, in the midst of a

14   plan under great pressure, with an Equity Committee breathing

15   down your neck, is hardly the ordinary course of business.

16          And we submit that in the ordinary course of business,

17   without bankruptcy, Fund I wouldn't give a whit about what was

18   happening to Funds II and III, and that Fund I would be solely

19   interested in what's in it for them.  To the extent that they're

20   entitled to their expenses first, that's fine.  I don't think

21   anyone's quibbling with that.  If anything, you know, that works

22   out well for us because it helps them recover some of those

23   expenses and reduces the exposure overall.  But to me, the — the

24   argument that this is somehow carte blanche for CMR Fund to do

25   whatever it wants with the loan as if we don't exist is just an

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 31 of
65

1    absurd reading of that last sentence.

2            THE COURT:  Okay.  I'm going to take a short break.

3    Stay seated, everyone, please.

4        (Recess taken from 10:17 a.m. to 10:26 a.m.)

5            THE CLERK:  All rise.

6            THE COURT:  Please be seated.

7            My very able law clerk was able, while we were

8    speaking, to go through the documents and — and I was able to

9    find the language in the — both the colender agreement and the —

10   and the Carr agreements regarding attorney's fees.

11                    THE RULINGS OF THE COURT

12           THE COURT:  I thank you all for your comments.  I'm

13   going to approve the settlement for the following reasons:

14           First and foremost, this settlement, which is mutual

15   releases, mutual walkaway, is in the best interest of the estate

16   because that is a beneficial result, viewing it in terms of the

17   litigation alone.  I'll state this a couple ways differently.

18           I think the — given the fact that there are fee

19   clauses and given the likely outcome of the litigation, these

20   lawsuits have — are worth less than zero to the estate.  They're

21   more likely, by a considerable measure, to bear liability for

22   attorney's fees than they are to recover anything in the

23   litigation.

24           Now I view this — I think Mr. Friedman made a very

25   good, fine point.  And that has to do with the — he argued that

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 32 of
65

1   one should look at this from the point of view of enforcement of

2   the rights under the B note alone.  And that one should not say,

3   'Oh, because this is convenient to the estate in a more general

4   sense, they may slight the interests of people who have specific

5   interests in the B loan,' the privileged participants in the B

6   loan.  And I look at it that way.  I don't know that that's

7   necessarily the case, but for this purposes that it has to be

8   that way, but I'm going to look at it this way.

9         Now we've had a lot of proceedings in these adversary

10  — in the adversary case.  There have been two motions to

11  dismiss.  This is a document case.  Loans are documented with

12  extensive writings.  This was a very big loan.  It was very

13  extensively documented.

14        And the reason that the estate lost this $42 million

15  has to do with the fact that they took a junior position at a

16  time when, unfortunately, the real estate market had went down

17  substantially and that the loan documents that they signed gave

18  total, total control to the A note.

19        Now the participation agreement acknowledges that

20  Hanauma knew about the second position and knew that all the

21  terms of the colender agreement, such that there wasn't any

22  breach of duty by — by the debtor in that — in the sense that

23  they knew what the terms were, they loaned into that risky

24  situation.  The argument made solely is that the litigation

25  shouldn't be settled to this point.  Given for all the reasons

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 33 of
65

1  I've said in the motions to dismiss, with respect to Canpartners

2  given the documentation, there's very little chance of this

3  succeeding.

4      So this, as I say, there is a fee clause, if

5  Canpartners prevails and if Stanford Carr prevails, they will —

6  they are entitled to fees.  The — it's very unlikely, because of

7  the terms of the colender agreement that the estate can prevail

8  against Canpartners.

9      The — the statement against the Carr parties, the

10  allegations against the Carr parties were legally sufficient,

11  but improbable.  And I think if it went to trial it's not likely

12  that it's taking — it's very unlikely that they would have

13  prevailed.  It's just an impossible scenario.  So the settlement

14  is within the range of reasonableness.

15      It's also — the other factor that weighs very, very

16  heavily in favor of settlement is that this would be a very,

17  very long pull.  To prevail, the — the plaintiffs would have to

18  on appeal get the rulings on dismissal reversed and then start

19  the trial process.  This would be very long, very expensive.

20  Once again, if — if they went forward and didn't prevail at the

21  trial level — or, you know, ultimately they would be liable for

22  fees.  The longer that it went on, the more those fees would be.

23      The other argument that I'm concerned about and I look

24  carefully at is whether the debtor is likely to suffer a claim

25  here.  Or whether the debtor is purporting to release rights —

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 34 of 65

1    rights it does not have.  I read the release carefully.  It

2    releases, to the maximum extent, that the debtor has the ability

3    to do so, the rights against Canpartners.  It does not in any

4    way purport to release any claims, direct claims, that Hanauma

5    may have.  Given the participation agreement and the nature of

6    the thing, I'm not sure they have any rights.  But if they do,

7    this does not purport to affect these third-party claims.

8    There's nothing wrong with the releases in that sense.  And I've

9    taken into account the additional language that you've proposed,

10   which does not affect this at all.

11          The next question is whether this settlement is

12   inappropriate because it will give rise to a claim against the

13   estate.  That could be only, as Mr. Friedman has himself

14   acknowledged, because the settlement is an improper act.  They

15   knew what they were getting into in the loan, is the settlement

16   improper.  And given the — and I find that it is not.

17          I find that the estate and the committee have acted

18   reasonably in attempting to enforce — they've taken all

19   reasonable steps in attempting to enforce their arguments under

20   the colender agreement.  There wasn't — that was — the A Lenders

21   drafted that very carefully and there wasn't much to argue.  But

22   they made a valiant effort to stave off relief from stay and to

23   assert claims against Canpartners.

24          As I've said, given my examination of this, on many

25   motions in the case, I think the claim is worth less than zero.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 35 of
65

1   And I think the estate is acting reasonably on behalf of, you

2   know, viewing the situation as involving this note alone and the

3   rights under the note, it makes more sense to have a mutual

4   walkaway, even viewed in that narrow context.

5          Now the — the other factors are collection.  The

6   estate has not argued that collection is a consideration here.

7   I'm not going to discuss it.

8          Then the last thing is what are the views of the

9   parties.  And the — there is some shareholder opposition to

10  this.  But the majority of shareholders have — have not voiced

11  any objection to it.  And I think I should take that into — I

12  think I should view such opposition as there is in context.  Mr.

13  Feinbaum, you're not authorized to represent anybody but

14  yourself.

15         The other thing I want to note here is that an

16  argument was raised that, well, this should go forward because —

17  what's the name of this group, Hanauma?

18         MR. BRATTON:  Yes, Your Honor.

19         THE COURT:  — Hanauma One is willing to fund this.

20  There is no evidence to that effect.

21         I also note with respect to the assessment of the

22  merits that there's really no analysis of the merits of the

23  underlying claims.  They just say that this is an abrupt turn of

24  — change of position by the committee, which once strongly

25  touted this claim and is now — is not changing its tune.  Well,

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 36 of
65

1  the did strongly tout it.  And they were, to use a vernacular,

2  creamed by this Court.  And adjustment is appropriate under

3  those circumstances.  They've — they've been vigorous.  They've

4  done — they've been as aggressive as anybody could — as anybody

5  could want in this.  So I'm going to approve it.

6          Is there any other findings that anybody thinks I need

7  to make?

8          MR. BRATTON:  Well, I have uploaded a proposed order,

9  Your Honor.

10         THE COURT:  Okay.

11         MR. BRATTON:  And I served it by email yesterday,

12 rather late in the day.  But it's there.

13         THE COURT:  Okay.

14         MR. BRATTON:  It makes findings that are consistent

15 with what you've just said.

16         THE COURT:  Well, I'll look the order over.  If I may

17 just amend it to say, "for the reasons stated on the record,

18 which will constitute the findings and conclusions."

19         MR. BRATTON:  That — that would be essentially

20 equivalent, Your Honor, so —

21         THE COURT:  Yeah.  Mr. Havel.

22         MR. HAVEL:  Yes, Your Honor.  In both your findings

23 and in the order the only thing that I would want to emphasize

24 for Canyon — and it was acknowledged briefly in the discussions,

25 is that the settlement agreement in the reps and warranties

1   area, did contain the rep and warranty by the debtor that it had

2   the power or the authority to bind the participants.

3           Canyon believes that that rep and warranty is

4   accurate, based on the record that's been developed today.  But

5   we believe that in order to avoid any ambiguity, if the findings

6   would expressly find that CMR, under the participation

7   agreement, had the authority to bind Hanauma Number One, that

8   would address the specific contractual representation of

9   warranty that is addressed to us.

10          So it's a finding not necessarily only for CMR's

11  interest but for ensuring that their settlement agreement with

12  us doesn't lead us to a claim there's some sort of a breach of

13  rep and warranty down the line.  I think the record clearly

14  supports that kind of a finding.  But I would request that it be

15  included to ensure any confusion.

16          THE COURT:  Where is this in the — I know they have

17  the sole right to enforce a note, to enforce their rights or

18  remedies for all aspects of the B loan.

19          MR. HAVEL:  What — what is the question, Your Honor?

20          THE COURT:  Well, I'm looking at 13.

21          MR. HAVEL:  Yes.

22          THE COURT:  Paragraph 13.  The first sentence of

23  paragraph 13 says they and only they do enforcement on behalf of

24  all the other parties.  And your — your comment, or your

25  argument is that that includes the right to release all claims

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 38 of 65

1   against the parties in — in conjunction with this — with the B

2   loan.

3          MR. HAVEL:  It — it gives them the authority in

4   administrating the B note to enter into this settlement, which

5   although it abandons any continuing claims under the B note and

6   intercreditor — colender agreement, also obtains a release of

7   any counterclaims and liabilities that already exist under the

8   colender agreement.  And those are, as pointed out, included in

9   the loan documents that were part of the participation agreement

10  and the form of order that was uploaded.  And you'll see this

11  when you get a chance to go back in chambers.  It was uploaded

12  yesterday by Mr. Bratton and makes specific reference to both

13  paragraphs 10 and 13, that provide explicit authority for CMR to

14  do this and to find the participant.

15         THE COURT:  Okay.  What in addition to 13, 10?

16         MR. HAVEL:  10.  10 has some fairly large type rights.

17         THE COURT:  Okay.  Let me...  (Perusing document.)

18         It's paragraph 10.2 that you're probably relying on,

19  right?  Because 10.1 really refers to enforcement vis-a-vis the

20  borrower.

21         MR. HAVEL:  But, as pointed out by Mr. Bratton, the

22  defined term "loan documents" includes also the colender

23  agreement.  And although the litany of specific writs do involve

24  the borrower, the general grant of authority in 10.1 does apply

25  to dealings under the colender agreement, as well as the B note

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 39 of
65

1    itself.  So I'm relying on both sections.

2        (Pause in the proceedings.)

3            MR. FRIEDMAN:  Your Honor, when the Court has a moment

4    I'd like to be heard on this issue.

5            THE COURT:  Okay.  Yeah, Mr. Friedman, go ahead.

6            MR. FRIEDMAN:  Thank you.

7            THE CLERK:  Could you please speak into the

8    microphone?

9            MR. FRIEDMAN:  Sure.  Your Honor, I think 10.1 and

10   10.2 both deal effectively with the borrower.  I think the use

11   of the word "ACCORDINGLY" after the — after the introduction,

12   that's in all caps, says:  Here's what this bolded paragraph of

13   words means and that refers to rights relative to the borrower.

14        10.2, I think, also refers to whether the collateral

15   should be acquired or realized upon, which again I think I

16   rights vis-a-vis the borrower.  So I think, you know, we're

17   really limited to 13.

18            As Your Honor, I thought, took pains to — to find, in

19   terms of reaching its decision to approve the settlement, is

20   that the — the debtors and the Equity Committee were not

21   purporting to release Hanauma's rights against Canyon.  Yet what

22   I hear Mr. Havel saying is that the debtors have the right to

23   bind Hanauma to this settlement.  And that is a fairly fine line

24   of distinction, Your Honor, because I'm not sure —

25            THE COURT:  It is a very fine line of distinction.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 40 of
65

1   And here's what I think I can do here.

2           MR. BRATTON:  Well, if I may, Your Honor?

3           THE COURT:  Yeah.

4           MR. BRATTON:  The point is not whether there is an

5   attempt to release whatever direct claims that Hanauma may have.

6   The point is that Fund I is authorized to enter into this

7   agreement.  And — and Fund I has the right to take any other

8   action with respect to these loan documents.  That's the phrase

9   in the document, to take any other action, it can settle.  It

10  can waive — we can waive, it can modify, it can't enforce, it

11  can not enforce, it can settle.  Fund I has the authority to do

12  it.  But if they think they have a direct claim of some sort,

13  that's a different question.

14          MR. FRIEDMAN:  And, Your Honor, either the Fund has

15  the authority and it's in the documents, and then Canyon has

16  nothing to worry about, because any claim we make will have been

17  lost, because they — they've had the authority to settle this,

18  or not.  I just don't — I just don't see why there has to be a

19  finding by the Court squarely on this issue.  I don't think that

20  that was one of the things that was sought.  I mean the Court

21  may ask for approval of the settlement agreement.  Is the Court

22  finding every single representation and warranty made by the

23  debtor to be appropriate and accurate?  I don't think that's

24  what the Court normally does in approving a settlement

25  agreement.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 41 of
65

1    MR. HAVEL:  Admittedly it's not normal for the Court

2  to adjudicate the accuracy of reps and warranties.  But the

3  distinction between the authority to bind the participant to the

4  terms of the settlement is important only in the respect that we

5  are not trying to get them to release claims that they may have

6  directly against us, but to establish that as a factual matter,

7  we believe that they're going to not have any direct claims,

8  because in effect what was done under the participation

9  agreement was authorized and then binding on them.  And I think

10  the second issue is appropriately before the Court and can be

11  included in the findings.

12    THE COURT:  What — what does — do you have a copy of

13  the order?

14    MR. HAVEL:  Yes, Your Honor.

15    THE COURT:  Can I see what you've put in there?

16    MR. BRATTON:  Yes, Your Honor.

17    (Comments off the record.)

18    MR. BRATTON:  It is cosigned in G2.

19    THE COURT:  G2.

20    (Pause in the proceedings.)

21    MR. BRATTON:  You can put it down, but basically what

22  it says is Fund I has the authority to enter into the agreement.

23  But it doesn't go as far as to say and then bind — and binds

24  everybody and everything.  It says they have the authority to

25  enter.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 42 of
65

1      MR. [SPEAKER]:  I have a copy from Mr. Friedman if I

2  could look at it?

3      MR. [SPEAKER]:  That would be great.  Thank you.  I

4  will need it back.

5      MR. [SPEAKER]:  No problem.  What I need is a printer

6  for my BlackBerry.

7      (Counsel confer.)

8      THE COURT:  It's B1 and — G1 and G2.

9      MR. HAVEL:  Yes.

10      MR. [SPEAKER]:  Your Honor, G.

11      THE COURT:  Okay.  Any comment?

12      MR. FRIEDMAN:  Well, sure, Your Honor, because I mean

13  I think again these are going beyond the findings that the Court

14  might have made.  I mean I don't think, for example, the Court

15  didn't sound convinced that paragraph 10, for example, gave Fund

16  I authority to — to deal as it's dealing with Canyon.  But the

17  fund that paragraph 10 is, we believe, is more related to the —

18  to the Fund's relationship with —

19      THE COURT:  All right.

20      MR. FRIEDMAN:  — the borrower, as an example.

21      THE COURT:  Okay.  I have no problem with these

22  warranties.  There certain kinds of claims the don't have to do

23  with the matters handled by Fund.  For instance, if — if Canyon

24  had made some direct representations to Hanauma, or something

25  like that, those would be different.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 43 of
65

1      MR. HAVEL:  That's correct.

2      THE COURT:  But with respect to everything having to

3  do with the administration of this loan, everything that's — all

4  claims having to do with the administration of the loan and the

5  release of Canyon for things having to do with the

6  administration and enforcement of these various agreements, are

7  solely within the enforcement power of — of Fund.  And — and I

8  did further find that they acted reasonably in doing so.  So I

9  think these representations are perfectly fine.

10      What they are not purporting to do and — is to the

11 extent that there really are direct claims, which don't come out

12 of the ministration of these agreements, but some other separate

13 contract or tort between Hanauma and — and Canyon, that are not

14 subject to administration under these documents.  Of course,

15 they are not an agent for the purposes of administering that

16 kind of claim.  And I don't think that those — it's not likely

17 they exist, given anything I've heard.

18      Okay.  I'm going to go through the rest of these

19 findings.  I don't know whether I will leave them all in there

20 or not, but those in particular don't bother me in the least.

21 They are very well supported by participation agreement.

22      MR. BRATTON:  Thank you, Your Honor.

23      THE COURT:  And by the — by the underlying facts of

24 the litigation.

25      Okay.  So I will sign an order; it may or may not

1  include each one of these finding.  I will go through it today,

2  though, and get it done.

3          All right.  What do you want to do next?

4          MR. BRATTON:  Well, we —

5          MR. FRIEDMAN:  Confirm a plan.

6          MR. BRATTON:  — might want to talk about the plan,

7  Your Honor.

8          THE COURT:  Okay.

9          MR. FRIEDMAN:  Your Honor, may I be excused?

10          THE COURT:  Of course.  And thank you —

11          MR. FRIEDMAN:  Thank you, Your Honor.

12          THE COURT:  — for your comments.

13          MR. BRATTON:  The Court had requested yesterday a

14  declaration about Class 4 equity voting.

15          THE COURT:  Right.

16          MR. BRATTON:  I'm just asking whether the Court is

17  satisfied —

18          THE COURT:  I did.  I did receive it.  And I think I —

19  your amended declaration addresses the question that needed to

20  be addressed.  I'll — for the illumination of the others in the

21  courtroom here, the — there was a ballot summary that seemed to

22  weigh or count the ballots of equity holders by person, rather

23  than by amount of equity interest.  And I did not expressly talk

24  about percentage equity interest.  And I — I asked the — the

25  committee to submit a declaration that addressed it in those

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 45 of 65

1    terms.  It wasn't just the similarity of numbers.  It was that

2    it talked about — it had numbers, rather than percentages.

3              MR. BRATTON:  Though it did —

4              THE COURT:  That's what — that's what caused the

5    inquiry, as much as anything else.

6              MR. BRATTON:  It did say percentage voting interest,

7    but it wasn't kind of highlighted, and so —

8              THE COURT:  But it wasn't expressed in percentage.  I

9    mean when you had acceptances and rejections, —

10             MR. BRATTON:  Yes, yes, yes, yes.

11             THE COURT:  You didn't express it in terms of

12   percentages.

13             MR. BRATTON:  We would — we didn't do the two-level

14   structure there, that's right, so.

15             THE COURT:  But, anyway, and you only — really only

16   did one, so.

17             MR. FEINBAUM:  For the record, Your Honor, I haven't

18   seen that document.

19             THE COURT:  Well, it's — it's filed today.  And nobody

20   raised any objection to the previous ballot summary filed, so I

21   don't think I'm going to open it up further at this point.

22             MR. BRATTON:  The — the ballot summary itself is

23   available much earlier.

24             THE COURT:  Much earlier.  And nobody raised a

25   question about what was being counted.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 46 of
65

1    MR. BRATTON:  Right.  The Court may recall that back

2  in March, there was presented an Oxford stand-still agreement.

3  An agreement between the Oxford investors and investors through

4  them with the funds regarding various loans and deeds of trust,

5  in which the Oxford parties are senior to the funds.

6    And the purpose of that standstill agreement was to

7  provide the respective rights of the parties, keep things in

8  place, avoid foreclosures.

9    THE COURT:  Foreclosures.

10    MR. BRATTON:  Exactly.  Our Fund's favorite activity

11  and fear, which is foreclosures.  And so that was in place.

12  Counsel for Oxford Investors has asked that in the confirmation

13  process we make it clear that that standstill agreement is not

14  somehow being adversely affected, that it's not being

15  automatically rejected by not being assumed, or things like

16  that.  It's not clear that it's an executory agreement at all

17  because it involves financial relationships, and so forth.  So

18  it may or may not be an executory agreement.  But it's an

19  agreement that neither side wants to displace at this point.

20  So —

21    THE COURT:  Don't know if the confirmation of the plan

22  does not alter the Oxford group's rights under that stipulation,

23  but rather incorporates it.

24    MR. BRATTON:  Either sides' rights under that

25  agreement, exactly.  And the —

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 47 of
65

1          THE COURT:  Well, they're only concerned with their

2     rights.

3          MR. BRATTON:  Well, that's right.  They — they've made

4     us sign up that, but they're already a nonbankrupt party to it,

5     so.  But we have filed mutually a stipulation that reflects that

6     point and it indicates language that would need to be in the

7     confirmation order that essentially says that.  So it's fairly

8     straightforward, but the stipulation is — is on file.  Mr.

9     O'Neill filed that on Monday and Tuesday.

10         THE COURT:  And all it does is just say that — that

11    survives the plan —

12         MR. BRATTON:  Yes.

13         THE COURT:  — and is enforceable notwithstanding the

14    plan.

15         MR. BRATTON:  Correct.

16         THE COURT:  And my understanding from everything I

17    read in the disclosure statement and plan that the plan was

18    premised on the debtor having the rights and obligations under

19    that agreement.

20         MR. BRATTON:  In many respects it is, yes, Your Honor.

21         THE COURT:  Well, only with respect to the properties

22    at issue, but —

23         MR. BRATTON:  Yes.  And they're — they're several, but

24    not — not every property —

25         THE COURT:  Right.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 48 of
65

1    MR. BRATTON:  — of course is affected by the

2  agreement.  So we wanted to call your attention to that and

3  indicate that the confirmation order will be asking for a little

4  bit of language that preserves that agreement.

5    THE COURT:  Right.

6    Mr. Feinbaum.

7    MR. FEINBAUM:  Yes, Your Honor.

8    THE COURT:  Are — are you saying — have something to

9  say with regards to this?

10    MR. FEINBAUM:  I sure do.

11    THE COURT:  Okay.

12    MR. FEINBAUM:  The Oxford Partners are a rather

13  mysterious entity, as far as I'm concerned and as far as several

14  other investors who have a talked to me are concerned.  We saw a

15  statement in the disclosure statement that suggested they are in

16  first position on several loans, several large loans.  That was

17  not our understanding.

18    Our understanding was that the CMR Fund was in first

19  position on those loans and somehow Oxford magically became —

20  put in as a first position on those loans.  Never been explained

21  as to how that happened.

22    I would ask the Court to require an explanation of how

23  Oxford came to become in first position on loans that CMR

24  investors understood they were in first position on.

25    MR. BRATTON:  Your Honor, the agreements that are in

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 49 of
65

1   place to this point don't foreclose any possibility of dealing

2   with relations with Oxford if it is found after further analysis

3   if there's something improper about them.  The avoidance powers

4   of the debtor-in-possession are preserved for the trust

5   postconfirmation.  If there's an appropriate reason to exercise

6   those, it would be done.

7        THE COURT:  Is this the usual situation where the

8   Oxford loans were recorded before the — the debtor's — now the

9   debtor either owns — owns the property pursuant to its own

10  foreclosure sale or holds a junior note on all of these, right?

11       MR. BRATTON:  Generally, yes, Your Honor.

12       THE COURT:  And was the — has the Committee looked

13  into this, into the records?  The recording files indicate that

14  Oxford recorded first?

15       MR. BRATTON:  The — it depends by property.  And the

16  chain of title and so forth is complex in some cases.  We are

17  after all talking about Mr. Choo.  Your — your reaction tells me

18  that you understand what I'm saying.  Some of these things have

19  had fractional shares transferred here and there, and so on and

20  so forth.  Tracking it through on one or two properties, is a

21  complex matter.

22       If we reached a conclusion that something is not

23  appropriate, then we would deal with it.  We are aware of this

24  is at issue.  We are aware of what our rights and positions are

25  and also aware of what our economic interests are.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 50 of 65

1    We have relationships with Oxford on a number

2    properties, as the Court noted and is aware.  And whether one

3    chooses to fight about something or to make deals about things

4    as an overall matter as well as well is a specific-property

5    matter.  So, in general, that's kind of the answer to that

6    question.

7        THE COURT:  Mr. O'Neill, is it — is it your

8    understanding that the — that the agreement with the Oxford

9    group does not purport to settle the question of priority?

10        MR. O'NEILL:  The standstill — as far as I know, the

11    standstill agreement does not address those issues.

12        THE COURT:  That preserves everyone's rights?

13        MR. O'NEILL:  It preserves everybody's rights.

14        MR. BRATTON:  It's silent on that.

15        MR. O'NEILL:  Yes.

16        THE COURT:  Okay.  Well, if it — if it's silent on it,

17    then it doesn't — then it preserves rights.

18        MR. BRATTON:  This is something that I specifically

19    looked at before we entered into this stipulation, is whether —

20    what we might get into.

21        MR. O'NEILL:  Yes, that — this issue was addressed

22    back with the committee.  And they — I think there was some

23    concern.  And they reviewed it back in January.

24        THE COURT:  And we also have counsel's representation

25    on the record now that that's the case.

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 51 of 65

1          MR. O'NEILL:  Right.

2          MR. BRATTON:  As indeed it is, Your Honor.

3          And then we wanted to update to Court a little bit on

4    the financing status, because that is in fact a vital topic for

5    all of us.

6          Ask Financial will now be making this financing in

7    conjunction with another party.  They are not putting up the

8    full 12 million themselves, but they have put us in touch with a

9    second party that does have the rest of the 12 million and has

10   committed to put it in.

11         The even better news from our point of view is that

12   the second party is also interested and willing to put in the

13   additional eight million that the plan allows us to borrow under

14   the plan terms and during the life of the plan.  So in fact, as

15   of today, our available liquidity is higher than the 12 million

16   that we — that we anticipated that we would need at this point.

17         One of the things that does is give us greater

18   flexibility than we had when we had only the — the original Ask

19   proposition in front of us, which is we — we knew that we might

20   need to sell some properties in the short term to fund the early

21   period of the plan, in addition to using our 12 million of

22   financing.  We will now at least have the option of deciding

23   whether we want to do that or perhaps keep a couple of those

24   properties a little longer, get a little more for them.  We have

25   a little bit more in the way of options than we had before.  So

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 52 of
65

1    the situation is not exactly the same as it was earlier, but it

2    remains favorable.

3            That is what we had by way of an update.  And then we

4    have remaining only what purports to be Mr. Feinbaum's

5    objection.  And what I would point out is that Mr. Feinbaum is

6    raising objections to disclosure, which were overruled, that he

7    brought back in June.  He's still objecting to the plan, but his

8    objections to plan confirmation were overruled on July the 30th.

9    And he's attempting now to piggyback on the Canyon objection,

10   which has been withdrawn.

11           So I — I would submit that his objection is not only

12   not cogent but it's — it's not viable at this point as a

13   procedural matter.

14           THE COURT:  The plan itself — I'm trying to remember

15   the conditions, the financing condition.

16           MR. BRATTON:  The financing condition is that we have

17   the 12 million of Ask Financial financing or other financing in

18   the same amount on substantially the same terms.

19           THE COURT:  So it would be — if it's confirmed, it

20   would be confirmed conditionally?

21           MR. BRATTON:  There is a condition —

22           THE COURT:  It would go would go into effect upon

23   funding?

24           MR. BRATTON:  On — on confirmation of the funding,

25   that's correct.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 53 of
65

1    THE COURT:  Well, but — but not a commitment, but
2  funding.

3    MR. BRATTON:  Yes, yes.

4    THE COURT:  Okay.

5    MR. BRATTON:  Delivered — delivered funding with —

6    THE COURT:  Delivered funds.

7    MR. BRATTON:  — within the 60-day period —

8    THE COURT:  That's what I — that's what I remembered.

9    MR. BRATTON:  Yes.  Within the 60-day period that the
10  plan has to go effective, yes.

11    THE COURT:  Okay.  Mr. Feinbaum, I'll let you speak,
12  but I want — I want to say a couple things first about the plan.

13    The — what's really going on here, in — with the
14  choice that the equity holders have to make is how to use the
15  assets to maximize return.  And there are two basic kinds of
16  assets here.  One are the — the real property assets, including
17  notes on real property.  And second are the litigation assets.

18    And with respect to the litigation assets you may
19  remember we had very extended proceedings in which a lot of time
20  and care was taken to make sure that the claims of the equity
21  holders against the parties that — that all of you equity
22  holders claim have done you wrong were to be prosecuted in a way
23  that would ensure the most careful representation of the equity
24  holders' interests.  In other words, the committee would — would
25  not automatically be the representative.  But if classes action

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 54 of
65

1    was filed, whatever court had that would — would make decisions

2    solely under — with the considerations of Rule 23 in mind, that

3    is the adequacy of representation.

4            With respect to the — to the real property assets, you

5    know, broadly defined as I did a moment ago, upon the objection

6    of other parties, including yourself, we engaged in an extensive

7    review of the disclosure statement.  Required extensive

8    modifications of the disclosure statement to make clearer to

9    equity holders the assumptions upon which the committee's plan

10   was based.  And, as I say, numerous additional information was

11   required.

12           It is — the plan contains projections.  These

13   projections are not the sort of thing that are like an operating

14   business.  They're not the sort of thing like collecting on

15   notes in the usual ordinary-course-of-business sense.  These

16   things ultimately are not provable or knowable.  One simply

17   cannot know or prove at trial whether liquidation is — a

18   shorter-term liquidation without borrowing money to — is — will

19   yield a higher return than the kind of liquidation the committee

20   has proposed.  It's like making an investment in the equity

21   markets itself.  It's — you — you get information and you make

22   your choice.

23           And with respect — thus I'm skeptical with respect to

24   the objection.  And the only objection that's timely is the one

25   filed the 27th of — of July.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 55 of
65

1    MR. FEINBAUM:  My objection, Your Honor.

2    THE COURT:  Your objection, yeah.

3    MR. FEINBAUM:  Yes.

4    THE COURT:  It's only your objection that remains.

5    MR. FEINBAUM:  Right.

6    THE COURT:  It has to do with the adequacy of

7  disclosure.  It raises — it says that the plan is unlikely to

8  produce more favorable results and the investors have lost faith

9  in David Choo.  You know, it's technically correct that the

10 adequacy of disclosure can be raised at any time.  But you

11 haven't provided any declarations or evidence that the

12 disclosure decision that we made previously is wrong.

13      With respect to the question of whether it's unlikely

14 to produce results more favorable, that is — that's not a

15 provable thing one way or the other.  This has to do with which

16 way the real estate market is going to go generally, how when

17 particular properties are going to sell.  It's just not

18 something that you can prove at trial.  And there is no formal

19 alternative plan.

20      What the — what the creditors were given was what I

21 thought was a complete description of the assumptions upon which

22 the plan proceeded and what — and an analysis of what a Chapter

23 7 liquidation, which assumes a fairly quick sale by the trustee

24 without operating the business, — that's what's normally meant

25 by that, it did what it was supposed to do.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 56 of
65

1      You had an alternative vision, but you didn't have an
2   alternative plan.  You were given — you had an opportunity to
3   sort of talk to your — to your fellow equity holders and — about
4   your, you know, vision in the more general way.  But they
5   weren't obligated to make the argument for you.  They were only
6   obligated to explain their plan and what the assumptions were.

7      And with respect — once these things — you deal with
8   these unknowable things of what the market was going to do.
9   That's why the creditors vote.  It's much better — I'm much more
10  comfortable with letting the creditors decide their own — decide
11  how they want to use their investment, what strategy they want
12  to follow to maximize their investment than for me to attempt to
13  — you know, listen to testimony and figure out what is the best
14  course of investment.  That's not something courts do.

15      MR. FEINBAUM:  May I?

16      THE COURT:  Yeah.

17      MR. FEINBAUM:  Well, I have several comments on that,
18  Your Honor.  First of all, the investors are due accurate
19  information.  Now projections are my livelihood.  I'm a
20  consultant myself and I've done projections for many years.  I
21  understand everything the Court is saying about projections and
22  the fact that different people can have different attitudes
23  toward projections.

24      That's why I'm saying I believe quite strongly,
25  without any imputations of impropriety, that the group that made

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 57 of
65

1   the projections, Mr. Elgrin's group, has a financial interest in

2   seeing that this plan is confirmed.  This is big money.  This is

3   big money for Elgrin's group and for the McNutt group.  They

4   have financial interest.  It's obvious that they have financial

5   interest.  And that's nothing to be sneered at.

6           What I was suggesting, Your Honor, is don't take my

7   projections.  My projections are that investors get zero in

8   2013.  Okay?  Mr. Elgrin's projections are they get $75 million

9   by 2013.  I think his projections are just — suffer from

10  irrational exuberance, as Alan Greenspan says.

11          But don't take our word for it.  What I was suggesting

12  is get people who are unbiased, who can advise this Court as to

13  whether projections are reasonable.  And I suggested three in my

14  filing who are above reproach in terms of their ability to

15  analyze the situation.  And I believe that if those folks were

16  consulted — and I have several others who are top-notch people,

17  like Beacon Economics down in Los Angeles, and others who do

18  forecasting, I believe those would show that the projections

19  that were furnished to investors are thoroughly inaccurate.  And

20  therefore that investors were not voting.

21          There were — you can — Your Honor, you can devise a

22  totalitarian election.  I mean Joseph Stalin did all the time

23  and he gets 99 percent of the vote.

24          That's not the issue.  The issue is if you have full

25  disclosure, and people are voting on what they understand, then

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 58 of
65

1    they have a reasonable chance of voting.  And I say this was not

2    a reasonable vote.  That's my opinion and — and also the opinion

3    of other investors who have contacted me — although you're

4    right, I'm not speaking for them.

5           The second thing is, Your Honor, there was an

6    alternative.  That alternative was not flushed out.  And I'm not

7    sure whether — it was even proposed to — whether any other

8    investor than myself knew about it.  And that obviously was the

9    U.S. Trustee's proposal.

10          The U.S. Trustee's proposal was not accepted by the

11   Court, but it was a valid and viable idea and proposal that

12   never made it to the light of day for investors.  Furthermore,

13   investors had no idea what the U.S. Trustee's proposal would

14   have entailed.  And the U.S. Trustee did not mail out any

15   information to investors as — I don't know whether that would

16   have even been allowed by the Court to happen or would have ever

17   happened, but it was a viable, intelligent proposal for a

18   Chapter 11 Trustee to be appointed to deal with the affairs

19   of this.

20          The — the base thing here, Your Honor, is we know

21   these assets are going to be liquidated.  There's no operating

22   plan for a business.  Who's going to do it?  Do we trust David

23   Choo and his professionals to do the job for the investors?  My

24   answer is absolutely not.  And another alternative, which would

25   have been a Chapter 11 Trustee who could have done perhaps a

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 59 of
65

1    better job for the investors, who they might have agreed to, was

2    not presented adequately.

3          So that is why I am asking for the disclosure on the

4    assets that are going to be sold and why they think they're

5    going to realize the amounts of money they think to reach the

6    $75 million.  I think that kind of disclosure to the Court's

7    satisfaction might lead to a different conclusion than we have

8    here, which is a very, I think, unsatisfactory conclusion for

9    the investors in this fund.

10          THE COURT:  Okay.  Any response you want to make?

11          MR. BRATTON:  Just very briefly.  As the Court is

12    aware, there is process for these kinds of things.  If an

13    alternative is to be presented, it has to be presented by a plan

14    with the process of disclosing on the other side, provisions in

15    a plan, and so forth.  None of that has been done here.

16          These same arguments were made in June and July and

17    they were already rejected by the Court properly.  Some of the

18    things that are being argued are simply factually incorrect.

19    The sequencing of — of sale of properties is within the Exhibit

20    F projections to the disclosure statement.  A year-by-year

21    projected result is in fact provided, was available to the

22    investors.  So I — I hear nothing here —

23          THE COURT:  Well, I — I understand that.  I don't know

24    that you can — I think it's self-evident that it's not possible

25    that something like the sale of real estate of this amount can

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 60 of
65

1  be — can be projected with certainty.  You —

2  　　　MR. BRATTON:  Well, —

3  　　　THE COURT:  — you have an approach and you describe an

4  approach and the assumptions of the approach.

5  　　　MR. BRATTON:  Yes.  And — and is —

6  　　　THE COURT:  You don't know whether it's going to

7  conclude, how it's going to work out.  Mr. Feinbaum couldn't

8  know how his alternative would —

9  　　　MR. BRATTON:  Well, and — and the disclosure statement

10  was explicit in saying that some properties may be sold earlier

11  and later.  And that that will be a judgment made as the process

12  continues, because — because that may change as we get through

13  it to.

14  　　　MR. FEINBAUM:  Yes, Your Honor.  In terms of subject —

15  I — I'm sorry, I just want to make one thing.  Assumption Number

16  5 of the Wind-Down Trust, here — here we go.  The sales values

17  contained in the projections are approximately 50 percent of

18  histori appraisals.  Now that raises a whole can of worms.

19  　　　And I would — we have a number properties, large

20  properties, that these folks are saying they're going to sell on

21  the backend to fund the investor recovery, namely the Wheatland

22  property which is 60 miles north of Sacramento; the Casa Grande

23  property which is in Arizona, about 40 or 50 miles from Phoenix.

24  And they're assuming that it's 50 percent of historic value of

25  their historic appraisals.

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 61 of 65

1          And leaving aside whether their appraisals were cooked

2    or not, that's an assumption that I think we could get some

3    people who do this sort of stuff for their livelihoods, like say

4    Beacon Economics, to say whether they agree with it in these

5    specific properties which are meant to fund the investor

6    recovery.  And I'm betting dollars to donuts that they would say

7    that that is whistling in the dark, that that is an assumption

8    that is not viable.

9          And I would just like to Court to hear that from

10   somebody other than me, because the Court doesn't —

11         THE COURT:  Okay.

12         MR. FEINBAUM:  — think that I have the only answers,

13   obviously.

14         THE COURT:  All right.  I'm going to overrule the

15   objection.  The objection, more than anything, it goes to two

16   things.  One is feasibility and two is whether the disclosure

17   was adequate.  With respect to feasibility, it's — a trial would

18   not help because one simply cannot, with any certainty, predict

19   what's going to happen to real estate prices.  The assets will

20   be sold.  The — they will bring what they bring.

21         The more serious or more — not more serious, but the

22   more appropriate objection to a plan like this is whether there

23   has been some cooking of everything.  Merely stating your

24   opinion that there might be cooking of something is not a basis

25   to upset the disclosure statement at this time.

1     You — you know, such experts may say that the

2  disclosure should have been different.  But they don't — you

3  know, that should have been brought up earlier and it's not even

4  here now, that we have declarations from people really saying

5  that, you know, these — these assumptions and the disclosures

6  are inaccurate.  Okay?

7     And, again, a lot of time has passed.  The opportunity

8  to come up with evidence specifically to contest these things,

9  there's been ample opportunity for that.  It's not here.  We

10 went through the assumptions to — to make them as clear as

11 possible.  We went through that very carefully.  At this point

12 I'm not — I see no reason to reverse the determination with

13 respect to the adequacy of disclosure.  The plan has clearly

14 been accepted by the creditors.  The other objections have been

15 resolved.  And so the plan will be confirmed subject to the

16 financing contingency, which has not been satisfied.

17     So the plan — the terms of the plan are fixed, the

18 plan is confirmed.  It is not effective until funding occurs.

19     MR. BRATTON:  Right.  The confirmation order —

20     THE COURT:  And if it turns out to founder then, you

21 know, then we're back where we were.  And the U.S. Trustee will

22 be heard from.  Okay?

23     MR. BRATTON:  Then with the Court's permissio, I will

24 circulate and then upload a proposed order.

25     THE COURT:  Yeah.  That's fine.

Case: 08-32220    Doc# 707    Filed: 10/17/10    Entered: 10/17/10 21:49:07    Page 63 of
65

1          All right.  Thank you all.

2          [COUNSEL]:  Thank you, Your Honor.

3          THE CLERK:  All rise.

4          THE COURT:  I'll go over this — I'll go over this

5    order today.  We'll get it done today — and the settlement.

6          (Proceedings were concluded at 11:23 o'clock a.m.)

7                           —o0o—

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 08-32220   Doc# 707   Filed: 10/17/10   Entered: 10/17/10 21:49:07   Page 64 of 65

```
State of California          )
                             )      SS.
County of San Joaquin        )
```

        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of California, of the
proceedings taken on the date and time previously stated in the
above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate No. 00124.  Palmer Reporting Services
is approved by the Administrative Office of the United States
Courts to officially prepare transcripts for the U.S. District
and Bankruptcy Courts.

                              Susan Palmer
                              Palmer Reporting Services

                              Dated October 13, 2010