# EXHIBIT A-1

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 1 of 49

# LOAN AND SECURITY AGREEMENT

### by and among

### CMR INCOME FUND, LLC,

### as Borrower,

### CALIFORNIA MORTGAGE AND REALTY, INC.,

### as Servicer

### and

### WELLS FARGO FOOTHILL, INC.,

### as Lender

### Dated as of August 11, 2005

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 2 of 49

# TABLE OF CONTENTS

Page

1. DEFINITIONS AND CONSTRUCTION ......................................................... 1
   1.1 Definitions ............................................................................. 1
   1.2 Accounting Terms ................................................................ 23
   1.3 Code ..................................................................................... 23
   1.4 Construction ........................................................................ 23
   1.5 Schedules and Exhibits ....................................................... 24
2. LOAN AND TERMS OF PAYMENT ........................................................ 24
   2.1 Revolver Advances .............................................................. 24
   2.2 Borrowing Procedures and Settlements ............................. 25
   2.3 Payments .............................................................................. 26
   2.4 Overadvances ...................................................................... 27
   2.5 Interest Rates: Rates, Payments, and Calculations .......... 27
   2.6 Cash Management ................................................................ 28
   2.7 Crediting Payments ............................................................. 29
   2.8 Designated Account ............................................................. 30
   2.9 Maintenance of Loan Account; Statements of Obligations ... 30
   2.10 Fees ...................................................................................... 30
   2.11 Capital Requirements ......................................................... 31
3. CONDITIONS; TERM OF AGREEMENT ................................................ 32
   3.1 Conditions Precedent to the Initial Extension of Credit ..... 32
   3.2 Conditions Subsequent to the Initial Extension of Credit ... 34
   3.3 Conditions Precedent to all Extensions of Credit ............... 34
   3.4 Term ...................................................................................... 35
   3.5 Extension of Term ................................................................ 35
   3.6 Effect of Termination .......................................................... 36
   3.7 Early Termination by Borrower .......................................... 36
4. CREATION OF SECURITY INTEREST ................................................... 37
   4.1 Grant of Security Interest ................................................... 37
   4.2 Negotiable Collateral .......................................................... 37

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 3 of 49

# TABLE OF CONTENTS
(continued)

4.3    Collection of Accounts, General Intangibles, and Negotiable Collateral ...... 37

4.4    Filing of Financing Statements; Commercial Tort Claims; Delivery of Additional Documentation Required.................................................................. 38

4.5    Power of Attorney ........................................................................... 39

4.6    Right to Inspect and Verify ............................................................. 39

4.7    Control Agreements......................................................................... 39

4.8    Servicing of Notes Receivable ....................................................... 40

4.9    Release of Notes Receivable .......................................................... 40

5.     REPRESENTATIONS AND WARRANTIES.............................................. 40

5.1    No Encumbrances............................................................................ 40

5.2    Eligible Notes Receivable .............................................................. 40

5.3    Compliance..................................................................................... 41

5.4    Equipment....................................................................................... 41

5.5    Location of Collateral .................................................................... 41

5.6    Records .......................................................................................... 41

5.7    State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims.................. 41

5.8    Due Organization and Qualification; Subsidiaries ......................... 42

5.9    Due Authorization; No Conflict ..................................................... 42

5.10   Litigation ....................................................................................... 44

5.11   No Material Adverse Change ........................................................ 44

5.12   Fraudulent Transfer ....................................................................... 44

5.13   Employee Benefits.......................................................................... 44

5.14   Environmental Condition ............................................................... 44

5.15   Brokerage Fees .............................................................................. 45

5.16   Intellectual Property ...................................................................... 45

5.17   Leases ............................................................................................ 45

5.18   Deposit Accounts and Securities Accounts ................................... 45

5.19   Complete Disclosure ..................................................................... 45

- ii -

009056.00101:910160.07

## TABLE OF CONTENTS
(continued)

|  | 5.20 | Indebtedness | 46 |
| 6. |  | AFFIRMATIVE COVENANTS | 46 |
|  | 6.1 | Accounting System | 46 |
|  | 6.2 | Collateral Reporting | 46 |
|  | 6.3 | Financial Statements, Reports, Certificates | 47 |
|  | 6.4 | Guarantor Reports | 49 |
|  | 6.5 | Collection of Notes Receivable | 50 |
|  | 6.6 | Maintenance of Properties | 50 |
|  | 6.7 | Taxes | 50 |
|  | 6.8 | Insurance | 50 |
|  | 6.9 | Location of Collateral | 51 |
|  | 6.10 | Compliance with Laws | 51 |
|  | 6.11 | Leases | 51 |
|  | 6.12 | Existence | 52 |
|  | 6.13 | Environmental | 52 |
|  | 6.14 | Disclosure Updates | 53 |
|  | 6.15 | Formation of Subsidiaries | 53 |
|  | 6.16 | Assignment of Notes Receivable | 53 |
|  | 6.17 | Escrow Deposits | 53 |
| 7. |  | NEGATIVE COVENANTS | 54 |
|  | 7.1 | Indebtedness | 54 |
|  | 7.2 | Liens | 54 |
|  | 7.3 | Restrictions on Fundamental Changes | 55 |
|  | 7.4 | Disposal of Assets | 55 |
|  | 7.5 | Change Name | 55 |
|  | 7.6 | Nature of Business | 55 |
|  | 7.7 | Prepayments and Amendments | 55 |
|  | 7.8 | Change of Control | 55 |
|  | 7.9 | Required Procedures | 55 |

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 5 of 49

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | 7.10 | Restricted Payments | 55 |
| | 7.11 | Accounting Methods | 56 |
| | 7.12 | Investments | 56 |
| | 7.13 | Transactions with Affiliates | 56 |
| | 7.14 | Suspension | 56 |
| | 7.15 | Intentionally Blank | 56 |
| | 7.16 | Use of Proceeds | 56 |
| | 7.17 | Collateral with Bailees | 56 |
| | 7.18 | Financial Covenants of Borrower | 56 |
| | 7.19 | Limitation on Defaulted Notes Receivable | 57 |
| | 7.20 | Financial Covenants of Servicer | 58 |
| 8. | | EVENTS OF DEFAULT | 58 |
| 9. | | LENDER'S RIGHTS AND REMEDIES | 60 |
| | 9.1 | Rights and Remedies | 60 |
| | 9.2 | Remedies Cumulative | 62 |
| 10. | | TAXES AND EXPENSES | 63 |
| 11. | | WAIVERS; INDEMNIFICATION | 63 |
| | 11.1 | Demand; Protest | 63 |
| | 11.2 | Lender's Liability for Borrower Collateral | 63 |
| | 11.3 | Indemnification | 63 |
| 12. | | NOTICES | 64 |
| 13. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 65 |
| 14. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | 66 |
| | 14.1 | Assignments and Participations | 66 |
| | 14.2 | Successors | 68 |
| 15. | | AMENDMENTS; WAIVERS | 68 |
| | 15.1 | Amendments and Waivers | 68 |
| | 15.2 | No Waivers; Cumulative Remedies | 68 |

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 6 of 49

# TABLE OF CONTENTS
(continued)

Page

16. GENERAL PROVISIONS ..................................................................... 68
    16.1  Effectiveness........................................................................ 68
    16.2  Section Headings .................................................................. 68
    16.3  Interpretation ...................................................................... 68
    16.4  Severability of Provisions.................................................... 69
    16.5  Withholding Taxes ............................................................... 69
    16.6  Counterparts; Electronic Execution...................................... 69
    16.7  Revival and Reinstatement of Obligations ........................... 69
    16.8  Confidentiality ..................................................................... 70
    16.9  Integration........................................................................... 70

009056.00101:910160.07

## EXHIBITS AND SCHEDULES

Exhibit C-1          Form of Compliance Certificate

Schedule D-1         Designated Account
Schedule L-1         Lender's Account
Schedule P-1         Permitted Liens
Schedule 2.6(a)      Cash Management Banks
Schedule 5.5         Locations of Collateral
Schedule 5.7(a)      States of Organization
Schedule 5.7(b)      Chief Executive Offices
Schedule 5.7(c)      Organizational Identification Numbers
Schedule 5.7(d)      Commercial Tort Claims
Schedule 5.8(b)      Capitalization of Borrower
Schedule 5.8(c)      Capitalization of Borrower's Subsidiaries
Schedule 5.10        Litigation
Schedule 5.16        Intellectual Property
Schedule 5.18        Deposit Accounts and Securities Accounts
Schedule 5.20        Permitted Indebtedness
Schedule 7.19        Excluded Delinquent and Defaulted Notes Receivable

009056.00101;910160.07

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of August 11, 2005, by and among **WELLS FARGO FOOTHILL, INC.**, a California corporation ("Lender"), **CMR INCOME FUND, LLC**, a Nevada limited liability company ("Borrower"), and **CALIFORNIA MORTGAGE AND REALTY, INC.**, a Delaware corporation ("Servicer").

The parties agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

**1.1    Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a General Intangible or is a maker of a Note Receivable.

"ACH Transactions" means any cash management or related services (including the Automated Clearing House processing of electronic fund transfers through the direct Federal Reserve Fedline system) provided by a Bank Product Provider for the account of Borrower or its Subsidiaries.

"Additional Documents" has the meaning set forth in Section 4.4(c).

"Advance" and "Advances" have the meanings set forth in Section 2.1(a).

"Affiliate" means, as applied to any Person, any other Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of the definition of Eligible Notes Receivable and Section 7.13 hereof: (a) any Person which owns directly or indirectly 10% or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership, membership or other ownership interests of a Person shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership or joint venture in which a Person is a partner or joint venturer shall be deemed an Affiliate of such Person.

"Agreement" has the meaning set forth in the preamble hereto.

009056.00101:910160.07

"Applicable Prepayment Premium" means (a) as of any date of determination before the Maturity Date, an amount equal to one percent (1.0%) *times* the Maximum Revolver Amount *times* the total number of full and partial months remaining until the Maturity Date *divided* by twelve (12), and (b) as of any date of determination on or after the Maturity Date, an amount equal to zero.

"Assignee" has the meaning set forth in <u>Section 14.1(a)</u>.

"Authorized Person" means each of Henry Park and H. David Choo., acting alone.

"Availability" means, as of any date of determination, the amount that Borrower is entitled to borrow as Advances hereunder (after giving effect to all then outstanding Obligations (other than Bank Product Obligations) and all sublimits and reserves then applicable hereunder).

"Bank Product" means any financial accommodation extended to Borrower or its Subsidiaries by a Bank Product Provider (other than pursuant to this Agreement) including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH Transactions, (f) cash management, including controlled disbursement, accounts or services, or (g) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by Borrower or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by Borrower or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that Borrower or its Subsidiaries are obligated to reimburse to Lender as a result of Lender purchasing participations from, or executing indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Borrower or its Subsidiaries.

"Bank Product Provider" means Wells Fargo or any of its Affiliates.

"Bank Product Reserve" means, as of any date of determination, the amount of reserves that Lender has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Borrower and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

009056.00101:910160.07

"Base Rate" means the greater of (i) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate, or (ii) four percent (4.0%) per annum.

"Base Rate Margin" means one and one-half percent (1.5%) per annum.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which Borrower or any Subsidiary or ERISA Affiliate of Borrower has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means the board of directors (or comparable managers) of a Person or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Books" means all of Borrower's and its Subsidiaries' now owned or hereafter acquired books and records (including all of their Records indicating, summarizing, or evidencing their assets (including the Collateral) or liabilities, all of Borrower's and its Subsidiaries' Records relating to their business operations or financial condition, and all of their goods or General Intangibles related to such information).

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Borrower Collateral" means all of Borrower's now owned or hereafter acquired right, title, and interest in and to all property, including, without limitation, each of the following:

(a)     all of its Accounts,

(b)     all of its Books,

(c)     all of its commercial tort claims described on <u>Schedule 5.7(d)</u>,

(d)     all of its Deposit Accounts,

(e)     all of its Equipment,

(f)     all of its General Intangibles,

(g)     all of its Inventory,

(h)     all of its Investment Property (including all of its securities and Securities Accounts),

(i)     all of its Negotiable Collateral, including all of its Notes Receivable,

009056.00101:910160.07

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 11 of 49

(j)     all of its Supporting Obligations,

(k)     money or other assets of Borrower that now or hereafter come into the possession, custody, or control of the Lender, and

(l)     the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Deposit Accounts, Equipment, General Intangibles, Inventory, Investment Property, Negotiable Collateral, Real Property, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"Borrower's Required Procedures" means the written policies, procedures and guidelines of Borrower specifically including underwriting, valuation (loan-to-value) and documentation guidelines, and appraising, renewal, extension, modification, non-accrual and charge-off policies, in the form delivered to Lender and approved by Lender prior to the Closing Date, as amended from time to time, with the prior written approval of Lender, which approval shall be given or withheld in Lender's Permitted Discretion.

"Borrowing" means a borrowing hereunder consisting of Advances.

"Borrowing Base" means, as of any date of determination, (a) prior to the Maturity Date, the result of:

(i)     seventy-five percent (75%) of Net Eligible Notes Receivable, *minus*

(ii)    the sum of (A) the Bank Product Reserve, and (B) the aggregate amount of reserves, if any, established by Lender under Section 2.1(b) for the Borrowing Base; and

(b)     on and after the Maturity Date, during any Extension Period, the result of:

(i)     seventy-five percent (75%) of Net Eligible Notes Receivable; provided, that such percentage shall be reduced with respect to certain Eligible Notes Receivable to the extent that the Concentration Percentage for such Eligible Notes Receivable exceed the limit specified for such Eligible Notes Receivable in the definition of Eligible Notes Receivable, *minus*

(ii)    the sum of (A) the Bank Product Reserve, and (B) the aggregate amount of reserves, if any, established by Lender under Section 2.1(b) for the Borrowing Base.

"Borrowing Base Certificate" means a certificate, in the form provided by Lender, from time to time, executed by an Authorized Officer, which sets forth information sufficient to determine the Borrowing Base.

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 12 of 49

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of California.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) demand Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation, and (f) Investments in money market funds or mutual funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.

"Cash Management Account" has the meaning set forth in Section 2.6(a).

"Cash Management Agreements" means those certain cash management agreements, in form and substance satisfactory to Lender, each of which is among Borrower or one of its Subsidiaries, Lender, and one of the Cash Management Banks.

"Cash Management Bank" has the meaning set forth in Section 2.6(a).

"Change of Control" means that (a) Permitted Holders fail to own and control, directly or indirectly, 67% or more of (i) the Stock of Borrower having the right to vote for the election of members of its Board of Directors and (ii) the Stock of Servicer having the right to vote for the election of members of its Board of Directors, (b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 10% or more of (i) the Stock of Borrower having the right to vote for the election of members of its Board of Directors or (ii) the Stock of Servicer having the right to vote for the election of members of its Board of Directors, (c) a majority of the members of Borrower's or Servicer's Board of Directors do not constitute Continuing Directors, or (d) Borrower ceases to

009056.00101:910160.07

own, directly or indirectly, and control 100% of the outstanding Stock of each of its Subsidiaries in existence as of the Closing Date.

"Closing Date" means the date of this Agreement.

"Closing Date Business Plan" means the set of Projections of Borrower for the 3-year period following the Closing Date (on a year-by-year basis, and for the 1-year period following the Closing Date, on a quarter-by-quarter basis), in form and substance (including as to scope and underlying assumptions) satisfactory to Lender.

"Code" means the California Uniform Commercial Code, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

"Collateral" means the Borrower Collateral and all other assets and interests in assets and proceeds thereof now owned or hereafter acquired by Borrower or Borrower's Subsidiaries in or upon which a Lien is granted under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in Borrower's or its Subsidiaries' Books, Equipment, or Inventory, in each case, in form and substance satisfactory to Lender.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commercial Tort Claim Assignment" has the meaning set forth in Section 4.4(b).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 delivered by the chief financial officer of Borrower to Lender.

"Concentration Percentage" means, with respect to a Note Receivable, on any date of determination, a percentage equal to the unpaid principal balance of such Note Receivable divided by the aggregate unpaid principal balance of all Eligible Notes Receivable, determined on such date in accordance with the applicable clause of the definition of Eligible Notes Receivable.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Borrower or Servicer, as applicable, on the Closing Date, and (b) any individual who becomes a member of the Board of Directors of Borrower or Servicer, as applicable, after the Closing Date, if such individual was appointed or nominated for

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 14 of 49

election to the Board of Directors by a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors of Borrower or Servicer, as applicable, in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Borrower or Servicer, as applicable, and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control Agreement" means a control agreement, in form and substance satisfactory to Lender, executed and delivered by Borrower or one of its Subsidiaries, Lender, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Daily Balance" means, with respect to each day during the term of this Agreement, the amount of an Obligation owed at the end of such day.

"Debt-to-Worth Ratio" means, as of any date of determination, a ratio of (a) (i) the outstanding amount of all Indebtedness of Borrower as of such date, minus (ii) the outstanding amount of Borrower's Subordinated Debt as of such date to (b) the sum of (i) Borrower's Tangible Net Worth as of such date, plus (ii) the outstanding amount of Borrower's Subordinated Debt as of such date.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulted Note Receivable" means any Note Receivable with respect to which any payment thereunder remains outstanding and unpaid, in whole or in part, for more than sixty (60) days past the date it became due and payable according to the original face and tenor of such Note Receivable.

"Delinquent Note Receivable" means any Note Receivable with respect to which any payment thereunder remains outstanding and unpaid, in whole or in part, for more than thirty (30) days past the date it became due and payable according to the original face and tenor of such Note Receivable.

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Borrower identified on Schedule D-1.

"Designated Account Bank" has the meaning ascribed thereto on Schedule D-1.

"Disbursement Letter" means an instructional letter executed and delivered by Borrower to Lender regarding the disbursements of the proceeds of an Advance on a Funding Date, the form and substance of which is satisfactory to Lender.

"Dollars" or "$" means United States dollars.

009056.00101:910160.07

"EBITDA" means, with respect to any fiscal period, Borrower's and its Subsidiaries' consolidated net earnings (or loss), *minus* extraordinary gains *minus* interest income (other than from Notes Receivable), *plus* Interest Expense, *plus* income taxes, *plus* depreciation and amortization for such period, in each case not otherwise defined, as determined in accordance with GAAP.

"Eligible Notes Receivable" means those Notes Receivable that comply with each of the representations and warranties respecting Eligible Notes Receivable made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be modified from time to time by Lender in Lender's Permitted Discretion. Eligible Notes Receivable shall not include the following (unless specifically determined to be an Eligible Note Receivable by the Lender following a review thereof on a case-by-case basis):

(a)     each Note Receivable that does not evidence a loan secured by real property (i) made by Borrower in the ordinary course of Borrower's business, or (ii) made by Servicer and assigned and transferred, in whole, to Borrower, in the ordinary course of business,

(b)     each Note Receivable that does not represent a valid and binding obligation enforceable in accordance with its terms for the amount outstanding thereof without defense (whether actual or alleged),

(c)     each Note Receivable that is not in conformance with Borrower's Required Procedures in effect upon the origination thereof,

(d)     each Note Receivable that has been extended or modified in a manner that is not in conformance with Borrower's Required Procedures in effect upon the date of the extension or modification thereof,

(e)     each Note Receivable with an original principal amount greater than $3,000,000.00,

(f)     (i) that portion of the unpaid principal balance of each Note Receivable secured by a first-priority Lien on a Type 1 Property or a Type 2 Property that causes the LTV for such Note Receivable to exceed 75%; (ii) that portion of the unpaid principal balance of each Note Receivable secured by a first-priority Lien on a Type 3 Property or Type 4 Property, that causes the LTV for such Note Receivable to exceed 65%; and (iii) that portion of the unpaid principal balance of each Second-Lien Note Receivable that causes the LTV for such Note Receivable to exceed 50%,

(g)     each Note Receivable not secured by a title-insured (i) first-priority Lien in real property located in the United States of America, or (ii) second-priority Lien in real property located in the State of California, which Lien, in each case, is held by Borrower,

009056.00101:910160.07

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 16 of 49

(h)     (i) each Note Receivable with an original principal amount greater than $1,000,000.00 and secured by a first priority lien in real property, (ii) each Second-Lien Note Receivable with an original principal amount greater than $500,000.00, and (iii) each Note Receivable secured by a first-priority Lien in real property located outside the State of California; provided, however, all or any portion of any such Note Receivable which would not be excluded by other items in this definition may, on a case-by-case basis, qualify as an Eligible Note Receivable with the consent of the Lender following a review by Lender of such Note Receivable and related credit analysis of its Account Debtor and collateral,

(i)     each Note Receivable that has a stated maturity date that is more than 36 months after the date of the origination or execution of such Note Receivable; provided, however, all or any portion of such Note Receivable which would not be excluded by other items in this definition may, on a case-by-case basis, qualify as an Eligible Note Receivable with the consent of the Lender following a review by Lender of such Note Receivable and related credit analysis of its Account Debtor and collateral,

(j)     each Note Receivable that is past due more than thirty (30) days on a contractual basis, and each Note Receivable owed by a maker (or its Affiliates) that is a maker of any Note Receivable that is past due thirty (30) days or more,

(k)     each Note Receivable that Borrower deems to be non-performing or non-collectible, or with respect to which foreclosure proceedings have been initiated against any property securing such Note Receivable,

(l)     each Note Receivable for which there is not contained in the credit file a current appraisal of the current fair market value of the real property securing such Note Receivable prepared by an appraiser meeting the qualifications set forth in Borrower's Required Procedures and acceptable to Lender, or a real estate consultant acceptable to Lender or, in the case of a Note Receivable with an original principal amount of $250,000.00 or less, a current price opinion for such real property prepared by a real estate broker,

(m)     each Note Receivable the proceeds of which were, are or will be used, in whole or in part, to finance the construction or installation of substantial improvements to real property,

(n)     each Note Receivable in which a participating interest therein has been transferred or assigned to any Person or in which Borrower only has a participating interest,

(o)     each Note Receivable that does not comply in all respects with all applicable federal, state and local laws and regulations, including usury, mortgage lending and credit disclosure laws and regulations,

(p)     each Note Receivable financing real property for which Borrower has not (i) obtained a mortgagee's title insurance policy insuring Borrower's first-priority or

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 17 of 49

second-priority Lien in such property in the amount of the maximum amount of such Note Receivable, (ii) received evidence that such real property is covered by adequate property insurance naming the Borrower as the insured and loss payee under a standard mortgagee clause, and (iii) obtained environmental and engineering reports in accordance with Borrower's Required Procedures, in each case, acceptable to Lender,

(q)     each Note Receivable with respect to which the maker is an Affiliate of Borrower or an employee or agent of Borrower or an employee or agent of any Affiliate of Borrower, or a member of the family of any of the foregoing, unless otherwise approved in writing by Lender in its sole discretion on a case-by-case basis,

(r)     each Note Receivable to the extent, and only to the extent, that the unpaid balance thereof and any information relating thereto as reported by Borrower to the Lender is not true and correct,

(s)     each Note Receivable that is not payable in Dollars,

(t)     each Note Receivable with respect to which the maker (i) does not maintain its chief executive office or principal residence in the United States, or (ii) is not organized under the laws of the United States or any state thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof,

(u)     each Note Receivable with respect to which the maker is either (i) the United States or any department, agency, or instrumentality of the United States, or (ii) any state of the United States,

(v)     each Note Receivable with respect to which the maker is a creditor of Borrower, has made a refundable deposit (not held in a separate escrow account), has a right of setoff, has asserted a right of setoff, or has disputed its obligation to pay all or any portion of the Note Receivable, to the extent of such deposit, claim, right of setoff, or dispute,

(w)     each Note Receivable owed by a maker that is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such maker,

(x)     each Note Receivable with respect to which any of the following actions has not been completed: (i) the original promissory note evidencing such Note Receivable has been delivered to Lender or a custodian that has acknowledged in writing that such note is held for the benefit of Lender, as collateral for the Obligations, (ii) a copy of each of the deed of trust, mortgage or other lien instrument and collateral assignment of rents in the form sent for recording have been delivered to Lender, with originally recorded versions of each delivered within five Business Days after receipt by Borrower, (iii) an originally executed Assignment of Note and Liens, in recordable form,

009056.00101:910160.07

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 18 of 49

has been delivered to Lender, (iv) a copy of the originally issued title policy, pro forma title policy, or marked title insurance commitment, evidencing that Borrower has a first-priority or second-priority Lien in the real property securing such Note Receivable, has been delivered to Lender, with the originally issued title policy delivered to Lender within five Business Days after receipt by Borrower,

(y)     each Note Receivable, the collection of which, Lender, in its Permitted Discretion, believes to be doubtful by reason of the maker's financial condition,

(z)     each Note Receivable that is not subject to a valid and perfected first priority Lender's Lien, including, after written notice by Lender, the recording of an appropriate assignment of lien to Lender in the real estate records of the jurisdiction where the property securing such Note Receivable is located, or

(aa)     each Second-Lien Note Receivable for which the sum of (i) the LTV of all obligations secured by Liens prior to the Lien securing the Second-Lien Note Receivable *plus* (ii) the LTV of such Second-Lien Note Receivable is greater than seventy-five percent (75%).

On each date of determination of the amount of Eligible Notes Receivable, after determining a preliminary amount of Eligible Notes Receivables by applying the foregoing exclusions, clause (bb) shall be applied, using such preliminary amount of Eligible Notes Receivable to determine a second preliminary amount of Eligible Notes Receivable. Upon determination of such second preliminary amount of Eligible Notes Receivable, clause (cc) shall be applied, using such second preliminary amount of Eligible Notes Receivable, to determine a third preliminary amount of Eligible Notes Receivable. Upon determination of such third preliminary amount of Eligible Notes Receivable, clause (dd) shall be applied, using such third preliminary amount of Eligible Notes Receivable, to determine a fourth preliminary amount of Eligible Notes Receivable. Upon determination of such fourth preliminary amount of Eligible Notes Receivable, clause (ee) shall be applied, using such fourth preliminary amount of Eligible Notes Receivable, to determine a fifth preliminary amount of Eligible Notes Receivable. Upon determination of such fifth preliminary amount of Eligible Notes Receivable, clause (ff) shall be applied, using such fifth preliminary amount of Eligible Notes Receivable, to determine the amount of Eligible Notes Receivable.

(bb)     after the sixtieth day after the Closing Date and after giving effect to all other exclusions under the preceding items of this definition, unless specifically determined to be an Eligible Note Receivable by the Lender following a review thereof on a case-by-case basis, each Note Receivable from a single Account Debtor to the extent that, when the unpaid principal balance thereof is added to the then aggregate principal balance of all Notes Receivable owing by such Account Debtor and its Affiliates, the Concentration Percentage of all such Notes Receivable exceeds fifteen percent (15%), as determined on the date of determination; provided that, following the Maturity Date, such Concentration Percentage shall not exceed fifty percent (50%); provided, further, that the percentage specified in clause (b)(i) of the definition of Borrowing Base shall be reduced five percent (5%) for each five-percent increase of the Concentration Percentage of all

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 19 of 49

Notes Receivable owing by a single Account Debtor and its Affiliates above fifteen percent [As an example, if after the Maturity Date, the Concentration Percentage of all Notes Receivable owing by an Account Debtor and its Affiliates is thirty-one percent (31%), then the percentage in clause (b)(i) of the definition of Borrowing Base shall be reduced from seventy-five percent to sixty percent (60%) with respect to all Notes Receivable owing by such Account Debtor and its Affiliates],

(cc)     each Note Receivable secured by Type 4 Property to the extent that, when the unpaid principal balance thereof is added to the then-outstanding aggregate principal balance of all Eligible Notes Receivable secured by Type 4 Property, the Concentration Percentage of all such Notes Receivable exceeds ten percent (10%), as determined on the date of determination; provided that, following the Maturity Date, such Concentration Percentage shall not exceed twenty percent (20%); provided, further that, the percentage specified in clause (b)(i) of the definition of Borrowing Base shall be reduced five percent (5%) for each five-percent increase of the Concentration Percentage of all Notes Receivable secured by Type 4 Property above ten percent [As an example, if after the Maturity Date, the Concentration Percentage of all Notes Receivable secured by Type 4 Property is seventeen percent (17%), then the percentage in clause (b)(i) of the definition of Borrowing Base shall be reduced from seventy-five percent to seventy percent (70%) with respect to all Notes Receivable secured by Type 4 Property],

(dd)     after the sixtieth day after the Closing Date, each Second-Lien Note Receivable to the extent that, when the unpaid principal balance thereof is added to the then-outstanding aggregate principal balance of all Second-Lien Notes Receivable held by Borrower, the Concentration Percentage of all such Notes Receivable exceeds ten percent (10%), as determined on the date of determination,

(ee)     each Note Receivable secured by Type 2 Property to the extent that, when the unpaid principal balance thereof is added to the then-outstanding aggregate principal balance of all Eligible Notes Receivable secured by Type 2 Property, the Concentration Percentage of all such Notes Receivable exceeds ten percent (10%), as determined on the date of determination, and

(ff)     each Note Receivable secured by Type 3 Property to the extent that, when the unpaid principal balance thereof is added to the then-outstanding aggregate principal balance of all Eligible Notes Receivable secured by Type 3 Property, the Concentration Percentage of all such Notes Receivable exceeds five percent (5.0%), as determined on the date of determination; provided that, following the Maturity Date, such Concentration Percentage shall not exceed ten percent (10%); provided, further that, the percentage specified in clause (b)(i) of the definition of Borrowing Base shall be reduced five percent (5%) for each five-percent increase of the Concentration Percentage of all Notes Receivable secured by Type 3 Property above five percent [As an example, if after the Maturity Date, the Concentration Percentage of all Notes Receivable secured by Type 3 Property is ten percent (10%), then the percentage in clause (b)(i) of the definition of Borrowing Base shall be reduced from seventy-five percent to seventy percent (70%) with respect to all Notes Receivable secured by Type 3 Property].

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 20 of 49

"Eligible Transferee" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000, (d) any Affiliate (other than individuals) of Lender, (e) so long as no Event of Default has occurred and is continuing, any other Person approved by Borrower (which approval of Borrower shall not be unreasonably withheld, delayed, or conditioned), and (f) during the continuation of an Event of Default, any other Person approved by Lender.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials from (a) any assets, properties, or businesses of Borrower, its Subsidiaries, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by Borrower, its Subsidiaries, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on Borrower or its Subsidiaries, relating to the environment, the effect of the environment on employee health or safety, or Hazardous Materials, including the Comprehensive Environmental Response Compensation and Liability Act, 42 USC § 9601 et seq.; the Resource Conservation and Recovery Act, 42 USC § 6901 et seq.; the Federal Water Pollution Control Act, 33 USC § 1251 et seq.; the Toxic Substances Control Act, 15 USC § 2601 et seq.; the Clean Air Act, 42 USC § 7401 et seq.; the Safe Drinking Water Act, 42 USC § 3803 et seq.; the Oil Pollution Act of 1990, 33 USC § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 USC § 11001 et seq.; the Hazardous Material Transportation Act, 49 USC § 1801 et seq.; and the Occupational Safety and Health Act, 29 USC §651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

009056.00101:910160.07

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equipment" means equipment (as that term is defined in the Code) and includes machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles), computer hardware, tools, parts, and goods (other than consumer goods, farm products, or Inventory), wherever located, including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrower or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrower or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Borrower or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Borrower or any of its Subsidiaries and whose employees are aggregated with the employees of Borrower or its Subsidiaries under IRC Section 414(o).

"Event of Default" has the meaning set forth in Section 8.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Executive Officer" means each of the following individuals: H. David Choo, Don Meyer, Craig Raymond, and Hyun Woo (Henry) Park.

"Extension Period" shall mean the period from the Maturity Date to the First Extended Maturity Date or the period from the First Extended Maturity Date to the Second Extended Maturity Date.

"Fee Letter" means that certain Fee Letter, dated as of even date herewith, between Borrower and Lender, in form and substance satisfactory to Lender.

"Filing Authorization Letter" means a letter duly executed by Borrower or a Pledgor authorizing Lender to file appropriate financing statements in such office or offices as may be necessary or, in the opinion of Lender, desirable to perfect the security interests to be created by the Loan Documents.

"First Extended Maturity Date" has the meaning set forth in Section 3.5(a).

"Funding Date" means the date on which a Borrowing occurs.

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 22 of 49

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"General Intangibles" means general intangibles (as that term is defined in the Code), including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, patents, trade names, trade secrets, trademarks, servicemarks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, insurance premium rebates, tax refunds, and tax refund claims, and any other personal property other than Accounts, commercial tort claims, Deposit Accounts, goods, Investment Property, and Negotiable Collateral.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation or organization or formation, by-laws, or partnership agreement, limited liability company agreement or operating agreement, or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor" means each Person executing and delivering the Guaranty.

"Guaranty" means the continuing joint and several limited guaranty in the amount of $500,000 in favor of Lender executed and delivered by (i) H. David Choo and (ii) a Person approved and determined to be creditworthy by Lender in its Permitted Discretion.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means any and all agreements or documents now existing or hereafter entered into by Borrower or any of its Subsidiaries that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Borrower's or any of its

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 23 of 49

Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all obligations owing under Hedge Agreements, and (g) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above.

"Indemnified Liabilities" has the meaning set forth in Section 11.3.

"Indemnified Person" has the meaning set forth in Section 11.3.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intangible Assets" means, with respect to any Person, that portion of the book value of all of such Person's assets that would be treated as intangibles under GAAP.

"Interest Expense" means, for any period, the aggregate of the interest expense and fees paid by a Person for such period as determined in accordance with GAAP.

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business consistent with past practice), purchases or other acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"Investment Property" means investment property (as that term is defined in the Code).

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender" has the meaning set forth in the preamble to this Agreement.

009056.00101:910160.07

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by Borrower or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) reasonable fees or charges paid or incurred by Lender in connection with Lender's transactions with Borrower or its Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) costs and expenses incurred by Lender in the disbursement of funds to Borrower (by wire transfer or otherwise), (d) charges paid or incurred by Lender resulting from the dishonor of checks, (e) costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses of Lender related to audit examinations of the Books to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement, (g) costs and expenses of third-party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with Borrower or any of its Subsidiaries, the Pledgors or the Guarantors, (h) Lender's reasonable third-party out-of-pocket costs and expenses (including attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering, or amending the Loan Documents, and (i) Lender's costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning Borrower or its Subsidiaries or the Guarantors or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender-Related Person" means Lender, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Lender's Account" means the account identified in Schedule L-1.

"Lender's Liens" means the Liens granted by Borrower and its Subsidiaries to Lender under Section 4.1 of this Agreement or the other Loan Documents.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes

009056.00101:910160.07

and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Loan Account" has the meaning set forth in Section 2.9.

"Loan Documents" means this Agreement, the Bank Product Agreements, the Cash Management Agreements, the Control Agreements, each Disbursement Letter, the Fee Letter, the Guaranty, the Pledge Agreements, the Servicing Agreement, the Subordination Agreements, any note or notes executed by Borrower in connection with this Agreement and payable to Lender, and any other agreement entered into, now or in the future, by Borrower and Lender in connection with this Agreement.

"LTV" for a Note Receivable means the ratio of (a) the unpaid principal balance of such Note Receivable to (b) the current fair market value of the real property securing such Note Receivable (i) as shown in the most recent appraisal of such property prepared by an appraiser meeting the qualifications set forth in Borrower's Required Procedures and acceptable to Lender, or, if applicable, as shown in the most recent broker price opinion, or (ii) at Lender's option, as estimated by Lender or its real estate valuation advisor.

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Borrower and its Subsidiaries, taken as a whole, (b) a material impairment of Borrower's and its Subsidiaries' ability to perform their obligations under the Loan Documents to which they are parties or of Lender's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Lender's Liens with respect to the Collateral as a result of an action or failure to act on the part of Borrower or its Subsidiaries.

"Maturity Date" has the meaning set forth in Section 3.4.

"Maximum Revolver Amount" means $20,000,000.

"Minimum Charge Period" has the meaning set forth in Section 2.10(d).

"Negotiable Collateral" means letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper).

"Net Eligible Notes Receivable" means, as of any date of determination, the aggregate unpaid principal amount of all Eligible Notes Receivable (less portions that are not in compliance with the definition thereof) on such date.

"Note Receivable" means a promissory note evidencing a loan made by Borrower secured by a mortgage or deed of trust granting a Lien on real property owned by the maker of such note.

"Obligations" means (a) all loans, Advances, debts, principal, interest (including any interest that, but for the commencement of an Insolvency Proceeding, would have accrued),

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 26 of 49

premiums, liabilities (including all amounts charged to Borrower's Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), charges, costs, Lender Expenses (including any fees or expenses that, but for the commencement of an Insolvency Proceeding, would have accrued), lease payments, guaranties, covenants, and duties of any kind and description owing by Borrower to Lender pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Expenses that Borrower is required to pay or reimburse by the Loan Documents, by law, or otherwise, and (b) all Bank Product Obligations. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals, supplements, restatements or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Overadvance" has the meaning set forth in Section 2.4.

"Participant" has the meaning set forth in Section 14.1(d).

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means (a) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents, (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, and (e) sales of Notes Receivable for not less than the unpaid balance thereof.

"Permitted Holder" means the Pledgors and any Person controlled by a Pledgor.

"Permitted Investments" means (a) Investments in cash and Cash Equivalents, (b) Investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, and (d) Investments received in settlement of amounts due to Borrower or any of its Subsidiaries effected in the ordinary course of business or owing to Borrower or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of Borrower or its Subsidiaries.

"Permitted Liens" means (a) Liens held by Lender, (b) Liens for unpaid taxes that either (i) are not yet delinquent, or (ii) do not constitute an Event of Default hereunder and are the subject of Permitted Protests, (c) Liens set forth on Schedule P-1, (d) the interests of lessors under operating leases, (e) Liens that secure Permitted Purchase Money Indebtedness, including the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as such Lien attaches only to the asset purchased or acquired and the proceeds thereof, (f) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which

009056.00101:910160.07

Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests, (g) Liens on amounts deposited in connection with obtaining worker's compensation or other unemployment insurance, (h) Liens on amounts deposited in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, (i) Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (j) Liens resulting from any judgment or award that is not an Event of Default hereunder, and (k) with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof.

"Permitted Protest" means the right of Borrower or any of its Subsidiaries to protest any Lien (other than a Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on the Books in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Borrower or any of its Subsidiaries, as applicable, in good faith, and (c) Lender is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Lender's Liens.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Purchase Money Indebtedness incurred after the Closing Date in an aggregate amount outstanding at any one time not in excess of $20,000.00.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Pledge Agreement" means a pledge agreement, in form and substance satisfactory to Lender, executed and delivered by a Pledgor, covering 100% of the ownership interests in Borrower held by such Pledgor.

"Pledgor" means each, and "Pledgors" means all, of Adeline Investments, Inc., a Nevada corporation; Jason Junsong Choo; H. David Choo and Hyseung Choo, Trustees of the Choo Family Revocable Trust U/A/D 12-21-2001, a grantor trust; H. David Choo, Hyesung Choo and Sixty-Two First Street, LLC, a Nevada limited liability company.

"Projections" means Borrower's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Borrower's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 28 of 49

"Real Property" means any estates or interests in real property now owned or hereafter acquired by Borrower or any of its Subsidiaries and the improvements thereto.

"Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials authorized by Environmental Laws.

"Restricted Payments" means (a) any dividend or other distribution, in cash or other property, direct or indirect, on account of any class of membership interests or other ownership interest in or Stock of Borrower, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any class of membership interests or other ownership interest in or Stock of Borrower, now or hereafter outstanding, (c) any payment made to retire, or obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of membership interests or other ownership interest in or Stock of Borrower, now or hereafter outstanding, (d) any payment or prepayment of principal, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Subordinated Debt or any Indebtedness owing to a member in Borrower or an Affiliate of a member in Borrower, to the extent such action would cause a net reduction in the principal amount of Subordinated Debt or other Indebtedness outstanding on the first day of the calendar quarter in which such action is taken, or (e) any payment to a member in Borrower or an Affiliate of a member in Borrower not expressly authorized herein.

"Revolver Usage" means, as of any date of determination, the amount of outstanding Advances.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Second Extended Maturity Date" has the meaning set forth in Section 3.5(b).

"Second-Lien Note Receivable" means a Note Receivable that is secured by improved or unimproved real property that is subject to a Lien securing borrowed money with priority over the Lien held by Borrower securing such Note Receivable.

"Securities Account" means a securities account (as that term is defined in the Code).

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 29 of 49

"Servicer" means California Mortgage and Realty, Inc., a Delaware corporation, or any successor or assignee approved by Lender.

"Servicer Authorized Person" means the President, Chief Executive Officer, Chief Operating Officer, or any Vice President of Servicer.

"Servicing Agreement" means the Servicing Agreement, among Servicer, Borrower, and Lender, relating to the servicing of the Notes Receivable.

"Solvent" means, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"Stock" means all shares, options, warrants, membership interests, units of membership interests, other interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subordinated Debt" means any unsecured Indebtedness specifically subordinated to the prior payment in full in cash of the Obligations and which shall otherwise be on terms and conditions reasonably satisfactory to the Lender and subject to a Subordination Agreement.

"Subordinated Debt and Equity Commitment" means the principal amount of Subordinated Debt or the capital contribution specified in a subscription agreement or loan commitment executed by a proposed lender to, member in, or a Person intending to become a member in, Borrower, accepted and approved by the Manager of Borrower, in form and substance acceptable to Lender, a copy of which has been delivered to Lender.

"Subordination Agreement" means a subordination agreement executed and delivered by Borrower and each of the holders of Subordinated Debt and Lender, the form and substance of which is satisfactory to Lender.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Supporting Obligation" means a letter-of-credit right or secondary obligation that supports the payment or performance of an Account, chattel paper, document, General Intangible, Note Receivable, instrument, or Investment Property.

"Tangible Net Worth" means, as of any date of determination, determined on a consolidated basis and in accordance with GAAP, the result of (a) a Person's total stockholders' or members' equity, minus (b) the sum of (i) all Intangible Assets of such Person, (ii) all of such Person's prepaid expenses, and (iii) all amounts due to such Person from Affiliates.

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 30 of 49

"Tax Distribution" means a distribution by a Person to the shareholders or members of such Person equal to the federal and state income taxes payable by the shareholders or members of such Person (calculated at the highest applicable marginal rate in effect at the relevant time) attributable to the taxable income or gain of such Person.

"Taxes" has the meaning set forth in Section 16.5.

"Total Subordinated Debt and Equity Commitments" means the aggregate Subordinated Debt and Equity Commitments for the Borrower.

"Type 1 Property" means improved real property used for (i) commercial purposes, (ii) mixed commercial and residential purposes, not owner-occupied, or (iii) multi-family residential purposes, not owner-occupied.

"Type 2 Property" means improved real property used for single-family residential purposes that is not owner-occupied.

"Type 3 Property" means improved real property used for single-family residential purposes that is either (i) owner-occupied, or (ii) being renovated or held for renovation or rehabilitation for occupancy by owner.

"Type 4 Property" means unimproved real property.

"United States" means the United States of America.

"Voidable Transfer" has the meaning set forth in Section 16.7.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

**1.2    Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrower and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

**1.3    Code.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 shall govern.

**1.4    Construction.** Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document,

009056.00101:910160.07

as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or cash collateralization in accordance with the terms hereof) of all Obligations other than contingent indemnification Obligations and other than any Bank Product Obligations that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding and are not required to be repaid or cash collateralized pursuant to the provisions of this Agreement. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a Record and any Record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

**1.5** **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2. LOAN AND TERMS OF PAYMENT.

**2.1** **Revolver Advances.**

(a)     Subject to the terms and conditions of this Agreement, and during the term of this Agreement, Lender agrees to make advances in immediately available funds (each an "Advance," and collectively, the "Advances") to Borrower in an amount at any one time outstanding not to exceed an amount equal to the *lesser of* (i) the Maximum Revolver Amount, or (ii) the Borrowing Base.

(b)     Anything to the contrary in this Section 2.1 notwithstanding, Lender shall have the right to establish reserves in such amounts, and with respect to such matters, as Lender in its Permitted Discretion shall deem necessary or appropriate, against the Borrowing Base, including reserves with respect to (i) sums that Borrower is required to pay (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay under any Section of this Agreement or any other Loan Document, (ii) amounts owing by Borrower or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than any existing Permitted Lien set forth on Schedule P-1 which is specifically identified thereon as entitled to have priority over the Lender's Liens), which Lien or trust, in the Permitted Discretion of Lender likely would have a priority superior to the Lender's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for *ad valorem*, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral, (iii) the valuation of collateral securing any Note Receivable, (iv) the valuation of any Note Receivable or other Collateral, and (v)

009056.00101:910160.07

sums that Borrower has committed to advance under Notes Receivable that are not yet advanced. In addition to the foregoing, Lender and its real estate valuation advisor shall have the right to determine the value of any property securing a Note Receivable during each calendar quarter for the purpose of redetermining the LTV for such Note Receivable and, as a result, redetermining the Borrowing Base.

(c)     Lender shall have no obligation to make additional Advances hereunder to the extent such additional Advances would cause the Revolver Usage to exceed the Maximum Revolver Amount. At no time shall (i) the Revolver Usage exceed the Maximum Revolver Amount, nor (ii) the sum of (A) the amount by which the Maximum Revolver Amount exceeds the Revolver Usage, plus (B) the aggregate balance of cash in the Cash Management Accounts, exceed the aggregate amount of unfunded commitments of Borrower to the makers of Notes Receivable, and the Lender shall have no obligation to make additional Advances hereunder to the extent such additional Advances would cause either of such limits to be exceeded.

(d)     Amounts borrowed pursuant to this <u>Section 2.1</u> may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.

### 2.2     <u>Borrowing Procedures and Settlements.</u>

(a)     **Procedure for Borrowing.** Each Borrowing shall be made by an irrevocable written request by an Authorized Person delivered to Lender. Such notice must be received by Lender no later than 10:00 a.m. (California time) on the Business Day prior to the date that is the requested Funding Date specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day. At Lender's election, in lieu of delivering the above-described written request, any Authorized Person may give Lender telephonic notice of such request by the required time. In such circumstances, Borrower agrees that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b)     **Making of Advances.** If Lender has received a timely request for a Borrowing in accordance with the provisions hereof, and subject to the satisfaction of the applicable terms and conditions set forth herein, Lender shall make the proceeds of such Advance available to Borrower on the applicable Funding Date by transferring available funds equal to such proceeds to Borrower's Designated Account.

009056.00101:910160.07

**2.3    Payments.**

    (a)    **Payments by Borrower.**  Except as otherwise expressly provided herein, all payments by Borrower shall be made to Lender's Account for the account of the Lender and shall be made in immediately available funds, no later than 11:00 a.m. (California time) on the date specified herein.  Any payment received by Lender later than 11:00 a.m. (California time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

    (b)    **Apportionment and Application.**

        (i)    All payments shall be remitted to Lender and all such payments, and all proceeds of Collateral received by Lender, shall be applied as follows:

            (A)    first, to pay any Lender Expenses then due to Lender under the Loan Documents, until paid in full,

            (B)    second, to pay any fees then due to Lender under the Loan Documents until paid in full,

            (C)    third, to pay interest due in respect of Advances until paid in full,

            (D)    fourth, so long as no Event of Default has occurred and is continuing, and at Lender's election (which election Lender agrees will not be made if an Overadvance would be created thereby), to pay amounts then due and owing by Borrower or its Subsidiaries in respect of Bank Products, until paid in full,

            (E)    fifth, so long as no Event of Default has occurred and is continuing, to pay the principal of all Advances until paid in full,

            (F)    sixth, if an Event of Default has occurred, then, so long as such Event of Default continues uncured and unwaived, ratably (i) to pay the principal of all Advances until paid in full, and (ii) to Lender, to be held by Lender, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount of the Bank Product Reserve established prior to the occurrence of, and not in contemplation of, the subject Event of Default until Borrower's and its Subsidiaries' obligations in respect of Bank Products have been paid in full or the cash collateral amount has been exhausted,

            (G)    seventh, to pay any other Obligations (including the provision of amounts to Lender, to be held by Lender, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount determined by Lender in its Permitted Discretion as the amount

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 34 of 49

necessary to secure Borrower's and its Subsidiaries' obligations in respect of Bank Products), and

(H)    eighth, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(ii)    In each instance, so long as no Event of Default has occurred and is continuing, this Section 2.3(b) shall not apply to any payment made by Borrower to Lender and specified by Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(iii)    For purposes of the foregoing, "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(iv)    In the event of a direct conflict between the priority provisions of this Section 2.3 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3 shall control and govern.

**2.4**    **Overadvances.** If, at any time or for any reason, the amount of Obligations (other than Bank Product Obligations) owed by Borrower to Lender pursuant to Section 2.1 is greater than any of the limitations set forth in Section 2.1 (an "Overadvance"), Borrower immediately shall pay to Lender, in cash, the amount of such excess, which amount shall be used by Lender to reduce the Obligations in accordance with the priorities set forth in Section 2.3(b). In addition, Borrower hereby promises to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full as and when due and payable under the terms of this Agreement and the other Loan Documents.

**2.5**    **Interest Rates: Rates, Payments, and Calculations.**

(a)    **Interest Rates.** Except as provided in clause (b) below and Section 2.10(d), all monetary Obligations (except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to the Base Rate *plus* the Base Rate Margin.

(b)    **Default Rate.** Upon the occurrence and during the continuation of an Event of Default (and at the election of Lender), all Obligations (except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear

009056.00101:910160.07

interest on the Daily Balance thereof at a per annum rate equal to four (4) percentage points above the per annum rate otherwise applicable hereunder.

(c)     **Payment.**  Except as provided to the contrary in <u>Section 2.10</u>, interest, and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month at any time that Obligations are outstanding or at any time that Lender has an obligation to extend credit hereunder.  Borrower hereby authorizes Lender, from time to time without prior notice to Borrower, to charge all interest and fees (when due and payable), all Lender Expenses (as and when incurred), all fees and costs provided for in <u>Section 2.10</u> (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including any amounts due and payable to the Bank Product Providers in respect of Bank Products up to the amount of the Bank Product Reserve) to Borrower's Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances hereunder.  Any interest not paid when due shall be compounded by being charged to Borrower's Loan Account and shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances hereunder.

(d)     **Computation.**   All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(e)     **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrower and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided, however</u>, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

## 2.6     <u>Cash Management.</u>

(a)     Borrower shall and shall cause each of its Subsidiaries to (i) within fifteen days after the Closing Date, establish and maintain cash management services of a type and on terms satisfactory to Lender at one or more of the banks set forth on <u>Schedule 2.6(a)</u> (each, a "<u>Cash Management Bank</u>"), and shall request in writing and otherwise take such reasonable steps to ensure that all of its and its Subsidiaries' Account Debtors forward payment of the amounts owed by them directly to such Cash Management Bank, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to Borrower or one of its Subsidiaries) into a bank account in Lender's name (a "<u>Cash</u>

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 36 of 49

Management Account") at one of the Cash Management Banks, (iii) cause all payments for each sale or other disposition of one or more Notes Receivable or payment in full of one or more Notes Receivable in connection with the refinancing of such Note Receivable or the sale and release of the collateral securing such Note Receivable to be made by the escrow company, title insurance company or refinancing lender or purchaser directly to Lender's Account by wire transfer or check drawn on the account of such escrow company or title insurance company or by cashier's check, and (iv) until such time as a Cash Management Account is established, forward or cause to be forwarded no later than the first Business Day after the date of receipt thereof, all of their Collections to the Lender's Account. Borrower shall request in writing and otherwise take such reasonable steps to ensure that all of its and its Subsidiaries' Account Debtors forward payment of the amounts owed by them to Borrower directly to the Cash Management Account.

(b)     Each Cash Management Bank shall establish and maintain Cash Management Agreements with Lender and Borrower, in form and substance acceptable to Lender. Each such Cash Management Agreement shall provide, among other things, that (i) the Cash Management Bank will comply with any instructions originated by Lender directing the disposition of the funds in such Cash Management Account without further consent by Borrower or its Subsidiaries, as applicable, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) it will forward, by daily sweep, all amounts in the applicable Cash Management Account to the Lender's Account.

(c)     So long as no Default or Event of Default has occurred and is continuing, Borrower may amend Schedule 2.6(a) to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to Lender, and (ii) prior to the time of the opening of such Cash Management Account, Borrower (or its Subsidiary, as applicable) and such prospective Cash Management Bank shall have executed and delivered to Lender a Cash Management Agreement. Borrower (or its Subsidiaries, as applicable) shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Lender that the creditworthiness of any Cash Management Bank is no longer acceptable in Lender's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Lender that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Lender's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Lender's reasonable judgment.

(d)     The Cash Management Accounts shall be cash collateral accounts subject to Control Agreements, and Borrower hereby grants a Lien in all Cash Management Accounts to Lender to secure payment of the Obligations.

**2.7     Crediting Payments.** The receipt of any payment item by Lender (whether from transfers to Lender by the Cash Management Banks pursuant to the Cash Management

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 37 of 49

Agreements or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Lender's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Lender's Account on a Business Day on or before 11:00 a.m. (California time). If any payment item is received into the Lender's Account on a non-Business Day or after 11:00 a.m. (California time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

**2.8** **Designated Account.** Lender is authorized to make the Advances under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.5(c). Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by Borrower and made by Lender hereunder. Unless otherwise agreed by Lender and Borrower, any Advance requested by Borrower and made by Lender hereunder shall be made to the Designated Account.

**2.9** **Maintenance of Loan Account; Statements of Obligations.** Lender shall maintain an account on its books in the name of Borrower (the "Loan Account") on which Borrower will be charged with all Advances made by Lender to Borrower or for Borrower's account, and with all other payment Obligations hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and expenses, and Lender Expenses. In accordance with Section 2.7, the Loan Account will be credited with all payments received by Lender from Borrower or for Borrower's account, including all amounts received in the Lender's Account from any Cash Management Bank. Lender shall render statements regarding the Loan Account to Borrower, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender unless, within 30 days after receipt thereof by Borrower, Borrower shall deliver to Lender written objection thereto describing the error or errors contained in any such statements.

**2.10** **Fees.** Borrower shall pay to Lender the following fees and charges, which fees and charges shall be non-refundable when paid (irrespective of whether this Agreement is terminated thereafter in accordance with its terms):

(a) **Fee Letter Fees.** As and when due and payable under the terms of the Fee Letter, Borrower shall pay to Lender the fees set forth in the Fee Letter,

(b) **Unused Line Fee.** During the period from the Closing Date until the Maturity Date, but not during any Extension Periods, an unused line fee shall be calculated and be due and payable as follows: on the first day of each calendar month, Borrower shall pay to Lender an amount equal to one-fourth of one percent (0.25%) per annum times the amount by which (A) the Maximum Revolver Amount exceeds (B) the greater of (1) the average Daily

009056.00101:910160.07

Case: 08-32220   Doc# 850-1   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 38 of 49

Balance of Advances that were outstanding during the immediately preceding calendar month, or (2) during the period that Section 2.10(d) applies, $10,000,000.

          (c)      **Audit, Appraisal, and Valuation Charges.**  Audit, appraisal, and valuation fees and charges as follows (i) a fee of $850 per day, per auditor, plus out-of-pocket expenses for each financial audit of Borrower performed by personnel employed by Lender; provided that so long as no Event of Default has occurred and is continuing, Borrower will not be charged for more than four (4) such financial audits in any calendar year, (ii) if implemented, a one-time fee of $5,000.00 for the establishment of electronic collateral reporting systems (such systems to be administered and maintained by Lender), (iii) after the occurrence of an Event of Default, a fee of $1,500 per day per appraiser, plus out-of-pocket expenses, for each appraisal of the Collateral, or any portion thereof, performed by personnel employed by Lender, and (iv) the actual reasonable and customary charges paid or incurred by Lender if it elects to employ the services of one or more third Persons to perform financial audits of Borrower or its Subsidiaries, to appraise the Collateral, or any portion thereof, or to assess Borrower's or its Subsidiaries' business valuation, and

          (d)      **Minimum Interest Charge.**  In the event the aggregate outstanding Advances on the date that is sixty days after the Closing Date are less than $10,000,000, during the period from such date until such time as the aggregate outstanding Advances equal or exceed $10,000,000 ("Minimum Charge Period"), a minimum interest charge shall be calculated and be due and payable as follows: Borrower shall pay to Lender an amount equal to (i) the amount of interest that would have accrued in accordance with the terms of this Agreement had the average Daily Balance of Advances during the Minimum Charge Period been equal to $10,000,000, minus (ii) the actual amount of interest paid by Borrower during the Minimum Charge Period; provided that in no event shall interest be charged, contracted for, collected or retained in excess of the maximum nonusurious amount determined in accordance with applicable law.

     **2.11**    **Capital Requirements.**  If, after the date hereof, Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by Lender or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on Lender's or such holding company's capital as a consequence of Lender's obligations hereunder to a level below that which Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by Lender to be material, then Lender may notify Borrower thereof. Following receipt of such notice, Borrower agrees to pay Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 90 days after presentation by Lender of a statement in the amount and setting forth in reasonable detail Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, Lender may use any reasonable averaging and attribution methods.

009056.00101:910160.07

## 3. CONDITIONS; TERM OF AGREEMENT.

**3.1 <u>Conditions Precedent to the Initial Extension of Credit</u>.** The obligation of Lender to make the initial extension of credit provided for hereunder, is subject to the fulfillment, to the satisfaction of Lender (the making of such initial extension of credit by Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a) The initial Funding Date must be requested to be a date that is on or before August 12, 2005;

(b) Lender shall have received Filing Authorization Letters, duly executed by each of Borrower and the Pledgors, together with appropriate financing statements duly filed in such office or offices as may be necessary or, in the opinion of Lender, desirable to perfect the Lender's Liens in and to the Collateral;

(c) Lender shall have received each of the following documents, in form and substance satisfactory to Lender, duly executed, and each such document shall be in full force and effect:

     (i)       the Cash Management Agreements,

     (ii)      the Control Agreements,

     (iii)     the Disbursement Letter for the initial Advance,

     (iv)     the Fee Letter,

     (v)      the Guaranty,

     (vi)     the Pledge Agreements, and

     (vii)    the Servicing Agreement;

(d) Lender shall have received (i) a certificate from an Authorized Person (A) attesting to the resolutions of Borrower's Board of Directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which Borrower is a party, (B) authorizing specific officers of Borrower to execute the same, and (C) attesting to the incumbency and signatures of such specific officers of Borrower, and (ii) a certificate from a Servicer Authorized Person (A) attesting to the resolutions of Servicer's Board of Directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which Servicer is a party, (B) authorizing specific officers of Servicer to execute the same, and (C) attesting to the incumbency and signatures of such specific officers of Servicer;

(e) Lender shall have received copies of (i) Borrower's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by an

009056.00101:910160.07

Authorized Person, and (ii) Servicer's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by a Servicer Authorized Person;

(f)     Lender shall have received (i) a certificate of status with respect to Borrower, dated within 20 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of Borrower, which certificate shall indicate that Borrower is in good standing in such jurisdiction, and (ii) a certificate of status with respect to Servicer, dated within 20 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of Servicer, which certificate shall indicate that Servicer is in good standing in such jurisdiction;

(g)     Lender shall have received certificates of status with respect to each of Borrower and Servicer, each dated within 30 days of the Closing Date, such certificates to be issued by the appropriate officer of the State of California (in the case of Borrower) and the jurisdictions (other than the jurisdiction of organization of each) in which its failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that each is in good standing in such jurisdictions;

(h)     Lender shall have received a certificate of insurance, together with the endorsements thereto, as are required by Section 6.8, the form and substance of which shall be satisfactory to Lender;

(i)     Lender shall have received an opinion of counsel to Borrower and Servicer, in form and substance satisfactory to Lender;

(j)     Lender shall have received satisfactory evidence (including a certificate of an Authorized Person or Servicer Authorized Person, as applicable) that all tax returns required to be filed by Servicer, Borrower and Borrower's Subsidiaries have been timely filed and all taxes upon Servicer, Borrower and Borrower's Subsidiaries or their properties, assets, income, and franchises (including Real Property taxes, sales taxes, and payroll taxes) have been paid prior to delinquency, except such taxes that are the subject of a Permitted Protest;

(k)     Lender shall have completed its business, legal, and collateral due diligence, including a collateral audit and review of Borrower's and its Subsidiaries' Books, a review of Borrower's collateral valuation methods, and verification of Borrower's representations and warranties to Lender, the results of which shall be satisfactory to Lender;

(l)     Lender shall have received completed reference checks with respect to each of the Executive Officers and other management of Borrower and Servicer, the results of which are satisfactory to Lender in its sole discretion;

(m)     Lender shall have received Borrower's Closing Date Business Plan;

(n)     Borrower shall have paid or shall pay with the initial Advance all Lender Expenses incurred in connection with the transactions evidenced by this Agreement;

009056.00101:910160.07

(o)     Lender shall have received the originally executed promissory notes evidencing all Notes Receivable duly endorsed to the order of Lender or such notes shall have been delivered to a custodian that has acknowledged in writing that such custodian holds in fireproof storage possession of such notes and related originally executed documents for the benefit of Lender;

(p)     Lender shall have received satisfactory evidence that as of the Closing Date, the sum of Borrower's members' equity *plus* Subordinated Debt is not less than $3,000,000.

(q)     Lender shall have received and approved Borrower's Required Procedures;

(r)     Servicer, Borrower and each of Borrower's Subsidiaries shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Servicer, Borrower or Borrower's Subsidiaries of the Loan Documents or with the consummation of the transactions contemplated thereby; and

(s)     all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender.

3.2     **Conditions Subsequent to the Initial Extension of Credit.** The obligation of Lender to continue to make Advances (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of each of the conditions subsequent set forth below (the failure by Borrower to so perform or cause to be performed constituting an Event of Default):

(a)     within 30 days after the Closing Date, Borrower shall deliver to Lender certified copies of the policies of insurance, together with the endorsements thereto, as are required by <u>Section 6.8</u>, the form and substance of which shall be satisfactory to Lender and its counsel;

(b)     within 15 days after the Closing Date, Borrower shall establish the Cash Management Account at a Cash Management Bank and cause such Cash Management Bank to enter into Cash Management Agreements in the form provided by Lender; and

(c)     within 30 days after the Closing Date, Borrower shall use its best efforts to cause Sixty-Two First Street, LLC, to obtain a Consent to Pledge, executed by East West Bank, in the form provided by Lender.

3.3     **Conditions Precedent to all Extensions of Credit.** The obligation of Lender to make any Advances hereunder at any time (or to extend any other credit hereunder) shall be subject to the following conditions precedent:

009056.00101:910160.07

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 42 of 49

(a)     the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date);

(b)     no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)     no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrower, Lender, or any of their Affiliates;

(d)     no Material Adverse Change shall have occurred;

(e)     Borrower shall have delivered to Lender a current Borrowing Base Certificate; and

(f)     Borrower shall have delivered to Lender with respect to each Note Receivable to be acquired with any portion of such Advance and each Note Receivable added to the Borrowing Base since the most recent Borrowing Base Certificate each of the following: (i) the original promissory note evidencing such Note Receivable or an acknowledgment in writing from a custodian that has acknowledged in writing that such note is held for the benefit of Lender, as collateral for the Obligations, (ii) a copy of each of the deed of trust, mortgage or other lien instrument and collateral assignment of rents in the form sent for recording have been delivered to Lender, with originally recorded versions of each delivered within five Business Days after receipt by Borrower, (iii) an originally executed Assignment of Note and Liens, in recordable form, covering such Note Receivable, and (iv) a copy of the originally issued title policy, pro forma title policy, or marked title insurance commitment, evidencing that Borrower has a first lien in the real property securing such Note Receivable, with the originally issued title policy delivered to Lender within five Business Days after receipt by Borrower.

**3.4     Term.** This Agreement shall continue in full force and effect for a term ending ~~expiring~~ on the third anniversary of the Closing Date (the "Maturity Date"), unless extended in 12·31·08 accordance with Section 3.5. The foregoing notwithstanding, Lender shall have the right to terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

**3.5     Extension of Term.**

(a)     So long as no Default or Event of Default has occurred and is continuing, the Borrower may, by sending written notice to the Lender, not fewer than ninety (90) days and not more than three hundred sixty (360) days prior to the Maturity Date, extend the term of this Agreement to the first anniversary of the Maturity Date (the "First Extended Maturity Date"); provided that such extension shall not be effective unless on the Maturity Date (i) there is no Default or Event of Default that has occurred and is continuing, and (ii) Borrower pays to Lender an extension fee in accordance with the terms of the Fee Letter; provided further that Borrower

009056.00101:910160.07

Case: 08-32220     Doc# 850-1     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 43 of 49

(i) may use the proceeds of any Advance following the Maturity Date only to pay servicing and other fees in accordance with Projections approved by Lender and (ii) may not use the proceeds of any Advance following the Maturity Date to originate or acquire any Note Receivable.

(b)     So long as no Default or Event of Default has occurred and is continuing, the Borrower may, by sending written notice to the Lender, not fewer than ninety (90) days and not more than three hundred sixty (360) days prior to the First Extended Maturity Date, extend the term of this Agreement to the first anniversary of the First Extended Maturity Date (the "Second Extended Maturity Date"); provided that such extension shall not be effective unless on the First Extended Maturity Date (i) there is no Default or Event of Default that has occurred and is continuing, and (ii) Borrower pays to Lender an extension fee in accordance with the terms of the Fee Letter; provided further that Borrower (i) may use the proceeds of any Advance following the Maturity Date only to pay servicing and other fees in accordance with Projections approved by Lender and (ii) may not use the proceeds of any Advance following the Maturity Date to originate or acquire any Note Receivable.

**3.6    Effect of Termination.**    On the date of termination of this Agreement, all Obligations (including all Bank Product Obligations) immediately shall become due and payable without notice or demand (including providing cash collateral (in an amount determined by Lender as sufficient to satisfy the reasonably estimated credit exposure) to be held by Lender for the benefit of the Bank Product Providers with respect to the Bank Product Obligations). No termination of this Agreement, however, shall relieve or discharge Borrower or its Subsidiaries of their duties, Obligations, or covenants hereunder or under any other Loan Documents and the Lender's Liens in the Collateral shall remain in effect until all Obligations have been paid in full and Lender's obligations to provide additional credit hereunder have been terminated. When this Agreement has been terminated and all of the Obligations have been paid in full and Lender's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Lender will, at Borrower's sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Lender's Liens and all notices of security interests and liens previously filed by Lender with respect to the Obligations.

**3.7    Early Termination by Borrower.**

(a)     Borrower has the option, at any time upon 90 days' prior written notice to Lender, to terminate this Agreement by paying to Lender, in cash, the Obligations (including providing cash collateral (in an amount determined by Lender as sufficient to satisfy the reasonably estimated credit exposure) to be held by Lender for the benefit of the Bank Product Providers with respect to the Bank Product Obligations), in full, together with the Applicable Prepayment Premium (if such termination is to be effective prior to any Extension Period). If Borrower has sent a notice of termination pursuant to the provisions of this Section, then Lender's obligations to extend credit hereunder shall terminate and Borrower shall be obligated to repay the Obligations (including providing cash collateral (in an amount determined by Lender as sufficient to satisfy the reasonably estimated credit exposure) to be held by Lender for the benefit of the Bank Product Providers with respect to the Bank Product Obligations), in full, together with the Applicable Prepayment Premium (if such termination is to be effective prior to

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 44 of 49

any Extension Period), on the date set forth as the date of termination of this Agreement in such notice.

(b)     In the event of the termination of this Agreement and repayment of the Obligations at any time prior to the Maturity Date, for any other reason, including (i) termination upon the election of Lender to terminate after the occurrence and during the continuation of an Event of Default, (ii) foreclosure and sale of Collateral, (iii) sale of the Collateral in any Insolvency Proceeding, or (iv) restructure, reorganization, or compromise of the Obligations by the confirmation of a plan of reorganization or any other plan of compromise, restructure, or arrangement in any Insolvency Proceeding, then, in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to Lender or profits lost by Lender as a result of such early termination, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of Lender, Borrower shall pay the Applicable Prepayment Premium to Lender, measured as of the date of such termination.

## 4.     CREATION OF SECURITY INTEREST.

**4.1     Grant of Security Interest.**  Borrower hereby grants to Lender, for the benefit of Lender and the Bank Product Providers, a continuing security interest in all of Borrower's right, title, and interest in all currently existing and hereafter acquired or arising Borrower Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Loan Documents and in order to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents.  The Lender's Liens in and to the Borrower Collateral shall attach to all Borrower Collateral without further act on the part of Lender or Borrower.  Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, except for Permitted Dispositions, Borrower and its Subsidiaries have no authority, express or implied, to dispose of any item or portion of the Collateral.

**4.2     Negotiable Collateral.**  In the event that any Borrower Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that Lender determines that perfection or priority of Lender's security interest is dependent on or enhanced by possession, Borrower, promptly upon the request of Lender, shall endorse and deliver physical possession of such Negotiable Collateral to Lender.  All Notes Receivable shall be delivered to Lender, duly endorsed in blank or as follows on the back of the signature page thereof or on a separate allonge affixed thereto:

"Pay to the Order of Wells Fargo Foothill, Inc.

CMR Income Fund, LLC

By: _____
Name:
Its: [Authorized Person]."

**4.3     Collection of Accounts, General Intangibles, and Negotiable Collateral.**  At any time after the occurrence and during the continuation of an Event of Default, Lender or Lender's designee may (a) notify Account Debtors of Borrower and makers of Notes Receivable

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 45 of 49

that Borrower's Accounts, Notes Receivable, chattel paper, or General Intangibles have been assigned to Lender or that Lender has a security interest therein, (b) cause a replacement servicer to take possession of, and collect Borrower's Accounts, or (c) collect Borrower's Accounts, Notes Receivable, chattel paper, or General Intangibles directly and charge the collection costs and expenses to the Loan Account. Borrower agrees that it will hold in trust for Lender, as Lender's trustee, any of its or its Subsidiaries' Collections that it receives and immediately will deliver such Collections to Lender or a Cash Management Bank in their original form as received by Borrower or its Subsidiaries.

### 4.4    Filing of Financing Statements; Commercial Tort Claims; Delivery of Additional Documentation Required.

(a)    Borrower authorizes Lender to file any financing statement necessary or desirable to effectuate the transactions contemplated by the Loan Documents, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of Borrower where permitted by applicable law. Borrower hereby ratifies the filing of any financing statement that complies with the preceding sentence filed without the signature of Borrower prior to the date hereof.

(b)    If Borrower or its Subsidiaries acquire any commercial tort claims after the date hereof, Borrower shall promptly (but in any event within three (3) Business Days after such acquisition) deliver to Lender a written description of such commercial tort claim and shall deliver a written agreement, in form and substance satisfactory to Lender, pursuant to which Borrower or its Subsidiary, as applicable, shall grant a perfected security interest in all of its right, title and interest in and to such commercial tort claim to Lender, as security for the Obligations (a "Commercial Tort Claim Assignment").

(c)    At any time upon the request of Lender, Borrower shall execute or deliver to Lender, and shall cause its Subsidiaries to execute or deliver to Lender, any and all fixture filings, security agreements, pledges, assignments, Commercial Tort Claim Assignments, endorsements of certificates of title, and all other documents (collectively, the "Additional Documents") that Lender may request in its Permitted Discretion, in form and substance satisfactory to Lender, to create, perfect, and continue perfected or to better perfect the Lender's Liens in the assets of Borrower and its Subsidiaries (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any owned Real Property acquired after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by applicable law, Borrower authorizes Lender to execute any such Additional Documents in Borrower's name and authorizes Lender to file such executed Additional Documents in any appropriate filing office. In addition, on such periodic basis as Lender shall require, but no more frequently than quarterly, Borrower shall (i) provide Lender with a report of all new material patentable, copyrightable, or trademarkable materials acquired or generated by Borrower or its Subsidiaries during the prior period, (ii) cause all material patents, copyrights, and trademarks acquired or generated by Borrower or its Subsidiaries that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of Borrower's or the applicable

009056.00101:910160.07

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 46 of 49

Subsidiary's ownership thereof, and (iii) cause to be prepared, executed, and delivered to Lender supplemental schedules to the applicable Loan Documents to identify such patents, copyrights, and trademarks as being subject to the security interests created thereunder; provided, however, that neither Borrower nor any of its Subsidiaries shall register with the U.S. Copyright Office any unregistered copyrights (whether in existence on the Closing Date or thereafter acquired, arising, or developed) unless (i) the Borrower provides Lender with written notice of its intent to register such copyrights not less than 30 days prior to the date of the proposed registration, and (ii) prior to such registration, the applicable Person executes and delivers to Lender a copyright security agreement in form and substance satisfactory to Lender, supplemental schedules to any existing copyright security agreement, or such other documentation as Lender reasonably deems necessary in order to perfect and continue perfected Lender's Liens on such copyrights following such registration.

   **4.5    Power of Attorney.**    Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any of Lender's officers, employees, or agents designated by Lender) as Borrower's true and lawful attorney, with power to (a) if Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 4.4, sign the name of Borrower on any of the documents described in Section 4.4, (b) at any time that an Event of Default has occurred and is continuing, sign Borrower's name on any invoice or bill of lading relating to the Borrower Collateral, drafts against Account Debtors, or notices to Account Debtors, (c) send requests for verification of Borrower's or its Subsidiaries' Accounts or Notes Receivable, (d) endorse Borrower's name on any of its payment items (including all of its Collections) that may come into Lender's possession, (e) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under Borrower's policies of insurance and make all determinations and decisions with respect to such policies of insurance, and (f) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting Borrower's or its Subsidiaries' Accounts, Notes Receivable, chattel paper, or General Intangibles directly with Account Debtors or makers of Notes Receivable, for amounts and upon terms that Lender determines to be reasonable, and Lender may cause to be executed and delivered any documents and releases that Lender determines to be necessary.  The appointment of Lender as Borrower's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and Lender's obligations to extend credit hereunder are terminated.

   **4.6    Right to Inspect and Verify.**    Lender (through any of its officers, employees, or agents) shall have the right, from time to time hereafter (i) to inspect the Books and make copies or abstracts thereof, (ii) from time to time, to communicate directly with any and all Account Debtors and makers of Notes Receivable to verify the existence and terms thereof, and (iii) to check, test, and appraise the Collateral, or any portion thereof, in order to verify Borrower's and its Subsidiaries' financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral.

   **4.7    Control Agreements.**    Borrower agrees that it will and will cause its Subsidiaries to take any or all reasonable steps in order for Lender to obtain control in accordance with Sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the Code with respect to all of its or their Securities Accounts, Deposit Accounts, electronic chattel paper, Investment Property, and letter-of-credit rights.  Upon the occurrence and during the continuance of a Default or Event of

Case: 08-32220    Doc# 850-1    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 47 of 49

Default, Lender may notify any bank or securities intermediary to liquidate the applicable Deposit Account or Securities Account or any related Investment Property maintained or held thereby and remit the proceeds thereof to the Lender's Account.

**4.8    Servicing of Notes Receivable.** Until such time as the Lender shall notify the Borrower of the revocation of such right after the occurrence and during the continuation of an Event of Default, the Borrower (a) shall, at its own expense, cause the Servicer to service all of the Notes Receivable, including, without limitation, (i) the billing, posting and maintaining complete records applicable thereto, and (ii) taking of such action with respect to the Notes Receivable as the Borrower may deem advisable, and (b) may grant, in the ordinary course of business, to any maker of a Note Receivable, any adjustment to which such maker may be lawfully entitled, and may take such other actions relating to the settling of any such maker's claims as may be commercially reasonable. Lender may, at its option, at any time or from time to time, after the occurrence and during the continuation of an Event of Default hereunder, revoke the collection and servicing rights given to Borrower herein by giving notice to Borrower in accordance with the terms of the Servicing Agreement.

**4.9    Release of Notes Receivable.**

(a)    When a Note Receivable is repaid in its entirety, Lender shall return such Note Receivable to Borrower to facilitate its payment and Lender shall release the Lender's Liens in such Note Receivable promptly upon receipt of the final payment relating to such Note Receivable.

(b)    When a Note Receivable is sold by Borrower in accordance with the terms of this Agreement, Lender shall release the Lender's Liens in such Note Receivable and shall transfer such Note Receivable to the purchaser thereof or as otherwise directed by such purchaser against payment of the agreed amount therefor.

## 5.    REPRESENTATIONS AND WARRANTIES.

In order to induce Lender to enter into this Agreement, Borrower and, with respect to Sections 5.3, 5.7, 5.8, 5.9, 5.10, and 5.15, Servicer, make the following representations and warranties to Lender which shall be true, correct, and complete, in all material respects, as of the date hereof, and shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

**5.1    No Encumbrances.** Borrower and its Subsidiaries have good and indefeasible title to, or a valid leasehold interest in, their personal property assets and good and marketable title to, or a valid leasehold interest in, their Real Property, in each case, free and clear of Liens except for Permitted Liens.

**5.2    Eligible Notes Receivable.** As to each Note Receivable that is identified by Borrower as an Eligible Note Receivable in the most recent Borrowing Base Certificate

009056.00101:910160.07

submitted to Lender, as of the date of such report: (a) such Note Receivable is a bona fide existing payment obligation of the maker of such Note Receivable created in the ordinary course of Borrower's business, (b) such Note Receivable is owed to Borrower without any known defenses, disputes, offsets, counterclaims, or rights of cancellation, (c) such Note Receivable is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Notes Receivable, (d) the original amount of, the unpaid balance of, and the amount and dates of payments on such Note Receivable shown on the Books of Borrower and in the schedules of same delivered to Lender are true and correct, (e) Borrower has no knowledge of any fact which is reasonably likely to impair the validity or collectability of such Note Receivable, (f) such Note Receivable is subject to a first priority security interest in favor of Lender, (g) such Note Receivable and all collateral therefor complies with all applicable laws, (h) since delivery to Lender, such Note Receivable has not been amended nor any requirements relating thereto waived without the prior written consent of Lender, other than an extension or modification in accordance with Borrower's Required Procedures then in effect, and (i) such Note Receivable is secured by a title-insured lien on improved real property or, in the case of a Second-Lien Note Receivable, secured by a second-priority title-insured lien on improved real property.

**5.3** **Compliance.** The standard forms and documents evidencing and executed in connection with Notes Receivable and all actions and transactions by Borrower and Servicer in connection therewith comply in all material respects with all applicable laws. Such standard forms and documents are commensurate with forms and documentation used by prudent lenders in the same or similar circumstances as Borrower and Servicer, and, without limiting the foregoing, are sufficient to create valid, binding and enforceable obligations of an Account Debtor.

**5.4** **Equipment.** All of the Equipment of Borrower and its Subsidiaries is used or held for use in their business and, to Borrower's knowledge, is fit for such purposes.

**5.5** **Location of Collateral.** The Borrower Collateral is not stored with a bailee, warehouseman, or similar party and are located only at, or in-transit between, the locations identified on Schedule 5.5 (as such Schedule may be updated pursuant to Section 6.9).

**5.6** **Records.** Borrower keeps complete, correct and accurate records of the Notes Receivable owned by Borrower and all payments thereon.

**5.7** **State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims.**

(a) The jurisdiction of organization of Servicer and Borrower and each of Borrower's Subsidiaries is set forth on Schedule 5.7(a).

(b) The chief executive office of Servicer and Borrower and each of Borrower's Subsidiaries is located at the address indicated on Schedule 5.7 (b) (as such Schedule may be updated pursuant to Section 6.9).

009056.00101:910160.07