# EXHIBIT A-2

(c)     Servicer's and Borrower's and each of Borrower's Subsidiaries' organizational identification numbers, if any, are identified on Schedule 5.7(c).

(d)     As of the Closing Date, Servicer and Borrower and Borrower's Subsidiaries do not hold any commercial tort claims, except as set forth on Schedule 5.7(d).

**5.8     Due Organization and Qualification; Subsidiaries.**

(a)     Each of Borrower and Servicer is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business in any state where the failure to be so qualified reasonably could be expected to result in a Material Adverse Change.

(b)     Set forth on Schedule 5.8(b), (as updated from time to time) is a complete and accurate description of the issued and outstanding membership interests in or Stock of Borrower and Servicer, by class, and a description of the interests of each such class that are issued and outstanding. Other than as described on Schedule 5.8(b), there are no subscriptions, options, warrants, or calls relating to any membership interests in or Stock of Borrower or Servicer, including any right of conversion or exchange under any outstanding security or other instrument. Except as set forth on Schedule 5.8(b), Borrower and Servicer are not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any membership interests in or shares of their Stock or any security convertible into or exchangeable for any membership interests in or shares of their Stock.

(c)     Set forth on Schedule 5.8(c) (as updated from time to time), is a complete and accurate list of Borrower's direct and indirect Subsidiaries, showing: (i) the jurisdiction of their organization, (ii) the number of shares of each class of common and preferred Stock authorized for each of such Subsidiaries, and (iii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by Borrower. All of the outstanding capital Stock of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)     Except as set forth on Schedule 5.8(c), there are no subscriptions, options, warrants, or calls relating to any shares of Borrower's Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. Neither Borrower nor any of its Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of Borrower's Subsidiaries' capital Stock or any security convertible into or exchangeable for any such capital Stock.

**5.9     Due Authorization; No Conflict.**

(a)     The execution, delivery, and performance by Borrower of this Agreement and the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of Borrower.

009056.00101:910160.07

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 2 of 49

(b)     The execution, delivery, and performance by Borrower of this Agreement and the other Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to Borrower, the Governing Documents of Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of Borrower, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of Borrower, other than Permitted Liens, or (iv) require any approval of Borrower's members or any approval or consent of any Person under any material contractual obligation of Borrower, other than consents or approvals that have been obtained and that are still in force and effect.

(c)     Other than the filing of financing statements, the execution, delivery, and performance by Borrower of this Agreement and the other Loan Documents to which Borrower is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority or other Person, other than consents or approvals that have been obtained and that are still in force and effect.

(d)     This Agreement and the other Loan Documents to which Borrower is a party, and all other documents contemplated hereby and thereby, when executed and delivered by Borrower will be the legally valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)     Upon Lender's giving value to Borrower and timely filing of any financing statements, amendments or continuation statements required under <u>Section 4.4</u> hereof or the taking of other actions required to achieve perfection, the Lender's Liens (1) will constitute validly created and perfected security interests under the Code, (2) will be entitled to all of the rights, benefits, and priorities provided by the Code, and (3) will be first-priority Liens, subject only to Permitted Liens.

(f)     The execution, delivery, and performance by Servicer of this Agreement and the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of Servicer.

(g)     The execution, delivery, and performance by Servicer of this Agreement and the other Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to Servicer, the Governing Documents of Servicer, or any order, judgment, or decree of any court or other Governmental Authority binding on Servicer, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of Servicer, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of Servicer, other than Permitted Liens, or (iv) require any approval of Servicer's interestholders or any approval or consent of any Person under any material contractual obligation of Servicer, other than consents or approvals that have been obtained and that are still in force and effect.

009056.00101:910160.07

(h)     Other than the filing of financing statements, the execution, delivery, and performance by Servicer of this Agreement and the other Loan Documents to which Servicer is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority or other Person, other than consents or approvals that have been obtained and that are still in force and effect.

(i)     This Agreement and the other Loan Documents to which Servicer is a party, and all other documents contemplated hereby and thereby, when executed and delivered by Servicer will be the legally valid and binding obligations of Servicer, enforceable against Servicer in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

**5.10    Litigation.** Other than those matters disclosed on Schedule 5.10 and other than matters arising after the Closing Date that reasonably could not be expected to result in a Material Adverse Change, there are no actions, suits, or proceedings pending and served or, to the best knowledge of Borrower, unserved or threatened against Servicer or Borrower or any of Borrower's Subsidiaries.

**5.11    No Material Adverse Change.** All financial statements relating to Borrower and its Subsidiaries that have been delivered by Borrower to Lender have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, Borrower's and its Subsidiaries' financial condition as of the date thereof and results of operations for the period then ended. There has not been a Material Adverse Change with respect to Borrower and its Subsidiaries since the date of the latest financial statements submitted to Lender on or before the Closing Date.

**5.12    Fraudulent Transfer.**

(a)     Each of Borrower and each of its Subsidiaries is Solvent; Servicer is Solvent.

(b)     No transfer of property is being made by Borrower or its Subsidiaries and no obligation is being incurred by Borrower or its Subsidiaries in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrower or its Subsidiaries.

**5.13    Employee Benefits.** None of Borrower, any of its Subsidiaries, or any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

**5.14    Environmental Condition.** (a) To Borrower's knowledge, none of Borrower's or its Subsidiaries' properties or assets has ever been used by Borrower, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such use, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to Borrower's knowledge, none of Borrower's or its Subsidiaries' properties or assets

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 4 of 49

has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) neither Borrower nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by Borrower or its Subsidiaries, and (d) neither Borrower nor its Subsidiaries has received a summons, citation, notice, or directive from the United States Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by Borrower or its Subsidiaries resulting in the releasing or disposing of Hazardous Materials into the environment.

**5.15** **Brokerage Fees.** None of Borrower, Servicer or any of Borrower's Subsidiaries has utilized the services of any broker or finder in connection with Borrower's obtaining financing from Lender under this Agreement and no brokerage commission or finders fee is payable by Borrower, Servicer or Borrower's Subsidiaries in connection herewith.

**5.16** **Intellectual Property.** Borrower and its Subsidiaries own, or hold licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of its business as currently conducted, and attached hereto as Schedule 5.16 (as updated from time to time) is a true, correct, and complete listing of all material patents, patent applications, trademarks, trademark applications, copyrights, and copyright registrations as to which Borrower or one of its Subsidiaries is the owner or is an exclusive licensee.

**5.17** **Leases.** Borrower and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating, and all of such leases are valid and subsisting and no material default by Borrower or its Subsidiaries exists under any of them.

**5.18** **Deposit Accounts and Securities Accounts.** Set forth on Schedule 5.18 (as updated from time to time) is a listing of all of Borrower's and its Subsidiaries' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person. Neither Borrower nor any of its Subsidiaries shall maintain funds in any deposit account or securities account that is not subject to a Cash Management Agreement or control agreement, executed by the depository bank with which such account is maintained, the named account holder and the Lender, in form and substance satisfactory to Lender, other than deposits not in excess of $20,000, in the aggregate.

**5.19** **Complete Disclosure.** All factual information (taken as a whole) furnished by or on behalf of Borrower or its Subsidiaries in writing to Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of Borrower or its Subsidiaries in writing to Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. On the Closing Date, the Closing Date Business Plan represents,

009056.00101:910160.07

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 5 of 49

and as of the date on which any other Projections are delivered to Lender, such additional Projections represent Borrower's good faith estimate of its and its Subsidiaries' future performance for the periods covered thereby.

**5.20    Indebtedness.** Set forth on <u>Schedule 5.20</u> is a true and complete list of all Indebtedness of Borrower and its Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date and such Schedule accurately reflects the aggregate principal amount of such Indebtedness and describes the principal terms thereof.

## 6.    AFFIRMATIVE COVENANTS.

Borrower and Servicer covenant and agree that, so long as any credit hereunder shall be available and until payment in full of the Obligations, Borrower and, with respect to <u>Sections 6.3, 6.7, 6.8, and 6.12</u>, Servicer shall and shall cause each of Borrower's Subsidiaries to do all of the following:

**6.1    Accounting System.** Maintain a system of accounting that enables Borrower to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Lender. Borrower also shall keep a reporting system that shows all additions, fees, payments, claims, and write-downs with respect to the Notes Receivable.

**6.2    Collateral Reporting.** Provide Lender with the following documents at the following times in form satisfactory to Lender:

| Daily | (a)    Notice of all claims, offsets, or disputes asserted by Account Debtors with respect to Borrower's and its Subsidiaries' Accounts and Notes Receivable; |
|---|---|
| Date of Each Advance | (b)    a detailed calculation of the Borrowing Base (including detail regarding all Notes Receivable of Borrower, including Notes Receivable that are not Eligible Notes Receivable) as of the most recent date information is available; |

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 6 of 49

| Monthly (not later than the 10th day of each month, calculated or determined as of the last day of the preceding month) | (c)     a detailed calculation of the Borrowing Base (including detail regarding all Notes Receivable of Borrower, including Notes Receivable that are not Eligible Notes Receivable) as of the most recent date information is available;<br><br>(d)     a detailed aging, by total, of the Notes Receivable of Borrower, together with a reconciliation to the detailed calculation of the Borrowing Base previously provided to Lender,<br><br>(e)     a summary aging, by vendor, of Borrower's and its Subsidiaries' accounts payable and any book overdraft,<br><br>(f)     a detailed report regarding Borrower and its Subsidiaries' cash and Cash Equivalents, and<br><br>(g)     a summary report of categories of non-Eligible Notes Receivable for the month most recently ended;<br><br>(i)     a collateral report with a detailed list of Borrower's Notes Receivable and specifying the LTV of each Note Receivable;<br><br>(j)     a report which identifies each Defaulted Note Receivable and each Delinquent Note Receivable; |
| Upon request by Lender | (l)     such other reports as to the Collateral or the financial condition of Borrower and its Subsidiaries, as Lender may request. |

In addition, (i) to the extent required by Lender, in Lender's Permitted Discretion, Borrower agrees to pay a one-time set-up fee of $5,000 to facilitate the establishment of electronic collateral reporting systems, which will be administered and maintained by Lender, and to cooperate with Lender to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth above, and (ii) Borrower's Authorized Person or other representative acceptable to Lender will meet with Lender at least once in each calendar quarter to review and discuss all Notes Receivable then owned by Borrower.

**6.3     Financial Statements, Reports, Certificates.** Deliver to Lender:

(a)     as soon as available, but in any event within 30 days (45 days in the case of a month that is the last month of a calendar quarter) after the end of each month during each year,

(i)     an unaudited consolidated and consolidating balance sheet and income statement covering Borrower's and its Subsidiaries' operations during such period, and

009056.00101:910160.07

Case: 08-32220     Doc# 850-2     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 7 of 49

(ii)      in the case of a month that is the last month of a calendar quarter, a Compliance Certificate,

(b)    as soon as available, but in any event within 90 days after the end of each of Borrower's fiscal years,

(i)      consolidated and consolidating financial statements of Borrower and its Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Lender and certified, without any qualifications (including any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of <u>Section 7.18</u>), by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management),

(ii)      to the extent not included in the financial statements and notes thereto of Borrower delivered to Lender in accordance with <u>Section 6.3(b)(i)</u>, a certificate of such accountants addressed to Lender stating that such accountants do not have knowledge of the existence of any Default or Event of Default under <u>Section 7.18</u>, and

(iii)    a Compliance Certificate,

(c)    as soon as available, but in any event within 30 days after the end of each month during each year, an unaudited consolidated and consolidating balance sheet, income statement and statement of cash flow covering Servicer's and its Subsidiaries' operations during such period,

(d)    as soon as available, but in any event within 90 days after the end of each of Servicer's fiscal years, consolidated and consolidating financial statements of Servicer and its Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Lender and certified, without any qualifications (including any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of <u>Section 7.23</u>), by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management),

(e)    as soon as available, but in any event within 30 days prior to the start of each of Borrower's fiscal years, copies of Borrower's Projections (including a budget), in form and substance (including as to scope and underlying assumptions) satisfactory to Lender, in its

009056.00101:910160.07

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 8 of 49

Permitted Discretion, for the forthcoming three years, year-by-year, and for the forthcoming fiscal year, month-by-month, certified by the Authorized Person as being such Authorized Person's good faith estimate of the financial performance of Borrower during the period covered thereby,

(f)     if and when filed by Borrower or Servicer,

(i)     Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K current reports,

(ii)     any other filings made by Borrower or Servicer with the SEC,

(iii)     copies of Borrower's federal income tax returns, and any amendments thereto, filed with the Internal Revenue Service, and

(iv)     any other information that is provided by Borrower to all of its members,

(g)     promptly, but in any event within 5 days after Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default, notice thereof and a statement of the curative action that Borrower proposes to take with respect thereto,

(h)     promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on Servicer, Borrower or any of Borrower's Subsidiaries, notice of all actions, suits, or proceedings brought by or against Servicer, Borrower or any of Borrower's Subsidiaries before any Governmental Authority which, if determined adversely to Servicer, Borrower or such Subsidiary, could reasonably be expected to result in a Material Adverse Change, and

(i)     upon the request of Lender, any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries.

In addition, Borrower agrees that no Subsidiary of Borrower will have a fiscal year different from that of Borrower. Borrower also agrees to cooperate with Lender to allow Lender to consult with its independent certified public accountants if Lender reasonably requests the right to do so and that, in such connection, its independent certified public accountants are authorized to communicate with Lender and to release to Lender whatever financial information concerning Borrower or its Subsidiaries that Lender reasonably may request. Borrower waives the right to assert a confidential relationship, if any, it may have with any accounting firm or service bureau in connection with any information requested by Lender pursuant to or in accordance with this Agreement, and agrees that Lender may contact directly any such accounting firm or service bureau in order to obtain such information.

**6.4**     **Guarantor Reports**. Cause each Guarantor to deliver such Guarantor's annual financial statements at the time when Borrower provides its audited financial statements to

009056.00101:910160.07

Lender, and copies of all federal income tax returns as soon as the same are available and in any event no later than 30 days after the same are required to be filed by law.

**6.5     Collection of Notes Receivable.**  (a) Subject to Section 4.8, use commercially reasonable efforts, at its sole cost and expense and in its own name, in accordance with industry standards and applicable laws, to promptly and diligently collect and enforce payment of all Notes Receivable to the extent that it is commercially reasonable to do so and in a commercially reasonable manner and defend and hold Lender harmless from any and all loss, damage, penalty, fine or expense arising from such collection or enforcement, (b) in accordance with the Borrower's Required Procedures, maintain at its chief executive office, and, upon the request of Lender, make available to Lender copies of its Notes Receivable and all related documents and instruments, and all files, surveys, certificates, correspondence, appraisals, computer programs, accounting records and other information and data relating to the Collateral, and (c) permit Lender or its representatives to discuss with Borrower's officers or with appraisers furnishing appraisals of property securing any Note Receivable the procedures for preparation, review and retention of, and to review and obtain copies of, such appraisals.

**6.6     Maintenance of Properties.**  Maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all material leases to which it is a party as lessee, so as to prevent any loss or forfeiture thereof or thereunder.

**6.7     Taxes.**  Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrower, Borrower's Subsidiaries, or any of their respective assets to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest.  Subject to Permitted Protests, Borrower will and will cause its Subsidiaries to make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof satisfactory to Lender indicating that Borrower, and Borrower's Subsidiaries have made such payments or deposits.

**6.8     Insurance.**

(a)     At Borrower's expense, maintain insurance respecting Borrower's and its Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Borrower also shall maintain business interruption, and public liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be in such amounts and with such insurance companies as are reasonably satisfactory to Lender. Borrower shall deliver copies of all such policies to Lender with an endorsement naming Lender as a loss payee (under a satisfactory lender's loss payable endorsement) or additional insured, as appropriate.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days' prior written notice to Lender in the event of cancellation of the policy for any reason whatsoever.

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 10 of 49

Insurance may be maintained by Servicer, so long as Borrower is a named insured on property insurance policies and an additional insured on liability insurance policies.

(b)     Borrower shall give Lender prompt notice of any loss covered by such insurance.  Lender shall have the exclusive right to adjust any losses claimed under any such insurance policies in excess of $50,000 (or in any amount after the occurrence and during the continuation of an Event of Default), without any liability to Borrower whatsoever in respect of such adjustments.  Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to Lender.  So long as no Event of Default has occurred and is continuing, such proceeds shall be disbursed to Borrower under staged payment terms reasonably satisfactory to Lender for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items of property destroyed prior to such damage or destruction.  If an Event of Default has occurred and is continuing, then Lender may apply such proceeds to the prepayment of the Obligations.

(c)     Borrower will not and will not suffer or permit its Subsidiaries to take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 6.8, unless Lender is included thereon as an additional insured or loss payee under a lender's loss payable endorsement.  Borrower promptly shall notify Lender whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and copies of such policies promptly shall be provided to Lender.

**6.9     Location of Collateral.**  Keep the Collateral only at the locations identified on Schedule 5.5 or at the Lender, in the case of Notes Receivable, and maintain the chief executive offices of Borrower and its Subsidiaries only at the locations identified on Schedule 5.7(b); provided, however, that Borrower may amend Schedule 5.5 and Schedule 5.7 so long as such amendment occurs by written notice to Lender not less than 30 days prior to the date on which such Collateral is moved to such new location or such chief executive office is relocated, so long as such new location is within the continental United States, and so long as, at the time of such written notification, Borrower provides to Lender a Collateral Access Agreement with respect thereto.

**6.10     Compliance with Laws.**  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, are not reasonably likely to result in a Material Adverse Change.

**6.11     Leases.**  Pay when due all rents and other amounts payable under any leases to which Borrower or any of its Subsidiaries is a party or by which Borrower's or any such Subsidiaries' properties and assets are bound, unless such payments are the subject of a Permitted Protest.

009056.00101:910160.07

Case: 08-32220     Doc# 850-2     Filed: 07/22/11     Entered: 07/22/11 13:38:30     Page 11 of 49

**6.12** **Existence.** At all times preserve and keep in full force and effect Borrower's and its Subsidiaries' valid existence and good standing and any rights and franchises material to their businesses. Each of Borrower and Servicer acknowledges that Lender is entering into the Loan Documents in reliance upon Borrower's identity as a separate legal entity from each of Servicer and its other Affiliates. From and after the Closing Date, each of Servicer and Borrower shall conduct its own business in its own name and take all reasonable steps, including, without limitation, all steps that Lender may from time to time reasonably request, to maintain Borrower's and Servicer's identity and existence as a separate legal entity and to make it manifest to third parties that Borrower is an entity with assets and liabilities distinct from those of Servicer and its other Affiliates and not an operating division of Servicer. Without limiting the generality of the foregoing and in addition to the other covenants set forth herein, Borrower shall:

(a)    conduct all transactions with Servicer and its other Affiliates strictly on an arm's-length basis and allocate all overhead expenses (including, without limitation, telephone and other utility charges) for items shared between Servicer or such other Affiliates, as the case may be, and Borrower on the basis of actual use to the extent practicable and, to the extent such allocation is not practicable, on a basis reasonably related to actual use;

(b)    observe all limited liability company formalities as a distinct entity, and ensure that all actions relating to the dissolution or liquidation of Borrower or the initiation or participation in, acquiescence in, or consent to any bankruptcy, insolvency, reorganization, or similar proceeding involving Borrower, are duly authorized by unanimous vote of its managers;

(c)    maintain Borrower's Books separate from those of Servicer and its other Affiliates and otherwise readily identifiable as its own assets rather than assets of Servicer or its other Affiliates;

(d)    except as herein specifically otherwise provided, not commingle funds or other assets of Borrower with those of Servicer or its other Affiliates and, except for the Cash Management Accounts, not maintain bank accounts or other depository accounts to which Borrower is an account party, into which Borrower makes deposits or from which Borrower has the power to make withdrawals; and

(e)    not permit Borrower to pay or finance any of Servicer's or its other Affiliates' operating expenses not properly allocable to Borrower.

**6.13** **Environmental.**

(a)    Keep any property either owned or operated by Borrower or its Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens, (b) comply, in all material respects, with Environmental Laws and provide to Lender documentation of such compliance which Lender reasonably requests, (c) promptly notify Lender of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by Borrower or its Subsidiaries and take any Remedial Actions required to abate said release or otherwise to come into compliance with applicable Environmental Law,

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 12 of 49

and (d) promptly, but in any event within 5 days of its receipt thereof, provide Lender with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of Borrower or its Subsidiaries, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against Borrower or its Subsidiaries, and (iii) notice of a violation, citation, or other administrative order which reasonably is likely to result in a Material Adverse Change.

**6.14    Disclosure Updates.** Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Lender if any written information, exhibit, or report furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

**6.15    Formation of Subsidiaries.** Not to form or acquire any Subsidiary without the prior written consent of the Lender, and at the time that Borrower forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date with the prior written consent of the Lender, Borrower shall (a) cause such new Subsidiary to provide to Lender a joinder to this Agreement, together with such other security documents (including mortgages with respect to any Real Property of such new Subsidiary), as well as appropriate financing statements (and with respect to all property subject to a mortgage, fixture filings), all in form and substance satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Lender a pledge agreement and appropriate certificates and powers or financing statements, hypothecating all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Lender, and (c) provide to Lender all other documentation, including one or more opinions of counsel satisfactory to Lender, if requested by Lender, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all property subject to a mortgage). Any document, agreement, or instrument executed or issued pursuant to this <u>Section 6.15</u> shall be a Loan Document.

**6.16    Assignment of Notes Receivable.** Prepare, execute and deliver to Lender, an assignment of note and lien or other appropriate assignment for each parcel of real property securing a Note Receivable, in a form appropriate for recording in the real property records of the jurisdiction where the property securing such Note Receivable is located, which would evidence the assignment to Lender of such Note Receivable and the liens securing such Note Receivable, which assignment may be recorded by or on behalf of Lender.

**6.17    Escrow Deposits.** Deposit into a Deposit Account that is subject to a perfected Lender's Lien all prepaid escrow amounts, including interest, construction funds, insurance premiums and proceeds, taxes, and other funds delivered to Borrower to be held on behalf of any Account Debtor.

009056.00101:910160.07

## 7. NEGATIVE COVENANTS.

Borrower and Servicer covenant and agree that, so long as any credit hereunder shall be available and until termination of this Agreement and payment in full of the Obligations, Borrower and, with respect to Section 7.8, Servicer will not and will not permit any of its Subsidiaries to do any of the following:

**7.1    Indebtedness.** Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents,

(b)    Indebtedness set forth on Schedule 5.20,

(c)    Permitted Purchase Money Indebtedness,

(d)    Subordinated Debt,

(e)    refinancings, renewals, or extensions of Indebtedness permitted under clause (b) of this Section 7.1 (and continuance or renewal of any Permitted Liens associated therewith) so long as: (i) the terms and conditions of such refinancings, renewals, or extensions do not, in Lender's reasonable judgment, materially impair the prospects of repayment of the Obligations by Borrower or materially impair Borrower's creditworthiness, (ii) such refinancings, renewals, or extensions do not result in an increase in the principal amount of, or interest rate with respect to, the Indebtedness so refinanced, renewed, or extended, (iii) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are materially more burdensome or restrictive to Borrower, (iv) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness, and (v) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended, and

(f)    endorsement of instruments or other payment items for deposit.

**7.2    Liens.** Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens (including Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is refinanced, renewed, or extended under Section 7.1(d) and so long as the replacement Liens only encumber those assets that secured the refinanced, renewed, or extended Indebtedness).

009056.00101:910160.07

### 7.3 Restrictions on Fundamental Changes.

(a) Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock.

(b) Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

(c) Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets.

### 7.4 Disposal of Assets.
Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of Borrower's or its Subsidiaries' assets.

### 7.5 Change Name.
Change Borrower's or any of its Subsidiaries' names, organizational identification number, state of organization or organizational identity; provided, however, that Borrower or any of its Subsidiaries may change their names upon at least 30 days' prior written notice to Lender of such change and so long as, at the time of such written notification, Borrower or its Subsidiary provides any financing statements necessary to perfect and continue perfected the Lender's Liens.

### 7.6 Nature of Business.
Make any change in the principal nature of its or their business.

### 7.7 Prepayments and Amendments.
Except in connection with a refinancing permitted by Section 7.1(e) or a Restricted Payment or other payment permitted by Section 7.10,

(a) optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of Borrower or its Subsidiaries (other than Subordinated Debt), other than the Obligations in accordance with this Agreement,

(b) prepay, redeem, defease, or purchase, any Subordinated Debt, or make any payment of principal thereof or interest thereon, or any distribution in respect thereof, unless permitted pursuant to the Subordination Agreement, or

(c) directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning Indebtedness permitted under Section 7.1(b).

### 7.8 Change of Control.
Cause, permit, or suffer, directly or indirectly, any Change of Control of Borrower or Servicer.

### 7.9 Required Procedures.
Make any changes or revisions in any material respect to Borrower's Required Procedures without advance notice to, and consent by, the Lender.

### 7.10 Restricted Payments.
Make any Restricted Payment; provided, however, that, so long as (x) no Default shall have occurred and be continuing or would occur as a result thereof

009056.00101:910160.07

and (y) following such distribution, Availability shall not be less than $500,000, Borrower may make quarterly Tax Distributions and other quarterly distributions.

**7.11** **Accounting Methods.** Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Borrower's or its Subsidiaries' accounting records without said accounting firm or service bureau agreeing to provide Lender information regarding Borrower's and its Subsidiaries' financial condition.

**7.12** **Investments.** Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

**7.13** **Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any transaction with any Affiliate of Borrower except for transactions that (a) are in the ordinary course of Borrower's business, (b) are upon fair and reasonable terms, (c) are fully disclosed to Lender, and (d) are no less favorable to Borrower or its Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate.

**7.14** **Suspension.** Suspend or go out of a substantial portion of its or their business.

**7.15** **Intentionally Blank.**

**7.16** **Use of Proceeds.** Use the proceeds of the Advances for any purpose other than (a) on the Closing Date and on the initial Funding Date, to pay transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, and (b) thereafter, consistent with the terms and conditions hereof, for (i) making or acquiring new loans, in each case evidenced by a Note Receivable, (ii) working capital purposes, (iii) paying service fees and other fees, costs, and expenses arising under the Loan Documents, or (iv) making distributions permitted by Section 7.10.

**7.17** **Collateral with Bailees.** Store any Collateral at any time now or hereafter with a bailee, warehouseman, or similar party.

**7.18** **Financial Covenants of Borrower.** Fail to maintain or achieve:

    (a) **Debt-to-Worth Ratio.** A Debt-to-Worth Ratio, measured as of the last day of each calendar quarter, of not more than 4 to 1.

    (b) **Interest Coverage Ratio.** The ratio of EBITDA for each calendar quarter to Interest Expense for such calendar quarter of at least 1.5 to 1.

    (c) **Tangible Net Worth and Subordinated Debt.** The sum of Tangible Net Worth *plus* Subordinated Debt of at least the required amount set forth in the following table, measured as of each day on and following the applicable date set forth opposite thereto:

009056.00101:910160.07

| Applicable Amount | Applicable Date |
| --- | --- |
| $3,000,000.00 | Closing Date |
| $3,090,000.00 | September 30, 2005 |
| $3,240,000.00 | December 31, 2005 |
| $3,390,000.00 | March 31, 2006 |
| $3,540,000.00 | June 30, 2006 |
| $3,690,000.00 | September 30, 2006 |
| $3,840,000.00 | December 31, 2006 |
| $3,990,000.00 | March 31, 2007 |
| $4,140,000.00 | June 30, 2007 |
| $4,290,000.00 | September 30, 2007 |
| $4,440,000.00 | December 31, 2007 |
| $4,590,000.00 | March 31, 2008 |
| $4,740,000.00 | June 30, 2008 (if applicable) |
| $4,890,000.00 | September 30, 2008 (if applicable) |
| $5,040,000.00 | December 31, 2008 (if applicable) |
| $5,190,000.00 | March 31, 2009 (if applicable) |
| $5,340,000.00 | June 30, 2009 (if applicable) |
| $5,490,000.00 | September 30, 2009 (if applicable) |
| $5,640,000.00 | December 31, 2009 (if applicable) |
| $5,790,000.00 | March 31, 2010 (if applicable) |

**7.19** **Limitation on Delinquent Notes Receivable**. Permit or suffer to exist at any time the aggregate unpaid balance of all Delinquent Notes Receivable to be in excess of ten percent (10.0%) of the Net Eligible Notes Receivable; provided, however, for purposes of

009056.00101:910160.07

determining compliance with this Section 7.19, the Notes Receivable described on Schedule 7.19 shall not be included as Delinquent Notes Receivable nor as Eligible Notes Receivable.

**7.20** **Limitation on Defaulted Notes Receivable**. Permit or suffer to exist at any time the aggregate unpaid balance of all Defaulted Notes Receivable to be in excess of five percent (5.0%) of the Net Eligible Notes Receivable; provided, however, for purposes of determining compliance with this Section 7.20, the Notes Receivable described on Schedule 7.19 shall not be included as Defaulted Notes Receivable nor as Eligible Notes Receivable.

## 8. ·   EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

**8.1** If Borrower fails to pay when due and payable, or when declared due and payable, all or any portion of the Obligations (whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations);

**8.2** If Borrower, Servicer or any of Borrower's Subsidiaries fails to (a) perform, keep, or observe any covenant or other provision contained in Sections 6.3, 6.7, 6.9, 6.10 or 6.11 hereof and such failure continues for a period of 10 days after the date on which such failure first occurs, (b) perform, keep, or observe any covenant or other provision contained in any Section of this Agreement (other than a Section that is expressly dealt with elsewhere in this Section 8.2), including failure to satisfy a condition subsequent set forth in Section 3.2 within the period stated, or the other Loan Documents, and such failure continues for a period of 15 Business Days after the date on which such failure first occurs, or (c) perform, keep, or observe any covenant or other provision contained in Section 6 (other than a subsection of Section 6 that is expressly dealt with elsewhere in this Section 8.2), or Section 7 of this Agreement or any comparable provision contained in any of the other Loan Documents;

**8.3** If any material portion of Servicer's, Borrower's or any of Borrower's Subsidiaries' assets is attached, seized, subjected to a writ or distress warrant, levied upon, or comes into the possession of any third Person;

**8.4** If an Insolvency Proceeding is commenced by Borrower, Servicer or any of Borrower's Subsidiaries;

**8.5** If an Insolvency Proceeding is commenced against Servicer or Borrower, or any of Borrower's Subsidiaries, and any of the following events occur: (a) Servicer or Borrower or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted; provided, however, that, during the pendency of such period, Lender shall be relieved of its obligations to extend credit hereunder, (c) the petition commencing the Insolvency Proceeding is not dismissed within 45 calendar days of the date of the filing thereof; provided, however, that, during the pendency

009056.00101:910160.07

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 18 of 49

of such period, Lender shall be relieved of its obligation to extend credit hereunder, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, Borrower or any of its Subsidiaries, or (e) an order for relief shall have been entered therein;

**8.6**    If Servicer or Borrower or any of Borrower's Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

**8.7**    If a notice of Lien, levy, or assessment, with respect to which the claim exceeds $2,500, is filed of record with respect to any of Servicer's, Borrower's or any of Borrower's Subsidiaries' assets by the United States, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, or if any taxes or debts owing at any time hereafter to any one or more of such entities becomes a Lien, whether choate or otherwise, with respect to which the claim exceeds $2,500, upon any of Servicer's, Borrower's or any of Borrower's Subsidiaries' assets and the same is not paid before such payment is delinquent;

**8.8**    If a judgment or other claim becomes a Lien or encumbrance upon any material portion of Servicer's, Borrower's or any of Borrower's Subsidiaries' assets or any Collateral;

**8.9**    If there is a default with respect to (x) any Subordinated Debt, or (y) any other agreement to which Servicer, Borrower or any of Borrower's Subsidiaries is a party, the termination of which is reasonably likely to result in a Material Adverse Change, and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by the other party thereto, irrespective of whether exercised, to accelerate the maturity of Servicer's, Borrower's or any of Borrower's Subsidiaries' obligations thereunder, to terminate such agreement or to refuse to renew such agreement in accordance with an automatic renewal right therein;

**8.10**    If Borrower or any of its Subsidiaries makes any payment on account of Indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent such payment is permitted by the terms of the subordination provisions applicable to such Indebtedness;

**8.11**    If any misstatement or misrepresentation exists as of the date when made or deemed made, in any material respect, in any warranty, representation, statement, or Record made to Lender by Servicer, Borrower, Borrower's Subsidiaries, or any officer, employee, agent, or director of Servicer, Borrower or any of Borrower's Subsidiaries;

**8.12**    If any Executive Officer shall become unable to perform, or cease to be employed in his current position with Servicer or Borrower and shall not be replaced within 90 days by an individual with comparable education, experience and other qualifications;

**8.13**    If any Guarantor dies or if the obligation of any Guarantor under such Guarantor's Guaranty is terminated by operation of law or by such Guarantor thereunder;

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 19 of 49

**8.14**   If this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in the Collateral covered hereby or thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

**8.15**   Servicer or Borrower fails to comply, in any material respect, with its obligations under the Servicing Agreement, and if such non-compliance is on the part of Servicer, such non-compliance is not cured to Lender's satisfaction within thirty (30) days;

**8.16**   Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by Servicer, Borrower or Borrower's Subsidiaries, or a proceeding shall be commenced by Servicer, Borrower or Borrower's Subsidiaries, or by any Governmental Authority having jurisdiction over Servicer, Borrower or Borrower's Subsidiaries seeking to establish the invalidity or unenforceability thereof, or Servicer, Borrower or Borrower's Subsidiaries, shall deny that Servicer, Borrower or Borrower's Subsidiaries has any liability or obligation purported to be created under any Loan Document.

## 9.   LENDER'S RIGHTS AND REMEDIES.

**9.1**   <u>Rights and Remedies</u>.  Upon the occurrence, and during the continuation, of an Event of Default, Lender (at its election but without notice of its election and without demand) may do any one or more of the following, all of which are authorized by Borrower:

(a)   Declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

(b)   Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between Borrower and Lender;

(c)   Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting any of the Lender's Liens in the Collateral and without affecting the Obligations;

(d)   Settle or adjust disputes and claims directly with Borrower's Account Debtors and makers of Notes Receivable for amounts and upon terms which Lender considers advisable, and in such cases, Lender will credit Borrower's Loan Account with only the net amounts received by Lender in payment of such disputed Accounts or Notes Receivable after deducting all Lender Expenses incurred or expended in connection therewith;

(e)   Exercise or assign any and all rights to collect, manage, and service the Notes Receivable, including, (i) receive, process and account for all Collections in respect of Notes Receivable, (ii) terminate the Servicing Agreement and assign servicing responsibilities to any replacement servicer, (iii) without notice to or demand upon Borrower, make any payments as are reasonably necessary or desirable in connection with the Servicing Agreement

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 20 of 49

or any other agreement that Lender enters into with the Servicer or any replacement servicer, and (iv) take all lawful actions and procedures which Lender or such assignee deems necessary to collect the amounts due to Borrower in connection with Notes Receivable (all amounts incurred by Lender pursuant to this clause (c) shall be Lender Group Expenses);

(f)     Without notice to or demand upon Borrower, make such payments and do such acts as Lender considers necessary or reasonable to protect its security interests in the Collateral. Borrower agrees to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender at a place that Lender may designate which is reasonably convenient to both parties. Borrower authorizes Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Lender's determination, in Lender's Permitted Discretion, appears to conflict with the priority of Lender's Liens in and to the Collateral and to pay all expenses incurred in connection therewith and to charge Borrower's Loan Account therefor. With respect to any of Borrower's owned or leased premises, Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(g)     Without notice to Borrower (such notice being expressly waived), and without constituting an acceptance of any collateral in full or partial satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Lender (including any amounts received in the Cash Management Accounts), or (ii) Indebtedness at any time owing to or for the credit or the account of Borrower held by Lender;

(h)     Hold, as cash collateral, any and all balances and deposits of Borrower held by Lender, and any amounts received in the Cash Management Accounts, to secure the full and final repayment of all of the Obligations;

(i)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Borrower Collateral. Borrower hereby grants to Lender a license or other right to use, without charge, Borrower's labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Borrower Collateral, in completing production of, advertising for sale, and selling any Borrower Collateral and Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit;

(j)     Sell the Borrower Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Lender determines is commercially reasonable. It is not necessary that the Borrower Collateral be present at any such sale;

(k)     Except in those circumstances where no notice is required under the Code, Lender shall give notice of the disposition of the Borrower Collateral as follows:

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 21 of 49

(i)      Lender shall give Borrower a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Borrower Collateral, the time on or after which the private sale or other disposition is to be made; and

(ii)      The written notice shall be personally delivered or mailed, postage prepaid, to Borrower as provided in <u>Section 12</u>, at least 10 days before the earliest time of disposition set forth in the notice; no notice needs to be given prior to the disposition of any portion of the Borrower Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market;

(l)      Lender may credit bid and purchase at any public sale;

(m)      Lender may seek the appointment of a receiver or keeper to take possession of all or any portion of the Borrower Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing;

(n)      Lender shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document; and

(o)      Exercise any and all rights of Borrower under the Servicing Agreement or assume or assign any and all rights and responsibilities to collect, manage, and service the Notes Receivable, including without limitation, (i) the responsibility for the receipt, processing and accounting for all payments on account of the Notes Receivable, (ii) periodically sending demand notices and statements to the Account Debtors, (iii) enforcing legal rights with respect to the Notes Receivable, including hiring attorneys to do so to the extent Lender or such assignee deems such engagement necessary, and (iv) taking all lawful actions and procedures which Lender or such assignee deems necessary to collect the Notes Receivable, and all such amounts shall be Lender Group Expenses.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in <u>Section 8.4</u> or <u>Section 8.5</u>, in addition to the remedies set forth above, without any notice to Borrower or any other Person or any act by the Lender, Lender's obligation to extend credit hereunder shall terminate and the Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall automatically and immediately become due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrower.

**9.2**    <u>**Remedies Cumulative**</u>.    The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

009056.00101:910160.07

## 10. TAXES AND EXPENSES.

If Borrower fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Lender, in its sole discretion and without prior notice to Borrower, may do any or all of the following: (a) make payment of the same or any part thereof, (b) set up such reserves against the Borrowing Base or the Maximum Revolver Amount as Lender deems necessary to protect Lender from the exposure created by such failure, or (c) in the case of the failure to comply with <u>Section 6.8</u> hereof, obtain and maintain insurance policies of the type described in <u>Section 6.8</u> and take any action with respect to such policies as Lender deems prudent. Any such amounts paid by Lender shall constitute Lender Expenses and any such payments shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement. Lender need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 11. WAIVERS; INDEMNIFICATION.

**11.1 Demand; Protest.** Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

**11.2 Lender's Liability for Borrower Collateral.** Borrower hereby agrees that: (a) so long as Lender complies with its obligations, if any, under the Code, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Borrower Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Borrower Collateral shall be borne by Borrower.

**11.3 Indemnification.** Borrower shall pay, indemnify, defend, and hold the Lender-Related Persons, and each Participant (each, an "<u>Indemnified Person</u>") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrower's and its Subsidiaries' compliance with the terms of the Loan Documents, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act,

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 23 of 49

omission, event, or circumstance in any manner related thereto (all the foregoing, collectively, the "Indemnified Liabilities"). This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.** The foregoing to the contrary notwithstanding, Borrower shall have no obligation to any Indemnified Person under this <u>Section 11.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person.

12.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by Borrower or Lender to the other relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as Borrower or Lender, as applicable, may designate to each other in accordance herewith), or telefacsimile to Borrower or Lender, as the case may be, at its address set forth below:

| | |
|---|---|
| If to Borrower: | **CMR Income Fund, LLC**<br>62 First Street, Fourth Floor<br>San Francisco, California 94105<br>Attn: H. David Choo<br>Fax No: 415-974-1143 |
| with copies to: | **Stein & Lubin**<br>600 Montgomery Street<br>San Francisco, CA 94111<br>Attn: Mark Lubin<br>Fax No.: 415-981-4343 |
| If to Lender: | **Wells Fargo Foothill, Inc.**<br>2450 Colorado Avenue<br>Suite 3000 West<br>Santa Monica, California 90404<br>Attn: Lender Finance Division Manager<br>Fax No.: 310-453-7413 |

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 24 of 49

|             |                                           |
|-------------|-------------------------------------------|
| and         | **Wells Fargo Foothill, Inc.**            |
|             | 13727 Noel Road, Suite 1020               |
|             | Dallas, Texas 75240                       |
|             | Attn: Loan Portfolio Manager—CMR Income Fund, LLC |
|             | Fax No.: 972-387-5775                     |
|             |                                           |
| with copies to: | **Hughes & Luce, L.L.P.**             |
|             | 1717 Main Street, Suite 2800              |
|             | Dallas, TX 75230                          |
|             | Attn: Gary G. Null                        |
|             | Fax No.: 214-939-5849                     |

Lender and Borrower may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 12</u>, other than notices by Lender in connection with enforcement rights against the Borrower Collateral under the provisions of the Code, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail (as specified in the first paragraph of this Section above) and shall be as effective if sent by telefacsimile or other electronic transmission as notice or demand sent by any other method. Borrower acknowledges and agrees that notices sent by Lender in connection with the exercise of enforcement rights against Borrower Collateral under the provisions of the Code shall be deemed sent when deposited in the mail (as specified in the first paragraph of this Section above) or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

## 13. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a) THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH

009056.00101:910160.07

COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 13(b)</u>.

(c) BORROWER AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 14. ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.

### 14.1 <u>Assignments and Participations</u>.

(a) Lender may assign and delegate to one or more assignees (each an "<u>Assignee</u>") that are Eligible Transferees all, or any ratable part of all, of the Obligations and the other rights and obligations of Lender hereunder and under the other Loan Documents, in a minimum amount of $5,000,000; provided, however, that Borrower may continue to deal solely and directly with Lender in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrower by Lender and the Assignee, and (ii) Lender and its Assignee have delivered to Borrower an assignment and acceptance. Anything contained herein to the contrary notwithstanding, the Assignee need not be an Eligible Transferee if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of the assigning Lender.

(b) From and after the date that Lender provides Borrower with such written notice and executed assignment and acceptance, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment and acceptance, shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such assignment and acceptance, relinquish its rights (except with respect to <u>Section 11.3</u> hereof) and be released from any future obligations under this Agreement (and in the case of an assignment and acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation between Borrower and the Assignee; provided, however, that nothing contained herein shall release any assigning Lender

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 26 of 49

from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 16.8 of this Agreement.

(c)     Immediately upon Borrower's receipt of such fully executed assignment and acceptance agreement, this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the rights and duties of Lender arising therefrom.

(d)     Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons not Affiliates of Lender (a "Participant") participating interests in Obligations and the other rights and interests of Lender hereunder and under the other Loan Documents; provided, however, that (i) Lender shall remain the "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations and the other rights and interests of Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible for the performance of such obligations, (iii) Borrower and Lender shall continue to deal solely and directly with each other in connection with Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) Lender shall not transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by Borrower hereunder shall be determined as if Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through Lender and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to Borrower, the Collections of Borrower or its Subsidiaries, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by Lender.

(e)     In connection with any such assignment or participation or proposed assignment or participation, Lender may, subject to the provisions of Section 16.8, disclose all documents and information which it now or hereafter may have relating to Borrower and its Subsidiaries and their respective businesses.

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 27 of 49

(f)     Any other provision in this Agreement notwithstanding, Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR § 203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

**14.2    Successors.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 14.1 hereof and, except as expressly required pursuant to Section 14.1 hereof, no consent or approval by Borrower is required in connection with any such assignment.

## 15.    AMENDMENTS; WAIVERS.

**15.1    Amendments and Waivers.** No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements), and no consent with respect to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by Lender and Borrower and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**15.2    No Waivers; Cumulative Remedies.** No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Borrower of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

## 16.    GENERAL PROVISIONS.

**16.1    Effectiveness.** This Agreement shall be binding and deemed effective when executed by Borrower and Lender.

**16.2    Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**16.3    Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 28 of 49

**16.4    Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**16.5    Withholding Taxes.** All payments made by Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes, and in the event any deduction or withholding of Taxes is required, Borrower shall comply with the penultimate sentence of this <u>Section 16.5</u>, "Taxes" shall mean, any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of Lender) and all interest, penalties or similar liabilities with respect thereto. If any Taxes are so levied or imposed, Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this <u>Section 16.5</u> after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; <u>provided, however,</u> that Borrower shall not be required to increase any such amounts if the increase in such amount payable results from Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Borrower will furnish to Lender as promptly as possible after the date the payment of any Tax is due pursuant to applicable law certified copies of tax receipts evidencing such payment by Borrower.

**16.6    Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**16.7    Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by Borrower, any Pledgor or any Guarantor or the transfer to Lender of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "<u>Voidable Transfer</u>"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of Lender related thereto, the liability of Borrower, such Pledgor or such Guarantor

009056.00101:910160.07

automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

   **16.8   Confidentiality.**   Lender agrees that material, non-public information regarding Borrower and its Subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by Lender in a confidential manner, and shall not be disclosed by Lender to Persons who are not parties to this Agreement, except:  (a) to attorneys for and other advisors, accountants, auditors, and consultants to Lender, (b) to Subsidiaries and Affiliates of Lender (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 16.8, (c) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, (d) as may be agreed to in advance by Borrower or its Subsidiaries or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (e) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Lender), (f) in connection with any assignment, prospective assignment, sale, prospective sale, participation or prospective participations, or pledge or prospective pledge of Lender's interest under this Agreement, provided that any such assignee, prospective assignee, purchaser, prospective purchaser, participant, prospective participant, pledgee, or prospective pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this Section, and (g) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents.  The provisions of this Section 16.8 shall survive for 2 years after the payment in full of the Obligations.

   **16.9   Integration.**   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[Signature pages to follow.]

009056.00101:910160.07

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

CMR INCOME FUND, LLC, a Nevada limited
liability company, as Borrower

By: _____

Name: Henry Park

Title: Manager

CALIFORNIA MORTGAGE AND REALTY,
INC., a Delaware corporation, as Servicer

By: _____

Name: CRAIG RHYMOND

Title: Senior Vice President

WELLS FARGO FOOTHILL, INC.,
a California corporation, as Lender

By: _____

Name: _____

Title: _____

009056.00101:910160.07

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**CMR INCOME FUND, LLC,** a Nevada limited liability company, as Borrower

By: _____
Name:
Title:

**CALIFORNIA MORTGAGE AND REALTY, INC.,** a Delaware corporation, as Servicer

By: _____
Name:
Title:

**WELLS FARGO FOOTHILL, INC.,** a California corporation, as Lender

By: _~~Scott Brand~~_
Name: _Scott Brand_
Title: _Senior Vice President_

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 32 of 49

**Exhibit C-1**

**Form of Compliance Certificate**

[on letterhead of CMR Income Fund, LLC]

To:     Wells Fargo Foothill, Inc.
        13727 Noel Road, Suite 1020
        Dallas, Texas 75240
        Attn: Loan Portfolio Manager—CMR Income Fund

        Re:     Compliance Certificate dated _____, _____

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of August 11, 2005, among CMR INCOME FUND, LLC, a Nevada limited liability company ("Borrower"), CALIFORNIA MORTGAGE AND REALTY, INC., a Delaware corporation ("Servicer"), and WELLS FARGO FOOTHILL, INC. (together with its successors and permitted assigns, the "Lender"), as amended, restated, renewed, replaced, supplemented or otherwise modified from time to time (the "Loan Agreement"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to Section 6.3 of the Loan Agreement, the undersigned manager of Borrower hereby certifies that:

1.      The financial statements of Borrower furnished in Schedule 1 attached hereto have been prepared in accordance with GAAP (except for the lack of footnotes and being subject to year-end audit adjustments, in the case of financial statements other than those as of the fiscal year end of Borrower) and fairly present in all material respects the financial condition of Borrower.

2.      The representations and warranties of Borrower contained in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Certificate, as though made on and as of such date (except to the extent that such representations and warranties (x) relate solely to an earlier date or (y) relate to an action or omission permitted by Lender to the extent of such permission).

3.      Such manager has reviewed the terms of the Loan Agreement and has made, or caused to be made under his supervision, a review in reasonable detail of the transactions and condition of Borrower during the accounting period covered by the financial statements delivered pursuant to Section 6.3 of the Loan Agreement.

4.      Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events

EXHIBIT C-1 – Page 1

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 33 of 49

listed on Schedule 2 attached hereto, specifying the nature and period of existence thereof and what action Borrower has taken is taking, or proposes to take with respect thereto.

5. The representations and warranties of Borrower set forth in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date hereof (except to the extent they relate to a specified date), except as set forth on Schedule 2 attached hereto.

6. Borrower is in compliance with the applicable covenants contained in Sections 7.18, 7.19, and 7.20 of the Loan Agreement, all as demonstrated on Schedule 3 hereof.

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, _____.

CMR Income Fund, LLC

By: _____
         Henry Park, Manager

EXHIBIT C-1 – Page 2

009056.00101:910160.07

## SCHEDULE 1

### Financial Statements

[Attached]


## SCHEDULE 2

### Defaults or Events of Default

[Attached]

EXHIBIT C-1 – Page 3

009056.00101:910160.07

**SCHEDULE 3**

**FINANCIAL COVENANTS**

1.  **Maximum Debt to Tangible Net Worth Ratio for Borrower.**

    (a)   (i)   Borrower's outstanding Indebtedness on the _____ day of _____, ____ is:    $ _____

           (ii)   Borrower's Subordinated Debt on such day is:    $ _____

           (iii)  Borrower's Tangible Net Worth on such day is:    $ _____

           (iv)  The difference of Item (a)(i) minus Item (a)(ii) is:    $ _____

           (v)   The sum of Item (a)(ii) and Item (a)(iii) is:    $ _____

           (vi)  Item (a)(iv) divided by Item (a)(v) (=Debt to Worth Ratio) is:    _____

    (b)   The Debt to Worth Ratio set forth above **[is/is not]** less than or equal to 4.0 to 1.0.

2.  **Interest Coverage Ratio.**

    (a)   (i)   Borrower's EBITDA for the three-month period ending _____, ____ is $ _____.

           (ii)   Borrower's Interest Expense for such period is $ _____.

    (b)   The ratio of Item (a)(i) to Item (a)(ii) is    _____

    The ratio of Borrower's EBITDA to Interest Expense, measured for the three-month period ending _____, ____ is ____:1.0, which **[is/is not]** greater than or equal to 1.5 to 1.0.

3.  **Minimum Tangible Net Worth and Subordinated Debt of Borrower.**

    (a)   (i)   Borrower's Tangible Net Worth on the _____ day of _____, ____ is:    $ _____

           (ii)   Borrower's Subordinated Debt on such day is:    $ _____

           (iii)  The sum of Item (a)(i) and Item (a)(ii) is:    $ _____

    (b)   The sum of Borrower's Tangible Net Worth and Subordinated Debt **[is/is not]** greater than or equal to the applicable amount set forth in Section 7.18(c) of the Loan Agreement for such day.

EXHIBIT C-1 – Page 4

009056.00101:910160.07

Case: 08-32220   Doc# 850-2   Filed: 07/22/11   Entered: 07/22/11 13:38:30   Page 36 of 49

4.  **Limitation on Delinquent Notes Receivable of Borrower**.

    (a)    (i)    the aggregate unpaid balance of Borrower's Delinquent Notes Receivable on the ____ day of _____, ____ is:    $_____

            (ii)    the aggregate unpaid balance of Borrower's Net Eligible Notes Receivable on such day is:    $_____

            (iii)    Item (a)(i) divided by Item (a)(ii) (=Ratio of Delinquent Notes Receivable) is:    _____

    (b)    The Ratio of Delinquent Notes Receivable [**is/is not**] equal to or less than 0.10.

5.  **Limitation on Defaulted Notes Receivable of Borrower**.

    (a)    (i)    the aggregate unpaid balance of Borrower's Defaulted Notes Receivable on the ____ day of _____, ____ is:    $_____

            (ii)    the aggregate unpaid balance of Borrower's Net Eligible Notes Receivable on such day is:    $_____

            (iii)    Item (a)(i) divided by Item (a)(ii) (=Ratio of Defaulted Notes Receivable) is:    _____

    (b)    The Ratio of Delinquent Notes Receivable [**is/is not**] equal to or less than 0.05.

EXHIBIT C-1 – Page 5

009056.00101:910160.07

## Schedule D-1

### Designated Account

Account number 612-0157257 of Borrower maintained with Borrower's Designated Account Bank, or such other deposit account of Borrower (located within the United States) that has been designated as such, in writing, by Borrower to Lender.

"Designated Account Bank" means Wells Fargo Bank, National Association, whose office is located at 1298 E. 14th Street, Second Floor, San Leandro, CA 94577, Attn: Benjamin F. Washington, Jr., Phone: 510-297-0681.

009056.00101:910160.07

## **Schedule L-1**

### **Lender's Account**

An account at a bank designated by Lender from time to time as the account into which Borrower shall make all payments to Lender under this Agreement and the other Loan Documents; unless and until Lender notifies Borrower to the contrary, Lender's Account shall be that certain deposit account bearing account number 323-266193 and maintained by Lender with JPMorgan Chase Bank, 4 New York Plaza, 15th Floor, New York, New York 10004, ABA #021000021.

009056.00101:910160.07

## Schedule P-1

### Permitted Liens

None

009056.00101:910160.07

## Schedule 2.6(a)

## Cash Management Banks

1.  Wells Fargo Bank, National Association
    1298 E. 14th Street, Second Floor
    San Leandro, CA 94577
    Attn: Benjamin F. Washington, Jr.
    Phone: 510-297-0681

009056.00101:910160.07

## Schedule 5.5

## Locations of Collateral

1. In the case of Notes Receivable, at Lender's office in Dallas, Texas

2. Other Collateral:

> 62 First Street, Fourth Floor
> San Francisco, California  94105

009056.00101:910160.07

## Schedule 5.7(a)

### States of Organization

1. Borrower - Nevada

2. Servicer – Delaware

## Schedule 5.7(b)

### Chief Executive Offices

1. Borrower –
   62 First Street, Fourth Floor
   San Francisco, California 94105

2. Servicer –
   62 First Street, Fourth Floor
   San Francisco, California 94105

## Schedule 5.7(c)

### Organizational Identification Numbers

1. Borrower – LLC4724-2004

2. Servicer - 2390528

## Schedule 5.7(d)

### Commercial Tort Claims

None

SCHEDULE 5.7 – Page 1

009056.00101:910160.07

## Schedule 5.8(b)

### Capitalization of Borrower

1.

| Name | Capital Contributions |
|---|---|
| Adeline Investments, Inc., a Nevada corporation | $4,470,265.97 |
| Jason Junsong Choo | 13,105.46 |
| Choo Family Revocable Trust U/A/D 12-21-2001 | 94,985.97 |
| David & Hyesung Choo, jointly | 21,810.46 |
| Sixty-Two First Street, LLC, a Nevada limited liability company | 3,240,994.78 |
| Total Investments by Members | $7,841,162.64 |

2.    There are no subscriptions, options, warrants or calls relating to any membership interests in Borrower.

### Schedule 5.8(c)

### Capitalization of Borrower's Subsidiaries

Borrower has no Subsidiaries

009056.00101:910160.07

## Schedule 5.10

### Litigation

None

009056.00101:910160.07

Case: 08-32220    Doc# 850-2    Filed: 07/22/11    Entered: 07/22/11 13:38:30    Page 45 of 49

## Schedule 5.16

### Intellectual Property

None

009056.00101:910160.07

## Schedule 5.18

### Deposit Accounts and Securities Accounts

| Bank | Type of Account | Account Number | Account Name |
|---|---|---|---|
| Wells Fargo Bank, N.A. 1298 E. 14th Street, Second Floor San Leandro, CA 94577 Attn: Benjamin F. Washington, Jr. Phone: 510-297-0681 | Operating Account Subscription Account Money Mkt. Account FICS Account | 612-0157257 958-6119092 657-9230126 642-6252612 | CMR Income Fund, LLC CMR Income Fund, LLC CMR Income Fund, LLC CMR Income Fund, LLC |
| | | | |

009056.00101:910160.07

## Schedule 5.20

### Permitted Indebtedness

None

009056.00101:910160.07

## Schedule 7.19

### Excluded Delinquent and Defaulted Notes Receivable

| Maker | Original Principal Amount | Date | Collateral's Address |
|---|---|---|---|
| Tristar Hotels & Investment LLC | $3,600,000 | October 21, 2004 | 330 North Bayshore Blvd. 350 North Bayshore Blvd. San Mateo, California |
| Tristar Hotels & Investment LLC | $600,000 | December 3, 2004 | 330 North Bayshore Blvd. 350 North Bayshore Blvd. San Mateo, California |
|  |  |  |  |
|  |  |  |  |

009056.00101:910160.07