1  McNUTT LAW GROUP LLP
   SHANE J. MOSES (CSBN 250533)
2  SCOTT H. McNUTT (CSBN 104696)
   188 The Embarcadero, Suite 800
3  San Francisco, California 94105
   Telephone: (415) 995-8475
4  Facsimile: (415) 995-8487

5  Attorneys for Official Committee
   of Equity Security Holders
6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11 | In re                          | Case Nos.  08-32220 TEC
   |                                |            09-30788 TEC
12 | CMR MORTGAGE FUND, LLC,        |            09-30802 TEC
   | CMR MORTGAGE FUND II, LLC,     |
13 | CMR MORTGAGE FUND III, LLC,    | Substantively Consolidated
   |                                |
14 |              Debtors.          | Chapter 11
   |                                |
15 |                                | **THIRD INTERIM APPLICATION FOR
   |                                | COMPENSATION AND
16 |                                | REIMBURSEMENT OF EXPENSES FOR
   |                                | McNUTT LAW GROUP LLP AS
17 |                                | COUNSEL FOR THE OFFICIAL
   |                                | COMMITTEE OF EQUITY SECURITY
18 |                                | HOLDERS**
   |                                |
19 |                                | Date:      April 12, 2013
   |                                | Time:      9:30 a.m.
20 |                                | Place:     235 Pine Street
   |                                |            Courtroom 24
21 |                                |            San Francisco, CA 94104
   |                                | Judge:     Hon. Thomas E. Carlson
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF RELIEF REQUESTED ................................................................... 1

II. NOTICE OF APPLICATION ............................................................................... 1

III. BACKGROUND AND BASIS FOR RELIEF REQUESTED ............................... 2

    A.    Background ................................................................................ 2

    B.    Prior Payments to Applicant ..................................................... 5

    C.    Available Funds and Administrative Expenses .......................... 5

IV. SUMMARY OF FEES AND COST REIMBURSEMENT ................................... 5

V. REQUIRED DISCLOSURE ................................................................................. 6

VI. SERVICES RENDERED ..................................................................................... 8

    A.    Confirmation of Chapter 11 Plan ............................................. 8

    B.    Objections to Plan Confirmation ............................................. 10

    C.    Canpartners Settlement Negotiation & Documentation ........... 11

    D.    Canpartners Settlement Approval ............................................. 12

    E.    Wells Fargo/ Wheatland Settlement ........................................ 13

    F.    Wells Fargo Participation in Plan ............................................ 14

    G.    ASK Financial Plan Financing ................................................. 14

    H.    Other Sources of Plan Financing – NHB Financial Advisors ... 15

    I.    Other Sources of Plan Financing – Discussions with Potential Lenders .............. 16

    J.    Oxford Plan Financing Proposal .............................................. 17

    K.    Post-Confirmation Issues and Modifications to Plan ............... 18

    L.    Pfau, Pfau & Pfau Bankruptcy Case and Properties ................ 19

    M.    Oxford Standstill Agreement & Related Properties ................. 21

    N.    General Real Estate Issues ....................................................... 22

    O.    General Litigation & Guarantors .............................................. 23

    P.    Relief from Stay Motions Regarding Indian Harbor Insurance Policy ................... 24

| | | |
|---|---|---|
| Q. | General Relief from Stay Issues | 25 |
| R. | Case Administration | 26 |
| S. | Equity Committee Meetings – Plan Period | 27 |
| T. | Equity Committee Meetings – Trustee Period | 28 |
| U. | Committee Agendas and Minutes | 29 |
| V. | Communications With Equity Committee Members | 29 |
| W. | Committee Website & BAPCPA Compliance | 30 |
| X. | Communications with Other Individual Creditors | 32 |
| Y. | Communications with Other Major Parties | 32 |
| Z. | Business Operations and Management Fee Issues | 33 |
| AA. | Status Conferences/ Miscellaneous Hearings | 34 |
| BB. | Appointment of Trustee and Transition Process | 34 |
| CC. | Employment and Fee applications (MLG) | 35 |
| DD. | Employment and Fee Applications (Other Professionals) | 36 |
| EE. | Stevens & Bornstein Litigation | 37 |
| FF. | D. Choo Proposals re: Abandonment of Property | 38 |

VII. SUMMARY OF EXPENSES .................................................................. 39

VIII. INTEROFFICE CONFERENCES ........................................................ 40

IX. MULTIPLE PROFESSIONALS .............................................................. 40

X. RESPONSIBLE PERSONNEL ................................................................ 41

XI. ESTABLISHMENT OF FEES ................................................................ 41

XII. CONCLUSION ..................................................................................... 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.  SUMMARY OF RELIEF REQUESTED

McNutt Law Group LLP ("MLG" or "Applicant"), attorneys for the Official Committee of Equity Security Holders (the "Committee") of CMR Mortgage Fund, LLC ("Fund I"), CMR Mortgage Fund II, LLC ("Fund II") and CMR Mortgage Fund III, LLC ("Fund III") (collectively the "Funds" or "Debtors") in the above-captioned case, hereby presents its third interim application, seeking an order for allowance of $571,045.40 (less a voluntary reduction described below) in fees and reimbursement of $40,977.57 in expenses incurred for the period August 1, 2010 through February 28, 2013 (the "Application").  MLG will take a voluntary reduction of $39,716.50 in fees incurred, thereby seeking allowance of a total of $531,328.90 in fees.  This voluntary reduction represents the fees incurred in two categories, the Stevens & Bornstein Litigation (Section VI.EE, below) and D. Choo Proposals re: Abandonment of Property (Section VI.FF, below).  These categories represent time incurred in represent the Committee regarding issues related to the associated class and derivative action, in which MLG acted as class counsel and successfully obtained a significant recovery of insurance proceeds.

MLG submits this Application in accordance with the orders authorizing MLG's employment as counsel for the Committee entered on November 2, 2009, in the Fund I case [Doc. No. 296], the Fund II case [Doc. No. 169], and the Fund III case [Doc. No. 143] (collectively, the "Employment Order"); § 327(a) of Title 11 of the United States Code ("Bankruptcy Code"); Federal Rule of Bankruptcy Procedure 2016; the Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees for the United States Bankruptcy Court for the Northern District of California ("Court Guidelines"); and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 ("UST Guidelines").

# II.  NOTICE OF APPLICATION

Notice of this Application, in the form attached hereto as Exhibit A, is being sent concurrently with its filing to creditors and parties-in-interest.  Full copies of the Application are being transmitted by mail to the United States Trustee, Debtors' counsel, counsel for Chapter 11

1  Trustee, and members of the Official Committee of Equity Security Holders.  Applicant
2  respectfully submits that no further notice is required in this matter.

### III.  BACKGROUND AND BASIS FOR RELIEF REQUESTED

**A.  Background**

The Funds were California limited liability companies that were managed by California Mortgage and Realty, Inc. ("CMRI" or the "Manager"), and were formed for the purpose of making or investing in business loans secured by deeds of trust on real estate properties – predominately commercial income producing structures or land held by businesses located primarily in California.  The principal assets of the Funds were interests in limited liability corporations that owned real property acquired by foreclosure.

On November 18, 2008, Fund I filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and on March 31, 2009, Fund II and Fund III filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On October 2, 2009, the United States Trustee appointed the Committee to serve in the Fund I, Fund II, and Fund III bankruptcy cases, as reflected in the Appointment of Official Committee of Unsecured Creditors filed with this Court on October 2, 2009.  The Committee hired MLG as counsel ("Committee Counsel") on October 16, 2009, and LECG as financial advisors on November 2, 2009.  LECG has since dissolved, with the individuals working on this matter moving to Navigant Consulting (together with LECG, "Committee Financial Advisors"), which has replaced LECG as financial advisors.

Since its appointment in the case the Committee has taken an active role.  It took the lead in bringing the Debtors and the investor constituency together to reach consensus on a joint plan and disclosure statement.  The Committee and its professionals formulated a wind-down plan (the "Plan" or "Joint Plan") that would have allowed a measured sale of the Funds' assets over a three to five year period.  It was expected that this measured approach, with investment in entitlements and other measures to increase properties values, would maximize the possibility of a meaningful return to equity holders.

Case: 08-32220    Doc# 1226    Filed: 03/22/13    Entered: 03/22/13 11:07:44    Page 5 of 44

The Committee's professionals including MLG negotiated the key provisions of the Joint Plan with the Debtors as well as various creditors with significant interests in the estates. The Committee's professionals, particularly MLG, then took the lead in drafting a plan and disclosure statement as well as the related motion for substantive consolidation of the estates in the three Funds' bankruptcy cases. The Disclosure Statement for the Plan was approved on June 24, 2010. Upon submission to creditors and equity investors, the Plan received overwhelmingly support. All objections to confirmation of the Plan were overruled (with qualifications as directed by the Court) or resolved through settlement. On October 5, 2010, this Court entered an order confirming the Plan.

The Plan required exit financing to go effective. This exit financing was to provide sufficient cash to cover expenses and allow significant investment in the properties. Because of the nature of the Funds' properties, it was expected that obtaining the best reasonable recoveries would in many cases require funding significant entitlement work, and/or obtaining forbearance from senior lenders to allow sufficient time to obtain a good sale price.

The Committee learned that ASK Financial, which had committed to provide exit financing, would not be able to fund. This led to a six month intensive effort by the Committee to obtain an alternate source of financing. Working with a national financial services company specializing in distressed asset financing, the Committee located a number of lenders with an interest in providing financing, and ultimately obtained letters of intent from three. None of these potential lenders were willing to close a financing deal. After it proved impossible to locate third party financing, the Committee worked for approximately two months with a group of investors known as Oxford, who were senior lenders on a number of the Funds' properties, regarding potential exit financing. Oxford ultimately pulled out of the transaction at the eleventh hour. This led the Committee to conclude that the only reasonable alternative was to vacate confirmation of the Plan, and obtain appointment of a Chapter 11 Trustee to administer the assets.

Although the Plan could not go effective because the necessary funding could not be obtained, the Plan process and Committee counsel's work in connection with the Plan led to significant benefits for the estate. The relationships and intercompany obligations between the

1  three Debtor funds were complex, with numerous intra-company assignments of rights and

2  subordinations.  In addition, may equity holders had interests in more than one Fund.  No

3  distributions to equity holders were possible without resolving these issues.  As a result of the

4  Committee's work in connection with the Plan, the Court ordered substantive consolidation of the

5  Debtor estates, and adopted the Committee's distribution mechanism for any distributions to equity

6  holders.  The Committee also obtained the elimination of one of the major unsecured claims in the

7  case, and worked with the Chapter 11 Trustee to reach a settlement eliminating the other major

8  claim.  This removed approximately $20 million in unsecured obligations, which would have

9  represented a $20 million obstacle to any distribution to equity holders.  There were no other

10  substantial unsecured claims.  Finally, working through a separate contingency representation,

11  MLG succeeded in recovering the proceeds of the Debtor's two insurance policies, resulting in a

12  substantial payment to the estate, as well as a direct recovery for equity holders.  In order to obtain

13  at least a 1% distribution to equity holders, MLG voluntarily reduced its contingency fee in that

14  matter by more than $300,000.  These actions, all of which flowed out of the Plan process, make it

15  possible for future recoveries from the Debtor's assets, should there be any, to flow directly to the

16  equity holders.

17      On April 4, 2011, the Court ordered the appointment of a Trustee.  Richard Kipperman

18  was subsequently appointed by the Office of the U.S. Trustee, and approved by this Court as

19  Chapter 11 Trustee (the "Trustee").  The Trustee is extremely experienced, and has done an

20  excellent job of administering the estate assets.

21      Since the appointment of the Trustee, the Committee has drastically scaled back its work

22  on the case, in order to avoid the duplication of efforts.  The Committee has remained actively

23  involved, however, in order to represent the interests of equity holders, and in order to provided

24  such assistance to the Trustee as is beneficial, based on the Committee's longer history and

25  experience with the case.

26      On June 25, 2010, three members of the Committee, acting individually and as Committee

27  members (the "Class Plaintiffs"), filed a class and derivative action against CMRI and its

28  principal, David Choo, seeking to recovery insurance proceeds (the "Class Action").  MLG acted

as counsel for the Class Plaintiffs under a separate engagement agreement, on a contingency basis. This was disclosed in this case, but did not require Court approval, because MLG was not retained by the Bankruptcy Estate in the Class Action. MLG was appointed class co-counsel (along with Lee Law Offices) by this Court on December 31, 2012. After two years of litigation and settlement negotiations, MLG, working with the Trustee, obtained a settlement of the Class Action which recovered nearly all of the available insurance coverage for the benefit of the estate and the class of all equity holders. This settlement was also approved on December 31, 2012. On December 20, 2012, the Court entered an order approving class counsel's contingency fee in the Class Action. All fees incurred in pursuing and obtaining the insurance recovery are treated by that award in the Class action, and are not included here.

**B.      Prior Payments to Applicant**

This Court approved on an interim basis $229,029.57 in fees and expenses incurred by MLG for the period October 16, 2099 through January 31, 2010, and $653,654.44 in fees and expenses incurred by MLG for the period February 1, 2010 through July 31, 2010, for a total interim approval of $882,684.01 in fees and expenses. Because the Debtors had very limited funds available, MLG has received only $89,359.35 towards the interim fee and expense awards.

**C.      Available Funds and Administrative Expenses**

MLG is informed and believes that there may not presently be sufficient assets held by the estates to produce funds to pay MLG's fees and costs in full. Applicant respectfully requests that the fees sought herein be awarded, and paid by the Trustee to the extent of available funds, pro rata with other Chapter 11 administrative expenses.

## IV.    SUMMARY OF FEES AND COST REIMBURSEMENT

From August 1, 2010, through February 28, 2013, MLG rendered the services described in this Application and in the invoices attached to the DECLARATION OF SCOTT H. MCNUTT IN SUPPORT OF THIRD INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR MCNUTT LAW GROUP LLP AS COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, filed concurrently herewith ("McNutt Decl."). MLG also incurred the actual and necessary expenses itemized in the invoices. MLG expended a total of 1,272.5 hours rendering

1  services to the Committee during the period covered by this Application, for which it seeks

2  $571,045.40 in compensation, less a voluntary reduction.  MLG will take a voluntary reduction of

3  $39,716.50 in fees incurred, thereby seeking allowance of a total of $531,328.90 in fees.  MLG

4  also seeks $40,977.57 in reimbursement of expenses incurred during the Application period.

5  The voluntary reduction of $39,716.50 represents the fees incurred in two categories, the

6  Stevens & Bornstein Litigation (Section VI.EE, below) and D. Choo Proposals re: Abandonment

7  of Property (Section VI.FF, below).  These categories represent time incurred in representing the

8  Committee regarding issues that relate to the associated Class Action.  MLG believes that the time

9  in these categories represents work done for the Committee on behalf of the Bankruptcy Estate,

10  and thus that it is fully compensable as part of this fee application, and not included within the

11  contingency award in the Class Action.  Nevertheless, in order to ensure that there is no possibility

12  of an appearance of double counting, MLG is willing to voluntarily write off this time.  This

13  represents a reduction in MLG's requested fees in this Application of approximately 7%.

14  ## V.  REQUIRED DISCLOSURE

15  MLG has not entered into any agreement for the purpose of fixing the fees or other

16  compensation to be paid for services rendered and expenses incurred in connection with this case.

17  MLG has not agreed to share the compensation to be received for the services rendered in this case

18  with any other entity.  *See* McNutt Decl., ¶ 10.

19  The names and hourly rates of the professionals and paraprofessionals of MLG who billed

20  time for the period covered by this Application are as follows:

| PROFESSIONAL | INITIALS | POSITION | DATE ADMITTED | RATE THROUGH 01/31/12 | RATE AS OF 02/01/12 |
|---|---|---|---|---|---|
| Scott H. McNutt | SHM | Attorney | 1982 | $525 | $550 |
| Michael A. Sweet | MAS | Attorney | 1996 | $495 | n/a |
| Dale L. Bratton | DLB | Attorney | 1986 | $450 | n/a |
| Douglas C. Graham | DCG | Attorney | 2001 | $395 | $425 |
| Shane J. Moses | SJM | Attorney | 2005 | $325 | $375 |
| Thomas B. Rupp | TBR | Attorney | 2011 | n/a | $300 |
| Jackie Jacobus | JJ | Paralegal | n/a | $150 | $150 |
| Carol A. Snell | CAS | Paralegal | n/a | $150 | $150 |

The hourly rates charged by MLG in this case are its customary rates charged by comparably skilled practitioners in cases other than cases under Title 11. MLG's rates in this case are not greater than those charged to other clients in other than bankruptcy matters.

As set forth below, MLG has compiled a project-based itemization of services rendered based upon its contemporaneous daily records during the period covered by this Application. MLG has utilized the project categories suggested by the UST Guidelines. The Committee has been given an opportunity to review this Application. *See* McNutt Decl., ¶ 9.

The following chart summarizes project billing categories and the total hours expended for each category during the period covered by this Application, and is followed by a narrative and detail.

| CATEGORY | | TOTAL HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| A. | Confirmation of Chapter 11 Plan | 54.4 | $26,445.00 |
| B. | Objections to Plan Confirmation | 18.5 | 8,496.00 |
| C. | Canpartners Settlement Negotiation & Documentation | 44.7 | 20,670.00 |
| D. | Canpartners Settlement Approval | 40.0 | 18,222.00 |
| E. | Wells Fargo / Wheatland Settlement | 7.8 | 3,455.00 |
| F. | Wells Fargo Participation in Plan | 23.8 | 10,804.50 |
| G. | ASK Financial Plan Financing | 31.0 | 13,066.90 |
| H. | Other Sources of Plan Financing – NHB Financial Advisors | 58.3 | 28,069.00 |
| I. | Other Sources of Plan Financing – Discussions with Potential Lenders | 49.4 | 23,934.00 |
| J. | Oxford Plan Financing Proposal | 69.0 | 32,168.00 |
| K. | Post-Confirmation Issues and Modifications to Plan | 60.8 | 28,237.50 |
| L. | Pfau, Pfau & Pfau Bankruptcy Case and Properties | 82.2 | 33,968.50 |
| M. | Oxford Standstill Agreement & Related Properties | 21.3 | 9,837.00 |
| N. | General Real Estate Issues | 49.2 | 23,040.00 |
| O. | General Litigation & Guarantors | 40.1 | 16,725.00 |

00015412-1

| Category | | Total Hours Billed | Total Fees |
|---|---|---|---|
| P. | Relief From Stay Motions Regarding Indian Harbor Insurance Policy | 52.0 | 22,049.50 |
| Q. | General Relief from Stay Issues | 23.2 | 9,283.00 |
| R. | Case Administration | 11.8 | 5,702.50 |
| S. | Equity Committee Meetings – Plan Period | 83.0 | 39,387.00 |
| T. | Equity Committee Meetings – Trustee Period | 47.8 | 21,744.50 |
| U. | Committee Agendas and Minutes | 40.1 | 17,861.50 |
| V. | Communications with Equity Committee Members | 19.7 | 9,411.50 |
| W. | Committee Website & BAPCPA Compliance | 25.1 | 10,686.00 |
| X. | Communications with Other Individual Creditors | 12.8 | 5,750.00 |
| Y. | Communications with Other Major Parties | 8.3 | 3,767.50 |
| Z. | Business Operations and Management Fee Issues | 16.9 | 7,939.50 |
| AA. | Status Conferences/ Miscellaneous Hearings | 31.7 | 13,544.50 |
| BB. | Appointment of Trustee and Transition Process | 49.6 | 24,294.00 |
| CC. | Employment and Fee Applications (MLG) | 65.0 | 28,040.50 |
| DD. | Employment and Fee Applications (Other Professionals) | 41.6 | 14,729.00 |
| EE. | Stevens & Bornstein Litigation | 76.6 | 31,831.50 |
| FF. | D. Choo Proposals re: Abandonment of Property | 15.1 | 7,885.00 |
| | **TOTALS:** | **1,270.8** | **$571,045.40** |

## VI.  SERVICES RENDERED

**A.  Confirmation of Chapter 11 Plan**

At the time the Committee was appointed, the three Debtor Funds appeared to be working at cross-purposes.  Funds II and III had separate plans pending before the Court.  There appeared to be no coherent or viable strategy for putting forward a plan that was actually likely to bring a positive result for any part of the equity class.  Meanwhile, Fund I was embroiled in expensive, high-stakes litigation with Canpartners over a property which was, in the final analysis, of no value to the Funds.

Having been appointed to represent the equity interests in all three Funds, the Committee early on focused on bringing the various divergent interests together. The goal was to formulate a Chapter 11 plan that actually had prospects of recovering significant value for equity investors, in difficult legal and financial circumstances and from a precariously-positioned pool of illiquid assets.

The first step in this process was the entry into a term-sheet with the three Funds. This occurred in mid-January 2010, which was in the period covered by Committee Counsel's prior fee application. The term-sheet called for the three Debtors to work together with the Manager and the Committee to negotiate a joint plan of reorganization. Shortly thereafter, the Committee and the Debtors set to work on such a plan. This eventually became the Plan as filed on June 24, 2010. The Plan, as conceived by MLG along with the Committee Financial Advisors, would have used a liquidating trust to sell off the Funds' various real property assets over a three to five-year period. The Committee was able to successfully confirm the Plan in October 2010, after resolving all objections to confirmation.

The time in this task relates to time incurred in resolving confirmation issues and obtaining confirmation of the Plan, during the time period from August 1, 2010, through entry of the order confirming the Plan on October 5, 2010. Time in this task code includes addressing numerous issues related to confirmation that arose prior to the September 22, 2010, final hearing on confirmation. While settlements with the major objecting parties are dealt with under a different task code, issues related to the involvement of those parties in the Plan and post-confirmation structure are included here. This was a complex Plan process, with numerous moving pieces, and the time in this task code also relates to addressing the logistical and procedural issues of Plan confirmation. This task code also includes time incurred after the confirmation hearing and before entry of the confirmation order, related to addressing issues of post-confirmation structure and preparing the final confirmation order.

Ultimately, as this Court knows, the Plan could not go effective because of a lack of financing. The initial financing commitment from ASK Financial fell through when ASK Financial informed the Committee that it would be unable to perform. The Committee was unable

00015412-1

THIRD INTERIM APPLICATION
FOR COMPENSATION FOR MLG

to obtain a source of replacement financing. After five months, the Committee ultimately advised the Court that it would not be possible to obtain financing, and requested that the plan confirmation be rescinded and a Trustee appointed. Time related to both post-confirmation issues and financing is set forth in other task codes.

While it was ultimately not possible for the Plan to go effective, at the time this work was done, it represented the most likely path to obtaining any meaningful return for equity investors. The Trustee in this case has done an excellent job, but as the Court knows, it has been difficult to obtain significant value from many, if not most, of the CMR properties. While the outcome of any other path is speculative at this point, it is likely that the Plan would have produced greater returns because it would have provided the ability to invest in entitlements and other actions to increase the value of the properties. Given the state of disorder in the cases when the Committee was formed, and the possibility of greatly increasing the value of some of the properties with significant investment, the work done to formulate and confirm the Plan was reasonable and necessary at the time. In addition, the work done in connection with the Plan, including substantive consolidation, a mechanism for distribution to equity holders, and resolution of the Canpartners claim, was of significant benefit to the estate.

Time in addressing objections to the Plan is separately task coded, as is time incurred in addressing modifications and extensions after the confirmation order was entered.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. A.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 16.9 | $8,872.50 |
| Michael A. Sweet | MAS | 15.5 | 7,672.50 |
| Dale L. Bratton | DLB | 22.0 | 9,900.00 |
| **TOTALS** | | **54.4** | **$26,445.00** |

**B.**    **Objections to Plan Confirmation**

There were a number of objections to Plan confirmation from various creditors and other parties. This category includes work by Committee Counsel to analyze objections to confirmation

00015412-1

THIRD INTERIM APPLICATION
FOR COMPENSATION FOR MLG

1  and to develop and implement strategies for responding to the various objections. Addressing and

2  resolving these objections was necessary to obtain confirmation of the Plan.

3       In addition to the creditor objections set forth above, there were objections from certain

4  equity holders who had filed state court actions seeking to obtain recovery of insurance proceeds

5  for their own benefit at the expense of the equity class in general (the "State Court Plaintiffs").

6  Committee Counsel had to extend significant time in responding to the State Court Plaintiffs'

7  objections. This represents the bulk of the time in this task code. Through the work of Committee

8  Counsel, these objections were ultimately overruled by the Court, leading to confirmation of the

9  Plan.

10       Prior to confirmation, the Committee was engaged in litigation with Canpartners, an entity

11  involved in the failed Hawaii investment, over the value of its unsecured claim. Canpartners

12  objected to confirmation based on its treatment under the Plan. Wells Fargo Foothill ("Wells

13  Fargo") also objected. Issues with both of these creditors were ultimately resolved through

14  settlement, and only a small amount of time was incurred in this task code in addressing these

15  objections. Time incurred in negotiating and documenting these settlements is set forth in separate

16  task codes.

17       The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. B.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Michael A. Sweet | MAS | 3.8 | $1,881.00 |
| Dale L. Bratton | DLB | 14.7 | 6,615.00 |
| **TOTALS** | | **18.5** | **$8,496.00** |

**C.  Canpartners Settlement Negotiation & Documentation**

23       There were a number of pending litigation matters that affected the interests of the equity

24  holders in the lead-up to Plan confirmation. The most significant piece of litigation was the

25  dispute between Fund I and Canpartners over the failed Hawaii investment. Counsel for Fund I

26  had expected more than a million dollars in legal fees in this litigation. Canpartners had also filed

27  a $5.8 million unsecured claim. If allowed, this claim would have been paid before any

distributions to the Committee's equity constituency. In fact, given the inability to obtain funding and the current status of this case, failure to favorably resolve the Canpartners claim would have resulted in no estate funds available for distribution to equity.

Ultimately, the Committee elected to object to the Canpartners claim and to seek negotiations for a global settlement between Canpartners and the Funds, with the purpose of resolving all issues through an appropriate compromise and ending the litigation.

Soon after the claim objection was filed, Canpartners and the Committee were able to commence the serious settlement discussions that led to the resolution through compromise of one of the most contentious and costly components of this case. By settling the Canpartners dispute, Committee Counsel succeeded in eliminating the sole remaining objection to confirmation, while simultaneously eliminating a major claim that would have to be paid before equity.

Time in this category reflects Committee Counsel's work in negotiating and documenting the settlement with Canpartners. This was a complex and difficult settlement, as it involved resolution of the Fund's litigation against Canpartners, the Canpartners claim, and Canpartners' objection to confirmation.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. C.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.0 | $1,050.00 |
| Michael A. Sweet | MAS | 9.0 | 4,455.00 |
| Dale L. Bratton | DLB | 33.7 | 15,165.00 |
| **TOTALS** | | **44.7** | **$20,670.00** |

**D. Canpartners Settlement Approval**

Once the settlement with Canpartners was negotiated and documented, the Committee needed to obtain Court approval, pursuant to Rule 9019 of the Federal Rules of Bankruptcy procedure. This required drafting the motion seeking approval and the related pleadings. In addition, it was necessary to address pending issues in the District Court proceedings in the context of settlement.

Certain parties related to the Hawaii transaction objected to the Canpartners settlement. This required Committee Counsel to review and respond to the objections. The objections were ultimately overruled and the settlement approved by the Court. As discussed above, this eliminated a $5.8 million unsecured claim, greatly reducing the unsecured claims burden for the benefit of the equity holders.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. D.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 1.7 | $892.50 |
| Michael A. Sweet | MAS | 2.1 | 1,039.50 |
| Dale L. Bratton | DLB | 36.2 | 16,290.00 |
| **TOTALS** | | **40.0** | **$18,222.00** |

**E.      Wells Fargo/ Wheatland Settlement**

On the property known as Wheatland, the Debtor's interests were subject to a senior lien in favor of Wells Fargo. This property and the related loans were of particular concern. Due to the nature of the loan documents, the bankruptcy estate was potentially exposed to a deficiency claim by Wells Fargo. Depending on Wells Fargo's ability to obtain relief from stay, and the results of a foreclosure sale, this deficiency claim could have been in excess of $15 million dollars. With the Committee's support, the Trustee was able to reach a resolution with Wells Fargo that eliminated the possibility of a deficiency claim. The time in this task code represents Committee Counsel's work in facilitating that settlement, both before and after appointment of the Trustee.

Resolution of the Wells Fargo deficiency issues, together with the Canpartners claim resolution, removed the two major obstacles to the equity holders benefiting from any recoveries to the bankruptcy estate.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. E.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.2 | $1,155.00 |
| Michael A. Sweet | MAS | 1.5 | 742.50 |

00015412-1

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Dale L. Bratton | DLB | 1.8 | 810.00 |
| Shane J. Moses | SJM | 2.3 | 747.50 |
| **TOTALS** | | **7.8** | **$3,455.00** |

**F.      Wells Fargo Participation in Plan**

As described above, Wells Fargo was the senior lender on the Wheatland property, and potentially had a significant unsecured claim against the estate, depending on the disposition of that property.  In the period leading up to confirmation of the Plan, the Committee worked extensively with Wells Fargo to obtain its support for the Plan.  This task code includes time incurred in working with counsel for Wells Fargo on issues related to the Plan, and an agreement for Wells Fargo's participation in the Plan.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. F.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Michael A. Sweet | MAS | 2.1 | $1,039.50 |
| Dale L. Bratton | DLB | 21.7 | 9,765.00 |
| **TOTALS** | | **23.8** | **$10,804.50** |

**G.      ASK Financial Plan Financing**

A critical component of the Plan was post-confirmation exit financing, which was necessary in order for the Plan to go effective.  This financing was integral to the Plan in order to provide necessary working capital to maximize the value of the Funds' properties.  The financing was to be used for a number of purposes, including funding entitlements, as well as making payments necessary to carry properties and prevent foreclosure.  The projections prepared in connection with the Plan indicated that this funding would greatly increase the value of the properties.

Prior to Plan confirmation, the Committee obtained a funding commitment from ASK Financial, a large and well known provider of distressed asset financing.  Time in this task code is

Case: 08-32220   Doc# 1226   Filed: 03/22/13   Entered: 03/22/13 11:07:42   Page 17 of 44

for work done in connection with the ASK Financial funding commitment. This was a basic necessity of the Plan, and required substantial investment of time. The initial block of time involves work related to appraisals and other conditions for financing.

As the Court is aware, the Committee was ultimately informed by ASK Financial that it would not be able to perform under its financing commitment. A significant amount of time in this category involves addressing this issue. This includes identifying other options and analyzing how to proceed. The time in this category is primarily for the period from the beginning of the Application period through approximately mid-October, 2010.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. G.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 16.5 | $6,037.90 |
| Michael A. Sweet | MAS | 11.2 | 5,544.00 |
| Dale L. Bratton | DLB | 3.3 | 1,485.00 |
| **TOTALS** | | **31.0** | **$13,066.90** |

## H. Other Sources of Plan Financing – NHB Financial Advisors

Following the failure of ASK Financial to provide the funding that it had committed, the Committee determined that the best alternative was to work with a distressed asset financing specialist that would promote the lending opportunity to a broad market of potential lenders. The Committee engaged NHB Financial Advisors ("NHB") to accomplish this. The Committee immediately began exploring this alternative when it learned that there might be an issue with the ASK Financial financing in mid-September 2010.

The Committee engaged with NHB in an intensive three-month push to find exit financing. This took place from the end of September 2010 through the end of December 2010. Financing was critical to the Plan's success, so this issue was of central importance. The Committee and MLG devoted a great deal of time over this period to the effort to find financing. As a result of this work, the Committee identified a number of potential funding sources who signed non-disclosure agreements to conduct due diligence. These included a number of major investment

funds.  Three of these potential funding sources eventually signed letters of intent.

The time in this task code represents work with NHB, as well as all work done in this period with regard to financing that did not related to a specific financing source.  Work with the individual lenders identified by NHB is separately categorized, below.  Work in this category involves initial meetings and calls with NHB; negotiating the terms of an agreement with NHB; preparing a form confidentiality agreement for due diligence; meetings and discussions regarding progress and strategy; work in identifying and sharing due diligence materials with NHB; and all other work related to the effort to secure financing in connection with NHB that was not related to a specific potential lender.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. H.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 12.6 | $6,615.00 |
| Michael A. Sweet | MAS | 29.2 | 14,454.00 |
| Dale L. Bratton | DLB | 13.1 | 5,895.00 |
| Shane J. Moses | SJM | 3.4 | 1,105.00 |
| TOTALS | | 58.3 | $28,069.00 |

## I.    Other Sources of Plan Financing – Discussions with Potential Lenders

As discussed above, the Committee's work with NHB resulted in the identification of a number of potential lenders.  Time in this task code represents work done in connection with due diligence and negotiations with those specific lenders.

Initially, time in this category involves negotiating and documenting non-disclosure agreements with the potential lenders, prior to providing due diligence materials.  This was necessary because the information needed by potential lenders to evaluate the financial situation involved significant non-public information.  Committee Counsel engaged in extensive meetings and telephone conferences with the Committee Financial Advisors and potential lenders over a two-month period in November and December 2010.  Committee Counsel also worked closely with the Committee Financial Advisor to respond to numerous detailed requests for information

00015412-1

regarding the Funds, the properties, and potential lending terms.  This led to three lenders signing letters of intent.

As the Court is aware, none of these potential sources were ultimately willing to close a deal.  The time and costs incurred in this process were necessary, however, because this effort represented the best possibility for obtaining the funding necessary for the Plan to go effective.  As the Court knows, while the Trustee has done an excellent job in administering the estate and the properties, his ability to maximize the value of the properties has been greatly hampered by the lack of available funds.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. I.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 7.0 | $3,675.00 |
| Michael A. Sweet | MAS | 26.2 | 12,969.00 |
| Dale L. Bratton | DLB | 16.2 | 7,290.00 |
| **TOTALS** | | **49.4** | **$23,934.00** |

## J.    Oxford Plan Financing Proposal

After the NHB process failed to yield exit financing for the Plan, it was apparent that financing from a third-party source would not be an option.  NHB's marketing was thorough, and the likelihood was very slim of finding an alternate third-party willing to commit financing where the lenders identified through NHB were not.  It was clear that without financing the Plan could not go effective, as the ability to realize significant value from the properties would be greatly reduced.

In early January 2011, the Committee entered into discussions with Oxford regarding potential exit financing, at a reduced level, through the Oxford investors.  Although the terms of Oxford's proposal involved a significantly lower level of funding than originally contemplated, Oxford's status as senior lender on a number of properties allowed for flexibility that made this an option.  Time in this task code relates to negotiations and discussions with Oxford regarding the terms of funding.  This was a complex transaction that involved extensive negotiations and

1  numerous rounds of term sheets and draft agreements.

2  Oxford provided a letter of intent regarding an exit financing commitment, and the parties

3  worked extensively on terms. Although it appeared that this effort would be successful, Oxford

4  pulled out of the transaction at the eleventh hour prior to the deadline set by the Court to obtain

5  financing. Although the reasons for this are uncertain, it is the Committee's understanding that

6  this was the result of terms demanded by CMRI in connection with the transaction and post-

7  confirmation management fees.

8  Time incurred in connection with modifications to the Plan required by the Oxford

9  proposal is task coded separately.

10  The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. J.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 1.8 | $945.00 |
| Michael A. Sweet | MAS | 22.4 | 11,088.00 |
| Dale L. Bratton | DLB | 44.6 | 20,070.00 |
| Shane J. Moses | SJM | .2 | 65.00 |
| **TOTALS** | | **69.0** | **$32,168.00** |

**K.    Post-Confirmation Issues and Modifications to Plan**

17  The Plan was confirmed by the Court on October 5, 2010. Over the next six months, the

18  Committee endeavored to resolve the issues necessary for the Plan to become effective. A

19  significant part of this involved working to obtain exit financing after the initial financing

20  commitment fell through, work which is captured in separate task codes. It was also necessary for

21  Committee Counsel to incur considerable time in addressing other post-confirmation issues. Time

22  addressing these issues is captured in this task code.

23  A relatively small amount of time in this category relates to addressing post-confirmation

24  issues in the initial two weeks after confirmation. This primarily involved effective date and

25  notice concerns. The remainder of the time in this task code relates to addressing the need for

26  extensions of time and modifications of the Plan, in order to respond to the financing issues.

27

28

After it became clear that the initial financing source would not be able to fulfill its financing commitment, it was necessary to obtain an extension of the deadline for the Plan to go effective. Time in this task code from mid-November 2010 through early December 2010 was incurred in obtaining an initial extension of time for the Plan to become effective while the Committee worked with a distressed asset financing broker to find replacement exit financing. Obtaining this extension of time provided the opportunity to search for the replacement financing that would have allowed the Plan to become effective.

After talks with the initial round of potential financers fell through, the Committee entered into talks with the Oxford investors regarding the possibility of providing exit financing on a more limited basis than originally contemplated. This required significant modifications to the Plan. Oxford was willing to lend only a significantly smaller amount than originally anticipated. In addition, the Oxford deal would have involved revisions related to Oxford's forbearance on the numerous properties for which it was the senior lender. Much of the time in this task code is related to work on the Plan modifications necessary for the Oxford financing arrangement. Time was also incurred in negotiating the terms of a new management agreement with an affiliate of the former manager, which was a necessary component of the Oxford financing scenario.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. K.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 1.5 | $787.50 |
| Michael A. Sweet | MAS | 17.0 | $8,415.00 |
| Dale L. Bratton | DLB | 42.3 | 19,035.00 |
| **TOTALS** | | **60.8** | **$28,237.50** |

L.    **Pfau, Pfau & Pfau Bankruptcy Case and Properties**

The Debtors indirectly owned a substantial percentage of the equity in an entity known as Pfau, Pfau, & Pfau, LLC ("Pfau"). Pfau was itself an entity in bankruptcy. Pfau's primary assets were two parcels of undeveloped real property in California. One property was a parcel of approximately 28,000 acres located in Fresno and San Benito Counties, known as Ashurst Ranch.

1   The other was a parcel of approximately 500 acres located in San Marcos, California. These

2   properties were subject to a secured deed of trust in favor of an entity known as Rancho Mountain

3   Properties, Inc. ("Rancho"), the successor in interest to ING USA ("ING"), securing a loan of

4   approximately $20,000,000.[1]

5           The Debtors believe that the Pfau properties had significant value for the estate, in excess

6   of the Rancho loan. This was based largely on the assertions of Pfau's manager that the larger

7   property was worth in excess of $150,000,000 if developed. Pfau supported this claim with a

8   purported offer from Gerova Financial Group ("Gerova") to purchase the property for value in

9   excess of the amount of Rancho's liens. Gerova was at the time a large financial institution traded

10  on the New York Stock Exchange, although it collapsed very shortly thereafter.

11          In order to preserve what appeared to be a valuable asset of the bankruptcy estate, the

12  Committee became actively involved in the Pfau case for a brief period of time, beginning in

13  August 2010. Committee Counsel spent a significant amount of time reviewing and analyzing

14  documents related to the Gerova offer. Committee Counsel also spent significant time attempting

15  to coordinate with counsel for Pfau. Because it appeared that Pfau's manager was unwilling to

16  take the actions necessary to preserve value, and had dramatically unrealistic expectations, this

17  was an involved process. Nevertheless, the Committee determined that it was necessary in order

18  to preserve the possibility of significant value, if loss of the properties to foreclosure could be

19  avoided.

20          Pfau had stipulated to grant Rancho relief from stay in Pfau's bankruptcy case in late 2009,

21  subject to a one year forbearance. After that forbearance period expired, Rancho moved forward

22  with foreclosure sales of the properties. The Committee worked with counsel for Pfau in an

23  attempt to prevent the foreclosure sales in order to preserve the possibility of significant value for

24  the estate. Committee Counsel also incurred significant time in discussions with Rancho to

25  determine whether a consensual resolution could be achieved that would preserve some value for

---

[1] The CMR funds were the original lenders, but apparently transferred the note and deed of trust to ING at some time prior to the bankruptcy cases.

equity. These efforts were unsuccessful, because Pfau's manager was unable to show that Gerova was actually prepared or able to close for sufficient cash to satisfy the amounts due under the Rancho loan.

After further investigation by Committee Counsel, the Committee determined that there was little chance of setting aside Rancho's foreclosure, and that the positions being taken by Pfau's manager were entirely unsupported and unreasonable. As a result, the Committee determined that there was no longer any likelihood that further involvement would result in a recovery for the bankruptcy estate. The Committee ceased to have any significant involvement in the Pfau cases in November 2010. Although the Committee was not able to obtain a recovery from the Pfau case, this work was reasonable and necessary at the time. The Pfau properties were clearly substantial assets, and there was very little unsecured debt in the case. Thus, had it been possible to reach resolution with Rancho, there was a meaningful possibility of a substantial recovery.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. L.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | .4 | $210.00 |
| Michael A. Sweet | MAS | 29.8 | 14,751.00 |
| Dale L. Bratton | DLB | 18.4 | 8,280.00 |
| Shane J. Moses | SJM | 32.5 | 10,562.50 |
| Carol A. Snell | CAS | 1.1 | 165.00 |
| **TOTALS** | | **82.2** | **$33,968.50** |

**M.    Oxford Standstill Agreement & Related Properties**

This category represents time incurred in addressing various issues connected to Oxford and the forbearance agreement between Oxford and the Funds known as the "Standstill Agreement." Oxford was the senior lender on a number of properties that the Funds held a junior lien or equity interest in. The Standstill Agreement is an forbearance agreement negotiated between the Funds and Oxford that prevented Oxford from seeking foreclose on a number of these properties.

In connection with the Plan and proposed financing for the Plan, Oxford expressed concerns that either the Plan or the borrowing contemplated under it would impair Oxford's rights under the Standstill Agreement. This raised a serious risk that Oxford would exercise various remedies under the Standstill Agreement, jeopardizing the Plan process. Time under this task code was primarily incurred in responding to Oxford's concerns. This included providing various assurances to Oxford as to how its investors and the Standstill Agreement would be treated by the Plan, and also negotiating various revisions to the Standstill Agreement in connection with the Plan.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. M.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Michael A. Sweet | MAS | 6.1 | $3,019.50 |
| Dale L. Bratton | DLB | 14.9 | 6,705.00 |
| Shane J. Moses | SJM | .3 | 112.50 |
| **TOTALS** | | **21.3** | **$9,837.00** |

## N.    General Real Estate Issues

The Debtors' business was to make relatively short-term loans secured by deeds of trust on real estate. As this real estate was developed, the Funds' investments would be refinanced out by construction financing or other equity financing. However, as the real estate market began to collapse, the Funds ended up foreclosing on many of these properties. The foreclosed properties, in most cases, were then held through single-purpose real estate entities. Usually when a Fund foreclosed, it was doing so from a junior position which meant that it still needed address senior debt.

The Committee Financial Advisors and Committee Counsel took an active role in activities relating to the disposition of these assets, particularly prior to appointment of a Trustee. Following appointment of the Trustee, the Committee worked closely with the Trustee regarding management and disposition of the real property assets. The time in this category relates to issues concerning numerous specific properties, including Myrtle Beach, Dyer Mountain, the A.F. Evans

properties, Hamilton Creek, Brisbane, and Mira Mesa. A substantial portion of the time relates to efforts to obtain additional borrowing related to the Hamilton Creek property.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. N.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 23.3 | $12,262.50 |
| Michael A. Sweet | MAS | 5.5 | 2,722.50 |
| Dale L. Bratton | DLB | 11.0 | 4,950.00 |
| Shane J. Moses | SJM | 9.4 | 3,105.00 |
| **TOTALS** | | **49.2** | **$23,040.00** |

## O.    General Litigation & Guarantors

The time in this category relates to various litigation issues. The majority of this time was incurred to investigate potential claims against guarantors of the Funds' loans. A substantial number of the loans made by the Funds were guaranteed by various affiliates or principals of the borrowers. It was necessary for the Committee to investigate this as a potential source of recovery to the estate. Committee Counsel incurred significant time in analyzing the loan documents, identifying potential guarantors, and issuing demand letters.

In addition, the Committee determined that it was necessary to evaluate whether an attempt should be made to recover distributions made to former equity holders in excess of the amount of their investment. Part of the time in this category was incurred in researching and analyzing these issues. The Committee ultimately concluded that seeking to recover distributions paid to equity holders would not be productive.

A small amount of time in this category relates to other various litigation issues that are not categorized elsewhere.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. O.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 1.8 | $945.00 |
| Michael A. Sweet | MAS | 5.3 | 2,623.50 |

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Dale L. Bratton | DLB | 2.5 | 1,125.00 |
| Douglas C. Graham | DCG | 29.7 | 11,731.50 |
| Shane J. Moses | SJM | .8 | 300.00 |
| **TOTALS** | | **40.1** | **$16,725.00** |

**P.    Relief from Stay Motions Regarding Indian Harbor Insurance Policy**

The most promising avenue for recovery was insurance policies which covered actions related to the Manager's conduct. The Funds purchased two primary policies, a $5,000,000 financial services liability policy issued through Indian Harbor Insurance Company ("Indian Harbor") and $3,000,000 in mortgage bankers and brokers professional liability coverage under a policy issued by Certain Underwriters at Lloyd's of London.

Time in this category was incurred in responding to multiple motions seeking to charge defense costs against the Indian Harbor Policy. Both policies were so-called "wasting" policies, meaning that any defense costs paid under the policy were deducted from the coverage limits. This meant that there was significant risk that the Indian Harbor policy would be substantially depleted.

In August 2010, Indian Harbor filed a motion seeking relief from stay to advance defense costs to the Fund's Manager, CMRI, and David Choo. This was based on the defense costs being incurred by CMRI and Choo in responding to both the class and derivative action filed by members of the Committee, and other actions brought be individual investors. In addition to the Funds' interest in potential recoveries from the insurance policies, the Funds were also insured under the Indian Harbor policy. The Committee incurred considerable time in opposing this motion in an effort to preserve value for the estate. The initial motion was continued a number of times, and ultimately taken off calendar after the Committee filed its opposition.

After Indian Harbor's initial motion was taken off calendar, CMRI and David Choo filed a similar motion in December 2010, seeking relief from stay to allow Indian Harbor to advance unlimited defense costs to them. The Committee again opposed the motion, seeking to preserve

1 the availability of the asset for the estate. Although the motion was granted, the Court capped the
2 amount of fees that could be charged at $750,000.

3 CMRI filed a third motion in June 2011, seeking an increase in the cap to $1,750,000. The
4 Committee succeeded in obtaining an order requiring defense counsel to provide documentation of
5 its fees. The Committee also opposed the amount of the increase, resulting in a more modest
6 increase to $1,200,000 initially, and $1,378,137.32 at a further hearing after documentation of fees
7 was provided by defense counsel. In effectively limiting the cap on reimbursement of fees from
8 the policy to fees already incurred, the Committee prevented CMRI and Choo from having a
9 largely unlimited war chest.

10 As the Court is aware, the remaining limits of the Indian Harbor policy were the subject of
11 a class and derivative action settlement, in which MLG recovered the insurance funds for the
12 benefit of the equity holders and the bankruptcy estate.

13 This category represents the time incurred responding to the multiple motions filed by
14 Indian Harbor and CMRI with respect to relief from stay as to the Indian Harbor policy. This
15 involved numerous complex and overlapping issues of bankruptcy law and insurance law. MLG
16 worked closely with special insurance counsel on this matter.

17 The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. P.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | .7 | $367.50 |
| Michael A. Sweet | MAS | 19.6 | 9,702.00 |
| Dale L. Bratton | DLB | 13.9 | 6,255.00 |
| Shane J. Moses | SJM | 13.2 | 4,345.00 |
| Thomas B. Rupp | TBR | 4.6 | 1,380.00 |
| **TOTALS** | | **52.0** | **$22,049.50** |

25 **Q.    General Relief from Stay Issues**

26 Many of the properties owned by the Funds, or on which the Funds held a junior lien, were
27 underwater on senior liens. Without financing, it was also impossible for the Funds to make any
28 adequate protection payments. As a result, there were a number of motions for relief from stay

filed by various lenders over the course of the two and a half year period covered by this Application. Time in this task code represents Committee Counsel's work in reviewing, analyzing, and responding appropriately to these motions. In most cases, there was no reasonable basis for opposition, and the Committee did not expend estate resources in attempting to oppose relief from stay. This still required time in analyzing the motions and the basis for relief, however, as well as coordination with the Trustee after his appointment.

Time in this category includes addressing motions for relief from stay regarding the Hamilton Creek, Casa Grande, and Myrtle Beach properties. It also includes addressing a motion regarding certain properties in Oakland owned by an entity known as A.F. Evans, which was itself a debtor in bankruptcy, and in which the Funds had an interest. In the case of the Myrtle Beach property, the Trustee and the Committee were successful in opposing the request for relief from stay.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. Q.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.3 | 1,247.50 |
| Michael A. Sweet | MAS | 1.9 | 940.50 |
| Dale L. Bratton | DLB | 2.8 | 1,260.00 |
| Shane J. Moses | SJM | 16.2 | 5,835.00 |
| **TOTALS** | | **23.2** | **9,283.00** |

**R.    Case Administration**

This is a complicated Chapter 11 case. There were three Debtors, approximately $186 million in initial invested capital, more than 1,200 investors, and various assets with intertwined interests and relationships. In most instances MLG has been able to place tasks into specific categories. However, some time entries relate to the most general areas of case administration, or bridge multiple categories. In large part, this is time incurred in discussions between MLG attorney's and the Committee's financial advisor regarding general case status and strategy, which were necessary to manage a case of this size.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. R.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.9 | $1,535.00 |
| Michael A. Sweet | MAS | 5.0 | 2,475.00 |
| Dale L. Bratton | DLB | 3.4 | 1,530.00 |
| Shane J. Moses | SJM | .5 | 162.50 |
| TOTALS | | 11.8 | $5,702.50 |

## S.  Equity Committee Meetings – Plan Period

The Committee has conducted regular meetings over the course of the case. Because of the size and complexity of the case, these meetings were usually attended by the two attorneys most active in the case. The Committee's involvement, and the time reflected in this task code, can generally be divided into the two time periods: the "Plan Period" through April 7, 2011, and the "Trustee Period" from April 8, 2011, until the present.

During the Plan Period, the Committee met roughly once every two weeks to once per month, as the workload or hearing schedule dictated. Generally, these meetings took place via telephone conference and ran one and a half to two and a half hours, with some members occasionally attending in person. For most meetings the two MLG attorneys who were most active in the case, Michael Sweet and Dale Bratton, participated. However, from time to time other attorneys participated for some or all of a meeting to discuss specific tasks that those attorneys were performing for the Committee. Scott H. McNutt, as the principal attorney, monitored these meeting to maintain continuity. This was most often done without charge.

Approximately two thirds of the Committee meeting time treated in this Application was incurred during this eight-month period. During this time, the Committee was seeking first to confirm the Plan, and then to obtain financing. This require extensive involvement of the Committee.

The time in this task code includes participation in Committees meetings, as well as direct preparation for meetings and follow-up. Time for preparation of agendas and minutes is

00015412-1

27

separately task coded. Although the amount of time in this task code is quite large, MLG does not believe that there is a reasonable basis for dividing it.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. S.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.1 | $1,102.50 |
| Michael A. Sweet | MAS | 42.6 | 21,087.00 |
| Dale L. Bratton | DLB | 38.0 | 17,100.00 |
| Shane J. Moses | SJM | .3 | 97.50 |
| **TOTALS** | | **83.0** | **$39,387.00** |

**T.      Equity Committee Meetings – Trustee Period**

During the Trustee Period, the Committee met less often, generally every one to two months. More frequent meetings were not necessary, because management of the Debtor Funds had been turned over to a skilled Trustee, and because the Committee was no longer working to confirm and bring effective a plan of reorganization. Again, meetings generally took place via telephone conference, and during this period usually ran one half to one hour. Most meetings during the Trustee period were attended by Scott McNutt and Shane Moses, the two attorneys primarily responsible for the matter during the Trustee Period.

Approximately one third of the Committee meeting time treated in this Application was incurred during this period. While the Committee remained active during the Trustee Period, because of the appointment of a Trustee, there were far fewer issues requiring extensive Committee attention. The approximately $21,000 of time in this task code covers a period of almost two years of regular Committee meetings.

The time in this task code includes participation in Committees meetings, as well as direct preparation for meetings and follow-up. Time for preparation of agendas and minutes is separately task coded.

/ / /

/ / /

00015412-1

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. T.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 26.4 | $14,027.50 |
| Michael A. Sweet | MAS | 1.1 | 544.50 |
| Dale L. Bratton | DLB | 2.0 | 900.00 |
| Shane J. Moses | SJM | 18.3 | 6,272.50 |
| TOTALS | | 47.8 | $21,744.50 |

## U.     Committee Agendas and Minutes

The time in this category includes preparation of agendas and minutes for Committee meetings, as well as preparing or reviewing materials that were the subject of discussion at these meetings.  Such materials have often involved complex legal and financial issues.  Preparation of agendas requires careful consideration of issues that need to be addressed by the Committee in a given meeting, as well as any documents that might need to be considered by the Committee. Time in this task code also includes preparation of detailed minutes of each meeting.  The time in this task code covers preparation of agendas and minutes for meetings held on roughly a monthly basis over the two and a half year period covered in this Application.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. U.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 8.8 | $4,655.0 |
| Michael A. Sweet | MAS | 13.2 | 6,534.00 |
| Dale L. Bratton | DLB | 5.0 | 2,250.00 |
| Shane J. Moses | SJM | 13.1 | 4,422.50 |
| TOTALS | | 40.1 | $17,861.50 |

## V.     Communications With Equity Committee Members

Most of the work with the Committee was handled through regular Committee meetings. This work is described separately in the task codes for Committee meetings.  However, members of the Committee also worked individually with Committee Counsel from time to time, for

00015412-1

example to discuss developments in the case and their implications for the investors, or to provide input on the formulation of specific strategies for the Committee.

During the Plan Period, communications between MLG and Committee members related to issues surrounding the plan process, means to obtain financing, the Canpartners settlement, the disposition of various Debtor assets, and Committee governance issues, along with various other topics. The bulk of the time in this task code was incurred during the Plan Period. During the Trustee Period, communications between MLG and Committee members related to issues around appointment of a trustee, general case status, and Committee governance issues. Time for communications regarding the class action with those Committee members who served as class plaintiffs is not included here, as that work was separately treated by the contingency award in the class action.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. V.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 1.6 | $870.00 |
| Michael A. Sweet | MAS | 10.2 | 5,049.00 |
| Dale L. Bratton | DLB | 7.4 | 3,330.00 |
| Shane J. Moses | SJM | .5 | 162.50 |
| **TOTALS** | | **19.7** | **$9,411.50** |

## W.  Committee Website & BAPCPA Compliance

With more than 1,200 investors as the Committee constituency, MLG anticipated expending considerable time responding to investor inquiries, concerns, and requests for information. MLG continues to receive dozens of calls a week from equity holders, virtually all of which are handled on a non-billing basis by staff. Accordingly, the Committee obtained authorization from the Court to establish procedures as to how the Committee should disseminate information as well as an order defining the extent of the Committee's obligation to provide access to the Debtor's confidential and other non-public proprietary information as well as to the Committee's privileged information. Such protocols ensure that confidential, privileged,

1  proprietary, and/or material non-public information is not be disseminated to the detriment of the

2  Debtors' estates and aid the Committee in performing its statutory function under Section

3  1102(b)(3)(A) of Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and

4  Consumer Protection Act of 2005.

5  Establishing a website is one way the Committee achieved effective dissemination of

6  information to its large constituency. Committee Counsel constructed a website that made the

7  following information available: (i) general public information concerning the Funds' cases,

8  including documents filed in the cases and links to the Court's PACER system and case docket;

9  (ii) the Committee's occasional written reports summarizing recent public proceedings, public

10  events, and financial information; (iii) a calendar with upcoming significant events in the cases;

11  (iv) a general overview of the Chapter 11 process; (v) press releases (if any) issued by the

12  Committee or the Debtors; and (vi) answers to frequently asked questions. Additionally,

13  Committee Counsel distributed case updates via electronic mail for investors who registered for

14  this service on the Committee website. In addition, Committee Counsel sent the same updates via

15  U.S. Mail to equity holders who requested updates be sent in this manner. Committee Counsel

16  also established and maintained a telephone number and electronic mail address for investors to

17  submit questions and comments.

18  In Chapter 11 cases Committees often outsource the committee website to companies that

19  charge tens of thousands of dollars to setup and maintain the website. By keeping the website in-

20  house at MLG, the Committee believes it saved a significant amount of money. This task code

21  includes work by Committee Counsel to keep the Committee website updated. In particular, a

22  substantial amount of the time in this task code was incurred in drafting updates posted to the

23  website and dissemination to creditors regarding general public information about the case and

24  frequently asked questions.

25  / / /

26  / / /

27  / / /

28  / / /

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. W.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 7.3 | $4,015.00 |
| Michael A. Sweet | MAS | .8 | 396.00 |
| Dale L. Bratton | DLB | 3.0 | 1,350.00 |
| Shane J. Moses | SJM | 14.0 | 4,925.00 |
| TOTALS | | 25.1 | $10,686.00 |

## X.  Communications with Other Individual Creditors

MLG has continued to incur considerable time responding to inquiries from among the 1,200-plus investors in the Funds.  This has included general inquiries about the Plan status and financing, the financial status of the Funds' assets, treatment of individual claims, and general case status.  MLG has received and responded to these inquiries by telephone, email, and postal mail. As a general rule such inquiries are handled by non-attorneys in order to minimize costs, but if requested an attorney will communicate with an investor.  Most inquiries are handled in a comparatively short time.  There have been some situations where investors have engaged MLG staff and attorneys in lengthy calls or have posed inquiries that required detailed email responses.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. X.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 3.8 | $1,995.00 |
| Michael A. Sweet | MAS | 1.5 | 742.50 |
| Dale L. Bratton | DLB | 4.6 | 2,070.00 |
| Shane J. Moses | SJM | 2.7 | 912.50 |
| Jackie Jacobus | JJ | .2 | 30.00 |
| TOTALS | | 12.8 | $5,750.00 |

## Y.  Communications with Other Major Parties

Time in this category relates to communications with other major parties in the case including Debtor's counsel, counsel for the Chapter 11 Trustee, and the Office of the U.S. Trustee.

Where such communications related to a separate specific category, they are captured under the task code for that category.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. Y.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.0 | $1,055.00 |
| Michael A. Sweet | MAS | 2.5 | 1,237.50 |
| Dale L. Bratton | DLB | 1.4 | 630.00 |
| Shane J. Moses | SJM | 2.4 | 845.00 |
| **TOTALS** | | **8.3** | **$3,767.50** |

**Z.      Business Operations and Management Fee Issues**

Time in this task code relates to work required with regard to business operational issues. This primarily involves work related to asset management fees of the Funds' Manager. There is also a small amount of time in this category related to other issues, including tax accounting and monthly operating reports.

In connection with the Plan, CMRI and David Choo made requests for payment of post-petition asset management fees based on management of the individual properties and loans. In October 2010, the Funds filed a request for payment of certain post-petition administrative fees to the Funds' Manager, CMRI. This task code includes time incurred in responding the requests for management fees, and in responding to the motion for approval of such fees.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. Z.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | .9 | $472.50 |
| Michael A. Sweet | MAS | 7.4 | 3,663.00 |
| Dale L. Bratton | DLB | 7.4 | 3,330.00 |
| Douglas C. Graham | DCG | 1.2 | 474.00 |
| **TOTALS** | | **16.9** | **$7,939.50** |

## AA.   Status Conferences/ Miscellaneous Hearings

Over the course of the two and a half year period covered by this Application, Committee Counsel needed to attend various status conferences and miscellaneous hearings.  Time spent preparing for and attending those hearings is included here, except where the time falls under another task code.

A large part of the time in this category was incurred in connection with the status conferences and hearings in March and April 2011, regarding how to move the case forward in the absence of Plan financing.  Additional time was incurred in preparing for, drafting status conference statements for, and attending the three subsequent status conferences in the case.

The breakdown of fees incurred in this category is as follows.  *See* McNutt Decl., Ex. AA.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 6.1 | $3,202.50 |
| Michael A. Sweet | MAS | 4.1 | 2,029.50 |
| Dale L. Bratton | DLB | 10.6 | 4,770.00 |
| Shane J. Moses | SJM | 10.9 | 3,542.50 |
| **TOTALS** | | **31.7** | **$13,544.50** |

## BB.   Appointment of Trustee and Transition Process

During the six months following confirmation of the Plan, the Committee worked diligently to secure the necessary exit financing to replace ASK Financial.  With the Committee's support, the Court set a deadline for the Plan to go effective at the end of March 2011.  With the withdrawal of Oxford at the eleventh hour before that deadline, it became clear that it would not be possible to obtain financing.  As a result, the Committee recommended the appointment of a Chapter 11 Trustee to administer and liquidate the Funds' assets.  At the status conference held on April 4, 2011, this Court ordered the appointment of a Trustee.  Richard Kipperman was subsequently appointed by the Office of the U.S. Trustee, and approved by the Court.

During the two weeks from the end of March to the beginning of April 2011, Committee Counsel worked extensively with the Office of the U.S. Trustee and Debtors' counsel regarding

00015412-1

issues and strategy to move the case forward and selection of a Trustee. Because of the nature of the case, the Committee felt that any possibility for a meaningful return from the properties required appointment of a highly skilled and experienced trustee. Following appointment of the Trustee, Committee Counsel worked closely with the Trustee during the transition process. Committee Counsel had numerous meetings and calls with the Trustee and his counsel, in order to quickly bring the Trustee up to speed on various aspects of the case.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. BB.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 19.2 | $10,080.00 |
| Michael A. Sweet | MAS | 12.6 | 6,237.00 |
| Dale L. Bratton | DLB | 17.2 | 7,740.00 |
| Douglas C. Graham | DCG | .6 | 237.00 |
| TOTALS | | 49.6 | $24,294.00 |

**CC. Employment and Fee applications (MLG)**

Time incurred in this category primarily concerns MLG's Second Interim Fee Application which was approved by the Court on October 6, 2010. There is also some time billed during this Application period related to this Application.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. CC.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 4.9 | $2,612.50 |
| Michael A. Sweet | MAS | 33.4 | 16,533.00 |
| Dale L. Bratton | DLB | 8.8 | 3,960.00 |
| Shane J. Moses | SJM | 10.0 | 3,750.00 |
| Jackie Jacobus | JJ | 7.9 | 1,185.00 |
| TOTALS | | 65.0 | $28,040.50 |

/ / /

/ / /

/ / /

Case: 08-32220    Doc# 1226    Filed: 03/22/13    Entered: 03/22/13 11:07:42    Page 38 of 44

**DD.    Employment and Fee Applications (Other Professionals)**

As primary counsel for the Committee, MLG has supported the Committee's other retained professionals as appropriate with regard to their employment applications and fee applications. Entries in this category include assisting special insurance counsel with their fee application. In January 2011, it became apparent that the Debtors would be unable to retain tax professionals to complete necessary tax work for the 2010 tax year. In order to address this issue, the scope of work of LECG, the Committee Financial Advisors, was expanding to include this tax preparation work. Committee Counsel worked with LECG to prepare the necessary application to expand the scope of work.

In early 2011, LECG was dissolved. F. Wayne Elggren, the individual primarily responsible for acting as the Committee's financial advisor, moved to Navigant, a large, nationally recognized financial services consulting company. As a result, it was necessary for Committee counsel to obtain the employment of Navigant as Committee Financial Advisors, in place of LECG. The Trustee separately employed Berkeley Research Group, the company that LECG's tax professionals moved to, to perform tax work for the bankruptcy estate.

A small amount of work in this category also relates to coordination with the Committee's professionals and the Trustee regarding preparing fee applications in early 2013, as requested by the Trustee.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. DD.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 2.8 | $1,500.00 |
| Michael A. Sweet | MAS | .3 | 148.50 |
| Dale L. Bratton | DLB | 6.2 | 2,790.00 |
| Shane J. Moses | SJM | 18.6 | 6,180.50 |
| Thomas B. Rupp | TBR | 13.7 | 4,110.00 |
| **TOTALS** | | **41.6** | **$14,729.00** |

/ / /

/ / /

/ / /

## EE.     Stevens & Bornstein Litigation

A small number of individual equity holders filed lawsuits in state court against CMRI and David Choo, seeking to recover the proceeds of applicable insurance policies for their own benefit. This represented a serious concern for the estate and the equity holders. Because the available coverage under the insurance policies was reduced by defense costs, these actions jeopardized the potential for a meaningful recovery through the derivative and class action.

In mid-2011, this became a serious concern, because one of these state court actions was proceeding toward arbitration. In responding to the arbitration, counsel for David Choo and CMRI was incurring fees well in excess of a hundred thousand dollars per month. These fees were directly reducing the available coverage under the Indian Harbor policy that could potentially be recovered for the benefit of the equity holders and the estate. Working with the Trustee, the Committee was able to negotiate a settlement that halted these costs in exchange for a relatively modest payment out of any eventual recovery by the estate. The Committee incurred significant time in connection with these negotiations, and documentation of the settlement agreement between the Trustee and the state court plaintiffs.

A separate group of state court plaintiffs objected to the proposed settlement reached in the class and derivative action. This threatened to derail the settlement, preventing any recovery to the estate. Again, the Committee worked with the Trustee to obtain a settlement that resolved this issue. This settlement also provided a modest payment to the state court plaintiffs out of any recovery by the estate from the class and derivative action. This category includes time incurred in negotiating and documenting the settlement between the Trustee and these plaintiffs. Time incurred in responding to the objection to settlement of the class and derivative action is not included in this fee application, as described below.

By working with the Trustee to obtain settlements of the various state court matters, the Committee obtained a significant benefit for the estate. Settlement of the class and derivative action has resulted in recovery of almost all of the available insurance proceeds, with 60% of the net recovery flowing to the estate. The amount of the recovery would have been significantly

reduced, or the recovery would have been prevented altogether, had these settlements not been obtained.

In addition to acting as general bankruptcy counsel to the Committee, MLG represented three members of the Committee, in their individual capacities, as class and derivative plaintiffs. MLG was ultimately appointed as class counsel in the class and derivative action. This representation was undertaken on a contingency basis, under an entirely separate engagement. For reasons more fully described in MLG's application for approval of its contingency compensation in the class and derivative action, the Committee determined that recovery of the insurance proceeds was best pursued in a separate action, rather than by the Committee. Time incurred by MLG in its role as class and derivative counsel is not included in this application. MLG has been compensated for this work in through its contingency fee in the class and derivative matter.

Time incurred in addressing the state court actions is set forth here, because it did not fall within the representation of the class, and because the settlements ultimately reached were between the estate and the state court plaintiffs. Although this work is set forth here, MLG recognizes that there is a close relationship to the class and derivative action for which it has been separately compensated. In order to avoid any concerns regarding this issue, MLG is taking a voluntary reduction in fees and is not seeking compensation for the time incurred in this category.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. EE.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 26.7 | $14,330.00 |
| Michael A. Sweet | MAS | .2 | 99.00 |
| Shane J. Moses | SJM | 49.7 | 17,402.50 |
| **TOTALS** | | **76.6** | **$31,831.50** |

## FF.  D. Choo Proposals re: Abandonment of Property

The Trustee ultimately determined that a number of properties in which the estate had an interest had no material value to the estate. In general this was because all of the value would be subject to senior liens and interests. Time in this category was incurred in addressing various

requests made by David Choo to obtain transfer of the estate's interest in three of these properties. Committee Counsel worked closely with counsel for the Trustee in assessing and responding to these requests.

MLG is taking a voluntary reduction in fees and not seeking compensation for this time. This issues became connected to negotiations with David Choo regarding release of certain insurance coverage held back as a reserve in connection with settlement of the class and derivative action. As a result, it is difficult to entirely separate time incurred on the two issues. MLG's work in the class and derivative action has been separately compensated, as described above. MLG believes that the majority of the work in this category relates to its role as Committee Counsel, and is therefore compensable in connection with this application. Nevertheless, in order to avoid any concerns regarding potential overlap, MLG is taking a voluntary reduction of fees for this time.

The breakdown of fees incurred in this category is as follows. *See* McNutt Decl., Ex. FF.

| PROFESSIONAL | INITIALS | HOURS BILLED | TOTAL FEES |
|---|---|---|---|
| Scott H. McNutt | SHM | 12.7 | $6,985.00 |
| Shane J. Moses | SJM | 2.4 | 900.00 |
| **TOTALS** | | **15.1** | **$7,885.00** |

## VII.  SUMMARY OF EXPENSES

MLG does not charge for incidental in-house copying, faxes, *de minimis* postage, or long-distance phone charges (other than third-party vendor hosted conference calls). MLG does charge for attorney travel expenses, and costs incurred with third party vendors, at actual cost. Committee Members incurred some travel expenses when attending Committee meetings in person.

The total expenses incurred by MLG in this case for the period covered by this Application are as follows. *See* McNutt Decl., Ex. GG.

| | CATEGORY | EXPENSES BILLED |
|---|---|---|
| A. | Outside Copying / Service | $6220.83 |
| B. | Printing & Service of Plan and Disclosure Statement | 29,678.88 |

| CATEGORY | | EXPENSES BILLED |
|---|---|---|
| C. | Conference Calls | 467.88 |
| D. | Online Research | 3,691.55 |
| E. | Delivery/Messengers | 163.68 |
| F. | Postage | 189.02 |
| G. | Out of Town Travel | 416.86 |
| H. | Transcripts | 132.00 |
| I. | Committee Expenses | 16.87 |
| **TOTAL EXPENSES BILLED:** | | **$40,977.57** |

## VIII.  INTEROFFICE CONFERENCES

Some of the attorneys' fees expended by Applicant in its representation of the Committee in this case include conferences between and among the attorneys of MLG.  Applicant believes such meetings are necessary to the efficient and economical administration of the case to (i) ensure that all professionals involved in the case understand and appreciate the overall case strategy and the ultimate goals of the case; (ii) effectively delegate those matters which can be most economically handled by junior professionals with a lower hourly billing rate while providing the necessary guidance and support to such junior professionals regarding their assignments; and (iii) ensure that the efforts of all professionals working on the case complement each other without waste or duplication.  Applicant does not believe that there has been an extraordinary or unwarranted use of interoffice conferences in this case.  McNutt Decl., ¶ 6.

## IX.  MULTIPLE PROFESSIONALS

At various times in the course of its representation of the Committee in this case, more than one professional from MLG may have participated in a significant meeting.  Such participation was based on the mix of issues involved, and particular professionals' knowledge and expertise on the relevant aspects of this representation.  Applicant believes that its use of multiple professionals in these instances was reasonable and was beneficial to the efficient representation of the Committee.  McNutt Decl., ¶ 7.

# X. **RESPONSIBLE PERSONNEL**

The services subject to this Application were performed by attorneys Scott H. McNutt, Michael A. Sweet, Dale L. Bratton, Douglas C. Graham, Shane J. Moses, and Thomas B. Rupp, and paralegals Jackie Jacobus and Carol A. Snell. A description of these individuals' experience and qualifications is set forth as an exhibit to the accompanying declaration of Scott H. McNutt. *See* McNutt Decl., Ex. HH.

# XI. **ESTABLISHMENT OF FEES**

"A compensation award based on a reasonable hourly rate multiplied by the number of hours actually and reasonably expended is presumptively a reasonable fee." In re Manoa Finance Company, 853 F.2d 687 (9th Cir. 1988). Establishing a reasonable hourly rate requires consideration of market rates in the relevant community which are, in turn, at least partly a function of the type of services rendered and the lawyer's experience, skill, and reputation. MLG has more than 20 years of successful experience representing creditors, trustees, debtors, creditors' committees, equity committees, and other parties in interest in bankruptcy proceedings. *See* McNutt Decl., ¶ 8. For this level of skill and experience in Chapter 11 work, the hourly rates charged by MLG are within the market range for attorneys in the San Francisco area legal market. Id.

# XII. **CONCLUSION**

WHEREFORE, Applicant requests that the Court approve an interim award of attorneys' fees in the amount of $531,328.90 and reimbursement of expenses in the amount of $40,977.57 on account of MLG's services rendered to the Committee for the period August 1, 2010, through February 28, 2013.

Dated: March 22, 2013                     MCNUTT LAW GROUP LLP


                                          By: _____/s/ Scott H. McNutt_____
                                                 Scott H. McNutt
                                          Attorneys for Official Committee of Equity Security
                                          Holders