David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
E-mail:dbertenthal@pszjlaw.com
       mlitvak@pszjlaw.com
       mmanning@pszjlaw.com

Counsel for Richard M Kipperman,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>CMR MORTGAGE FUND, LLC,<br>CMR MORTGAGE FUND II, LLC,<br>CMR MORTGAGE FUND III, LLC,<br><br>                    Debtors. | Case No.: 08-32220-TEC<br>              09-30788-TEC<br>              09-30802-TEC<br><br>Substantively Consolidated<br><br>Chapter 11<br>**DECLARATON OF RICHARD M KIPPERMAN IN SUPPORT OF MOTION FOR ORDER APPROVING TRUSTEE'S CONSENT TO SALE OF ESTATE'S INTEREST IN DYER PROPERTY AND RELATED AGREEMENTS**<br><br>Date:  August 30, 2013<br>Time:  9:00 AM<br>Place: U.S. Bankruptcy Court<br>         235 Pine Street<br>         San Francisco, CA<br>Judge: Honorable Thomas E. Carlson |

I, Richard M Kipperman, declare as follows:

1.      Pursuant to an order of this Court, I am the duly appointed chapter 11 trustee of the above-captioned substantively consolidated debtors. All statements in this declaration (the "Declaration") are based on my personal knowledge or on information and belief. If I were called to testify in this matter, I would and could competently testify to each of the statements in this Declaration.

**A. The Bankruptcy Proceeding.**

2. CMR Mortgage Fund, LLC ("Fund I") filed a voluntary chapter 11 petition in this Court on November 19, 2008 as Case No. 08-32220. On March 31, 2009, CMR Mortgage Fund II, LLC ("Fund II") and CMR Mortgage Fund III, LLC ("Fund III") filed voluntary chapter 11 petitions in this Court as Case Nos. 09-30788 and 09-30802, respectively. Fund I, Fund II and Fund III are collectively referred to herein as the "Debtors."

3. On April 7, 2011, the Court substantively consolidated the Debtors' cases, and ordered the appointment of a chapter 11 trustee.

4. By order dated April 14, 2011, I was appointed as chapter 11 trustee of the Debtors' cases, which are now treated as a single case.

**B. The Dyer Property.**

5. Dyer Management, LLC ("DM") owns approximately 7,130 acres of undeveloped real property and timberlands located in Lassen and Plumas Counties, California commonly referred to as the "Dyer Property." The Debtors own 66.7% of DM. Dyer Holdings LLC ("Dyer Holdings") owns 33.3% of DM.

6. Frontier Ridge Global Fund Ltd ("Frontier") is the manager of DM. I understand that Frontier claims that it is owed accrued and unpaid management fees from the time of its appointment in 2009 to the present.

7. The Dyer Property is encumbered by two outstanding loans. The senior loan, in the principal amount of $10,000,000 [Loan 05-061A] (the "Senior Loan"), is secured by two first priority deeds of trust filed against the Dyer Property. The Debtors do not have any interest in the first priority deed of trust. The holders of the Senior Loan are Dyer Loan, LLC ("Dyer Loan"), First Street Commercial Mortgage Fund, LLC ("First Street"), and Brodke & Noe Profit Sharing Plan FO Stephen H. Able ("Able") (Dyer Loan, First Street and Able are collectively referred to as the "Senior Lenders"). The Senior Lenders assert that over $18,000,000 is due and owing under the Senior Loan, inclusive of interest and fees.

8. The Dyer Property is also encumbered by a second priority deed of trust, in the original principal amount of $10,000,000 [Loan 05-061B] (the "Junior Loan"). The Debtors are the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:01:10    Page 2 of 91

holders of a 55% interest in the Junior Loan. I am informed and believe and thereon allege that Frontier Ridge Global Fund LP ("Frontier LP") holds a 10% interest in the Junior Loan and other noteholders ("Junior Noteholders") hold the remaining interest in the Junior Loan.

### C. The Standstill Agreement.

9.      Prior to my appointment as Trustee, Fund II, Fund III, California Mortgage & Realty, Inc., and certain investors ("Investors") and First Street entered into that certain Amended and Restated Standstill Agreement dated January 22, 2012 (the "Standstill Agreement"). Fund I was not a party to the Standstill Agreement. Under the Standstill Agreement, Fund II and Fund III agreed to make certain payments to the Investors and First Street out of any proceeds that they received on account of the Junior Loan in the context of a sale or refinance of the Dyer Property, up to the maximum amount of $5.1 million dollars.

### D. Relief From Stay Order

10.      Over my counsel's objection, on June 3, 2013, the Court entered an *Order Granting Motion For Relief From The Automatic Stay (Dyer Mountain Property)*, which authorized the Senior Lenders under the Senior Loan to enforce their rights and remedies to the Dyer Property effective as of June 1, 2013 ("Relief From Stay Order"). Despite obtaining relief from the automatic stay, the Senior Lenders have consented to sale of the Dyer Property as evidenced by their signatures to the Senior Release (defined below).

### E. Pending Sale of the Dyer Property and the Release Agreements.

I am informed and believe and thereon allege that DM has entered into that certain Timberlands Purchase and Sale Agreement, dated as of May 13, 2013 (the "Sale Agreement"), to sell the Dyer Property to Sierra Pacific Industries (the "Buyer") for the sum of $17,165,000 on an "as-is" basis and subject to certain terms and conditions (the "Pending Sale"). A true and correct copy of the Sale Agreement is attached hereto as **Exhibit A.** The Pending Sale is effectively a short sale in that the sale proceeds are insufficient to pay the full amounts due on the Senior Loan but it does provide a large payout to the Senior Lenders (as evidenced by the Senior Release) and provide an agreed to distribution to the holders of the Junior Loan (as evidenced by the Junior Release) who would likely not have otherwise received a distribution due to the Relief From Stay Order and the

DOCS_SF:83467.1 49666-001

DECLARATION OF RICHARD M KIPPERMAN IN SUPPORT OF MOTION FOR ORDER APPROVING TRUSTEE'S CONSENT TO SALE OF ESTATE'S INTEREST IN DYER PROPERTY

3

remedies otherwise expected to be exercised upon the entry of that order absent the Release Agreements.

11.     Pursuant to section 7.2.7 of Sale Agreement and the applicable operating agreement for DM, DM is required to obtain the consent of its members, including the Debtors, to the Pending Sale.  I have agreed to provide such consent, on behalf of the Debtors, on the terms and conditions set forth in the following two separate Release Agreements, both of which are contingent upon all parties signing the Release Agreements and Bankruptcy Court approval.

                    a.     The Senior Release Agreement

12.     I have negotiated the terms a *Release Agreement (Dyer Property) Senior Lien/Standstill* (the "Senior Release"), by and between DM, the Senior Lenders, the Investors, Frontier, Frontier Investment Manager, LLC ("FR Investment"), and me (on behalf of the Debtors' estate). Pursuant to the Senior Release, the Senior Lenders are willing to consent to the Pending Sale and to the receipt of cash proceeds in the amount of $16,650,000 (i) less the costs to close the Pending Sale in an amount not to exceed $38,000, (ii) less the amount required to pay outstanding and unpaid real property taxes excepting therefrom (x) $216,858.81 in property tax liability[1]; and (y) 50% of any reduction in the property taxes obtained from the applicable taxing authorities, and (iv) plus $375,000 representing fifty percent (50%) of the proceeds from the sale of remaining timber eligible to be harvested under the approved plan known as Timber Harvest Plan #1.

13.     Upon the receipt of such cash proceeds and upon the closing of the Pending Sale, the Investors under the Standstill Agreement, First Street and the Senior Lenders, and the other parties to the Senior Release and I will agree to release the other of all claims relating to the Standstill Agreement (as it relates to the Dyer Property), the Senior Loan and the Dyer Property, including all claims known or unknown.   A true and correct copy of the Senior Release is attached here to as **Exhibit B.**

                    b.     The Junior Release Agreement.

---

[1] The Senior Lenders and the Junior Noteholders have agreed to split the unpaid property taxes incurred from October 2012 until the Pending Sale closes.  Fifty percent of the unpaid property taxes due from October 2012 to August 2013 are $216,858.81.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

DOCS_SF:833673.1 49666-001

DECLARATION OF RICHARD M KIPPERMAN IN SUPPORT OF MOTION FOR ORDER APPROVING TRUSTEE'S CONSENT TO SALE OF ESTATE'S INTEREST IN DYER PROPERTY

4

14. Concurrently with the negotiation of the Senior Release, I have also negotiated the terms of a *Release Agreement (Dyer Property) - Junior Lien* ("Junior Release") by and between me (on behalf of the Debtors), DM, Dyer Holdings, Frontier, Frontier Investment, FR LP, and the Junior Noteholders. Pursuant to the Junior Release, Frontier LP, the Junior Noteholders and I have agreed to consent to the Pending Sale, contingent upon the closing of the Pending Sale and receipt of the estimated sum of $1,525,000 in full and final satisfaction of any and all outstanding claims that they may have with regard to the Junior Loan. Frontier has also agreed to accept the sum of $500,000 for accrued but unpaid management fees in exchange for a release of all claims relating to the Junior Loan and the Dyer Property. The $1,525,000 will be divided among the Junior Noteholders and the estate in accordance with their pro-rata interest in the Junior Loan.

15. I expect that the estate will receive approximately $640,000 from the Pending Sale or more depending on the final amount of the closing costs and the amount of the unpaid property tax obligations that are to be split with the Senior Lenders. The exact amount of the distribution to the estate will be determined at the closing.

16. In exchange for the distributions and the closing of the Pending Sale, the parties to the Junior Release will further agree to release any and known and unknown claims relating to the Junior Loan and the Dyer Property. A true and correct copy of the Junior Release is attached hereto as **Exhibit C.**

17. The Senior Release and the Junior Release are collectively referred to herein as the "Release Agreements."

F. **Sound Business Reasons Justify My Consent To The Pending Sale**

18. I am informed and believe that sound business reasons justify my consent to the Pending Sale because doing so will enable me to create and maximize the value of the Junior Loan which, absent the transactions contemplated herein, would be valueless. Without the Senior Lenders' agreement to accept the terms of the proposed short sale as set forth in the Sale Agreement and Senior Release and the Investors' and First Street's agreement to release the Debtors of all obligations under the Standstill Agreement (as it relates to the Dyer Property), the estate would not likely receive any distributions on account of its interest in the Junior Loan. However, as a result of

DECLARATION OF RICHARD M KIPPERMAN IN
SUPPORT OF MOTION FOR ORDER APPROVING
TRUSTEE'S CONSENT TO SALE OF ESTATE'S INTEREST
IN DYER PROPERTY

the Sale Agreement and the Release Agreements, the Debtors' estate stands to recover a sizable distribution of approximately $640,000 or more on account of its interest in the Junior Loan, free and clear of any competing claims under the Standstill Agreement.

19.     The Motion has been served on all of creditors who have requested special notice pursuant to Bankruptcy Rule 2002, the Buyer, the parties to the Release Agreements, and other parties in interest who may have an interest in the Dyer Property. I submit that no additional notice is required or necessary for this Motion.

20.     I believe that the estate's expected recovery on the Junior Loan is "fair and reasonable." There is no liquid or active market for the Junior Loan because the value of the Dyer Property is less than the amount due on the Senior Loan as evidenced by the Relief From Stay Order. In addition, under the Standstill Agreement, Fund II and Fund III agreed to make certain payments to the Investors and First Street out of any proceeds that they received on account of the Junior Loan in the context of a sale or refinance of the Dyer Property, up to the maximum amount of $5.1 million dollars. As such, absent the Senior Release, any amounts that would be paid to Debtors on account of the Junior Loan in connection with the Pending Sale would likely have to be paid to the Investors and First Street under the Standstill Agreement. However, by virtue of my consent to the Pending Sale on the terms and conditions set forth in the Release Agreements, the estate will be poised to recover approximately $640,000 or more in cash unencumbered by any competing claims of the Investors and First Street under the Standstill Agreement, thereby rending such consideration, "fair and reasonable."

21.     The Pending Sale is also proposed in good faith. My consent to the Pending Sale was reached via extensive arms-length negotiations between the parties to the Release Agreements and represents the best offer for the estate's interest in the Junior Loan received to date. I have spent considerable time and effort negotiating the terms of the Release Agreements in an attempt to generate and maximize the value of the Junior Loan for the benefit of creditors. There was no fraud or collusion in the negotiation of the Release Agreements or the Pending Sale.

22.     For similar reasons, I believe that the Release Agreements should be approved as they represent compromise of claims that will benefit the estate. The Release Agreements, while

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

1   allowing the estate to recover a sizeable distribution on account of the estate's interest in the Junior

2   Loan, result in a complete release of all claims between the parties thereto in connection with the

3   Dyer Property, including Frontier's claims to accrued and unpaid management fees and the claims

4   that could have been asserted by the Investors and First Street for obligations arising under the

5   Standstill Agreement. Although no litigation is pending between the parties to the Release

6   Agreements, the compromises embodied in the Release Agreements will save the estate from having

7   to expend valuable time and resources on these matters, thereby maximizing the value of the Junior

8   Loan for the benefit of creditors.

9       23.    I am informed and believe and thereon allege that the Buyer seeks to close the sale as

10  quickly as possible in an effort to be able to harvest the available timber on the Dyer Property before

11  winter and before harvesting becomes more difficult or impracticable. Additionally, it would be

12  advantageous to the estate if the Pending Sale closes quickly so that the Junior Noteholders would

13  cease accruing unpaid real property tax obligations beyond those which have been itemized in the

14  Senior Release.

15      I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct.

17      Executed this _7th_ day of August 2013, at _La Mesa_ , California.

18                          By _____

19                               Richard M Kipperman

20

21

22

23

24

25

26

27

28

DECLARATION OF RICHARD M KIPPERMAN IN
SUPPORT OF MOTION FOR ORDER APPROVING
TRUSTEE'S CONSENT TO SALE OF ESTATE'S INTEREST
IN DYER PROPERTY

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

# Exhibit A

# TIMBERLANDS PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**"), dated as of May 13, 2013 (the "**Effective Date**"), is made and entered into by and between **DYER MANAGEMENT, LLC,** a California limited liability company ("**Seller**"), and **SIERRA PACIFIC INDUSTRIES,** a California corporation ("**Buyer**").

## RECITALS:

A.    Seller is the owner of certain real property located in Lassen and Plumas Counties, California, consisting of approximately 7,130 acres, as more particularly described in Exhibit A attached hereto, including all timber (standing or downed), reproduction, and any improvements located thereon, together with related timber rights, water rights, petroleum, gas, minerals and mineral interests of Seller, if any, and all rights, privileges and easements appurtenant thereto, but excepting the Permitted Exceptions, as defined below in Section 3.3 (collectively, the "**Timberlands**").

B.    Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller the Timberlands, subject to the Permitted Exceptions, for the price and on the terms and conditions set forth in this Agreement.

## AGREEMENTS:

**NOW, THEREFORE,** in consideration of the foregoing, the mutual covenants of Seller and Buyer (individually, a "**Party**," and collectively, the "**Parties**") set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are both hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Purchase and Sale.** Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, the Timberlands for the price and on the terms and conditions set forth in this Agreement.

2.    **Purchase Price and Payment.**

    2.1.    **Purchase Price.** Unless otherwise adjusted pursuant to the terms hereof, the purchase price for the Timberlands shall be the sum of Seventeen Million One Hundred Sixty-Five Thousand Dollars ($17,165,000) (the "**Purchase Price**"); provided, however, that in the event Seller elects to cease all timber harvesting as described in Section 6.2 hereof as of the Effective Date, the Purchase Price shall be increased by Seven Hundred Fifty Thousand Dollars ($750,000) and the Purchase Price shall be the sum of Seventeen Million Nine Hundred Fifteen Thousand Dollars ($17,915,000).

    2.2.    **Payment.** The Purchase Price shall be paid to Seller as follows:

        2.2.1.    **Earnest Money Deposit.** On or before the date that is five (5) days following the Effective Date, Buyer shall deposit with Placer Title Company at its offices in Redding, California (the "**Title Company**") an earnest money deposit in the amount of Three

Million Dollars ($3,000,000) (the "**Earnest Money Deposit**"). Title Company may deposit the Earnest Money Deposit in a non-interest-bearing account. The Earnest Money Deposit shall be non-refundable except upon the material default of Seller hereunder, termination by Buyer under the specific relevant terms of Sections 3.1, 4.2, 5 or 12.11, or failure of Buyer's or Seller's conditions (absent waiver thereof) under Sections 7.1 or 7.2, respectively. The Earnest Money Deposit shall be applied to the Purchase Price at the Closing.

2.2.2. **Remaining Balance.** The remaining balance of the Purchase Price, subject to the prorations and adjustments described herein, shall be paid in full at the Closing by Buyer in immediately available U.S. Dollars.

3. **Title Examination.**

3.1. **Title.** Within a reasonable time after the Effective Date, Seller shall deliver to Buyer or Buyer's counsel (as applicable) one or more preliminary title reports covering the Timberlands to the extent insurable, issued by Placer Title Company (the "**Title Company**"), including copies of all underlying documents relating to conditions and exceptions contained therein (collectively, the "**Title Reports**"). Buyer will have ten (10) business days after the date that Buyer receives all items comprising the Title Reports (the "**Title Examination Period**") within which to notify Seller in writing ("**Buyer's Title Objection**") of any conditions, defects, encroachments, any and all mortgages, deeds of trust, unfulfilled real estate contract vendor interests or other consensual or non-consensual liens securing any monetary claim or indebtedness or other objections to title which are not acceptable to Buyer in Buyer's reasonable business judgment (each, a "**Title Issue**," and collectively, the "**Title Issues**"); provided, however, that Buyer shall be deemed to have accepted all conditions and exceptions to title not specified in Buyer's Title Objection. If Buyer does not provide Buyer's Title Objection to Seller prior to the expiration of the Title Examination Period, Buyer shall be deemed to have determined that the Title Reports and all matters referenced therein are satisfactory to Buyer. Seller shall have twenty (20) business days after receiving Buyer's Title Objection to (i) cure the Title Issues identified by Buyer, (ii) provide Buyer with reasonable assurances of the manner in which the Title Issues will be cured before the Closing, or (iii) provide Buyer with written notice that Seller will not cure the Title Issues prior to the Closing; provided, however, that if Seller does not provide Buyer with such written notice prior to the expiration of such 20-day period, Seller shall be deemed to have declined to cure the Title Issues objected to by Buyer. If Seller declines or is deemed to have declined to cure the title defect or title defects objected to by Buyer, or is thereafter prior to the Closing unable to cure the same after electing to do so or providing assurances regarding the same, then, Buyer may waive in writing the Title Issues, or terminate this Agreement upon written notice to Seller, receive a full refund of the Earnest Money Deposit and this Agreement shall have no further force or effect. For purposes of this Agreement any and all applicable laws affecting the Property and the use thereof, whether or not disclosed in the Title Report, shall not be considered a title defect hereunder.

3.2. **Permitted Exceptions.** All title exceptions approved, accepted, or deemed approved by Buyer pursuant to Section 3.1 shall be deemed for all purposes hereunder the "**Permitted Exceptions.**"

4.     **Due Diligence.**

    4.1.     **Buyer's Inspections.** Buyer shall have from the Effective Date until the date that is twenty (20) days following the Effective Date (the "**Due Diligence Period**") to inspect and investigate all aspects of the Timberlands to satisfy itself that: there are no material adverse issues affecting title, including liens, encumbrances, easements, rights of way and the like; that there are no hazardous substances on the Timberlands that are reasonably likely to create/have a material adverse effect when considered in light of the magnitude of the entire transaction; that there is no pending litigation or zoning activity or other facts that are reasonably likely to create/have a material adverse effect on the Timberlands taken as a whole; and there are no material contracts or binding arrangements affecting the Timberlands which are reasonably likely to materially affect the value to or use of the Timberlands by Buyer following Closing. As soon as reasonably practicable after the Effective Date, Seller shall deliver to Buyer one set, in electronic format or hard copy (as Seller shall determine), of any contracts, leases or other agreements by which the Timberlands are bound, GIS data, maps, aerial photographs, forest inventory records and all other pertinent information, data and records related to the management of the Timberlands, including (without limitation) owl studies, data and maps and all other such information pertaining to threatened and endangered species, as Seller has in its possession which pertain only to the Timberlands (collectively, the "**Timberland Information**"). Seller's obligation to provide documents as provided for herein is limited to what is readily available to Seller, given that it was not the developer of the Dyer Mountain Resort project, and has no assurance that it has all of the relevant studies, and lacks contractual relationships with the consultants who prepared those studies. Further, any reports or studies in the public record (e.g. County of Lassen land use proceedings; California Department of Forestry timber harvest plans are deemed to be in the possession of the Buyer as of twenty (20) days from the Effective Date. In connection with any investigations of Buyer and any other entry by Buyer, its agents, consultants, engineers, contractors and other invitees of Buyer (collectively, "**Invitees**") onto the Timberlands for the purpose of Buyer's review and inspection of the Timberlands, Buyer shall give Seller reasonable advance notice of such entry and shall conduct such entry and any investigations in connection therewith so as to minimize, to the extent reasonably practicable, disruption at the Timberlands and otherwise in a manner reasonably acceptable to Seller. Without limiting the foregoing, prior to any entry to perform any on-site testing Buyer shall give Seller advance facsimile notice thereof, including the identity of the company or persons who will perform such testing and the proposed scope of the testing. Prior to entering onto the Timberlands, Buyer, Buyer's agents, contractors, subcontractors, or their respective employees, Buyer shall deliver to Seller a certificate of insurance with a financially responsible insurance company licensed to do business in California which includes the following coverage: 1) the inspection and testing activities of Buyer, and its employees, agents, contractors, subcontractors on the Timberlands; 2) per occurrence coverage of no less than One Million Dollars ($1,000,000.); and 3) an aggregate limit of no less than Two Million Dollars ($2,000,000). The certificate required under this Section shall name Seller as an additional insured, shall be primary and non-contributing with any other insurance available to Seller, and shall contain waiver of subrogation rights. The insurance may not be cancelled or amended on less than thirty days prior written notice to Seller. Buyer may provide such insurance by way of a commercially reasonable self-insurance program; provided that such program directly satisfies the foregoing coverage and certificate requirements or provides Seller with equivalent benefits and protections. Buyer may

proceed with that testing unless Seller gives Buyer facsimile notice of Seller's reasonable objection within two (2) days after Buyer's notice. Seller or its representative may be present to observe any testing or other investigations performed on the Timberlands. Buyer shall keep the Timberlands free and clear of any liens asserted against Seller or the Timberlands as a result of any such entry and investigation activities by Buyer or any Invitees. If any of the investigations or related tests or inspections disturb the Timberlands, Buyer will promptly restore the Timberlands to substantially the same condition as existed prior to any such inspection or test. Buyer shall indemnify, defend, save and hold Seller harmless from any and all damage, expenses, liens or claims (including attorneys' fees and costs) arising from Buyer's exercise of its access rights hereunder or previously granted by Seller to Buyer. The provisions of this indemnity shall survive the Closing or the termination of this Agreement.

        4.2    **Termination Rights; Earnest Money Deposit.** At any time prior to the expiration of the Due Diligence Period, Buyer may terminate this Agreement in the event Buyer, in its sole discretion, is dissatisfied with its due diligence investigations, by written notice to Seller, in which event the Earnest Money Deposit shall be returned to Buyer and the Parties hereto shall be released from all liability hereunder, except as specifically set forth otherwise herein.

        5.    **Casualty Loss and Condemnation.** Subject to the terms hereof, if a material loss or damage to the timber or any other portion of the Timberlands (with a loss/damage threshold exceeding One Million Dollars ($1,000,000.00)) resulting from a casualty or condemnation occurs after the Effective Date and prior to Closing, then Buyer may terminate this Agreement by written notice to Seller, in which event the Earnest Money Deposit shall be returned to Buyer and the Parties hereto shall be released from all liability hereunder, except as specifically set forth otherwise herein. In the event of a loss or damage under the Threshold, the Purchase Price will be adjusted accordingly at Closing.

        6.    **Condition of the Timberlands; Ongoing Operations.** Buyer acknowledges and agrees for itself and its successors and assigns, except as otherwise expressly provided in this Agreement, (i) that as of the Closing it will have inspected and will be thoroughly familiar with the Timberlands and its physical aspects and that it is acquiring the Timberlands in its "as is" condition, (ii) that Buyer assumes the responsibility and risks of all defects to and conditions in the Timberlands, including defects and conditions, if any, that cannot be observed by inspection, (iii) that Seller has not made and makes no representations or warranties of any kind with respect to the condition of the Timberlands or its fitness, suitability or acceptability for any particular use or purpose, except as may be otherwise set forth herein; (iv) that Seller shall not be liable for any latent or patent defects therein, (v) Seller is selling the Timberlands by the tract or parcel only, it being understood and agreed that the acreage of the Timberlands is not guaranteed or warranted in any way by Seller, and (vi) that, other than continuing obligations to be performed in the ordinary course of Seller's business prior to the Closing set forth in Section 6.2 below, Seller shall have no obligation to repair or make any improvements to the condition of the Timberlands prior to the Closing. By purchasing the Timberlands, Buyer acknowledges and agrees for itself and its successors and assigns (i) that it has been given a reasonable opportunity to inspect and to investigate the Timberlands and the timber located thereon either independently or through agents of Buyer's choosing prior to and during the Due Diligence Period, (ii) that any

information, whether written or oral, or in the form of maps, surveys, inventory information, GIS data, plats, soil reports, engineering studies, environmental studies, inspection reports, plans, specifications, or any other information whatsoever, without exception, pertaining to the Timberlands and the timber thereon, any and all other matters concerning the condition, suitability, integrity, marketability, compliance with law, or other attributes or aspects of the Timberlands and the timber located thereon, is furnished to Buyer as a courtesy without warranty by Seller, that neither Seller nor its representatives, officers, members or employees have verified the accuracy of any statements or other information therein contained nor the qualifications of the persons preparing such information, (iii) subject to Section 3.1 above, that legal access is not guaranteed by Seller and Buyer is responsible for determining access to the Timberlands, including contacting any responsible government agencies regarding access, permits, restrictions or existing hazards, (iv) that mineral rights will not be included if not owned by Seller as of the Effective Date, (v) that Buyer is also responsible for evaluating whether the Timberlands are suitable for Buyer's intended purpose and any and all environmental, land use, regulatory and other constraints relating to the use of the Timberlands or the harvest of timber therefrom, (vi) that Buyer shall be solely responsible for obtaining all permits and licenses, if any, required of or by Buyer to carry out its intended operations or activities on the Timberlands, and (vii) that Buyer is responsible for determining whether the Timberlands or any portion thereof is within any flood plain, flood prone area, watershed or "wetlands" area, the availability of water, sewer, electrical, gas, or other utility services or the amount and type of timber located on the Timberlands.

6.1.     Without limiting the generality of the foregoing, SELLER EXPRESSLY DISCLAIMS THE EFFECT OF ALL PAST, PRESENT OR FUTURE LAWS UPON THE OPERATION OF THE TIMBERLANDS, ALL WARRANTIES RELATING TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND SUITABILITY FOR BUYER'S INTENDED USE AS WELL AS ANY WARRANTY WHATSOEVER WITH RESPECT TO THE VOLUME, MARKETABILITY, HARVESTABILITY, AGE, SPECIES MIX, SITE CLASSIFICATION, BOUNDARIES OF THE TIMBER OR THE TIMBERLANDS, QUANTITIES, GRADES, OR QUALITY OF ANY TIMBER ON THE TIMBERLANDS, OR THE COSTS ASSOCIATED WITH HARVESTING OR REMOVING THE SAME THEREFROM. The provisions of this Section 6 shall survive the Closing.

6.2.     From the date hereof until the Closing, Seller (i) shall continue to operate the Timberlands in the ordinary course of business, and (ii) shall not enter into any agreement that would materially affect Buyer's ability to harvest and remove the timber on the Timberlands or any other agreement that would have a material adverse effect on the use, value, operation or enjoyment of the Timberlands. For purposes hereof, "ordinary course of business" means action consistent with the past practices of Seller and action taken in the ordinary course of the normal day-to-day operations of Seller. Seller agrees that, except as otherwise set forth herein, it shall not enter into, amend, renew or otherwise modify any agreement for any purposes disposing of, encumbering or otherwise affecting the Timberlands or the rights of Buyer hereunder, without the written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing or any other provision herein to the contrary, Buyer and Seller agree that, at Seller's election, Seller may either (i) cease all timber harvesting activities as

of the Effective Date, and the Purchase Price shall be adjusted as provided in Section 2.1 or (ii) continue to perform harvesting of timber and log removal upon the Timberlands between the Effective Date and Closing Date in the ordinary course of Seller's business as contemplated by that certain Timber Harvest Plan #1 and retain all revenues associated with such timber harvesting, and such activities shall result in no reduction in the Purchase Price as provided in Section 2.1 hereof. In the event that Seller has not completed Timber Harvest Plan #1 by Closing, the Parties shall confer for purposes of negotiating a sale of Seller's residual rights under the Timber Harvest Plan, and in the event that the Parties are unable to agree upon a price, Seller shall be entitled to include a reservation of temporary access rights in the Deeds as part of the Closing as reasonably necessary to complete Timber Harvest #1.

   6.3. **"AS IS" CONDITION.** BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY PROVIDED HEREIN, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) VALUE; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (IV) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (V) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (VI) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, GEOLOGY, SEISMIC CONDITION OR SAFETY. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY AND REVIEW INFORMATION AND DOCUMENTATION AFFECTING THE PROPERTY, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER, INCLUDING, WITHOUT LIMITATION, THE PROPERTY DOCUMENTS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION MADE AVAILABLE TO BUYER OR PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER WITH RESPECT TO THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PROPERTY DOCUMENTS) WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. BUYER AGREES TO FULLY AND IRREVOCABLY RELEASE ALL SUCH SOURCES OF INFORMATION AND PREPARERS OF INFORMATION AND DOCUMENTATION AFFECTING THE PROPERTY WHICH WERE RETAINED BY SELLER (INCLUDING, WITHOUT LIMITATION, THE PROPERTY DOCUMENTS) FROM ANY AND ALL CLAIMS THAT THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SUCH SOURCES AND PREPARERS OF INFORMATION FOR ANY COSTS, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND,

ACTION OR CAUSE OF ACTION ARISING FROM SUCH INFORMATION OR DOCUMENTATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN **"AS IS"** CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO OBLIGATIONS TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS EXCEPT AS MAY OTHERWISE BE EXPRESSLY STATED HEREIN. BUYER REPRESENTS, WARRANTS AND COVENANTS TO SELLER THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SPECIFIED IN THIS AGREEMENT, BUYER IS RELYING SOLELY UPON BUYER'S OWN INVESTIGATION OF THE PROPERTY. THIS COVENANT SHALL SURVIVE THE CLOSE OF ESCROW.

_____
Buyer's Initials

_____
Seller's Initials

7. **Conditions to the Closing.**

7.1.  **Buyer's Conditions.** Buyer's obligation to close this transaction shall be subject to and contingent upon the satisfaction or waiver of each of the following conditions:

7.1.1.  At the Closing, Seller shall convey good and marketable title to the Timberlands, as evidenced by the issuance of the title policies specified in section 8.7, subject only to the Permitted Exceptions.

7.1.2.  Each of the obligations and covenants of Seller to be performed prior to or on the Closing Date pursuant to this Agreement shall have been performed in all material respects and Seller's representations and warranties set forth in this Agreement shall be true and correct in all material respects as of the Closing Date.

7.1.3.  No suit, action, arbitration or other proceeding shall be pending before any court or governmental agency, which may result in the restraint or prohibition of the purchase and sale of the Timberlands.

7.1.4.  A Seller's closing certificate (the **"Seller's Certificate"**) in form and substance identical to the document attached hereto as <u>Schedule 7.1.4</u>, reaffirming as of the Closing Date the representations and warranties of Seller contained in Section 9.1 hereof, shall have been delivered to and received by Buyer.

7.1.5.  The transaction contemplated under this Agreement shall have received all applicable governmental approvals prior to the Closing, and all applicable waiting periods, if any, shall have expired or been terminated.

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 15 of 91

7.1.6. The Title Company shall be prepared to issue to Buyer the Title Policies to which Buyer is entitled as contemplated under Section 8.7 below.

7.1.7. Seller shall have instructed the Title Company to withhold from Seller's net proceeds and pay to the tax collectors of the Counties of Lassen and Plumas all delinquent property taxes and assessments accrued with respect to the Timberlands in the aggregate amount of approximately $3,200,000 (the "Delinquent Taxes"). Seller reserves the right (a) to meet with governmental officials and to contest any reassessment governing or affecting Seller's tax obligations, but with respect to the periods before the Closing only, and (b) to contest any assessment of the Property or any portion thereof for periods before the Closing only and to attempt to obtain a refund for any taxes paid by Seller. Seller shall retain all rights with respect to any refund of taxes applicable to any periods prior to Closing. Notwithstanding any other provision in this Agreement to the contrary, Seller's rights as provided for in this paragraph 7.1.7 shall survive the Closing.

7.1.8 Seller shall have settled, to Buyers sole satisfaction, that certain existing litigation known as *Mountain Meadow Conservancy v. County of Lassen*, Lassen County Superior Court Case No. 45938 (the "Litigation"), and Seller shall have provided reasonably satisfactory documentation to Buyer evidencing such settlement including dismissal of the appeal.

If the conditions set forth in Section 7.1 above are not satisfied prior to Closing, Buyer can waive such conditions in writing or terminate this Agreement in writing, in which case the Earnest Money Deposit shall be returned to Buyer and neither Party shall have further liability hereunder, except as otherwise set forth herein. Notwithstanding the foregoing should Buyer choose to proceed to Closing, Buyer shall be deemed to have waived all conditions to Closing.

7.2. **Seller's Conditions.** Seller's obligation to close this transaction shall be subject to and contingent upon the satisfaction or waiver of each of the following conditions:

7.2.1. Each of obligations and covenants of Buyer to be performed prior to or on the Closing Date pursuant to this Agreement shall have been performed in all material respects and Buyer's representations and warranties set forth in this Agreement shall be true and correct in all material respects as of the Closing Date.

7.2.2. No suit, action, arbitration or other proceeding shall be pending before any court or governmental agency, which may result in the restraint or prohibition of the purchase and sale of the Timberlands.

7.2.3. A Buyer's closing certificate (the "**Buyer's Certificate**") in form and substance substantially identical to the document attached hereto as Schedule 7.2.3, reaffirming as of the Closing Date the representations and warranties of Buyer contained in Section 9.2 hereof, shall have been delivered to and received by Seller.

8

7.2.4. The transaction contemplated under this Agreement shall have received all applicable governmental approvals prior to the Closing, and all applicable waiting periods shall have expired or been terminated.

7.2.5. Seller shall have settled, to its sole satisfaction, the Litigation, and shall have provided reasonably satisfactory documentation to Buyer evidencing such settlement including dismissal of the appeal.

7.2.6. The full and complete release of any and all liens created by mortgages or deed of trusts encumbering the Property.

7.2.7. Seller shall have obtained the consent of each of its members to the transaction contemplated under this Agreement, including the consent of Richard M Kipperman, solely in his capacity as chapter 11 trustee of CMR Mortgage Fund II LLC and CMR Mortgage Fund III LLC, whose consent is subject to the approval of the U.S. Bankruptcy Court of the Northern District of California.

If the conditions set forth in Section 7.2 above are not satisfied prior to Closing, Seller can waive such conditions in writing or terminate this Agreement in writing, in which case the Earnest Money Deposit shall be returned to Buyer and neither Party shall have further liability hereunder, except as otherwise set forth herein. Notwithstanding the foregoing should Seller choose to proceed to Closing, Seller shall be deemed to have waived all conditions to Closing.

8.    **Closing.**

8.1.    **Time and Place of Closing.** This transaction shall be closed in escrow (the "**Closing**") at the office of the Title Company in Redding, California, or at such other location as the Parties may mutually agree in writing. The Closing shall take place on the date mutually convenient for the Parties, but no later than the date which is sixty (60) days after the Effective Date (the "**Closing Date**"); provided, however, that Seller shall have the right to extend the Closing Date for up to ninety (90) days in order to settle the Litigation, including dismissal of the appeal, and/or to cure the Title Issues which Seller has agreed to cure in accordance with Section 3.1.

8.2.    **Buyer's Closing Deliveries.** At or before Closing, Buyer shall deliver to Title Company, for delivery through escrow to Seller or as otherwise directed, the following:

8.2.1. the balance due on the Purchase Price, together with any other amounts required by this Agreement to be paid by Buyer, all in immediately available funds by wire transfer to the Title Company's account;

8.2.2. certified resolutions, certificates of good standing and other evidence of the authority of the persons executing this Agreement and the closing documents on behalf of Buyer to execute such documents and close the transactions contemplated hereby;

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 17 of 91

8.2.3. all reports and forms (if any) required under (i) Section 1060 of the Code and Department of Treasury regulations thereunder, and (ii) all Stamp Tax Laws;

8.2.4. any other documents required by this Agreement to be delivered by Buyer including proof of insurance as specified in 4.1, and any necessary assumptions of interests and rights to be conveyed;

8.2.5. an executed Buyer's Certificate;

8.2.6. such additional instructions, resolutions, and other documents as Title Company may reasonably require or Buyer may desire to utilize that are not inconsistent with or contrary to the provisions hereof. In the event of any inconsistency or conflict between said instructions and the provisions of this Agreement, this Agreement shall control.

8.3. **Seller's Closing Deliveries**. At the Closing, Seller shall deliver through escrow to Buyer or as otherwise directed, the following:

8.3.1. a grant deed or grant deeds with respect to all portions of the Timberlands (collectively, the **"Deeds"**), properly executed and acknowledged and in proper form for recording in individual counties where the Timberlands are located so as to convey the Timberlands to Buyer as required by this Agreement, subject only to the Permitted Exceptions.(covered in Section 6.2);

8.3.2. an executed certificate to the effect that Seller is not a foreign person as defined in Section 1445 of the Code and Department of Treasury regulations thereunder;

8.3.3. all reports and forms (if any) required under (i) Section 1060 of the Code and Department of Treasury regulations thereunder, and (ii) all Stamp Tax Laws;

8.3.4. an executed Seller's Certificate;

8.3.5. certified resolutions, certificates of good standing and other evidence of the authority of the persons executing this Agreement and the closing documents on behalf of Seller to execute such documents and close the transactions contemplated hereby;

8.3.6. any other documents required by this Agreement to be delivered by Seller including any necessary assignments of interests and rights to be conveyed;

8.3.7. such additional instructions, resolutions, and other documents as Title Company may reasonably require or Seller may desire to utilize that are not inconsistent with or contrary to the provisions hereof. In the event of any inconsistency or conflict between said instructions and the provisions of this Agreement, this Agreement shall control.

8.4. **Reasonable Actions**. The Parties shall take such other actions as may be reasonably necessary to complete the Closing in accordance with this Agreement.

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 18 of 91

8.5. **Prorations.** Adjustments and prorations shall occur at Closing as follows:

8.5.1. All monies due for accounts payable and direct operating costs and expenses owing or accrued in connection with the operation of the Timberlands prior to the Closing Date shall be for Seller's account. All accounts payable and direct operating costs and expenses incurred on or after the Closing Date for operation of the Timberlands will be the sole obligation of the Buyer.

8.5.2. All real and personal property taxes and installments of special or general assessments, if any, for the tax years prior to the present tax year, including the Delinquent Taxes, shall be paid by the Seller. All real and personal property taxes and special or general assessments, if any, whether payable in installments or not, for the tax year during which the Closing Date occurs will be prorated on a daily basis to the Closing Date based upon the latest available tax rate and assessed valuation.

8.5.3. All other items which are customarily prorated in transactions similar to the transaction contemplated under this Agreement and which are not heretofore identified in this Section 8.5 shall be prorated as of the Closing Date in accordance with customary practices.

8.6. **Closing Costs.** The costs associated with the Closing shall be allocated as follows:

8.6.1. Seller shall pay (i) one-half of the escrow fee of Title Company, (ii) one-half of all Title Expenses, as hereafter defined in this Section 8.6.1, (iii) all recordation fees for the Deeds; (iv) Seller's attorneys fees; and (v) all documentary transfer taxes and other fees due to state and local authorities in connection with the Closing. Seller shall also be responsible for the recording fees resulting from the recordation of all documents needed to clear any title exceptions required to be removed by Seller hereunder. For purposes of this Section 8.6, the term **"Title Expenses"** shall mean the premiums and other charges and examination fees for the Title Report and Title Policies (defined in Section 8.7 below) issued by the Title Company in connection with the transaction contemplated under this Agreement.

8.6.2. Buyer shall pay (i) one-half of the escrow fee of Title Company, (ii) all of Buyer's environmental or other consultants' and attorneys' fees, and (iii) one-half of all Title Expenses, as defined in Section 8.6.1.

8.6.3. Except as expressly provided in this Agreement, each Party shall bear and pay at its sole cost and expense all costs and expenses incurred by such Party in connection with this Agreement and the transaction contemplated hereby, including (without limitation) all attorneys' and accountants' fees.

8.7. **Title Insurance Policies.** At the Closing, Seller shall cause the Title Company to deliver to Buyer up to two ALTA standard coverage owner's policies of title insurance with respect to the Timberlands (one each for properties in Plumas and Lassen

11

counties respectively), with coverage amounts in the aggregate equal to the Purchase Price, as may be adjusted herein, insuring marketable fee simple title to the Timberlands, as the case may be, in Buyer, subject only to the Permitted Exceptions, and any liens or encumbrances suffered or created by Buyer (collectively, the "Title Policies").

8.8. **Possession.** Buyer shall be entitled to possession of the Timberlands immediately upon the Closing.

9. **Representations and Warranties.**

9.1. **Seller's Representations and Warranties.** Seller represents and warrants to Buyer as follows:

9.1.1. Seller is duly organized, validly existing, and in good standing under the laws of the State of California, and has full power and authority to execute, deliver, and perform its obligations under this Agreement and all instruments required to be delivered by Seller hereunder. All requisite authorizing action has been taken by Seller in connection with the execution and delivery of this Agreement and the consummation of this transaction.

9.1.2. The execution, delivery and performance of this Agreement by Seller will not (i) violate or conflict with the respective Seller's limited liability company power or authority, (ii) constitute a violation of any law, regulation, order, writ, judgment, injunction, or decree applicable thereto, or (iii) conflict with, or result in the breach of the provisions of, or constitute a default under, any material agreement, license, permit, or other instrument to which Seller is a party or is bound.

9.1.3. Except as disclosed in Schedule 9.1.3 attached hereto, there is neither pending nor, to Seller's knowledge, threatened against Seller, the Timberlands, or any part thereof any legal action, arbitration, administrative proceeding before any governmental authority, or investigation that could (i) have a material adverse effect on Buyer or upon the use, value or operation of the Timberlands following the Closing, or (ii) enjoin or restrict the right or ability of Seller to perform its obligations under this Agreement.

9.1.4. Except as disclosed in Schedule 9.1.4 attached hereto, to Seller's knowledge, Seller has received no written notification from any governmental authority (i) that the Timberlands or any part thereof is in violation of any applicable law, ordinance, rule, regulation, or judicial or administrative order or ruling, or (ii) that the condemnation of any portion of the Timberlands is contemplated or being considered.

9.1.5. Except as disclosed in Schedule 9.1.5 attached hereto, to Seller's knowledge, Seller has received no notice during Seller's period of ownership that there are parties that may claim to adversely possess or have any possessory rights in any part of the Timberlands being sold to Buyer.

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 20 of 91

9.1.6. Except as disclosed in Schedule 9.1.6 attached hereto, there are no contracts affecting any portion of the Timberlands, oral or written, which extend beyond the Effective Date, and bind Buyer or encumber the Timberlands.

9.1.7. Seller is not a foreign person or entity, as described in the Foreign Investments in Real Timberlands Tax Act, Section 1445 of the Code.

9.1.8. There are no outstanding reforestation or slash removal obligations imposed by applicable law or governmental regulation concerning the Timberlands, except those listed on Schedule 9.1.8 attached hereto.

9.1.9. Seller and each person or entity owning a direct interest in Seller is: (a) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (b) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States. None of the funds or other assets of Seller constitute property of, or are beneficially directly owned by, any Embargoed Person (as defined below). No Embargoed Person has any direct interest in Seller. The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that a transaction with or an investment in Seller is prohibited by law or Seller is in violation of law. Seller also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Seller is or shall be listed on the List or is or shall be an Embargoed Person. This Section shall not apply to any person to the extent that such person's interest in Seller is through a U.S. Publicly-Traded Entity. As used in this Agreement, "U.S. Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

9.1.10. For purposes hereof, the term "to Seller's knowledge," means the present, actual knowledge of the following employees, officers and representatives of Seller, with no duty of due diligence or inquiry on the part of such Parties: Sean Armstrong. Seller has reviewed the representations and warranties contained in this Section 9.1 with each of the individuals identified in this Section 9.1.10, all of whom are named herein to define the scope of Seller's knowledge, but none of whom shall have any personal liability hereunder.

9.2. **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller as follows:

9.2.1. Buyer is duly organized, validly existing, and in good standing under the laws of the State of California and has full power and authority to execute, deliver, and

13

perform its obligations under this Agreement and all instruments required to be delivered by Buyer hereunder. All requisite authorizing action has been taken by Buyer in connection with the execution and delivery of this Agreement and the consummation of this transaction.

9.2.2. The execution, delivery and performance of this Agreement by Buyer will not (a) violate or conflict with Buyer's limited liability company power or authority, (b) to Buyer's knowledge, constitute a violation of any law, regulation, order, writ, judgment, injunction, or decree applicable to Buyer, or (c) to Buyer's knowledge, conflict with, or result in the breach of the provisions of, or constitute a default under, any material agreement, license, permit, or other instrument to which Buyer is a party or is bound.

9.2.3. There is neither pending nor, to Buyer's knowledge, threatened any legal action, arbitration, administrative proceeding before any governmental authority, or investigation that could enjoin or restrict Buyer's right or ability to perform its obligations under this Agreement.

9.2.4. None of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Timberlands Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "US Patriot Act"). Buyer and each person or entity owning a direct interest in Buyer is: (a) not currently identified on the List, and (b) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States. None of the funds or other assets of Buyer constitute property of, or are beneficially directly owned by, any Embargoed Person. No Embargoed Person has any interest of any direct interest in Buyer. Buyer has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties in this Section 9.2.4 remain true and correct at all times. The term "**Embargoed Person**" as such relates to Buyer means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that a transaction with or an investment in Buyer is prohibited by law or Buyer is in violation of law. Buyer also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Buyer is or shall be listed on the List or is or shall be an Embargoed Person. This Section shall not apply to any person to the extent that such person's interest in Buyer is through a U.S. Publicly-Traded Entity (including those named on OFAC's Specially Designed and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Timberlands and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

10. **Indemnification.**

10.1.  General Indemnification Obligations.

10.1.1. **Loss.** The term "**Loss**" means any liability, loss, cost, damage, expense or payment including (i) related reasonable attorneys', accountants' and other professional advisors' fees and expenses and incidental damages, (ii) reasonable attorneys' fees incurred in enforcing the indemnification provisions of this Agreement, (iii) amounts paid in settlement (made in accordance with the procedures of Section 5 below) of a dispute with a person not a party to this Agreement that if resolved in favor of such third person would constitute a matter to which a party is indemnified pursuant to this Agreement, even though such settlement does not acknowledge that the underlying facts or circumstances constitute a violation of law or a breach of a representation and warranty or other matter as to which the party is indemnified, and (iv) reasonable costs and expenses necessary to avoid having a claim for indemnification against another party pursuant to this Agreement, to mitigate any such claim, or to correct facts and circumstances that would have resulted in its having a claim for indemnification against another party pursuant to this Agreement.

10.1.2. **Waiver and Estoppel.** No Party will be entitled to assert after the Closing any claim based on a breach of any representation, warranty or covenant under this Agreement, to the extent such representation, warranty or covenant otherwise would survive the Closing, if the Party asserting such a claim had actual knowledge of the facts constituting the breach prior to the Closing Date and any such claim will be deemed waived and the Party asserting such claim will be estopped from asserting, any claim or remedy based upon such breach. For purposes of this Section 10.1.2, "actual knowledge" of a party will include the actual knowledge of its legal counsel and consultants, with respect to their representation of the party in connection with this Agreement.

10.1.3. **Cooperation.** Buyer and Seller shall cooperate fully with each other and their respective attorneys, accountants and other representatives in connection with the defense or settlement of a matter for which a party has an indemnification obligation pursuant to this Section 10.

10.2.  **Indemnity by Seller.** Seller shall indemnify and hold harmless Buyer and its officers, directors, shareholders, employees, agents, representatives, legal representatives, successors and assigns (the "**Buyer Indemnitees**"), from and against any Loss arising out of, in connection with or resulting from:

10.2.1. any breach of or failure to comply with any covenant or agreement made by the Seller in this Agreement or in any agreement delivered pursuant hereto;

10.2.2. any inaccuracy in or breach of any of the representations or warranties made by the Seller herein or in any schedule, certificate or agreement delivered pursuant hereto; and

10.2.3. any claim by any person for a brokerage or finder's fee or a commission or similar payment based upon any agreement or understanding alleged to have been

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 23 of 91

made by any such person with the Seller (or any person acting on the Seller's behalf) in connection with the transactions contemplated by this Agreement.

Subsections 10.2.1 through 10.2.3 above shall be deemed to be independent bases for indemnification, and the Buyer Indemnitees shall be entitled to indemnification under each such subsection. Subject to the terms hereof, the indemnification provided by this Section 10.2 shall encompass claims of the Buyer Indemnitees against the Seller for any Loss sustained by the Buyer Indemnitees whether or not involving any claim, action or proceeding by a third party.

10.3. **Indemnification by Buyer.** Buyer shall indemnify and hold harmless Seller against any Loss suffered by Seller its respective officers, directors, members, employees, agents, representatives, legal representatives, successors and assigns (the "**Seller Indemnitees**"), arising out of, in connection with or resulting from:

10.3.1. any breach of or failure to comply with any covenant or agreement made by Buyer in this Agreement or in any agreement delivered pursuant hereto;

10.3.2. any inaccuracy in or breach of any of the representations or warranties made by Buyer herein or in any schedule, certificate or agreement delivered pursuant hereto;

10.3.3. any claim by any person for a brokerage or finder's fees or a commission or similar payment based upon any agreement or understanding alleged to have been made by such person with the Buyer (or any person acting on any of the Buyer's behalf) in connection with the transactions contemplated by this Agreement;

Subsections 10.3.1 through 10.3.3 above shall be deemed to be independent bases for indemnification and Seller Indemnitees shall be entitled to indemnification under each subsection. The indemnification provided by this Section shall encompass claims by the Seller Indemnitees against Buyer for any Loss sustained by the Seller whether or not involving any claim, action or proceeding by a third party.

10.4. **Tax Impact; Insurance and Contracts.** The Parties agree that any Loss for which indemnity is sought pursuant to the provisions of this Section 10 shall be computed after deduction of any net tax benefit which may accrue to the Party seeking indemnity (each, individually an "**Indemnitee,**" and collectively, the "**Indemnitees**") after giving effect to the incurrence by such party of the Loss giving rise to the claim for indemnification, the payment by such Party of any such Loss, and the receipt by such Indemnitee of any indemnity pursuant hereto, but only to the extent such tax benefit is actually realized. In connection with any indemnity claim, the Parties agree to first seek recovery of any Loss under any available insurance policy (not including any portion of any self-insured retention) or third party contract. Buyer specifically agrees, to the extent any such claim may be covered by the Title Policies, to bring any claim and seek recovery for Loss arising with respect to any breach of the warranties under the Deeds after Closing first against the Title Company and further agrees to pursue in good faith and completely exhaust all available remedies against the Title Company before bringing any claim related to such breach against Seller. The amount of any Loss for which

indemnification is provided under this Section 10 shall be reduced by the insurance proceeds received and any other amounts, if any, recovered from third parties by the Indemnitee (or its affiliates) with respect to any Loss. If any Indemnitee (or its affiliates) received any indemnification payment pursuant to this Section 10 with respect to any Loss, such Indemnitee shall, upon written request by the indemnifying party (each, individually an "**Indemnitor**," and collectively, the "**Indemnitors**") assign to such Indemnitor (to the extent of the indemnification payment) any claim which such Indemnitor may have under any applicable insurance policy or contract which provided coverage for such Loss. Such Indemnitee shall reasonably cooperate (at the expense of the Indemnitor) to collect under such insurance policy or contract. If any Indemnitee (or its affiliates) receives any payment pursuant to this Section 10 with respect to any Loss and subsequently receives insurance proceeds or other amounts with respect to such Loss, the Indemnitee (or its affiliates) shall promptly pay over to the Indemnitor the amount so recovered (after deducting the amount of the expenses incurred by it in procuring such recovery), but not in excess of the amount previously so paid by the Indemnitor. Following Closing, each Party agrees to notify the other Party in writing and provide accurate and relevant information to the other Party at any time that the notifying Party receives any net tax or insurance benefit that would impact the obligations of the other Party as an Indemnitor hereunder. Within a reasonable time following receipt of all relevant information by the Party acting as Indemnitor, the Parties shall mutually calculate any adjustment necessary with respect to any sums due and owing or already paid by the Party acting as Indemnitor under this Section 10. In the event that such calculations indicate that the Party acting as Indemnitor owes the notifying Party less than any sum then deemed due and owing to the notifying Party under this Section 10, the sum due and owing such Party shall be reduced accordingly. To the extent that the calculations indicate that the Party acting as Indemnitor has overpaid sums due under this Section 10, the notifying Party shall immediately refund to the Indemnitor the amount overpaid.

10.5. Claims Procedure.

10.5.1. **Notice.** An Indemnitee hereunder shall, within fifteen (15) days after receiving notice of a Loss, notify the Indemnitor in writing of the facts that are the basis of such Loss which the Indemnitee has determined has given or may give rise to a right of indemnification under this Agreement (a "**Claim**"). Notwithstanding the foregoing, a delay in providing any notice of a Claim shall not prejudice any right to indemnification under this Agreement except to the extent that the Indemnitor is actually prejudiced by such failure. The amount of the Claim as set forth in the notice shall be based upon the Indemnitee's good faith opinion of the reasonable maximum exposure to the Indemnitor but shall not limit the Indemnitee's right to indemnification if the resulting Loss exceeds the amount set forth in the notice.

10.5.2. **Third Party Claims.** If any Claim relates to a claim or demand by a third party (including governmental authorities) against any Buyer Indemnitee or Seller Indemnitee, and the Indemnitor acknowledges its obligation to indemnify the Indemnitee with respect to such claim or demand, the Indemnitor shall have the right to settle any such third party claim or demand (at the Indemnitor's expense and without admitting that the Indemnitee had any liability with respect thereto and provided the sole relief is monetary damages to be paid in full by Indemnitor) or to employ counsel chosen by the Indemnitor in its reasonable discretion to

defend any such third party claim or demand, and the Indemnitee shall have the right to participate in the defense of any such claim or demand with counsel of the Indemnitee's selection and at the Indemnitee's cost. So long as the Indemnitor is defending in good faith any such third party claim or demand, the Indemnitee will not settle such claim or demand. The Indemnitee shall make available to the Indemnitor or its representatives, at the Indemnitor's expense, all records and other materials required by it for its use in contesting any such claim or demand asserted by a third party against such Indemnitee. If the Indemnitor is not entitled to defend or settle a third party claim or demand because the Indemnitor does not acknowledge its indemnification obligation with respect to the Claim, or if the Indemnitor does not otherwise assume the defense of a third party claim or demand or abandons the defense of a third party claim or demand, the Indemnitor shall be deemed to have waived its right to defend or settle such a third party claim or demand and the Indemnitee shall have the right to defend or settle such third party claim or demand, and the Indemnitee shall continue to be entitled to indemnification pursuant to this Section 10, but only to the extent that the Indemnitor is liable hereunder with respect to the Claim in question. The Indemnitee may only settle a third party claim or demand in which it is entitled to defend or settle upon delivery to the Indemnitor of a statement by counsel for the Indemnitee that any such proposed settlement would be reasonable and in good faith under the circumstances of such third party claim or demand. If the Indemnitor objects to such proposed settlement, it may either assume the defense of such third party claim or demand or pay the Indemnitee's attorneys' fees and other out-of-pocket costs incurred thereafter in continuing to defend such third party claim or demand. If the Indemnitor rejects any such proposed settlement, it shall be liable to the Indemnitee for any amount paid by the Indemnitee in excess of the settlement amount included in the rejected settlement offer, whether or not the Indemnitor would otherwise be liable to indemnify the Indemnitee with respect to such third party claim or demand.

        **10.5.3. Other Claims.** If a Buyer Indemnitee or Seller Indemnitee suffers a Loss other than that arising from a claim or demand asserted by a third party, the Indemnitee shall in its notice of Claim propose a reasonable course of remedial action. The Indemnitor shall notify the Indemnitee whether it disputes its obligation to indemnify the Indemnitee or the amount of the Indemnitee's Loss, and shall propose a course of remedial action to satisfy the Claim. The Indemnitee shall allow the Indemnitor to undertake its reasonable proposed course of remedial action, if, and only if, such proposed course of remedial action (i) provides for the satisfaction of the claim in a manner consistent with applicable law and with applicable industry standards and (ii) will not be more disruptive of the Indemnitee's operations at the affected site or elsewhere than the remedial action proposed by the Indemnitee. If the Indemnitor disputes such Claim or any portion thereof, the Indemnitor shall specify in detail the portion of such Loss (if less than all) which is disputed and the facts relied upon by the Indemnitor as a basis for such dispute.

        **10.6.  Satisfaction of Claim.** If the Indemnitor has acknowledged its obligation to indemnify Indemnitee with respect to a Claim and does not dispute the amount of such Claim, Indemnitee shall be entitled to immediate satisfaction in cash of any related Loss. If the Indemnitor disputes its obligation to indemnify Indemnitee with respect to a Claim, the Indemnitor shall pay the amount of any Loss related to the Claim in cash upon a final determination that the Indemnitor is obligated to indemnify Indemnitee with respect to such

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 26 of 91

Claim. If the Indemnitor disputes the amount of a Claim, Indemnitee shall be entitled to immediate satisfaction in cash of any undisputed Loss related to the Claim and the Indemnitor shall pay in cash the amount of any disputed Loss upon a final determination of the indemnifiable amount of such Loss. No Indemnitee (or its affiliate) shall be entitled to offset the amount of any Loss to which it is entitled to indemnification hereunder against any obligation due by it to the Indemnitor (or its affiliate).

10.7. **Nature and Survival of Representations, Warranties, Covenants and Indemnities.** All of the representations, warranties, covenants, indemnities and agreements of the Parties contained herein shall survive the Closing Date for a period of six (6) months thereafter except as otherwise set forth herein and as to any matters with respect to which a bona fide written Claim has been received before such date, in which event survival shall continue, but only with respect to, and to the extent of, such Claim; provided, however, that any Claims against the Buyer Indemnitees under Sections 4, 12.15 and 12.17 shall survive the Closing until the running of the applicable statutes of limitation. Except as otherwise provided in this Agreement, the covenants, terms and provisions of this Agreement shall not merge with the Deeds, but shall survive Closing.

10.8. **Purchase Price Adjustment.** Any amount paid by Seller on the one hand, or Buyer on the other hand, to the other pursuant to this Section 10 will be treated for tax purposes as an adjustment to the Purchase Price.

11. **Default; Remedies. IF BUYER FAILS TO CLOSE THIS TRANSACTION ON OR BEFORE THE CLOSING DATE, OTHER THAN BECAUSE OF A MATERIAL DEFAULT BY SELLER OR TERMINATION OF THIS AGREEMENT BY BUYER UNDER ANY OF SECTIONS 3.1, 4.2, 5, 7.1, 7.2 OR 12.11, THEN TITLE COMPANY SHALL CAUSE THE EARNEST MONEY DEPOSIT TO BE PAID OVER TO SELLER, THE SAME BEING AGREED UPON AS LIQUIDATED DAMAGES FOR THE FAILURE OF BUYER TO CONSUMMATE THE TRANSACTION CONTEMPLATED HEREUNDER. SELLER SHALL ACCEPT AND TAKE THE EARNEST MONEY DEPOSIT AS ITS TOTAL DAMAGES AND RELIEF AND AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR BUYER'S FAILURE TO CONSUMMATE THE TRANSACTION CONTEMPLATED HEREUNDER. THE PARTIES AGREE AND ACKNOWLEDGE THAT (I) SELLER WOULD SUFFER DAMAGES BY REASON OF A FAILURE OF THIS TRANSACTION TO CLOSE, (II) THE EXACT AMOUNT OF SUCH DAMAGES WOULD BE DIFFICULT TO ASCERTAIN AND TO PROVE WITH CERTAINTY, (III) THE EARNEST MONEY DEPOSIT CONSTITUTES A FAIR AND REASONABLE ESTIMATE OF THE ACTUAL DAMAGES SELLER WOULD SUFFER, AND (IV) THE PARTIES (AND/OR THEIR REPRESENTATIVES) HAVE NEGOTIATED AND ATTEMPTED, IN GOOD FAITH, TO ESTIMATE THE AMOUNT OF SUCH DAMAGES AND TO COMPENSATE SELLER THEREFOR AS SET FORTH HEREIN.**

Buyer's Initials                    Seller's Initials

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 27 of 91

Should the Closing not occur due to the material default of Seller, Buyer may, at its sole discretion and as its sole remedies, either (i) maintain the Earnest Money Deposit in escrow and pursue an action for specific performance (in which case, the prevailing party would be entitled to recover from the losing party its reasonable attorneys fees and expenses incurred pursuant to Section 12.7 below); provided, however, that Buyer may not pursue an action for specific performance in the event of termination of the Agreement by Seller due to a failure of Seller's conditions set forth in Section 7.2 or failure of Seller to cure title defects as provided in Section 3.1, or (ii) terminate this Agreement and receive from Title Company a refund of the Earnest Money Deposit.

12. **Miscellaneous Provisions.**

   12.1. **Binding Effect.** The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and, subject to the restrictions on assignment set forth herein, their respective successors and assigns.

   12.2. **Assignment; No Recording.** Buyer may assign to or divide for acquisition by entities wholly owned by Buyer or affiliates of Buyer, any of its rights or obligations under this Agreement or particular portions of the Timberlands; and/or Buyer may designate such entities as grantees of particular portions of the Timberlands, all after the prior written consent of Seller, which shall not be unreasonably withheld, conditioned or delayed. Otherwise Buyer shall not assign any of its rights or obligations under this Agreement without the consent of Seller, which Seller may withhold, condition or delay in its reasonable discretion. Buyer waives any right to record this Agreement, a memorandum of agreement or lis pendens.

   12.3. **Notices.** All notices under this Agreement shall be in writing and signed by a Party or its counsel. Notices may be (i) delivered personally, (ii) transmitted by facsimile, (iii) delivered by a recognized national overnight delivery service, or (iv) mailed by certified United States mail, postage prepaid and return receipt requested. Notices to any Party shall be directed to the address set forth below, or to such other or additional address as any Party may specify from time to time by notice to the other Party. Any notice delivered in accordance with this section shall be deemed given (a) in the case of any notice transmitted by facsimile, on the date on which the receiving Party receives receipt by facsimile transmission, telephone, or otherwise, (b) in the case of any notice delivered by a recognized national overnight delivery service, on the day of delivery to the service, or (c) in the case of any notice mailed by certified U.S. mail, three (3) business days after deposit therein.

If to Buyer:                 Sierra Pacific Industries
                             19794 Riverside Avenue
                             Anderson, CA 96007
                             Phone No.: (530) 378-8000
                             Fax No.: (530)378-8266
                             Email: memmerson@spi-ind.com
                             Attn: Mark D. Emmerson

With a copy to:              Dun & Martinek, L.L.P.
                             2313 I Street
                             P.O. Box 1266
                             Eureka, CA 95501
                             Phone No.: (707) 442-3791
                             Fax No.: (707) 442-9251
                             Email: DHD@dunmartinek.com
                             Attn: David Dun

If to Seller:                Dyer Management, LLC
                             Attn: Sean Armstrong
                             Westport Capital Partners LLC
                             2121 Rosecrans Avenue, Suite 4325
                             El Segundo, CA 90245

With a copy to:              Abbott & Kindermann, LLP
                             Attn: William Abbott
                             2100 21st Street, Sacramento, CA 95818
                             wabbott@aklandlaw.com
                             (f) 916-456-9599

    **12.4. Waiver.** Any Party's failure to exercise any right or remedy under this Agreement, delay in exercising any such right or remedy, or partial exercise of any such right or remedy, shall not constitute a waiver of that or any other right or remedy hereunder. A waiver of any breach of any provision of this Agreement shall not constitute a waiver of any succeeding breach of such provision or a waiver of such provision itself. No waiver of any provision of this Agreement shall be binding on a Party unless it is set forth in writing and signed by such Party.

    **12.5. Amendment.** This Agreement may not be modified or amended except by the written agreement of the Parties.

    **12.6. Exclusive Remedies; Costs.** The remedies of the Parties set forth in Section 11 shall be deemed to be the exclusive remedy for breaches of any representation, warranty, agreement or covenant contained in this Agreement, including any statutory, equitable, or common law remedy or theory. A Party who prevails in prosecuting or defending an

(in addition to any other relief hereunder) be paid by the other Party all costs, fees and expenses, including reasonable attorneys' fees, expert witness (whether or not called to testify at trial or other proceeding) and other professional fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith, including but not limited to deposition transcript and court reporter costs, as determined by the judge or arbitrator at trial or other proceeding, and including such fees, costs and expenses incurred in any appellate or review proceeding, or in collecting any judgment or award, or in enforcing any decree rendered with respect thereto, in addition to all other amounts provided for by law. This cost and attorneys fee provision shall apply with respect to any litigation or other proceedings in bankruptcy court, including litigation or proceedings related to issues unique to bankruptcy law.

12.7. **Integration.** This Agreement contains the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements with respect thereto. The Parties acknowledge and agree that there are no agreements or representations relating to the subject matter of this Agreement, eitherwritten or oral, express or implied, that are not set forth in this Agreement or in the Schedules to this Agreement.

12.8. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to the principles thereof relating to conflicts of laws).

12.9. **Construction and Interpretation.** The headings or titles of the sections of this Agreement are intended for ease of reference only and shall have no affect whatsoever on the construction or interpretation of any provision of this Agreement; references herein to sections are to sections of this Agreement unless otherwise specified. Meanings of defined terms used in this Agreement are equally applicable to singular and plural forms of the defined terms. As used herein, (i) the terms "hereof," "herein," "hereunder," and similar terms refer to this Agreement as a whole and not to any particular provision of this Agreement, (ii) the term "this transaction" refers to the transaction(s) contemplated by this Agreement, and (iii) the term "including" is not limiting and means "including without limitation." In the event any period of time specified in this Agreement ends on a day other than a business day, such period shall be extended to the next following business day. Buyer and Seller each agree and acknowledge that each has been advised and represented by legal counsel in the negotiation, execution and delivery of this Agreement and that all provisions of this Agreement have been negotiated at arm's length. Each Party accordingly agrees that if any ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any Party solely because such Party or its representatives were the drafters of any such provision.

12.10. **Execution.** This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same agreement. Each Party may rely upon the signature of each other Party on this Agreement that is transmitted by facsimile as constituting a duly authorized, irrevocable, actual, current delivery of this Agreement with the original ink signature of the transmitting Party. This Agreement shall become effective and in full force only when duly and properly executed, authorized, and delivered by the Parties hereto.

12.11. **Recitals and Schedules.** The Recitals to this Agreement and any Schedules attached to this Agreement are incorporated herein by this reference. From time to time prior to the Closing, Seller will promptly supplement or amend any Schedule with respect to any matter, including (without limitation) exceptions to title to the Timberlands (each, a **"New Matter,"** and collectively, the **"New Matters"**) arising which, if existing or occurring as of the date of this Agreement, would have been required to have been set forth in such Schedule or which is necessary to correct the information set forth therein which has been rendered inaccurate. Buyer shall have ten (10) days to object in writing to any New Matter disclosed by Seller. If Buyer objects to any New Matter, the Parties shall endeavor to resolve Buyer's objection. If for any reason the Parties are unable to agree on a mutually acceptable resolution of Buyer's objection to the New Matter after good faith negotiations within ten (10) days of the Closing, Buyer may terminate this Agreement by written notice to Seller, in which event the Earnest Money Deposit shall be returned to Buyer and the Parties hereto shall be released from all liability hereunder, except as specifically set forth otherwise herein. No disclosure of any such New Matter arising after the date of this Agreement shall form the basis of a claim for misrepresentation or breach of a representation or warranty hereunder. The term **"New Matter"** shall be deemed to include any conditions, defects, encroachments or other objections to title which are not Permitted Exceptions as defined herein.

12.12. **Further Assurances.** Each Party agrees to execute and deliver such additional documents and instruments as may reasonably be required to effect this transaction fully, so long as the terms thereof are consistent with the terms of this Agreement.

12.13. **No Third Party Beneficiaries.** This Agreement is made and entered into for the sole protection and legal benefit of Seller and Buyer and, subject to the restrictions on assignment set forth herein, their respective successors and assigns, and no other person or entity shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

12.14. **Brokers.** Seller and Buyer each represent and warrant to the other that they have had no dealings, negotiations or consultations with any brokers or finders in connection with this transaction. Each Party shall indemnify, defend and hold harmless the other Party from all liability and damages resulting from any claims that may be asserted against the other Party by any broker, finder, or other person, with whom a Party has or purportedly has dealt.

12.15. **1031 Exchange.** Either Seller or Buyer or both may be structuring a like-kind exchange or exchanges pursuant to Section 1031 of the Code. The Parties shall reasonably cooperate with one another in creating or completing like-kind exchanges pursuant to Section 1031 of the Code in connection with the sale and purchase of the Timberlands; provided however, that (a) such exchanges do not directly or indirectly reduce the Purchase Price, (b) such exchanges will not delay or otherwise adversely affect the Closing, and (c) there is no additional unreimbursed loss, cost, damage, tax or expense incurred by the cooperating Party resulting from, or in connection with, such exchanges. Buyer's rights and obligations hereunder shall be assignable, without the Seller's consent, to one or more qualified intermediaries, escrow agents or other intermediaries, for the purpose of receiving replacement property in order to accomplish

any like kind exchange. Any such assignment shall provide for the direct conveyancing of such replacement property to such intermediary or Buyer, but not to Seller.

12.16. **Publicity; Confidentiality.** Both prior to and following the Closing, neither Buyer nor Seller shall release any information to the media or the general public concerning Buyer's purchase or Seller's sale of the Timberlands unless the Parties otherwise agree in writing or unless such disclosure is required by any law, regulation or rule applicable to either Party or to this transaction; provided, either Party may disclose this Agreement and its terms to its partners, members, or investors. *Either Party may share information with the County of Lassen and Appellants (Sierra Club et al) only as necessary to facilitate settlement of the Litigation.* Each of Buyer and Seller will hold confidential, and cause its respective officers, employees, accountants, counsel, financial advisers and other representatives to hold confidential, any nonpublic information related to or derived from this transaction.

12.18. **Time.** If any date upon which some action, notice or response is required of any Party hereunder occurs on a weekend or national holiday, such action, notice or response shall not be required until the next succeeding business day.

12.19. **Time is of the Essence.** Time is of the essence with respect to all terms, provisions, covenants and conditions contained in this Agreement.

12.20. **Cooperation.** Subject to the other provisions in this Agreement, the Parties hereto shall use reasonable, good faith efforts to perform their respective obligations herein and to take, or cause to be taken or do, or cause to be done, all things necessary, proper or advisable under applicable law to cause the transactions contemplated by this Agreement to be carried out promptly in accordance with the terms hereof, and shall cooperate fully with each other and their respective officers, directors, members, managers, employees, agents, counsel, accountants and other designees in connection with any steps required to be taken as part of their respective obligations under this Agreement.

12.21. **Potential Invalidity.** If any provision of this Agreement is found by an arbitrator or court of competent jurisdiction to be invalid, illegal, or unenforceable, then (i) such provision shall be enforceable to the fullest extent permitted by applicable law, and (ii) the validity and enforceability of the other provisions of this Agreement shall not be affected and all such provisions shall remain in full force and effect.

12.22. **Arbitration of Disputes; Dispute Resolution.** All disputes hereunder shall be resolved between the Parties by final and binding arbitration pursuant to the following terms:

12.22.1. Any Party who fails to submit to binding arbitration following a lawful demand by the other Party shall bear all costs and expenses, including reasonable attorneys' fees, (including those incurred in any trial, bankruptcy proceeding, appeal or review) incurred by the other Party in obtaining a stay of any pending judicial proceeding concerning a dispute which by the terms of this Agreement has been properly submitted to mandatory arbitration, and or compelling arbitration of any dispute.

12.22.2.     The award in such arbitration may be enforced on the application of either Party by the order of judgment of a court of competent jurisdiction. The arbitrator shall resolve all disputes in accordance with the substantive law of the State of California. The arbitrator shall have no authority nor jurisdiction to award any damages or any other remedies beyond those which could have been awarded in a court of law if the Parties had litigated the claims instead of arbitrating them. The Federal Arbitration Act, Title 9 of the United States Code, is applicable to this transaction and shall be controlling in any judicial proceedings and in the arbitration itself as to issues of arbitrability and procedure. No provision of, nor the exercise of any rights under this arbitration section shall limit the right of either Party to exercise self help remedies or obtain provisional or ancillary remedies such as an injunction, receivership, attachment or garnishment; provided, however, that any such action or proceeding arising out of this Agreement that is litigated for any reason will be litigated in courts located in Shasta County, California, and each Party consents and submits to the jurisdiction of any state or federal court located in Shasta County, California, for any such litigation. Additionally, each of the Parties waives any right it may have to trial by jury in any proceeding between or involving the Parties whether arising under this Agreement or otherwise.

12.22.3.     The Parties shall use their best efforts to complete any arbitration within sixty (60) days of the filing of the dispute unless the dispute is regarding the refusal to grant a consent or approval in which case the time period shall be thirty (30) days. The arbitrator shall be empowered to impose sanctions for any Party's failure to do so. The provisions of this arbitration provision shall survive any termination, amendment, or expiration hereof unless the Parties otherwise expressly agree in writing. Each Party agrees to keep all disputes and arbitration proceedings strictly confidential, except for the disclosure of information required in the ordinary course of business of the Parties or as required by applicable law or regulation. Any time limitation (such as the statute of limitations or laches) which would bar litigation of a claim shall also bar arbitration of the claim. If any provision of this arbitration procedure is declared invalid by any court, the remaining provisions shall not be affected thereby and shall remain fully enforceable. The Parties understand that they have decided that upon demand of either of them, their disputes as described herein will be resolved by arbitration rather than in a court and once so decided cannot later be brought, filed or pursued in court.

12.22.4     "NOTICE: BY INITIALLING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALLING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

_____
Buyer's Initials

_____
Seller's Initials

The Parties have executed this Agreement in duplicate originals as of the Effective Date.

SELLER:

**DYER MANAGEMENT, LLC,**
a Delaware limited liability company

By:  FR Investment Manager, LLC
     its Manager

By:  Westport Capital Partners, LLC
     its Member

By: _____

Name: SEAN ARMSTRONG
Title: Principal

By: _____

Name: PETER ARONSON
Title: Principal

BUYER:

**SIERRA PACIFIC INDUSTRIES,**
a California corporation

By: M D Emmerson
Its: Chief Financial Officer

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 34 of 91

## SCHEDULE 7.1.4

## FORM OF SELLER'S CLOSING CERTIFICATE

### SELLER'S CLOSING CERTIFICATE

This Closing Certificate is executed on this _____ day of _____, 2013(the "Effective Date"), by DYER MANAGEMENT, LLC, a California limited liability company (the "Seller"), for the benefit of SIERRA PACIFIC INDUSTRIES, a California corporation ("Buyer").

Seller hereby certifies as accurate and reaffirms to Buyer as of the Effective Date all representations and warranties made by Seller to Buyer contained in Section 9.1 of that certain Timberlands Purchase and Sale Agreement dated _____, 2013, between Seller and Buyer, regarding the sale by Seller to Buyer of timberland located in Lassen and Plumas Counties, California.

Executed effective as of the Effective Date.

DYER MANAGEMENT, LLC, a California
limited liability company

By: _____
Its: _____

27

## SCHEDULE 7.2.3

### FORM OF BUYER'S CLOSING CERTIFICATE

### BUYER'S CLOSING CERTIFICATE

This Closing Certificate is executed on this _____ day of _____, 2013(the "Effective Date"), by SIERRA PACIFIC INDUSTRIES, a California corporation ("Buyer"), for the benefit of DYER MANAGEMENT, LLC, a California limited liability company (the "Seller").

Buyer hereby certifies as accurate and reaffirms to Seller as of the Effective Date, all representations and warranties made by Buyer to Seller contained in Section 9.2 of that certain Timberlands Purchase and Sale Agreement dated _____, 2013, between Seller and Buyer, regarding the sale by Seller to Buyer of timberland located in Lassen and Plumas Counties, California.

Executed effective as of the Effective Date.

SIERRA PACIFIC INDUSTRIES, a California corporation

By: _____

Its: _____

## SCHEDULE 9.1.3
## PENDING LEGAL ACTIONS

1. Legal actions and proceedings relating to the CMR bankruptcy and foreclosure by Oxford Investment Partners.

2. Mountain Meadows Conservancy et al. v. County of Lassen et al. (Lassen County No. 45938).

3. Appeal of Lassen County tax assessments (32 tax lots -- 1 lot in Plumas County not affected).

4. Actions and proceeding relating to Lassen County unpaid taxes.

## SCHEDULE 9.1.4
## VIOLATION OF LAWS

1. Defaulted Tax Notice dated October 9, 2012, Parcel #s: 123-020-1611, et al.

## SCHEDULE 9.1.5

## OWNERSHIP AND POSSESSION ISSUES

None.

# SCHEDULE 9.1.6
## CONTRACTS

1.　　SPI Timber Purchase Agreement, Harvest Agreement, and Operating Plan regarding THP #1.

2.　　Forest Services Agreement between Jeff Webster, RPF and Dyer Management, LLC regarding submission of THP #2.

3.　　Draft Agreement for Consulting Services between Mountain Resort Consulting Services, LLC (Doug Clyde) and Dyer Management, LLC regarding on-the-ground management items.

4.　　Draft Grazing Permit Agreement between Bernard Stroing and Dyer Management, LLC.

5.　　Assumption of Development Agreement between Dyer Management, LLC and Lassen County dated as of December 15, 2009.

6.　　Mitigation/Development Agreement between Lassen County and Dyer Mountain Associates , LLC dated as of November 27, 2007.

7.　　Engagement Letter between Sutherland Asbill & Brennan LLP and Dyer Management, LLC dated November 19, 2012 regarding representation in property tax assessment appeals.

32

## SCHEDULE 9.1.8

## REFORESTATION AND SLASH REMOVAL OBLIGATIONS

None.

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 41
of 91

# **Exhibit B**

**RELEASE AGREEMENT (DYER PROPERTY) – SENIOR LIEN/STANDSTILL**

This Release Agreement (this "Agreement") is entered into by and between Dyer Management LLC ("DM"), Dyer Loan, LLC ("DL"), First Street Commercial Mortgage Fund, LLC ("First Street"), Brodke & Noe Profit Sharing Plan FBO Stephen H. Abel ("Abel"), the persons and entities who have entered into that Standstill Agreement (defined below) and who are subscribing their names hereto by executing a counterpart signature page to this Agreement (together, the "Investors"), Dyer Holdings LLC ("Holdings"), Frontier Ridge Global Fund Ltd. ("Frontier Ridge"), Frontier Ridge Global Fund LP ("Frontier LP") FR Investment Manager, LLC ("FR Investment") and Richard M Kipperman (the "Trustee"), solely in his capacity as Chapter 11 trustee of the consolidated bankruptcy estate of CMR Mortgage Fund, LLC ("Fund I"), CMR Mortgage Fund II, LLC ("Fund II"), and CMR Mortgage Fund III, LLC ("Fund III" and together with Fund I and Fund II, the "Debtors") pending in the U.S. Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). DM, DL, Holdings, Frontier Ridge, Frontier LP, FR Investment, First Street, Abel, the Investors, the Debtors and the Trustee are together the "Parties." This Agreement shall be deemed effective on the date set forth in paragraph 20 below.

## RECITALS

A.      DM owns approximately 7,130 acres of undeveloped real property and timberlands located in Lassen and Plumas Counties, California commonly referred to as the "Dyer Property." The Debtors own 66.7% of DM. Holdings owns 33.3% of DM.

B.      The Dyer Property is encumbered by two outstanding loans. The senior loan on the Dyer Property is evidenced by a promissory note dated November 4, 2005 in the original principal amount of $10,000,000 [Loan 05-061A] (the "Senior Loan"), executed and delivered by Dyer Mountain Associates, LLC to Fund II. The Senior Loan is secured by two first priority deeds of trust recorded against the Dyer Property.

C.      The Senior Loan is currently held by DL, First Street, and Abel (together, the "Senior Lenders"). DL, as successor in interest to the Investors, is the holder of a seventy percent (70%) interest in the Senior Loan. First Street is the holder of a twenty-five (25%) interest in the Senior Loan. Abel is the holder of a five percent (5%) interest in the Senior Loan. The Senior Lenders assert that more than $18,000,000 is due and owing under the Senior Loan, inclusive of interest and fees.

D.      The Dyer Property is further encumbered by a second lien loan in the original principal amount of $10,000,000 [Loan 05-061B] (the "Junior Loan"). The Debtors are the holders of a nearly fifty-five (55%) interest in the Junior Loan. Frontier LP is the holder of a ten percent (10%) interest in the Junior Loan. During the course of the Debtors' bankruptcy cases, Fund II, Fund III, California Mortgage & Realty, Inc. ("CMRI"), and the Investors entered into that certain Amended and Restated Standstill Agreement dated as of January 22, 2010 (as it may have been amended, the "Standstill Agreement"). Fund I was not a party to the Standstill Agreement. Under the Standstill Agreement, Fund II and Fund III agreed to make certain payments to the Investors and First Street out of any proceeds that they received on account of the Junior Loan upon a sale or refinance of the Dyer Property, subject to certain terms and conditions described in the Standstill Agreement.

DOCS_SF:83146.10 49666-001

E.     DM has entered into that certain Timberlands Purchase and Sale Agreement dated as of May 13, 2013 (the "Sale Agreement"), to sell the Dyer Property to Sierra Pacific Industries for $17,165,000 (the "Sale Price"), subject to certain adjustments (the "Pending Sale").  The Senior Lenders shall be paid their pro rata shares of the following amount ("Net Sales Proceeds"):  (i) $16,650,000 from the Sale Price,   (ii) less the costs to close the Pending Sale in an amount not to exceed $38,000, (iii) less the amount required to pay outstanding and unpaid real property taxes excepting therefrom (x) $216,858.81 in property tax liability; and (y) 50% of any reduction in the property taxes obtained from the applicable taxing authorities, and (iv) plus $375,000 representing fifty percent (50%) of the proceeds from the sale of remaining timber eligible to be harvested under the approved plan known as Timber Harvest Plan #1.

F.     The Senior Lenders are willing to consent to the Pending Sale and to accept the Net Sale Proceeds in full and final satisfaction of any and all claims outstanding with respect to the Senior Loan. The Investors are willing to agree not to seek collection of any payments from Fund II and Fund III or their affiliate, Fund I, under the Standstill Agreement or otherwise on account of the Pending Sale or to assert any claims to proceeds received or to be received by DM, Frontier Ridge, Frontier LP, FR Investment or their affiliates.

G.     The Trustee's consent is a condition to the sale of the Dyer Property under the Sale Agreement, consistent with the provisions of DM's operating agreement.  The Trustee is prepared to provide such consent, subject to the approval of the Bankruptcy Court, upon execution of this Agreement by the Parties.

## AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms and conditions:

1.     Bankruptcy Court Approval.  This Agreement is expressly subject to the Trustee obtaining a final, non-appealable order of the Bankruptcy Court, approving this Agreement.

2.     Release of DM, Holdings, Frontier Ridge, Frontier LP, FR Investment and Debtors' Estate by Senior Lenders.  Subject to paragraphs 1 and 7 of this Agreement, upon the occurrence of the closing of the transactions contemplated in the Sale Agreement and receipt by the Senior Lenders of the Net Sale Proceeds (the "Closing Date"), each of the Senior Lenders, for itself and its respective predecessors, successors, assigns, subsidiaries, affiliates, and current and former agents, release DM, Holdings, Frontier Ridge, Frontier LP, FR Investment, the Trustee, the Debtors' estate, and their respective successors, assigns, members, managers, officers, directors, employees, representatives,  professionals, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, liquidated or unliquidated, fixed, contingent, disputed or undisputed,  foreseen or unforeseen, existing or hereafter arising in law or equity, relating to the Senior Loan and the Dyer Property.  Upon the Closing Date, the Senior Lenders shall take any and all steps reasonably necessary or reasonably requested by DM to release all liens of the Senior Lenders against the Dyer Property or any proceeds thereof. Notwithstanding the forgoing, Senior Lenders are not releasing and reserve any all claims they have,

2

known or unknown, against any or all of CMRI, David Choo, Graham Seel, or any of their respective successors, assigns, subsidiaries, employees, affiliates (for the avoidance of doubt, the term 'affiliates' shall not include the Trustee, the Debtors or their estates).

3.    <u>Release of Senior Lenders by DM, Holdings, Frontier Ridge, Frontier LP, FR Investment and Trustee</u>.  Subject to paragraphs 1 and 7 of this Agreement, upon the Closing Date, DM, Holdings, Frontier Ridge, Frontier LP, FR Investment, each for itself and its predecessors,  successors, assigns, subsidiaries, affiliates, and current and former agents, and the Trustee, on behalf of himself and the Debtors' estate and its predecessors,  successors, assigns, subsidiaries, affiliates, and current and former agents, release the Senior Lenders and each of their respective successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, liquidated or unliquidated, fixed, contingent, disputed or undisputed, foreseen or unforeseen, existing or hereafter arising at law or in equity, relating to the Senior Loan, the Dyer Property and the Standstill Agreement solely as it relate to the Dyer Property.

4.    <u>Release of Debtors' Estate by Investors, First Street, and Senior Lenders</u>.  Subject to paragraphs 1 and 7 of this Agreement, upon the Closing Date, each of the Investors, First Street and Senior Lenders, for itself and its respective predecessors, successors, subsidiaries, affiliates, and current and former agents, releases the Trustee and the Debtors' estate and their respective successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, liquidated or unliquidated, fixed, contingent, disputed or undisputed, foreseen or unforeseen, existing or hereafter arising at law or in equity, relating to the Senior Loan, the Dyer Property and the Standstill Agreement solely as it relates to the Dyer Property.  In particular, and without limitation, the Investors, First Street and Senior Lenders waive the provisions of sections 3, 4 and 9 of the Standstill Agreement as such provisions relate to the Dyer Property.  Notwithstanding the forgoing Investors and Senior Lenders are not releasing and reserve any all claims, known or unknown, they have against any or all of CMRI, David Choo, Graham Seel, or any of their respective successors, assigns, subsidiaries, employees, affiliates (for the avoidance of doubt, the term 'affiliates' shall not include the Trustee, the Debtors or their estates); nor are the Investors or Senior Lenders waiving any right as against CMRI or releasing CMRI, and its respective successors, assigns, subsidiaries, employees, affiliates (for the avoidance of doubt, which shall not include the Trustee, the Debtors or their estates) from any obligation under the Standstill Agreement, including any obligation relative to the Dyer Property.

5.    <u>Release of Investors by Trustee</u>.  Subject to paragraphs 1 and 7 of this Agreement, upon the Closing Date, the Trustee, on behalf of the Debtors' estate and its predecessors, successors, assigns, subsidiaries, affiliates, and current and former agents, releases each of the Investors and their respective successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, liquidated or unliquidated, fixed, contingent, disputed or undisputed, foreseen or unforeseen,

3

existing or hereafter arising at law or in equity, relating to the Dyer Property and the Standstill Agreement solely as it relates to the Dyer Property.

6.  Release of Unknown Claims.  The Parties, and each of them, understand and acknowledge that there are laws that may invalidate releases of claims that are unknown to the releasing party.  The Parties, and each of them, expressly acknowledge and agree that they are hereby waiving and relinquishing any and all rights that they have or might have against the Parties they release pursuant to this Agreement, or any of them, under such laws, including but not limited to any and all rights afforded under California Civil Code § 1542.  That statute reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OF OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In connection with such waiver and relinquishment, the Parties, and each of them, acknowledge that they are aware that they may later discover facts in addition to or different from those that they currently know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to hereby fully, finally, and forever release all of the matters and claims identified in the releases contained at paragraphs 2 through 5 of this Agreement, which now exist, may exist, or previously existed between them and any of the Parties they release pursuant to this Agreement, whether known or unknown, suspected, or unsuspected.  In furtherance of such intention, subject to paragraphs 1 and 7 of this Agreement, the releases contained at paragraphs 2 through 5 of this Agreement shall be and remain in effect as full and complete releases, notwithstanding the discovery or existence of such additional or different facts by any of the Parties or by any person acting on their respective behalf.

7.  No Third Party Beneficiaries.  This Agreement is made and entered into for the sole protection and legal benefit of the Parties hereto and, subject to the terms and conditions set forth herein, no other person or entity, including but not limited to CMRI, David Choo, Graham Seel, or any of their respective successors, assigns, subsidiaries, assigns, employees, affiliates (for the avoidance of doubt, the term 'affiliates' shall not include the Trustee, the Debtors or their estates), shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with this Agreement.

8.  Party Representations.  Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party, enforceable against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement.  Notwithstanding the foregoing, the Trustee's execution of this Agreement is subject to

4

approval by the Bankruptcy Court.

9.     <u>Integration Clause</u>.  Once executed by the Parties, this Agreement is the entire agreement of the Parties and supersedes any prior agreements or understandings regarding the subject matter hereof. Changes or modifications to this Agreement shall be effective only if in writing and signed by all Parties, and approved by a final, non-appealable order of the Bankruptcy Court.

10.     <u>Successors and Assigns.</u>  Except as provided in paragraph 7, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective legal representatives, successors, and assigns.

11.     <u>Representations and Warranties.</u>  Except as provided in paragraph 8, each Party to this Agreement expressly represents and warrants that all necessary action has been taken to properly and lawfully authorize that Party to enter into, execute, and deliver this Agreement and render the Agreement binding upon that Party.

12.     <u>Survivability.</u>  If any provision in this Agreement is determined to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

13.     <u>Choice of Law.</u>  This Agreement shall be governed by and construed in accordance with the law of the State of California.

14.     <u>Choice of Forum.</u>  Any action to enforce the terms of this Agreement shall be brought before the Bankruptcy Court so long as the Debtors' cases are pending and thereafter in the U.S. Bankruptcy Court for the Northern District of California

15.     <u>Attorney's Fees in Any Enforcement Action</u>.  In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in such action or proceeding.

16.     <u>Duplicate Originals</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimiles or email attachments and/or other copies of this Agreement, including facsimiles of and/or copies of signatures (including attachments to emails), may be used in lieu of originals to establish the existence of this Agreement.

17.     <u>Terms.</u>  The terms of this Agreement are contractual in nature and not mere recitals and the obligations of the Parties are acknowledged to be capable of performance through specific performance.

18.     <u>Construction</u>.  Each of the Parties has cooperated in the drafting and preparation of this Agreement, and if there is any alleged ambiguity in the construction of this Agreement, it shall not be construed against either Party according to principles of law calling for the construction of ambiguous documents against the drafter.

19.     <u>Legal Counsel</u>.  The Parties to this Agreement represent, warrant, and certify that they have secured independent legal advice and consultation in connection with this Agreement.

DOCS_SF:83146.10 49666-001

20.    Effective Date; Time of the Essence.  The effective date of this Agreement shall be the date when all of the Parties have signed this Agreement and an order of the Bankruptcy Court has been entered, approving this Agreement (the "Effective Date").  .

Dyer Management, LLC
By: FR Investment Manager, LLC, its Manager
By: Westport Capital Partners LLC, its sole member

By: _____        by: _____

Its: _Principal and General Counsel_        _Principal_

Date: _8/1/13_        _8/1/13_


Dyer Loan, LLC


By: _____

Its: _____

Date: _____


First Street Commercial Mortgage Fund, LLC


By: _____

Its: _____

Date: _____


Brodke & Noe Profit Sharing Plan FBO Stephen H. Abel


By: _____

Its: _____

Date: _____


Richard M Kipperman, solely in his capacity as
Chapter 11 trustee of the Debtors' consolidated bankruptcy estate

_____

Date: _____

Dyer Holdings LLC

*By: Frontier Ridge Global Fund, Ltd., its sole member*
*By: FR Investment Manager, LLC, its investment manager*
*By: Westport Capital Partners LLC, its sole Member*

By: _____    By: _____
Principal + GC                    Principal
Date: 8/1/13                      8/1/13


Frontier Ridge Global Fund Ltd.

*By: FR Investment Manager, LLC, its investment manager*
*By: Westport Capital Partners LLC, its sole member*

By: _____    By: _____
Principal + GC                    Principal
Date: 8/1/13                      8/1/13


FR  ~~Frontier Ridge~~ Frontier Ridge Investment Manager, LLC

*By: Westport Capital Partners LLC, its sole member*

By: _____    By: _____
Its: Principal + GC               Principal
8/1/13                            8/1/13

[Signature Pages for the Investors Attached]

Dyer Loan, LLC,
an Arizona limited liability company

By:    Oxford Investment Partners. LLC,
       Its Chief Executive Officer

       By:   _____
            Walter Clarke

       Its:    President

       Date:  AUGUST 5, 2013

First Street Commercial Mortgage Fund, LLC,
a California limited liability company

By:     Bay View Asset Services, LLC
        a Delaware limited liability company,
        Manager

        By:     McDowell Properties,
                a California corporation,
                Member

                By:  _____
                     W. Patrick McDowell, President

                Date:  ___ 8 - 2 - 13 _____

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___August 1___, 2013

_Brooke & Noe Profit Sharing Retirement Plan FBO Stephen H.M_

By: _[signature]_

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___8__/_3__/___, 2013

By: ___RICHARD RUSSELL___
(AN INDIVIDUAL)

DOCS_SF:83146.7 49666-001

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of  07 / 29 / 2013  , 2013

By:_____
　　　　Paul Buchheit

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___July 30___, 2013

_JBuchheit_

By: _____

8

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 55 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _____8 - 1_____, 2013

_Linda Houghton_

By: _Linda Houghton_

8

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 56 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___July 29___, 2013

By: _____

DOCS_SF:83146.7 49666-001
Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 57 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _August 2_____, 2013

By: _William and Sandra Miller_
_Miller Family Trust_

8

DOCS_SF:83146.7 49666-001

# INVESTOR
## COUNTERPART SIGNATURE PAGE
### TO
## RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of July 30 , 2013

By: _____

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _August 5_, 2013

By: _Trustee_

8

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 60 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _July 29th_, 2013

_Robert K. Rader_
By: _Katalin a. V. Rader_

DOCS_SF:83146.7 49666-001

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) -- Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _Aug 1_____, 2013

JAN M STERLING, TRUSTEG

By: _____

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of July 29 , 2013

By: Kameeen Smythe

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _____8 - 2_____, 2013

By: _____

8

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 64 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _07/29/13_, 2013

FREDERICK & DONNA HEITHAN TRUST dtd 9/9/88

By: _Fred C. Heitman - Trustee_

_Donna R. Heitman Trustee_

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 65 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _30 July_ , 2013

RME MORTGAGES LLC

By: _____

8

DOCS_SF:83146.7 49666-001

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 66 of 91

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _July 29_, 2013

_The 1977 Gill Trust_

By: _James W. Gill, IV_

8

DOCS_SF:83146.7-49666-001

INVESTOR
COUNTERPART SIGNATURE PAGE
TO
RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of     7/30          , 201

S B Howell

STEPHEN B. HOWELL

8

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _July 31_____, 2013

By: _Kathleen K. Tomasulo_
KATHLEEN K. TOMASULO

DOCS_SF:83146-7_40666.001

**INVESTOR
COUNTERPART SIGNATURE PAGE
TO
RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___8th August___ : 2013

Fifth Age of Man Foundation.

By: _____ Casey Chandler, President

**INVESTOR**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – FIRST LIEN/STANDSTILL**

The undersigned ("Investor") hereby executes and delivers this Investor Counterpart Signature Page ("Signature Page") to evidence the undersigned Investor's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Senior Lien/Standstill (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Investor represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Investor's own attorney for advice regarding whether to execute the Agreement. The undersigned Investor acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Investor or any other Investor, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _August 8_____, 2013

By: _SIGRID VAN BLADEL_

# Exhibit C

## RELEASE AGREEMENT (DYER PROPERTY) - JUNIOR LIEN

This Release Agreement (this "Agreement") is entered into by and between Dyer Management, LLC ("DM"), Dyer Holdings LLC ("Holdings"), Frontier Ridge Global Fund Ltd. ("FR"), Frontier Ridge Global Fund LP ("FR LP"), FR Investment Manager, LLC ("FR Investment") the persons and entities subscribing their names hereto by executing a counterpart signature page to this Agreement (such persons, the "Noteholders"), and Richard M Kipperman (the "Trustee"), solely in his capacity as Chapter 11 trustee of the consolidated bankruptcy estate of CMR Mortgage Fund ("Fund I"), LLC, CMR Mortgage Fund II, LLC ("Fund II"), and CMR Mortgage Fund III, LLC ("Fund III" and together with Fund I and Fund II, the "Debtors") pending in the U.S. Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). DM, FR, FR LP, Holdings, FR Investment, the Noteholders, the Debtors and the Trustee are together the "Parties." This Agreement shall be deemed effective on the date set forth in paragraph 17 below.

## RECITALS

A.    DM owns approximately 7,130 acres of undeveloped real property and timberlands located in Lassen and Plumas Counties, California commonly referred to as the "Dyer Property." The Debtors own 66.7% of DM. Holdings owns 33% of DM.

B.    The Dyer Property is encumbered by two outstanding loans. The senior loan on the Dyer Property is evidenced by a promissory note dated November 4, 2005 in the original principal amount of $10,000,000 [Loan 05-061A] (the "Senior Loan"), executed and delivered by Dyer Mountain Associates, LLC to Fund II. The Senior Loan is secured by two first priority deeds of trust recorded against the Dyer Property.

C.    The Dyer Property is further encumbered by a second lien loan in the original principal amount of $10,000,000 [Loan 05-061B] (the "Junior Loan"). The Debtors are the holders of a nearly fifty-five percent (55%) interest in the Junior Loan. FR LP is the holder of a ten percent (10%) interest in the Junior Loan, and the Noteholders hold the remaining share of the Junior Loan.

D.    The Dyer Property was also encumbered by a third and fourth priority deeds of trust. The fourth priority deed of trust was sold to FR, which foreclosed on the Dyer Property and placed it in DH, which is owned by DM. The Debtors conveyed the third deed of trust to DM and thereby acquired their 66.7% interest in DM.

1

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 73 of 91

E.    DM has marketed the Dyer Property and entered into that certain Timberlands Purchase and Sale Agreement dated as of May 13, 2013 (the "Sale Agreement"), to sell the Dyer Property to Sierra Pacific Industries for $17,165,000, subject to certain adjustments (the "Pending Sale"). The proceeds from the Pending Sale after settlement of the Senior Loan will be approximately $625,000. At the time of closing of the Pending Sale, DM believes it will have approximately $1,300,000 of cash on hand. The Trustee (on behalf of the Debtors), FR LP, and the Noteholders are willing to consent to the Pending Sale and to accept the sum of approximately $1,525,000 (the exact amount shall be determined at closing based on cash remaining after paying costs and fees relating to the Pending Sale, the settlement of the Senior Loan and the payment of unpaid management fees to FR as described below) in full and final satisfaction of any and all claims outstanding with respect to the Junior Loan.

F.    The Trustee's consent is a condition to the sale of the Dyer Property under the Sale Agreement, consistent with the provisions of DM's operating agreement. The Trustee is prepared to provide such consent, subject to the approval of the Bankruptcy Court, upon execution of this Agreement by DM, FR, FR LP, Holdings, FR Investment, and the Noteholders.

## AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.    Consent to Pending Sale. The Trustee (on behalf of the Debtors), FR LP, and the Noteholders consent to the Pending Sale, subject to the approval of the Bankruptcy Court and contingent upon receipt of the sum of approximately $1,525,000 (the exact amount shall be determined on or before the Closing Date (as that term is defined below)) in full and final satisfaction of any and all claims outstanding with respect to the Junior Loan.

2.    Release of DM, FR Investment, and Debtors' Estate by Holdings, FR LP, FR and the Noteholders. Upon the occurrence of the closing of the transactions contemplated in the Sale Agreement (the "Closing Date") and receipt by FR of cash proceeds of Five Hundred Thousand Dollars ($500,000) for accrued but unpaid management fees, and the Noteholders (including but not limited to FR LP and Debtors' estate) receipt of cash proceeds of approximately $1,525,000 (the exact amount of which shall be determined on or before the Closing Date), each of Holdings, FR LP and the Noteholders, for itself and its respective predecessors, successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries, affiliates, and current and former agents, releases each other, DM, FR Investment, the Trustee, the Debtors' estate, and their respective successors, assigns, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, liquidate or unliquidated, fixed, contingent, disputed or undisputed, foreseen or unforeseen, existing or hereafter arising in law or equity, relating to the Junior Loan and the Dyer Property. Upon the Closing Date, Holdings, FR. FR LP and the Noteholders shall take any and all steps reasonably necessary or reasonably requested by DM to release all liens of Holdings, FR, FR LP and the Noteholders on account of the Junior Loan against the Dyer Property or any proceeds thereof. In addition to the foregoing, the Noteholders acknowledge that at the time of the assignment of that certain Deed of Trust recorded

2

November 18, 2005 as instrument no. 2005-11158 in the official records of Lassen County and as instrument no. 2005-12569 in the official records of Plumas County, under the Assignment recorded December 16, 2010 as instrument no. 2010-6391 in the official records of Lassen County and as recorded November 22, 2010 as instrument no. 2010-7467 in the official records of Plumas County, the assignor (i.e., the Debtors) held no interest capable of assignment and, as such, the Noteholders received no interest thereby.

3.      Release of Holdings, FR, FR Investment, FR LP and Noteholders by DM and Trustee.  Upon the Closing Date and receipt by the Trustee of cash proceeds of approximately $641,250  (the exact amount of which shall be determined on or before the Closing Date), DM, for itself and its predecessors, successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries, affiliates, and current and former agents, and the Trustee, on behalf of himself, the Debtors' estate and its predecessors,  successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries, affiliates, and current and former agents, release Holdings, FR, FR Investment, FR LP and the Noteholders and each of their respective successors, assigns, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, relating to the Junior Loan and the Dyer Property.  Upon the Closing Date and receipt of payment by the Trustee, the Trustee, on behalf of the Debtors, shall take any and all steps reasonably necessary or reasonably requested by DM to release all liens of the Debtors on account of the Junior Loan against the Dyer Property or any proceeds thereof.

4.      Release of Trustee by FR Investment.  Upon the Closing Date, FR Investment, for itself and its predecessors,  successors, assigns, members, managers, officers, directors, employees, representatives, professionals, subsidiaries, affiliates, and current and former agents, releases the Trustee and the Debtors' estate and each of their respective successors, assigns, subsidiaries and affiliates, and each of the foregoing party's respective current and former agents, from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, relating to the Junior Loan and the Dyer Property.  Upon the Closing Date, FR Investment shall take any and all steps reasonably necessary or reasonably requested by DM to release all liens on account of the Junior Loan against the Dyer Property or any proceeds thereof.

5.      Release of Unknown Claims.  The Parties, and each of them, understand and acknowledge that there are laws that may invalidate releases of claims that are unknown to the releasing party.  The Parties, and each of them, expressly acknowledge and agree that they are hereby waiving and relinquishing any and all rights that they have or might have against the Parties they release pursuant to this Agreement, or any of them, under such laws, including but not limited to any and all rights afforded under California Civil Code § 1542.  That statute reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OF OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

DOCS_SF:83507.8 49666/0001

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 75 of 91

In connection with such waiver and relinquishment, the Parties, and each of them, acknowledge that they are aware that they may later discover facts in addition to or different from those that they currently know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to hereby fully, finally, and forever release all of the matters and claims identified in the releases contained at paragraphs 2 through 4 of this Agreement, which now exist, may exist, or previously existed between them and any of the Parties they release pursuant to this Agreement, whether known or unknown, suspected, or unsuspected. In furtherance of such intention, the releases contained at paragraphs 2 through 4 of this Agreement shall be and remain in effect as full and complete releases, notwithstanding the discovery or existence of such additional or different facts by any of the Parties or by any person acting on their respective behalves.

6.      Party Representations. Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party, enforceable against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement. Notwithstanding the foregoing, the Trustee's execution of this Agreement is subject to approval by the Bankruptcy Court.

7.      Integration Clause. Once executed by the Parties, this Agreement is the entire agreement of the Parties and supersedes any prior agreements or understandings regarding the subject matter hereof. Changes or modifications to this Agreement shall be effective only if in writing and signed by all Parties.

7.      Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective legal representatives, successors, and assigns.

8.      Representations and Warranties. Except as set forth in Paragraph 5, each Party to this Agreement expressly represents and warrants that all necessary action has been taken to properly and lawfully authorize that Party to enter into, execute, and deliver this Agreement and render the Agreement binding upon that Party.

9.      Survivability. If any provision in this Agreement is determined to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

10.     Choice of Law. This Agreement shall be governed by and construed in accordance with the law of the State of California.

4

11.    Choice of Forum.  Any action to enforce the terms of this Agreement shall be brought before the Bankruptcy Court so long as the Debtors' cases are pending and thereafter in the U.S. Bankruptcy Court for the Northern District of California.

12.    Attorney's Fees in Any Enforcement Action.  In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in such action or proceeding.

13.    Duplicate Originals.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimiles or email attachments and/or other copies of this Agreement, including facsimiles of and/or copies of signatures (including attachments to emails), may be used in lieu of originals to establish the existence of this Agreement.

14.    Terms.  The terms of this Agreement are contractual in nature and not mere recitals and the obligations of the Parties are acknowledged to be capable of performance through specific performance.

15.    Construction.  Each of the Parties has cooperated in the drafting and preparation of this Agreement, and if there is any alleged ambiguity in the construction of this Agreement, it shall not be construed against either Party according to principles of law calling for the construction of ambiguous documents against the drafter.

16.    Legal Counsel.  The Parties to this Agreement represent, warrant, and certify that they have secured independent legal advice and consultation in connection with this Agreement.

17.    Effective Date.  The effective date of this Agreement shall be the date when all Parties have signed this Agreement and the Bankruptcy Court has entered an order approving this Agreement.


[Signature Pages Follow]

Dyer Management LLC
By: FR Investment Manager, LLC, its manager
By: Westport Capital Partners LLC, its sole member

By: _____
Its: PRINCIPAL
Date: 7/26/13

By: _____
Its: PRINCIPAL
Date: 7/26/13


Frontier Ridge Global Fund, Ltd.
By: FR Investment Manager, LLC, its investment manager
By: Westport Capital Partners LLC, its sole member

By: _____
Its: PRINCIPAL
Date: 7/26/13

By: _____
Its: PRINCIPAL
Date: 7/26/13


FR Investment Manager, LLC
By: Westport Capital Partners LLC, its sole member

By: _____
Its: PRINCIPAL
Date: 7/26/13

By: _____
Its: PRINCIPAL
Date: 7/26/13


Dyer Holdings LLC
By: Frontier Ridge Global Fund, Ltd., its sole member
By: FR Investment Manager, LLC, its investment manager
By: Westport Capital Partners LLC, its sole member

DOCS_SF:83507.3 49666/0001

By: _____

Its: PRINCIPAL

Date: 7/26/13

By: _____

Its: PRINCIPAL

Date: 7/20/13

Richard M Kipperman, solely in his capacity as
Chapter 11 trustee of the Debtors' consolidated bankruptcy estate

_____

Date: _____

[Signature Pages for the Noteholders Attached]

DOCS_SF:83507.3 49666/0001

**NOTEHOLDER**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN**

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _____, 2013

_____

By:_____

8

DOCS_SF:83507.8 49666/0001

**NOTEHOLDER
COUNTERPART SIGNATURE PAGE
TO
RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN**

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _JULY 26_, 2013

CLAUDIA L HAMMERMAN

By: _____

8

NOTEHOLDER
COUNTERPART SIGNATURE PAGE
TO
RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___July 2 9__, 2013

Eric James Nord Trust
By: _Jon A. Nord, Trustee_

8

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _August 6_, 2013

By: _Faramarz Mark Yazdani_

8

NOTEHOLDER
COUNTERPART SIGNATURE PAGE
TO
RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of July 26, 2013

Frontier Ridge Global Fund, LP
By: FR GP LLC, its general partner
By: Westport Capital Partners LLC, its sole member

By: _____
Its: PRINCIPAL
Date: 7/26/13

By: _____
Its: PRINCIPAL
Date: 7/26/13

8

DOCS_SF:83507.3 49666/0001

# NOTEHOLDER
## COUNTERPART SIGNATURE PAGE
### TO
## RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___7__|_30__, 2013

Hammerman Family Partnership

By: _John Hammerman, General Partner_

Case: 08-32220   Doc#: 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 85 of 91

Received Time Jul. 30.  2013  9:24AM No. 3323

## NOTEHOLDER
# COUNTERPART SIGNATURE PAGE
### TO
### RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding

whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___7 | 30___, 2013

_John Hammerman_

By: _____



## NOTEHOLDER
## COUNTERPART SIGNATURE PAGE
## TO
## RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___7/26___, 2013

Jason + Julie
Nhnrempran Revocable Inter Vivos Trust
By: _____

## NOTEHOLDER
## COUNTERPART SIGNATURE PAGE
## TO
## RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of _July 29_, 2013

By: _Jon A. Nord_

**NOTEHOLDER**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN**

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of 29 July , 2013

By: _Marietta Mentz_

8

DOCS_SF:83507.3 49666/0001

Case: 08-32220   Doc# 1286-2   Filed: 08/09/13   Entered: 08/09/13 17:10:14   Page 89 of 91

**NOTEHOLDER**
**COUNTERPART SIGNATURE PAGE**
**TO**
**RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN**

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of July 26, 2013

Phyllis D. WARANOFF Trustee of the M. Fred C. Farrell Living Trust

By: _Phyllis D Waranoff_
Phyllis D. WARANOFF

DOCS_SF:83507.3 49666/0001

## NOTEHOLDER
## COUNTERPART SIGNATURE PAGE
## TO
## RELEASE AGREEMENT (DYER PROPERTY) – SECOND LIEN

The undersigned ("Noteholder") hereby executes and delivers this Noteholder Counterpart Signature Page ("Signature Page") to evidence the undersigned Noteholder's consent and agreement to the terms and conditions of the foregoing Release Agreement (Dyer Property) – Second Lien (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

By delivering this Signature Page, the undersigned Noteholder represents and warrants to the other Parties that he, she or it has been provided with, has read and understands the Agreement, and has full and adequate opportunity to consult with such Noteholder's own attorney for advice regarding whether to execute the Agreement. The undersigned Noteholder acknowledges, represents and agrees that (i) no attorney engaged by the other Parties, represents the undersigned Noteholder or any other Noteholder, and (ii) the undersigned has, consulted with his or her own counsel or has voluntarily waived any right to obtain separate legal counsel to represent him or her in connection with the Agreement.

IN WITNESS WHEREOF, the undersigned hereby subscribes to and agrees to be bound by the Agreement, and agrees to comply with the terms and conditions thereof.

Dated as of ___July 26___, 2013

By: _Bruce J' Rice_

Case: 08-32220    Doc# 1286-2    Filed: 08/09/13    Entered: 08/09/13 17:10:14    Page 91